**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON**

| | | |
|---|---|---|
| CONFEDERATED TRIBES OF THE COLVILLE RESERVATION; CONFEDERATED TRIBES OF THE CHEHALIS RESERVATION, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | No. _____ |
| | ) | |
| NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; SECRETARY OF COMMERCE HOWARD LUTNICK, in his official capacity; JENNIFER QUAN, Regional Administrator, NOAA Fisheries West Region, in her official capacity; BUREAU OF INDIAN AFFAIRS; SECRETARY OF THE INTERIOR DOUGLAS BURGUM, in his official capacity. | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**COMPLAINT**

Plaintiffs, by and through their undersigned attorneys, for their complaint, hereby allege as follows:

**INTRODUCTION**

1.    Plaintiffs, the Confederated Tribes of the Colville Reservation

1

("Colville Tribes" or "Colville") and the Confederated Tribes of the Chehalis Tribes ("Chehalis Tribe" or "Chehalis," together the "Tribes" or "Plaintiff Tribes") are federally recognized Indian tribes with federally recognized reservations situated within the boundaries of the State of Washington.  The Tribes bring this action to correct Defendant National Oceanic and Atmospheric Administration's ("NOAA") arbitrary, capricious, and unlawful exclusion of the Plaintiff Tribes from the list of federally recognized Indian tribes deemed "eligible" to apply for certain Pacific salmon hatchery grant funding, including the unlawful withholding of and unreasonable delay in NOAA's issuance of any kind of a reasoned decision to support leaving the Plaintiff Tribes out of that group of "eligible" tribes. Federal law requires that federal agencies treat their beneficiary Indian tribes fairly, without discriminating against one to benefit another.  Here, NOAA has discriminated, and continues to discriminate, against the Plaintiff Tribes.

2.      Instead, NOAA's decision to include only certain tribes on the list of "eligible" tribes was, from all appearances, an arbitrary and unreasoned *fait accompli*. Whatever discretion NOAA may have had under federal law does not include acts or omissions of whim, haste, or convenience.

3.      The Plaintiff Tribes initially seek injunctive and declaratory relief to permit them to submit applications for that grant funding before the grant funding is

completely exhausted.   Upon information and belief is imminent, awards are imminent, so it is vital that, either by agreement or Court order, sufficient funds are set aside to make the Plaintiff Tribes whole should their project applications be approved in full.

4.      The grant funding consists of $240 million set aside by NOAA from the Act of Congress known as the Inflation Reduction Act ("Inflation Act"), 136 Stat. 1818, Pub. L. 117-69 (Aug 16, 2022).  *See* "Commerce and Interior Departments Announce $240 Million from President Biden's Investing in America Agenda for Fish Hatcheries to Support Pacific Northwest Tribes," (July 25, 2024), *available at* https://www.commerce.gov/news/press-releases/2024/07/commerce-and-interior-departments-announce-240-million-president-bidens (last visited Jan. 29, 2026). Section 40001 of the Inflation Act allocated $2.6 billion to NOAA for "for the conservation, restoration, and protection of coastal and marine habitats, resources, Pacific salmon and other marine fisheries, . . ." so NOAA's allocation to tribal Pacific salmon hatcheries of $240 million for competitive and non-competitive grants is less than ten percent of the total..

5.      That $240 million amount, minus the $2 million non-competitive grants given to each of the 27 pre-select "eligible" tribes (on information and belief totalling $54 million), is referred to herein as the "Inflation Act tribal hatchery grant funding"

or variants thereof.

6. Defendant NOAA entered into an agreement with the Defendant Bureau of Indian Affairs ("BIA"), whereby BIA would hold the grant funds, evaluate grant applications, and distribute the grant funds to tribes awarded grants, including the initial non-competitive grants already provided to the twenty-seven tribes already deemed "eligible."

7. However, on information and belief based on the extensive factual recitation herein, the list of twenty-seven tribes "eligible" to apply for grant funds was developed and fixed exclusively by NOAA, and approved specifically by Defendant Jennifer Quan, Regional Administrator, West Coast Regional Office, NOAA Fisheries.

8. The Plaintiff Tribes were left off that list without any sound basis or explanation, as will be shown below and going forward.

**JURISDICTION**

9. Jurisdiction in this Court is proper under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (defendant United States), 28 U.S.C. § 1362 (civil actions brought by federally recognized tribes when the matter in controversy arises under the laws of the United States), and arguably 28 U.S.C. § 1491(b)(authorizing an "action by an interested party objecting to a solicitation by a Federal agency for

bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded."). Federal questions arise under the Administrative Procedures Act ("APA"), and the Indian Reorganization Act ("IRA," not to be confused with the Inflation [Reduction] Act.)  The (solely equitable) relief sought (at this time) is authorized by 28 U.S.C. §§ 2201 (declaratory relief) and 2202 (injunctive relief), and 5 U.S.C. § 706.

10.     This Court also has jurisdiction over the subject matter of this action under a well-developed body of federal case law describing and defining the fiduciary relationship between the United States (including its agencies and agents) and the Tribes, created, acknowledged, and/or facilitated by the statutes listed above and by other relevant federal law, including executive orders and regulations, and funding agreements and other agreements approved by the United States concerning management of Pacific salmon-related resources of the Tribes.

### VENUE

11.     Venue is appropriate under 28 U.S.C. § 1391 in this Court, not only

because there is a very strong nexus between the facts of the case and this District, but also and perhaps more saliently because (1) the site visit by NOAA officials (including Defendant Quan) to the Colville Reservation in September 2024 is a central event in the Tribes' claims, and (2) Defendant Bureau of Indian Affairs has an agency office in Nespelem, WA, which is also the location of the headquarters of the Colville Tribes, where many potential witnesses work or reside.

## PARTIES

### Plaintiff Tribes

12.    Plaintiff Tribes are federally recognized Indian tribes, each recognized by the United States, through the Secretary of the Interior, as a sovereign Indian Tribe with legal rights and responsibilities, eligible for the special programs and services provided by the United States to Indians because of the status of each as an Indian tribe, and recognized as possessing powers of limited self-government.

### *Confederated Tribes of the Colville Reservation*

13.    The Colville Reservation was established by executive order. In an 1891 Agreement with the United States, the Colville Tribes agreed to receive compensation for a 1.6-million-acre area called the "North Half" that is bounded on the north by the U.S.-Canadian border, on the east by the Columbia River, and on the west by the Okanogan River.   Article 6 of that 1891 Agreement reserved to the Colville Indians

6

hunting and fishing rights throughout the North Half.  Congress ratified the 1891 Agreement in a series of appropriations acts from 1906 through 1910.

14.    The history of the 1891 Agreement is described in detail in the U.S. Supreme Court's decision in *Antoine* v. *Washington*. 420 U.S. 194 (1975). The Court in *Antoine* held that the hunting and fishing rights reserved by the Colville Tribes in the 1891 Agreement were in full force and effect, that Congress's method of ratifying the agreement had the same Supremacy Clause effect as a treaty to preempt state regulation of tribal hunting and fishing activities, and the Colville Tribes is the exclusive regulator of tribal-member hunting and fishing in the North Half. *Id.* at 201–08.

15.    As highlighted in *Antoine*, members of the Colville Tribes possess off-reservation federally reserved rights on the North Half which, for legal purposes, are substantively identical to the off-reservation fishing rights reserved to the so-called "treaty tribes" in *U.S. v. Washington* and *U.S. v. Oregon*.

16.    For this reason alone, NOAA should have included the Colville Tribes as an eligible tribe for purposes of the Inflation Act tribal hatchery grant funds.

17.    But if this reason were not enough, the Colville Tribes is substantively identical to the Metlakatla Indian Community in that both are non-treaty tribes with federally reserved fishing rights, and both operate Pacific salmon hatcheries.

18.     Defendants owe numerous fiduciary duties to the Tribes with respect to the Plaintiff Tribes' hatcheries.   The United States employs various federal agencies (like NOAA and BIA) to perform these fiduciary duties owed to Plaintiffs.   BIA is the federal agency most often and most directly responsible for generally discharging the United States' fiduciary duties to tribes, and in this case is the agency which, through agreement, is charged with distributing the Inflation Act funds to tribes on NOAA's behalf.

19.     And, although not named as a Defendant here, the Army Corps of Engineers ("USACE") has a pivotal role in permitting the projects (for tribes generally, not just the Plaintiff Tribes,) that will be funded by these Inflation Act grants.   The Colville Tribes built the Chief Joseph Hatchery facility with Bonneville Power Authority ("BPA")/Accords funding but also with USACE involvement, namely permitting, engineering design review, and construction oversight.

### *Confederated Tribes of the Chehalis Reservation*

20.     The Confederated Tribes of the Chehalis Reservation, a federally recognized Indian tribe, occupies a reservation at the confluence of the Black and Chehalis Rivers within the boundaries of the State of Washington. The Chehalis Reservation was created by secretarial order in 1864. Tribal membership includes persons descended from the Upper Chehalis Indians, and may also include

descendants of the Lower Chehalis, Cowlitz and other tribes of Southwest Washington.

21. Federal courts have held that Chehalis possesses on-reservation fishing rights arising from the Executive Order that created the Chehalis Reservation. *U.S. v. Washington*, 18 F.Supp.3d 1172, 1196 (W.D. Wash. 1991), *aff'd*, *Confederated Tribes of the Chehalis Reservation v. Washington*, 96 F.3d 334 (9th Cir. 1996).

22. Chehalis is, therefore, comparable to both the Hoopa and Yurok Tribes, both of which NOAA included on its list of twenty-seven pre-selected "eligible" tribes and both of which were similarly established by executive orders that courts also have construed to provide those tribes on-reservation fishing rights. Unlike the Hoopa and Yurok Tribes, however, the Chehalis Tribe owns and operates an on-reservation Pacific salmon hatchery.

**Defendant**s

### *National Oceanic and Atmospheric Administration*

23. Defendant NOAA is an agency of the United States within the Department of Commerce and therefore also has recognized trust responsibilities to the Plaintiff Tribes.

### *Secretary of Commerce Howard Lutnick, in his official capacity*

24. Secretary of Commerce Howard Lutnick is the Cabinet-level official

who heads the United States Department of Commerce, of which NOAA is a part.

25.    Depending on the injunctive relief that may be required in this case, if any, it may be important that Secretary Lutnick expressly be a Defendant subject to the Court's equitable powers.

### *Jennifer Quan, Regional Administrator, West Coast Region, NOAA Fisheries, in her official capacity*

26.    Jennifer Quan is the Regional Administrator, West Coast Region, for NOAA Fisheries.

27.    Based on information, belief, and considerable available evidence, Plaintiff Tribes allege that Defendant Quan had a substantial, if not determinative role, in selecting the Indian tribes that would be eligible to apply for the Inflation Act tribal hatchery grant funds.

### *Bureau of Indian Affairs*

28.    Defendant Bureau of Indian Affairs ("BIA") is an agency of the United States within the Department of the Interior and therefore also has recognized trust responsibilities to the Plaintiff Tribes.

29.    While Congress appropriated Inflation Act hatchery grant funds to NOAA (as an unsegregated part of the $2.6 billion appropriated in Section 40001), documents authored by BIA acknowledge that a funding agreement between the two federal agencies transferred the funds to BIA, meaning that BIA is the federal agency

that has present custody of, and that will actually distribute, the Inflation Act hatchery grant funds to Indian tribes.

### *Secretary of the Interior Douglas Burgum, in his official capacity*

30.    Secretary of the Interior Douglas Burgum is the Cabinet-level official who heads the United States Department of the Interior, of which BIA is a part.

31.    Depending on the injunctive relief that may be required in this case, if any, it may be important that Secretary Burgum expressly be a Defendant subject to the Court's equitable powers.

## BACKGROUND

### Factual Background

32.    The Colville Tribes owns and operates the Chief Joseph Hatchery, a salmon hatchery facility located near Bridgeport, Washington that produces Chinook salmon for conservation, harvest, and reintroduction purposes.  The facility was designed to produce some two million salmon annually, but is unable to reach its designed production goals due to limited quantities of cooler water needed for fish health and regulation of growth rates.

33.    Chief Joseph Hatchery production includes Upper Columbia Spring Chinook salmon.

34.    The Chehalis Tribal Hatchery is located on the Tribe's reservation in

Oakville, WA. Chehalis purchased land on the Black River (a tributary to the Chehalis River) and agricultural buildings in the early 2000s. In 2008, the Tribe began construction, including retrofitting a former agricultural building to accommodate rearing tanks. The hatchery is fully owned and operated by the Tribe. Current production is 25,000 late coho smolts and an estimated 150,000 chum salmon fry.

35. For several years, staff in the Colville Tribes' Fish and Wildlife Program have worked closely with NOAA and other federal agency staff on efforts to reintroduce salmon into the "blocked area" of the upper Columbia River Basin above Chief Joseph and Grand Coulee Dams. These interactions occur on at least a weekly basis and often more frequently. They include emails, phone calls, and meetings focused on planning, funding, permitting, and technical issues relating to salmon reintroduction in the blocked area.

36. Both Colville and Chehalis hatcheries have received in the past, and are applying for, hatchery maintenance grants from the BIA.

37. The Colville Tribes has an Integrated Resource Management Plan ("IRMP") which was approved by the BIA and expressly addresses management of Colville's                    hatcheries.                    :
https://static1.squarespace.com/static/56a24f7f841aba12ab7ecfa9/t/5b982dbbf950b

7869155ef48/1536699865371/CTCR+2015+IRMP+online+2018-08-14.pdf     (last

visited Jan. 29, 2026).

38.     The Colville Tribes's 2015 IRMP was an update of an earlier approved

IRMP, dated 2000, and BIA approved it by Record of Decision dated February 1,

2023

https://static1.squarespace.com/static/56a24f7f841aba12ab7ecfa9/t/642b1ad562955

274d42dad05/1680546519342/CTCR+Record+of+Decision+2023+BKM.pdf   (last

visited Jan. 29, 2026), and was a decade in the making, including preparation of a

full-blown environmental impact statement.   *See* 87 Fed. Reg. 73755 (Dec. 1, 2022)

(notice of availability of "Final Programmatic Environmental Impact Statement for

the 2015 Integrated Resource Management Plan for the Colville Indian Reservation,

Nespelem, Washington").

39.     The BIA authored the final environmental impact statement "in

cooperation with" the Colville Tribes.   (The FEIS is available on the Colville Tribes'

IRMP webpage, which serves as the repository for the IRMP documents,

https://www.colvilletribes.com/irmp (last visited Jan. 29, 2026).   The FEIS includes

a photo of the Chief Joseph Hatchery on page 102.

40.     As described on the BIA's webpage devoted specifically to IRMPs,

https://www.bia.gov/service/integrated-resource-management-plans (last visited Jan.

29, 2026):

> An integrated resource management plan (IRMP) is a policy document prepared by a Tribal government "to assess available resources and to provide identified holistic management objectives that include quality of life, production goals and landscape descriptions of all designated resources that may include (but not be limited to) water, fish, wildlife, forestry, agriculture, minerals, and recreation, as well as community and municipal resources, and may include any previously adopted tribal codes and plans related to such resources" (25 USC Ch. 39).

> IRMPs are approved by the Bureau of Indian Affairs (BIA) regional director of the BIA region where the Tribe is located.

41. An IRMP is a significant undertaking for both a tribe and the BIA.

42. The Plaintiff Tribes allege that that hatchery maintenance grant funding and development and approval of Colville's IRMP are express acknowledgements by the United States, through the BIA, of the importance of, and trust responsibilities related to, the Tribes' hatcheries.

43. Accordingly, prior to the events described herein since 2023, NOAA had prior, independent knowledge of the Plaintiff Tribes' legal status and fish management and hatchery operations based on ongoing communications, initiatives, activities, and funding.

44. For example, for the last several years, the Colville Tribes' fish and wildlife staff have engaged with NOAA personnel on a daily, if not weekly, basis, on issues related to the Colville Tribes' ongoing efforts to reintroduce salmon in the

blocked areas above the Chief Joseph and Grand Coulee Dams.

45.    In 2023 and 2024, NOAA conducted tribal consultation sessions on how it would use funds appropriated to NOAA under section 40001 of the Inflation Act for Pacific salmon hatcheries, but NOAA did not consistently provide notice of those sessions to Chehalis and Colville representatives.

46.    One or more Colville employees received notice from NOAA of the first relevant consultation session, called a Hatchery Engagement Session, to be held on June 21, 2023.

47.    On June 21, 2023, Colville Tribe representatives participated in the virtual NOAA consultation concerning the use of Inflation Act funds for Pacific salmon hatcheries.

48.    The session was hosted by NOAA Fisheries' West Coast Region as part of a series of tribal engagement meetings held on June 21 - 23, 2023.

49.    On information and belief, some of these June 2023 sessions were not relevant to this case, as there were other grant funds from the Inflation Act that were relevant to some tribes.

50.    The June 21, 2023 session (which is relevant here) included presentations and discussion regarding NOAA's proposed approach to allocating approximately $240 million in Inflation Act funding for tribal hatchery maintenance,

15

modernization, and potential expansion.

51.     NOAA officials participating in the session included Defendant Jennifer Quan, West Coast Regional Administrator; Dr. Scott Rumsey, Deputy Regional Administrator; Dr. Zach Penney, NOAA Senior Advisor for Tribal Issues; and other NOAA West Coast Region staff. A representative of the BIA, Bryan Mercier, Northwest Regional Director, also participated in the session.

52.     To current Chehalis staff's knowledge and based on their own reasonable investigation, Chehalis was not informed of, and therefore did not attend, the June 21, 2023 session.

53.     During the June 21, 2023 session, NOAA informed participating tribes that it intended to continue tribal engagement through the summer of 2023, accept written tribal comments through July 23, 2023, and later determine the scope and allocation approach for the Inflation Act tribal hatchery grant funds.

54.     NOAA also stated that the funds would ultimately be transferred to the BIA for distribution through Indian Self-Determination and Education Assistance Act contracts.

55.     Charissa Eichman, a natural resources attorney who works in the Colville Tribes' Office of Reservation Attorney, along with Charles Brushwood, Senior Policy Advisor/Policy Division Manager for the Colville Tribes Fish and

16

Wildlife Program and Kirk Truscott of the Colville Tribes Fish and Wildlife Department, participated in the June 2023 meetings on behalf of the Colville Tribes.

56.     Ms. Eichman, Mr. Brushwood, and Mr. Truscott received prior notice of the June session but then received no notifications about any other upcoming meetings or sessions on this topic until October 23, 2023, when Ms. Eichman received notice of a discussion that occurred with the *U.S. v. Oregon* policy committee (a group that the Colville Tribes is not a part of, despite having federally reserved fishing rights) earlier in October 2023.

57.     The Colville Tribes and the Chehalis Tribe each sent at least one representative to each NOAA meeting about which it received notice, but neither received notice of all of the meetings, and both would have sent representatives to all of the meetings had they been provided notice by NOAA.

58.     Further, as detailed below, in one instance, the Colville Tribes only received prior notice because ***it asked*** (*see* ¶¶ 72-74).

59.     Curiously, and in stark contrast, NOAA on its own initiative affirmatively reached out to the Metlakatla Indian Community, as detailed in a July 17, 2023 internal NOAA email that describes NOAA's efforts to initiate Metlakatla's involvement even after that tribe failed to attend the June 2023 "tribal engagement sessions." Metlakatla is one of the tribes NOAA deemed "eligible" for Inflation Act

grant funding, is the only Alaska tribe so deemed, and has federally reserved fishing rights based in federal statute (not treaty), just like the Colville Tribes.

60.     On September 27, 2023, Lalena Amiotte, of NOAA, sent an email to dozens of tribal contacts stating that "NOAA Fisheries Regional Administrator Jennifer Quan will be hosting a tribal engagement and information sharing session on webex on October 11, 2023 from 10-11am. Updated information on Inflation Reduction Act Tribal Hatchery funding specific to Non-Mitchell Act tribal hatcheries will be provided as well as a question and answer session."   No one from the Colville Tribes was included.

61.     On October 11, 2023, NOAA conducted multiple tribal engagement sessions regarding the Inflation Act tribal hatchery grant funding. Separate sessions were held for Tribes that are party to *U.S. v. Oregon* (Mitchell Act) and for Tribes that are not party to that litigation.

62.     On October 11, 2023, NOAA, through Lalena Amiotte, distributed an email to tribes, including Chehalis, providing Inflation Act tribal hatchery grant funding materials. Attachments included: (1) the Inflation Act Tribal Hatcheries Presentation; (2) a summary of notes from tribal consultations and written comments received during Summer 2023; and (3) transcripts of tribal engagement sessions conducted in June 2023 for both Mitchell Act and non-Mitchell Act Tribes.

18

63. On October 11, 2023, Jesse McMahan, Hatchery Supervisor for the Chehalis Tribe, initiated an email inquiry to NOAA seeking clarification regarding the Inflation Act hatchery grant funding process. Mr. McMahan requested information concerning the timing of proposal submissions, the purpose of prior allocation meetings, eligibility requirements, and whether the Chehalis Tribe was included among the tribes referenced during the meeting. Mr. McMahan also identified two potential projects for which the Tribe might seek funding: (1) remodeling the existing hatchery facility and (2) development of a proposed new hatchery facility.

64. NOAA responded the same day, indicating that due to the complexity of the funding process, a telephone conversation would be preferable. The parties coordinated schedules, and NOAA confirmed a telephone call with Mr. McMahan for later that afternoon.

65. Mr. Brushwood, a primary point of contact for NOAA at the Colville Tribes, did not receive notice of the October 11, 2023 session, another example of NOAA's failure to keep the Plaintiff Tribes informed.  For example, Ms. Eichman and Mr. Brushwood received no notice or information regarding this matter after June 2023 until late 2023.

66. On October 20, 2023, representatives of the Chehalis Tribe attended a

NOAA Inflation Act tribal meeting concerning the hatchery grant funding. Following the meeting, the Chehalis Tribe prepared written comments expressing support for a hybrid funding allocation approach. The Chehalis Tribe stated that such an approach would allow tribes with smaller hatchery projects, or those in feasibility and planning stages, to access funding, with remaining funds distributed through a competitive process.

67.    The Chehalis Tribe further described intended uses of any funds received, including remodeling its existing hatchery facility by converting the effluent pond into additional rearing space and constructing an adult fish collection facility, as well as developing a feasibility study for a proposed new hatchery facility on the Chehalis River located outside the floodplain.

68.    The Chehalis Tribe indicated it would seek additional funding for construction costs and requested continued participation in discussions regarding allocation of the Inflation Act tribal hatchery grant funding.

69.    Again, the Colville Tribes was not given notice of this meeting.

70.    On October 24, 2023, Mr. McMahan submitted the Chehalis Tribe's official written comments to NOAA, including the Tribe's position on funding allocation and a description of proposed uses of funds.

71.    NOAA acknowledged receipt of the Chehalis comments the same day.

20

NOAA advised that no additional meetings or webinars were scheduled at that time, that the agencies were continuing to receive comments, and that NOAA was working with the BIA on an inter-federal agency agreement. NOAA further indicated that updates to tribes were anticipated in December 2023, subject to federal budget considerations, including the possibility of a government shutdown on November 17. NOAA confirmed that the Chehalis Tribe had been added to the distribution list for future communications.

72.    While discussing other issues with one of the Colville Tribes' outside counsel on November 29, 2023, Ms. Eichman was made aware of a relevant NOAA meeting set in Seattle, WA, on December 4, 2023. The attorney asked whether Ms. Eichman was aware of the meeting and would she be able to attend. Ms. Eichman had not received notice of the meeting (from NOAA or otherwise), but she said that she would be available to attend in person if needed.

73.    Other Colville Fish and Wildlife staff reached out to NOAA for more information and to get the Colville Tribes more information about the meeting.

74.    Only on November 30, 2023, Ms. Eichman received two emails with general information for the meeting from NOAA and an RSVP list that now showed Colville Tribes staff who would be attending (including Ms. Eichman).

75.    On December 4, 2023, Mr. Brushwood and Ms. Eichman attended, on

21

behalf of the Colville Tribes, the in-person meeting at NOAA Fisheries' offices in Seattle, Washington concerning the allocation and administration of the Inflation Act tribal hatchery grant funding.

76.    The meeting included discussion of NOAA's proposed approach to distributing Inflation Act tribal hatchery grant funds and the anticipated role of the BIA in administering those funds.

77.    Based on discussions at the meeting with the federal agency representatives, although some of the other tribes continued to discuss the "27 Tribes," Ms. Eichman was left with the impression that the Colville Tribes would be included in the group of "eligible" tribes.

78.    Much of the meeting focused on what type of projects should be included and how much weight should be given to proposals based on a tribe owning *and* operating a hatchery, versus just ownership or just operating.

79.    Nothing in the meeting indicated that the Colville Tribes, which has federally reserved off-reservation fishing rights and owns and operates a Pacific salmon hatchery, would be arbitrarily excluded from the opportunity and funding now that the Colville Tribes was again engaged in the discussions and informed about what was occurring.

80.    After the meeting on December 4, 2023, Ms. Eichman spoke with

22

Defendant Quan and asked specifically why Ms. Eichman did not receive timely notice of the meeting directly from NOAA.   Defendant Quan told Ms. Eichman that the email list had been narrowed down to those tribes who had participated in meetings over the fall (meetings to which the Colville Tribes had not been invited). When Ms. Eichman asked why neither Ms. Eichman nor anyone else from the Colville Tribes had received notice of the December 4 meeting, Defendant Quan told Ms. Eichman that she was not sure, that other staff might have received notice and not forwarded it.   Again, however, it is very unlikely that such a message would have been received and not distributed to Mr. Brushwood, who received no such communication.

81.    On December 12, 2023, Mr. Brushwood participated in a tribal roundtable meeting concerning the allocation and administration of Inflation Reduction Act funding for tribal hatcheries.

82.    The meeting was organized by NOAA Fisheries as a follow-up to the December 4, 2023, in-person meeting at NOAA's Seattle offices. The meeting covered NOAA's developing approach to Inflation Act tribal hatchery grant funding, including eligibility, allocation concepts, and the anticipated administrative role of the BIA.

83.    In these meetings, Mr. Brushwood and other Colville Tribal staff

23

described the Colville Tribal salmon programs and hatchery operations, including Colville's role in blocked-area salmon reintroduction efforts and its interest in Inflation Act grant funding to support these efforts.

84.    Based on these interactions, Ms. Eichman worked with staff regarding next steps. Staff reached out individually to their federal contacts to continue educating them on the federally reserved adjudicated rights possessed by the Colville Tribes, and to discuss its ongoing hatchery operations.

85.    However, rather than issue a general funding opportunity that allowed any tribal government with qualifying hatchery operations to apply, NOAA decided to pre-select twenty-seven Indian tribes as the only tribes that would be allowed to compete for these Inflation Act tribal hatchery grant funds.

86.    On information and belief, NOAA further decided that each of the twenty-seven pre-selected tribes would receive $2 million in "capacity building" funding, with the remaining funds to be distributed competitively among only those same twenty-seven tribes.

87.    As a follow-up to NOAA's December meetings and being concerned that NOAA might not deem Colville Tribes "eligible" to apply for the Inflation Act tribal hatchery grant funds, Mr. Brushwood sent an email on December 19, 2023 to Lalena Amiotte, NOAA Tribal Relations Coordinator, and Rudy Peone, BIA Natural

24

Resource Officer, offering insights and clarifications regarding the Colville Tribes's eligibility for Inflation Act tribal hatchery grant funding and technical staff engagement on this matter. That email described the Colville Tribes's federally recognized and adjudicated on- and off-Reservation fishing rights, the Colville Tribes's ownership and operation of the Chief Joseph Hatchery, and the Colville Tribes technical staff participation in several meetings related to Inflation Act tribal hatchery grant funding.  He concluded his email by stating his conclusion that accordingly, the Colville Tribes is eligible for Inflation Act tribal hatchery grant funding alongside the other "eligible" West Coast Tribes.

88.    In response to another email Mr. Brushwood sent on January 3, 2024, both Ms. Amiotte and Mr. Peone acknowledged receipt of his December 19, 2023 email. Ms. Amiotte also confirmed that she had shared Mr. Brushwood's email with NOAA Fisheries' Regional Administrator, Defendant Quan, on December 22, 2023.

89.    The twenty-seven pre-selected tribes include all of the treaty tribes in/parties to the *U.S. v. Washington* and *U.S. v. Oregon* litigation, as well as three non-treaty tribes: the Hoopa Valley Tribe and Yurok Tribe in California, and the Metlakatla Indian Community in Alaska. Based on NOAA's materials, Mr. Brushwood and Ms. Eichman reviewed and information shared during consultation, they understood and understand that NOAA did not include the Colville Tribes on

25

this list of 27 eligible tribes, despite the fact that Colville owns and operates a Pacific salmon hatchery and has federally reserved fishing rights.

90.    On March 29, 2024, the Colville Tribes Chairman, Jarred Erickson, and the Colville Tribal Executive Director Cody Desautel attended a 20-year habitat conversation celebration event hosted by the mid-Columbia Public Utility Districts at Rocky Reach dam, which is operated by Chelan Public Utility District.

91.    Defendant Quan was also present at this event, during which she mentioned to Chairman Erickson and Executive Director Desautel that she had some "bad news" to share with the Chairman and that she would be in contact.   She did not state what the news was or what it regarded.

92.    After the event and in response to Defendant Quan's statement that she had "bad news," Executive Director Desautel sought and received Colville Business Council approval to send a letter to NOAA (and specifically Defendant Quan) restating the Colville Tribal position and requesting a response, which letter was dated April 2, 2024.

93.    On April 3, 2024, Executive Director Desautel was in Chairman Erickson's office for a call with Defendant Quan, during which she stated that Colville would not be included as one of the twenty-seven tribes deemed eligible for the Inflation Act hatchery funding.   Chairman Erickson was not pleased about the

26

decision and asked for more information.   Defendant Quan did not elaborate on the reasoning for limiting the number of tribes and excluding Colville (and Chehalis).

94.     Chairman Erickson asked Defendant Quan if there would be a written determination from NOAA for why the eligibility was limited to those twenty-seven tribes.   Defendant Quan responded "no" to Chairman Erickson's question.

95.     On April 4, 2024, Chairman Erickson and Executive Director Desautel participated in a call with the BIA's Northwest Regional Director to learn more about the decision to exclude the Colville Tribes from eligibility for the Inflation Act tribal hatchery grant funding opportunity. The Regional Director explained that NOAA, not the BIA, had decided which tribes would be eligible. The Regional Director indicated that three Indian tribes that did not have treaty-based federal fishing rights were included on the list of twenty-seven tribes, which included the Hoopa Valley Tribe, the Yurok Tribe, and the Metlakatla Indian Community. As noted above, the Hoopa Valley and Yurok Tribes are located within the boundaries of California and Metlakatla within the boundaries of Alaska.

96.     In Executive Director Desautel's role as executive director of the Colville Tribes, he often provides technical assistance and advice to the Colville Business Council and the Chairman on a variety of issues. When he is able and requested to do so, he also accompanies the Chairman and/or members of the Colville

27

Business Council on visits Washington, DC, to meet with congressional representatives and agency officials on the Colville Tribes' behalf.

97. At various times beginning in April 2024, Executive Director Desautel participated in meetings with Chairman Erickson with federal officials and congressional offices at which the Colville Tribal delegation raised with congressional offices concerns about NOAA's decision to exclude the Colville Tribes from eligibility for the Inflation Act tribal hatchery grant funding.

98. Around this time, the Colville Tribes became aware that the Chehalis Tribe was also excluded from list of tribes "eligible" for Inflation Act tribal hatchery grant funds and was similarly situated to the Colville Tribes in that it also owned and operated a Pacific salmon hatchery, and had been excluded without cogent explanation.

99. One of the offices that the Colville Tribal delegation met with during this time was the office of Senator Maria Cantwell, who the Colville Tribes understood was primarily responsible for securing the Inflation Act grant funds in the U.S. Senate. Upon information and belief, from April through September 2024, Senator Cantwell's office engaged with NOAA personnel in an attempt to understand the rationale for NOAA's decision to pre-select the twenty-seven tribes and to exclude the Colville Tribes and the Chehalis Tribe.

100.   On July 25, 2024, NOAA announced in a press release, available at:

https://www.commerce.gov/news/press-releases/2024/07/commerce-and-interior-departments-announce-240-million-president-bidens (last visited Jan. 29, 2025) that it would be providing $240 million to Indian tribes for Pacific salmon hatcheries. The release stated that an initial $54 million would be available to the twenty-seven tribes with the remaining amount being awarded competitively.

101.   Accordingly, Plaintiff Tribes allege that NOAA had predetermined, when it announced the grant funding publicly, which Indian tribes would be "eligible."

102.   Upon information and belief, NOAA has never publicly identified the twenty-seven tribes it selected (although, as discussed below, BIA's updated request for proposals would later include each tribe by name and was posted on BIA's website.   But availability in a corner of the internet is not notice, certainly not according to 2 C.F.R. Part 200.)

103.   On April 3, 2024, NOAA and the BIA entered into an agreement whereby NOAA transferred the Inflation Act tribal hatchery grant funds to the BIA for the BIA to distribute to the twenty-seven tribes that NOAA selected.   *See* Lalena Amiotte email, April 3, 2024 [FOIA 1007-08].   Ms. Amiotte wrote:

> The Bureau of Indian Affairs will distribute these funds to 27 tribes through noncompetitive and competitive programs for deferred

29

maintenance and repairs at hatchery facilities that produce Pacific salmon and steelhead. The structure of this funding distribution, including the transfer of funds to Bureau of Indian Affairs and a non-competitive and competitive process, was widely supported by participating tribes. The non-competitive process will allow for these tribes to plan for and participate in the competitive process, as well as start working on the most dire repair and maintenance needs at hatchery facilities. The competitive process will follow the non-competitive process some months later. The focus of this funding is to address shovel-ready and high priority projects and support the salmon and steelhead hatchery infrastructure that supports tribal treaty fishing rights."

*Id.* at 1008.

104. On June 11, 2024, Chehalis submitted a Freedom of Information Act request to NOAA's FOIA Officer, to which NOAA responded.

105. The Plaintiff Tribes allege that the FOIA response was incomplete based on apparently responsive records that the Plaintiff Tribes sent to NOAA that seemingly were not included in NOAA's FOIA response.

106. The Colville Tribes learned from Senator Cantwell's office in August 2024 that NOAA would not change its "decision" to exclude the Colville and Chehalis Tribes.

107. Upon information and belief, NOAA's purported (but vague) reason for not including the Plaintiff Tribes was that doing so could delay distribution of the Inflation Act tribal hatchery grant funds and that the funds could be rescinded by a new Presidential administration.

30

108. To Colville Executive Director Desautel's knowledge, NOAA has never provided a more detailed, coherent explanation, written or oral, through Senator Cantwell's office or otherwise, as to why the Chehalis and Colville Tribes were excluded from the list of twenty-seven tribes in the first place.

109. After NOAA's refusal to include the Plaintiff Tribes, Senator Cantwell's office indicated to the Colville Tribes that it would encourage NOAA Fisheries leadership to visit both the Colville Tribes' and the Chehalis Tribes' hatcheries to discuss potential alternative sources of funds outside the Inflation Act tribal hatchery grant funds that NOAA may be able to provide or that the tribes could apply for.

110. On August 27, 2024, the Colville Business Council approved Ms. Eichman sending a letter to NOAA officials, including Defendant Quan and then-Assistant Administrator for NOAA Fisheries Janet Coit, among others, asking for a meeting and consultation.

111. On September 17, 2024, several NOAA Fisheries representatives – Janet Coit, Assistant Administrator; Defendant Jennifer Quan, West Coast Regional Administrator; and Lalena Amiotte, Tribal Relations, West Coast Region – visited the Chehalis Reservation to tour the fish hatchery, meet the staff and discuss funding opportunities.

112. Glen Connelly, Director of the Chehalis Department of Natural

31

Resources, recalls that the original list of expected NOAA Fisheries visitors also included Scott Rumsey, NOAA Fisheries West Coast Deputy Regional Administrator; Taylor Debevek, Policy Advisor; and Caitlin Adams, Policy Advisor. Mr. Connelly does not recall if one or more of the three attended.

113.   Chehalis Tribal Chairman Dustin Klatush hosted the NOAA group and other Tribal staff attended, including: Mr. Connelly; Jeff Warnke, Tribal Government Liaison; Robbi Kesler, Lead Tribal Attorney; Shawn Ortivez, Fisheries Manager; Tara Livingood-Schott, Fish and Wildlife Biologist; Colleen Parrott, Environmental Programs Manage; and Dan Penn, Tribal Historic Preservation Officer.

114.   The tour took the NOAA visitors to the Chehalis Tribe's existing on-Reservation Fish Hatchery and to a site on the Chehalis River where the Tribe hopes to someday build a new hatchery to better support the salmonid species that are in jeopardy in the Chehalis Watershed. The Tribe then hosted a luncheon at the Tribal Community Center that included salmon cooked over an open fire in the traditional manner.

115.   The feedback Mr. Connelly received from then-Assistant Administrator Coit was that her staff was impressed by Chehalis's technical staff, and that they recognized that the Tribe has a solid hatchery program and could benefit from additional funds. While none of the NOAA representatives made any guarantees

32

about future funding, they did express regret that we were not a part of the group of "eligible" tribes for the Inflation Act tribal hatchery grant funding.

116. The next day, NOAA officials, including Defendant Quan and Ms. Coit and other NOAA staff, then travelled to Bridgeport, Washington, to meet with representatives of the Colville Tribes at the Chief Joseph Hatchery on September 18, 2024. Mr. Brushwood participated in this meeting and accompanied the NOAA officials on a tour of the hatchery. During the visit, Defendant Quan and Ms. Coit were reminded of the desire of the Colville Tribes to install a third water source to allow the hatchery to operate at its full potential.

117. Neither Defendant Quan nor Ms. Coit identified any other sources of NOAA funds that might be applicable for those hatchery upgrades. They instead suggested that the Colville Tribes pursue congressional appropriations with its congressional delegation.

118. During the September 18 meeting, Chairman Erickson, staff, and Executive Director Desautel discussed with Defendant Quan and Ms. Coit NOAA's decision to limit the "eligible" tribes to 27. The discussion began with Chairman Erickson stating his disappointment in NOAA's decision to exclude the Colville Tribes from the list of "eligible" tribes.

119. During that meeting, Executive Director Desautel noted that the Colville

Tribes had never received an explanation for its exclusion and asked NOAA officials to explain why Colville had not been included on the list of twenty-seven pre-selected tribes despite the Colville Tribes' ownership and operation of the Chief Joseph hatchery and its participation in those NOAA consultations that Colville had received notice of.

120.   In response to Executive Director Desautel's question, Defendant Quan stated that the Colville Tribes would "not like the answer." Executive Director Desautel responded by stating that the Colville Tribes still wanted to know why. Defendant Quan proceeded to explain that while NOAA publicly announced consultations with a larger group of tribes, as discussions evolved, those consultations narrowed to a smaller group of tribes. Defendant Quan added that NOAA only included those tribes that participated in the consultations.

121.   The Colville Tribes' Anadromous Fisheries program manager, Kirk Truscott, also participated in the September 18 meeting. Mr. Truscott asked why the Colville Tribes was not included in or invited to all the consultation sessions hosted by NOAA. Neither Defendant Quan nor Ms. Coit answered Mr. Truscott's question.

122.   Mr. Brushwood also asked Defendant Quan and Ms. Coit to explain why NOAA had excluded Colville from the list of twenty-seven pre-selected tribes despite Colville's hatchery operations and despite its participation in the NOAA

consultations (for which it actually received notice). In response, Defendant Quan and Ms. Coit offered explanations that did not, in Mr. Brushwood's view, follow a coherent or consistent rationale, and that did not explain why other similarly situated non-treaty tribes had been included while the Colville Tribes had been excluded. Charissa Eichman recalls that the answers were incomplete and varied.

123. Ms. Eichman recalls that one of the reasons Defendant Quan or Ms. Coit used was that the Colville Tribes had other funding options. However, when asked about for specific alternative funding options, the NOAA representatives discussed going to ask Congress for funding or other existing sources of funding that either the Colville Tribes or its projects were ineligible to receive, or that were subject to a political appropriations process.

124. After the site visit by Defendant Quan and Ms. Coit, the Colville Business Council discussed litigation and other potential options to challenge NOAA's decision to exclude the Colville Tribes from the Inflation Act tribal hatchery grant funds. That activity was put on hold after the November 2024 election because it appeared that the incoming Trump administration could attempt to rescind the Inflation Act hatchery funds.

125. This holding pattern continued until August 2025, when the Colville Tribes became aware that the Department of the Interior had determined that the

Inflation Act tribal hatchery grant funds would not be subject to rescission by Congress or reallocated for other purposes.

126. Upon learning that the Inflation Act tribal hatchery grant funds would not be rescinded, the chairmen of the Colville Tribes and the Chehalis Tribe sent a joint letter, dated August 13, 2025, to Eugenio Piñeiro Soler, Director of NOAA Fisheries, and Scott Davis, Acting Assistant Secretary-Indian Affairs.

127. The August 13 letter provided background on the issue and requested that NOAA reconsider its decision and add the Colville Tribes and the Chehalis Tribe to the list of "eligible" tribes selected by NOAA. The letter also requested meetings on the Plaintiff Tribes' joint request.

128. On September 17, 2025, Colville Chairman Erickson and Chehalis Chairman Dustin Klatush met in Washington, DC, with NOAA Director Soler and Acting Assistant Secretary Davis to provide further information and background on the Tribes' joint request. Executive Director Desautel also participated in both meetings. Based on follow-up conversations with officials who attended the meetings, the Colville Tribes believed that the Department of the Interior was amenable to deeming the Tribes "eligible" for the Inflation Act tribal hatchery grant funding if NOAA were to concur in this decision.

129. Having not received any response or follow-up from NOAA after the

September 17 and 18, 2025, site visits, the Colville Tribes and the Chehalis Tribe sent another joint letter to NOAA leadership dated October 2, 2025.

130.  The federal government was shut down due to a lapse in congressional appropriations from October 1, 2025, to November 12, 2025. The federal government reopened on November 13, 2025, and that same day the Colville Tribes requested a follow-up meeting with NOAA in hopes of getting an update on the status of the Tribes' joint request.

131.  Executive Director Desautel is personally aware that the Colville Tribes followed up on the meeting request on November 14, 2025, and again on November 20, 2025, to which NOAA responded to the letter request and indicated that the Tribes' request was proceeding through the review process.

132.  However, as explained herein, NOAA had already made the "decision," de facto or otherwise, to not include the Plaintiff Tribes by or before November 18, 2025.

133.  On December 3, 2025, Executive Director Desautel telephoned the BIA's Northwest Regional Office to inquire whether the BIA had (re)issued an updated request for proposals ("Updated RFP") to the twenty-seven tribes for the competitive portion of the Inflation Act tribal hatchery grant funds and learned that the updated RFP had gone out in November.

134.    Chairman Erickson emailed the Northwest Regional Office inquiring if the Colville Tribes could get a copy of the Updated RFP.

135.    The Northwest Regional Office responded via email that same day and provided electronic copies of the Updated RFP, and the accompanying Dear Tribal Leader letter, both of which (based on the date) had gone out to the twenty-seven tribes on or about November 18, 2025, some two weeks prior.

136.    The Updated RFP stated:  "The Bureau of Indian Affairs (BIA), in coordination with NOAA Fisheries (NMFS), is pleased to reannounce the availability of funds for Pacific salmon and steelhead hatchery maintenance and modernization. This is a unique and one-time merit-based competitive opportunity that ensures the long-term viability and effectiveness of critical infrastructure for the propagation and reintroduction of Pacific salmon and steelhead in support of tribal fisheries. Under this opportunity, BIA seeks applications for projects from eligible Tribes to support existing fish hatchery facilities that support Pacific salmon and steelhead."

137.    The priorities of the Inflation Act tribal hatchery grant funding, as stated in the Updated RFP, are:

> Proposals will be evaluated based on the criteria in Section 5.A. Successful proposals will address some or all the following priorities:
>    1) Supporting Tribal Fishing Rights - Supporting best management practices in hatcheries that raise stocks in areas where Tribes have federal ***adjudicated or*** treaty-reserved

38

rights.
2) Sustainability - Ensuring hatchery infrastructure is maintained and functions effectively for future generations.
3) Modernization through Innovative Technologies - Effectively implement cutting-edge technology and innovation to optimize operations and data collection for informed decisionmaking.
4) Infrastructure Upgrades for Improved Efficiency - Streamlining operations, promoting water conservation, and optimizing productivity within hatcheries.

(Emphasis added.)

138. The Dear Tribal Leader letter and Updated RFP gave the "eligible" tribes only 30 days to (re)apply: "Please refer to the enclosed application guidance document when putting together your proposal. All applications should be submitted by email to [email address omitted] by **Thursday, December 18, 2025**. As applications come in there will be an administrative review. After the closing date the eligible applications will undergo a technical review and ranking process to determine how well they meet the priorities and evaluation criteria." (Emphasis in original Dear Tribal Leader letter.)

139. Like the original, the RFP limited each proposal and award to $6 million (with a floor of $250,000), although reportedly multiple proposals from, and awards to, a given tribe are allowed.

140. While authority to award Inflation Act tribal hatchery grant funding rests with NOAA and BIA (or, if appropriate, the courts), the Plaintiff Tribes allege that

their respective proposals would and will satisfy *all four* of these priorities.

141.  Based on information and belief and excluding NOAA's 27 "eligible" tribes, there are no other federally recognized Indian tribes in NOAA's West Region (other than the Plaintiff Tribes) that both (1) have adjudicated or treaty based federally reserved fishing rights, and (2) own and/or operate a Pacific salmon hatchery.

142.  The Plaintiff Tribes have advocated, starting in 2023 and through late 2025, for each tribe's inclusion on the list of tribes eligible for the Inflation Act tribal hatchery grant funding.

143.  Despite those efforts the Plaintiff Tribes have been excluded without any consistent or coherent explanation from NOAA, either oral or written.

144.  On information and belief, of the twenty-seven tribes deemed "eligible" by NOAA, some do not have hatchery operations or otherwise participate in hatchery management.

145.  The Inflation Act funding at issue in this case is *not* listed on NOAA's list of available funding opportunities available at: https://www.fisheries.noaa.gov/funding-opportunities/all-opportunities (last visited Jan. 25, 2026).

146.  To the Plaintiff Tribes' knowledge, NOAA has not provided general

notice to federally recognized Indian tribes who might have both projects and arguments that they would satisfy the priorities identified by the BIA for the Inflation Act tribal hatchery grant funding.

147. Further, the Plaintiff Tribes believe that they are the only two federally recognized Indian tribes that should have been deemed "eligible" to apply for the Inflation Act tribal hatchery grant funding but were neither allowed to apply nor notified of any opportunity to apply.

148. Both of the Plaintiff Tribes have tribally owned and operated Pacific salmon hatcheries, and both participated in the NOAA facilitated consultation sessions or which NOAA sporadically made one or both tribes aware.

149. The Colville and Chehalis Tribes understand that NOAA facilitated other meetings and consultation sessions on the tribal hatchery funds that the Plaintiff Tribes were neither invited to nor made aware of.

150. As far as the Plaintiff Tribes are aware, NOAA did not develop application criteria that would allow any qualifying Indian tribe to apply for these funds, or allow a tribe to understand why it was not "eligible" and thus potentially challenge those criteria.

### *PLAINTIFF TRIBES' PROPOSED PROJECTS*

#### *Chehalis Renovation Plan*

151.     Based on the professional knowledge of Chehalis Tribal staff, along with a feasibility study the Tribe commissioned (dated December 30, 2024), the Chehalis Tribe would apply for and use Inflation Act tribal hatchery grant funds to update its existing hatchery to increase capacity and therefore increase production of fish stock ("Chehalis Renovation").

152.     The Chehalis Renovation would include reducing the size of the existing pollution pond as needed to allow construction of a new adult holding facility within the pond's footprint.

153.     The plan includes renovations to the water supply distribution box, updates to the adult holding/rearing facility, the fishway, and the surface water pump facility.

154.     The existing pollution pond's current dimensions (200 feet by 200 feet and 4 feet deep) provide more holding capacity than necessary for adult holding or rearing. The pond currently holds approximately 160,000 cubic feet ("cf") of space, whereas the requirement for holding around 440 adult chum salmon only requires about 1,748 cf of holding space. The smaller adult holding structure would occupy a small part of the existing pollution pond and pollution pond volume would be reduced

by an equivalent amount. Downsizing the pond would necessitate the following additional five items:

155.   (1) Dewatering and dredging accumulated organic material from its years of use as a settling pond.

156.   (2) Rebuilding the east side of the pond would likely require substantial select-fill material beyond what is needed for the other alternatives.

157.   (3) Both the inlet and outlet of the pond need to be reconfigured to fit the new design.

158.   (4) The soil beneath the proposed new structure would need to be excavated and reinforced to ensure it meets the bearing capacity required for the new holding and rearing facility, thereby minimizing the risk of settlement.

159.   (5) Adding additional length and height of the fishway.

160.   The 2024 feasibility study estimates these upgrades and renovations will cost $8.5 million, more than the $6 million ceiling on Inflation Act tribal hatchery fund grants, but only slightly more than the $8 million total were Chehalis to also receive the $2 million in non-competitive funds reportedly already distributed to each tribe previously deemed "eligible" by NOAA.

161.   Were Chehalis to receive the full $8 million in Inflation Act funding, Chehalis staff are reasonably confident that alternative sources of funding, including

perhaps tribal funds, could be obtained to cover the $500,000 difference.

162. In contrast, were Chehalis to receive less than the full $8 million in Inflation Act funding, Chehalis staff have identified discrete portions of the full Chehalis Renovation plan that could be conducted beneficially for lesser amounts.

163. For example, replacing the hatchery well supply tower is the most important need of the hatchery and could be accomplished for less than $400,000.

164. The current tower does not function properly, is not allowing for the safe rearing of eggs/fish, does not properly strip out dangerous nitrogen, and does not allow for the use of more than one well at a time. It is therefore a limiting factor in any future expansion of the hatchery.

165. As a second example, the next most important need of the facility is adding two (or less effectively one) water supply wells, which would cost somewhat less than $1 million each.

166. The current wells do not supply enough water to run more than half of the hatcheries available rearing vessels. Adding even an additional 400 gallons per minute of water would allow Chehalis to comfortably double the hatchery's production. 800-1000 gallons per minute would be the target goal.

167. The cost figures stated herein include piping, electrical, site work, design, and construction but are estimates only.

44

168.   The end goal of modernization of the hatchery, if fully funded, is to double or perhaps triple the current production numbers.

### *Colville Tribes Project Proposals*

169.   The Colville Tribes intends to submit two project proposals if it is declared "eligible" to do so.

### Chief Joseph Hatchery Relief Tunnel Water Source (Third Water Source)

170.   Construction of the Colville Chief Joseph Hatchery ("CJH") by the Colville Tribes and the BPA began in fiscal year 2010, with fish production starting in 2013 for release into the Columbia and Okanogan rivers. As noted above, ownership the CJH has since been transferred to Colville.  The CJH operates to restore and enhance depleted runs of spring and summer/fall salmon Chinook salmon for release into the Columbia and Okanogan rivers.

171.   The original hatchery design included three water sources, which were to include: 1) surface water from Rufus Woods Reservoir behind Chief Joseph Dam (~60 cubic feet per second or "cfs"); 2) groundwater provided from five production wells (~35 cfs); and 3) Relief Tunnel Water for the toe-drain water on the right bank (north side) of the Columbia River, near the monolith of the dam (~16-18 cfs).

172.    Due to CJH construction overruns, the development of the Relief Tunnel Water Source was deferred during the original hatchery construction and as

45

such CJH has only surface and well/ground water provided by only five wells.

173. Developing the Relief Tunnel Water Source is a very high priority for the Colville Tribes due to increased water temperature of the groundwater provided from the well field. Since fish production began in 2013, the groundwater temperature has risen. Because the CJH temperatures cannot be moderated with the cooler Relief Tunnel water, the CJH Program has suffered repeated broodstock mortality events associated with Columnaris, a highly contagious and often fatal bacterial pathogen in fish, that have been significant (near 30% loss of broodstock). Columnaris disease risks increase substantially as water temperatures approach $15°$ C and above. The CJH adult holding area water temperatures do reach $15°$ C and, in some years, can reach around $16°$ C. Warm water in the hatchery environment has a number of adverse impacts on fish production and survival, including increased stress and metabolic rates, decreased egg fertilization rates, and decreased available oxygen.

174. Developing the Relief Tunnel Water Source would allow the CJH Program to switch to the Relief Tunnel water as the groundwater source begins to warm each year and keep the water temperatures and volume for juvenile rearing and adult broodstock at a range where pathogen risks are reduced considerably, thus providing a greater probability of achieving full program production.

175. Because of these challenges, the CJH Program's summer Chinook

46

juvenile production has been closer to 1 million annually, rather than the original target of 2 million. The best available estimates provide that adding the third water source could or would allow for meeting that target, an increase in juvenile production that might even reach 100 percent and would almost certainly exceed 70 percent.

176. The current engineering estimate of cost to construct the Relief Tunnel Water Source is $13.2 million, which is greater than the $6 million maximum award amount per project specified in the BIA's Update RFP. If Colville were awarded $6 million in competitive Inflation Act tribal hatchery grant funding from BIA (and presumably also the $2 million in non-competitive funding), Colville would seek additional funding needed to construct the Relief Tunnel Water Source from BPA or other funding entities. Receipt of the federal grant funding likely would help Colville immeasurably with the BPA negotiations for the remainder of the funding because BPA has historically (and recently) insisted that the Tribes identify a cost-share source for the CJH. The Inflation Act tribal hatchery grant funding provides a rare, and according to the Updated RFP "unique," opportunity for the Colville Tribes to leverage BPA funding and therefore complete the Relief Tunnel Water Source, an express goal for the Tribes since the CJH was built and that third water source was not completed as specified in the design.

**Chief Joseph Hatchery Program Acclimation Pond Roof Structures**

177.   The Chief Joseph Hatchery Program operates two acclimation ponds along the Okanogan River; one near Riverside, WA and one near Omak, WA.

178.   Acclimation ponds are bodies of water in which young salmon are gradually acclimated to the conditions they will experience upon release and develop homing fidelity for adult returns to the river or tributary in which they are released.

179.   The Riverside Pond rears the integrated Spring Chinook program, and the Omak Pond rears the integrated Summer Chinook program.

180.   The integrated spring Chinook program is supported by annual eye-egg transfers of Methow Composite stock from Winthrop National Fish Hatchery, while the integrated summer Chinook program is derived primarily from natural-origin returns (NOR) and returning adults from the CJH-integrated program captured via purse seine, at the mouth of the Okanogan River.

181.   Both ponds are open to the environment year-round. As fish are moved in late fall and overwintered at the respective ponds, the ponds are subjected to sub-freezing temperatures and typically freeze over from December through March. During this time, fish are not fed, fish health cannot be monitored, mortality is difficult to measure or monitor, and the pond screens can overflow during the initial freeze due to slush and/or ice clogging the screens.

48

182.    Predation is also an issue for these ponds when not frozen over.

183.    To address fish health, fish monitoring, improved pond hygiene during rearing, improved disease treatment options, icing conditions, and predation, Colville's second Inflation Act tribal hatchery grant funding proposal project would construct permanent, clear-span buildings over each acclimation pond, which would substantially mitigate, if not eliminate, these problems.

184.    Because over-winter conditions are variable within and between years, it is difficult to project how many additional fish would be reintroduced each year if the acclimation ponds were covered, but the Colville Tribes believes that, if the acclimation ponds were covered, the overall survival and overall health of fish in the ponds would increase and risk of catastrophic loss of fish would be considerably reduced, resulting in more fish released and greater adult returns.

185.    The Colville Tribes estimates, based on a 2025 construction quote, that construction costs alone for the two pond buildings would exceed $5 million, and accordingly that the total project costs to be sought from the Inflation Act grant funds would come in at $6 million or somewhat more.

**LEGAL BACKGROUND**

186.    Various statutes, among other applicable federal laws, executive orders, regulations, and policies are relevant to the Plaintiff Tribes' claims.

49

## *INDIAN REORGANIZATION ACT*

187. The Indian Reorganization Act, 25 U.S.C. § 5101 *et seq.*, is the 1934 legislation that signaled the end of the so-called Assimilation Era and was intended to usher in a new era in relations between the United States and its indigenous peoples.

188. 25 U.S.C. § 5123(f), often referred to as the "Privileges and Immunities" clause, provides, in pertinent part, that:

> Departments or agencies of the United States shall not … make any decision or determination pursuant to … any … Act of Congress, with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.

## *ADMINISTRATIVE PROCEDURE ACT*

189. The APA provides the right of judicial review to any person adversely affected by agency action. 5 U.S.C. § 702.

190. Section 704 of Title 5 states *in toto*:

> Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and

50

provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

191.  The APA requires that a reviewing court "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

192.  The APA states that a court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

193.  A court shall "hold unlawful and set aside" any agency action that was promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

194.  25 C.F.R. Part 200 and the Department of Commerce's "Grants and Cooperative Agreements Manual" both implement the APA's requirement for reasoned, deliberate, and well-explained decision making when awarding federal funds such as the Inflation Act tribal hatchery grant funding.

### *INFLATION REDUCTION ACT*

195.  The Inflation Reduction Act, Pub. L. 117-69 (Aug 16, 2022), was passed relatively early in the COVID19 pandemic and appropriated the funds at issue in this case.  Section 40001 stated in relevant part:

(a)     IN GENERAL.—In addition to amounts otherwise available, there is

appropriated to the National Oceanic and Atmospheric Administration for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $2,600,000,000, to remain available until September 30, 2026, to provide funding through direct expenditure, contracts, grants, cooperative agreements, or technical assistance to . . . Tribal Governments . . . for the conservation, restoration, and protection of coastal and marine habitats, resources, Pacific salmon and other marine fisheries. . . and for projects that support natural resources that sustain coastal and marine resource dependent communities, marine fishery and marine mammal stock assessments, and for related administrative expenses.

(b)    TRIBAL GOVERNMENT DEFINED.—In this section, the term ''Tribal Government'' means the recognized governing body of any Indian or Alaska Native tribe, band, nation, pueblo, village, community, component band, or component reservation, individually identified (including parenthetically) in the list published most recently as of the date of enactment of this subsection pursuant to section 104 of the Federally Recognized Indian Tribe List Act of 1994 (25 U.S.C. 5131).

196.   Both of the Plaintiff Tribes are "tribal governments" under the Inflation Act because they were on the BIA's "most recent" list at the time the Inflation Act was enacted.   (*See*  91 Fed. Reg. 4102, 4102, Jan. 30, 2026.)

### FEDERAL TRUST RESPONSIBILITY TO INDIAN TRIBES

197.   As discussed in more detail below under Claim Four, the United States, including its departments and agencies, owe trust duties to federally recognized Indian tribes.   Those duties are relevant to and interlaced with the factual and legal issues in this case.

## FIRST CLAIM FOR RELIEF

**Violation of the Indian Reorganization Act and the Administrative Procedure Act: NOAA's Failure to Include the Plaintiff Tribes as "Eligible" to Apply for Inflation Act Tribal Hatchery Grant Funds**

198. The Plaintiff Tribes incorporate herein by reference the allegations of paragraphs 1 through 197, above.

199. Defendants NOAA, and particularly Defendant Quan, were fully aware that the Plaintiff Tribes were actively interested in being included in the Inflation Act tribal hatchery grant funding opportunity.

200. By not including the Plaintiff Tribes in the group of "eligible" tribes for the grant funding, Defendants violated 25 U.S.C. § 5123(f). Again, that section provides, in relevant part, that:

> Departments or agencies of the United States shall not … make any decision or determination pursuant to … any … Act of Congress, with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.

Parsing that language, NOAA is an "agency of the United States," made a "decision" pursuant to an "Act of Congress" (the Inflation Act, because it is distributing Inflation Act appropriations) to exclude, and therefore "with respect to," the "recognized" Plaintiff Tribes. That "decision," on its face, "diminishes the privileges (federal grant funding)" of the Plaintiff Tribes, all of which is relevant to

the statutory provision as a whole because NOAA lawfully allocated the $240 million in Inflation Act tribal hatchery grant funds to Indian tribes.

201.   Due to Defendants' failure to explain the decision, despite the legal requirement to do so and despite numerous requests and invitations from the Plaintiff Tribes that their trustee do so, the Tribes cannot now refute a reasonably articulated decision because there is not one.   However, the facts stated above demonstrate irrefutably that, from at least June 2023 forward, NOAA and Defendant Quan (and ultimately BIA) were aware that the Plaintiff Tribes desired to be, and should have been, included in the group of "eligible" tribes but, inexplicably, arbitrarily and without coherent explanation, were not.

202.   BIA's Updated RFP states that its first priority is to "[s]upport[] best management practices in hatcheries that raise stocks in areas where Tribes have federal adjudicated or treaty-reserved rights," and there can be no dispute that the Plaintiff Tribes have such federally reserved rights.

203.   The Plaintiff Tribes allege that, and can think of no lawful counterargument to, they are each similarly situated to one or more of the "eligible" tribes included in the Updated RFP and accordingly that their exclusion from the group of "eligible" tribes privileges those other tribes over the Plaintiff Tribes.

204.    Given that the Inflation Act funds in Section 40001 – the $2.6 billion

from which the $240 million was allocated – "remain available until September 30, 2026," the Plaintiff Tribes recognize that (given NOAA's failure over **three** years to deem the Plaintiff Tribes "eligible") it is imperative that the Plaintiff Tribes be **added to** the group of eligible tribes and that there is insufficient time to request relief from this Court (or from the Defendants, for that matter) that would require further consultation or any substantial delay.   **Most** of the Inflation Act tribal hatchery grant funds should be distributed to tribes already deemed "eligible," and on NOAA's and BIA's existing timetable.   The relief sought by the Plaintiff Tribes would only hold back roughly ten percent of those funds and establish a schedule for consideration of the Plaintiff Tribes' project applications within a timeframe that would allow **all** funds to be obligated before September 26, 2026.

## SECOND CLAIM FOR RELIEF

**Violation of the Indian Reorganization Act and the Administrative Procedure Act: NOAA's Failure to Issue *and* Articulate a Reasoned Decision Excluding the Plaintiff Tribes from the Group of Tribes "Eligible" to Apply for Inflation Act Tribal Hatchery Grant Funds**

205.   The Plaintiff Tribes incorporate herein by reference the allegations of paragraphs 1 through 204, above.

206.   Despite Plaintiff Tribes' numerous attempts to have Defendants NOAA and Quan articulate their reason(s) for limiting the group of "eligible" tribes to twenty-seven, no coherent or consistent explanation was ever given, and certainly

55

not a written decision.

207.   While a "decision" ostensibly was "made," as evidenced by the twenty-seven tribes being listed as "eligible" in the Updated RFP (as well as the original), NOAA and Defendant Quan never issued a written decision, let alone one that complies with the APA, the Department of Commerce Grants and Cooperative Agreements Manual (*see, e.g.,* § 17(B)(2)(c) ), or federal regulations, including 2 C.F.R. § 200.202(b), which reads:

> Federal agencies should develop programs in consultation with communities benefiting from or impacted by the program. In addition, Federal agencies ***should consider available data, evidence, and evaluation results*** from past programs and ***make every effort to extend eligibility requirements to all potential applicants***. Federal agencies are encouraged to coordinate with other agencies during program planning and design, particularly when the goals and objectives of a program or project align with those of other agencies.

(Emphasis added.)

208.   NOAA and Defendant Quan thus "delayed" and/or "withheld" agency action in the terms of the APA, 5 U.S.C. § 706(1), and the delay was not reasonable nor was the withholding lawful.

209.   Without an articulated decision, it is impossible for the Plaintiff Tribes effectively to rebut whatever reasons might have been stated in such a written decision, but Plaintiff Tribes allege that they cannot fathom a reason that would be lawful or reasonable, either for the delay or the decision itself.

210.   Defendant Quan did state to the Colville Tribes, albeit orally, that there was a concern that adding the Colville Tribes or more tribes would delay the award process.

211.   Any concern about time and timing, if true, cannot form a lawful, reasonable, and non-arbitrary reason for the exclusion of the Plaintiff Tribes. NOAA was more than well aware by the end of 2023 that both Plaintiff Tribes were interested in the Inflation Act tribal hatchery grant funding and of the nature of their hatchery needs.   That was still at least *six months* before the press release announcing the funding.   It was at least *four months* before NOAA concluded the funding agreement with BIA.   And it was more than *two years* before this litigation is being filed, at which point the competitive funding still has not yet been distributed.   Just because a government agency might say the sky is falling does not make it so.

212.   And regardless, if NOAA was in fact concerned about timing, it could have (and should have) issued a written decision to that effect.   It did not.   Not in 2023.   Not in 2024.   And not in 2025.   After almost three years of meetings with, and letters to, numerous Department of Commerce officials from the NOAA Fisheries West Region to high-level Department political appointees in Washington, DC, the Plaintiff Tribes are left with no choice but to litigate.   But in

doing so, the Plaintiff Tribes are left to imagine NOAA's reason for excluding them because of the unlawful, unjust, and unreasonable failure to render a written decision.

213.   Ms. Quan also stated that NOAA had narrowed the list of "eligible" tribes based on which tribes continued to participate in NOAA's consultations.   *See* ¶ 120.   Any argument along those lines is outlandish and circular, at best, given that the Plaintiff Tribes were not given notice of all of the consultations and consistently attended when they did receive notice.

214.   The Plaintiff Tribes were at least entitled to a reasoned (and written) decision.   In the words of the APA, such a decision was "unlawfully withheld or unreasonably delayed."   5 U.S.C. § 706(1).   In the words of the IRA, The Plaintiff Tribes' "privileges. . . available to [each] Indian tribe relative to other federally recognized tribes" were unlawfully "diminishe[d]."

**THIRD CLAIM FOR RELIEF**

**Violation of the Indian Reorganization Act**
**and the Administrative Procedure Act:**
**NOAA's Exclusion of the Plaintiff Tribes from the Group of Tribes "Eligible"**
**to Apply for Inflation Act Tribal Hatchery Grant Funds Was "Arbitrary,**
**Capricious, an Abuse of Discretion, or Otherwise not in Accordance with Law"**

215.   The Plaintiff Tribes incorporate herein by reference the allegations of paragraphs 1 through 214, above.

216.   If, on the other hand, the Court were to conclude that NOAA did in fact make a "decision" to exclude the Plaintiff Tribes from the group of tribes "eligible" to apply for Inflation Act tribal hatchery grant funds (and to receive the $2 million non-competitive grants), that decision violated the APA because it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance of law."

217.   For federal assistance purposes, 2 C.F.R. §200.001 defines an Indian tribe as:

> . . . any Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act (43 U.S.C. Chapter 33), which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians. See 25 U.S.C. 5304(e). This includes any Indian Tribe identified in the annually published Bureau of Indian Affairs list of ''*Indian Entities Recognized and Eligible to Receive Services*'' and other entities that qualify as an Alaska Native village or regional village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act.

218.   Both of the Plaintiff Tribes are on that list and therefore recognized by the United States "as eligible for the special programs and services provided by the United States to Indians *because of their status as Indians.*"   It was arbitrary and capricious for NOAA to exclude the Plaintiff Tribes for the Inflation Act tribal hatchery grant funding opportunity because there was no reasoned basis for doing

so.   Each Plaintiff Tribe is similarly situated to at least one of the other "eligible" tribes in all relevant respects.   "Treaty" or "non-treaty" is not a distinguishing factor, nor is any other factor the Plaintiff Tribes can imagine.   Both Plaintiff Tribes have active Pacific salmon hatcheries that can clearly benefit from grant funds, and in this respect they might be considered as more in need of grant funds than other tribes.   But that is for the application and review process to determine. The Plaintiff Tribes should not have been summarily and arbitrarily excluded.

219.   Accordingly, their exclusion was "not in accordance with law," including specifically the "privileges and immunities" clause in the IRA, 25 U.S.C. § 5123(f).   Any "decision" that NOAA may have made manifestly "diminishe[d] the privileges . . . available to the [Plaintiff Tribes] relative to other federally recognized tribes" regarding funds available specifically and only to Indian tribes. Their exclusion also was at least arbitrary and potentially capricious.

**FOURTH CLAIM FOR RELIEF**

**Violation of the United States' Trust Responsibilities to the Plaintiff Tribes: NOAA's Breach of Trust Through Its Failure to Include the Plaintiff Tribes in the Group of Tribes "Eligible" to Apply for Inflation Act Tribal Hatchery Grant Funds**

220.   The Plaintiff Tribes incorporate herein by reference the allegations of paragraphs 1 through 219, above.

221.   The United States' trust responsibility to Indian tribes has a long and

venerable history in case law.   *See, e.g., Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1 (1831); *Seminole Nation v. United States*, 316 U.S. 286 (1942); *United States v. Mitchell,* 463 U.S. 206 (1983) ("*Mitchell II*"), 463 U.S. 206 (1983); *White Mountain Apache Tribe v. United States*, 537 U.S. 465 (2003).

222.   Congress has continually, and often quite forcefully, confirmed and in fact strengthened and defined the trust responsibility.   *See,* e.g., Indian Self-Determination and Education Assistance Act of 1975, 25 U.S.C. §§ 5301 *et seq.* (for which the "model agreement" Congress provided in §5329(c) states, in part: "Nothing in this Contract may be construed to terminate, waive, modify, or reduce the trust responsibility of the United States to the tribe(s) or individual Indians. The Secretary shall act in good faith in upholding such trust responsibility."); IRA, 25 U.S.C. §§ 5101 *et seq.* (of which § 5123(f), quoted above and relied on herein, is a part); American Indian Trust Fund Management Reform Act of 1994, 25 U.S.C. §§ 4001 *et seq.* (creating the Office of the Special Trustee to better fulfill the United States' trust responsibilities to tribes with respect to funds held in trust by the United States).

223.   The executive branch expressly recognizes this trust responsibility, as it must.   BIA's own website explains the trust responsibility thusly:

> The **federal Indian trust responsibility** is a legal obligation under which the United States "has charged itself with moral obligations of

61

the highest responsibility and trust" toward Indian tribes (*Seminole Nation v. United States*, 1942). This obligation was first discussed by Chief Justice John Marshall in *Cherokee Nation v. Georgia* (1831). Over the years, the trust doctrine has been at the center of numerous other Supreme Court cases, thus making it one of the most important principles in federal Indian law.

The federal Indian trust responsibility is also a legally enforceable fiduciary obligation on the part of the United States to protect tribal treaty rights, lands, assets, and resources, as well as a duty to carry out the mandates of federal law with respect to American Indian and Alaska Native tribes and villages. In several cases discussing the trust responsibility, the Supreme Court has used language suggesting that it entails legal duties, moral obligations, and the fulfillment of understandings and expectations that have arisen over the entire course of the relationship between the United States and the federally recognized tribes.

https://www.bia.gov/faqs/what-federal-indian-trust-responsibility (last visited Jan. 28, 2026).

224. The trust responsibility to the Plaintiff Tribes, and the Defendants' failure to honor that trust responsibility is interwoven throughout the facts, and therefore the law, in this case.

**WHEREFORE**, Plaintiff Tribes respectfully request the Court to award the following relief:

1. To take jurisdiction of this action;

2. To consider in due course any motion(s) the Plaintiff Tribes may find it necessary to file, in short order, should the Defendants not be amenable to resolving

this matter amicably, very promptly, and in a manner that will protect the Plaintiff Tribes from the impending prejudicial obligation of the Inflation Act tribal hatchery grant funds by BIA to other tribes;

3.    To declare that the Plaintiff Tribes were unlawfully and improperly excluded from the group of tribes "eligible" for Inflation Act tribal hatchery grant funding and therefore;

4.    To, if not already provided by preliminary injunctive relief, order Defendants to include the Plaintiff Tribes in the group of tribes "eligible" for Inflation Act tribal hatchery grant funding, specifically by ordering:

a.    that NOAA and BIA treat the Plaintiff Tribes as "eligible" tribes for Inflation Act tribal hatchery grant funding;

b.    that, given that the deadline to apply under the Updated RFP has passed, the Plaintiff Tribes be given until May 15, 2026 to submit their project proposals pursuant to the Updated RFP and that Defendants be given a reasonable, but fixed, time thereafter to evaluate those proposals;

c.    that Plaintiff Tribes, as an equitable matter and stemming from the declaration that they are "eligible" to submit competitive project proposals, are entitled to receive $2 million each, just as the twenty-seven other "eligible" tribes reportedly have already received;

63

d.      that Defendants preserve and maintain $18 million of the Inflation Act tribal hatchery grant funding until the Plaintiff Tribes' three project proposals (with a cap of $6 million each) have been evaluated, and a report of that evaluation has been made to the Court by Defendants;

5.      To immediately order Defendants to preserve *all* records of any kind whatsoever concerning the Inflation Act tribal hatchery grant funds;

6.      To grant Plaintiff Tribes post judgment interest, if any, costs and expenses, and attorney's fees as provided by law.

7.      To grant such other and further relief as the Court deems proper and appropriate.

Dated: February 3, 2026                    Respectfully submitted,

/s Marty Raap
Marty Raap
Managing Attorney
Office of Reservation Attorney
Confederated Tribes of the Colville Reservation
21 Colville St.
Nespelem, WA 99155
telephone: (509) 634-2533
Marty.Raap.ORA@colvilletribes.com

*Attorney for Plaintiff Confederated Tribes of the Colville Reservation*

/s Robbi Kesler
Robbi Kesler
Lead Attorney
Confederated Tribes of the Chehalis Reservation
420 Howanut Rd.
Oakville, WA 98568
telephone: (360) 709-1835
rkesler@chehalistribe.org

*Attorney for Plaintiff Confederated Tribes of the Chehalis Reservation*

Thomas J. Peckham
Nordhaus Law Firm LLC
6739 Academy Rd. NE, Suite 256
Albuquerque, NM   87109
telephone:   505-243-4275
tpeckham@nordhauslaw.com
*Attorney for Plaintiff Tribes (pending Pro Hac Vice Admission by motion to be filed promptly)*

65