# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WASHINGTON

CONFEDERATED TRIBES OF THE )
COLVILLE RESERVATION; )
CONFEDERATED TRIBES OF )
THE CHEHALIS RESERVATION, )
)
    Plaintiffs, )
)
v. )      No. 2:26-cv-00061-RLP
)
NATIONAL OCEANIC AND )
ATMOSPHERIC ADMINISTRATION; )
SECRETARY OF COMMERCE )
HOWARD LUTNICK, in his official )
capacity; JENNIFER QUAN, Regional )
Administrator, NOAA Fisheries West )
Region, in her official capacity; BUREAU )
OF INDIAN AFFAIRS; SECRETARY )
OF  THE INTERIOR DOUGLAS )
BURGUM, in his official capacity, )
)
    Defendants. )
)

## Memorandum in Support of Plaintiff Tribes' Motion for Emergency Temporary Restraining Order, Motion for Temporary Restraining Order, and Motion for Preliminary Injunction

The Confederated Tribes of the Colville Reservation ("Colville Tribes" or "Colville") and the Confederated Tribes of the Chehalis Reservation ("Chehalis Tribe" or "Chehalis", together "Plaintiff Tribes" or "Tribes") have been excluded unlawfully by the federal Defendants from even applying for an "unprecedented" tribal salmon hatchery federal funding opportunity in violation of the Administrative

Procedure Act, the Indian Reorganization Act, the Inflation Reduction Act, the federal trust responsibility to tribes, and common sense.

In the accompanying motions, the Plaintiff Tribes seek narrowly tailored, sequential injunctive and declaratory relief intended to keep the grant process moving for the tribes already deemed "eligible" while reserving enough of the funds so that the Plaintiff Tribes may submit applications and receive funds if the Defendants (with oversight from the Court, if necessary) evaluate their applications favorably. The sequencing is intended to address the imminent issuance of award letters to the twenty-seven pre-selected tribes "no sooner than March 6, 2026," as stated by Defendants' counsel.

## I.    *Factual Background*

The facts are set out in detail in the Complaint, ECF No. 1, but the Plaintiff Tribes here state the facts necessary to decide these motions. Because Defendants never issued any sort of written decision on ***why*** the Plaintiff Tribes were excluded from applying from the federal funding opportunity, Plaintiff Tribes are unable to refute a reasoned decision but instead must posit what facts could be relevant had Defendants fulfilled their responsibility to render a reasoned decision.

### A. The NOAA Tribal Hatchery Grant Funds

The grant funding at issue originally consisted of $240 million set aside by NOAA from the Act of Congress known as the Inflation Reduction Act ("Inflation

Act"), 136 Stat. 1818, Pub. L. 117-69 (Aug 16, 2022). *See* "Commerce and Interior Departments Announce $240 Million from President Biden's Investing in America Agenda for Fish Hatcheries to Support Pacific Northwest Tribes," (July 25, 2024)("7/25/24 Grant Announcement").[1]   Section 40001 of the Inflation Act allocated $2.6 billion to NOAA for "the conservation, restoration, and protection of coastal and marine habitats, resources, Pacific salmon and other marine fisheries, . . ." so NOAA's allocation of $240 million to ***tribal*** Pacific salmon hatcheries for competitive and non-competitive grants is less than ten percent of that total.[2]   That $240 million amount, minus the $2 million non-competitive grants already given to each of the pre-selected twenty-seven Indian tribes, or $54 million (*see* 7/25/24 Grant Announcement), is referred to herein as the "Inflation Act tribal

---

[1] Available at https://www.commerce.gov/news/press-releases/2024/07/commerce-and-interior-departments-announce-240-million-president-bidens (last visited March 2, 2026).

[2] Occasionally in the filings, and also in the exhibits, the Court will see references to "Mitchell Act tribes," which refers to the Mitchell Act of 1938, a 1938 federal statute not relevant here.  For different and complex reasons, neither of the Plaintiff Tribes is considered a "Mitchell Act tribe," and neither is contesting in this action its (in)eligibility for a portion of the separate $60 million in Inflation Act funds allocated solely to "Mitchell Act tribes." *Cf.* Biden-Harris Administration announces $60 million to advance tribal priorities and address climate change impacts on Pacific salmon and steelhead in the Columbia River, available at: https://www.noaa.gov/news-release/biden-harris-administration-announces-60-million-to-advance-tribal-priorities-and-address-climate, March 22, 2024 (last visited March 2, 2026).

hatchery grant funding" or variants thereof.[3]

In April 2024, Defendant NOAA entered into an agreement ("Interagency Agreement") with the Defendant Bureau of Indian Affairs ("BIA"), whereby BIA would hold the grant funds, evaluate grant applications, and distribute the grant funds to tribes awarded grants, including the initial non-competitive grants already provided to the twenty-seven tribes already deemed "eligible." Kesler Decl., Ex. 5-D.[4] Plaintiff Tribes have not seen this agreement.

On information and belief based on the extensive factual recitation herein, the list of twenty-seven tribes "eligible" to apply for grant funds was developed and fixed exclusively by NOAA. Defendant Quan *repeatedly* called the funding opportunity "unprecedented." McMahan Decl., Ex. 6-B-1 at 6:8, and 6-B-2 at 3:25, 6-B-3 at 5:15.[5] The Plaintiff Tribes were left off the list of "eligible" tribes without

---

[3] BIA announced that only $184 million is available for the competitive grants to tribes. Obviously, $240 million minus $54 million does not equal $184 million (but rather $186 million). Regardless, Plaintiff Tribes ask that $22 million be preserved to allow for consideration and funding of their applications.

[4] The Plaintiff Tribes attach six declarations, three from each Tribe. They are labeled Exhibits 1-6, alphabetically by last name. Attachments to those declarations are labeled with capital letters. Attachments to attachments are labeled with Arabic numerals. Accordingly, Ex. 5-D refers to attachment D to Exhibit 5, the Declaration of Robbi Kesler. The Plaintiff Tribes also attach to affidavits (Exhibits 7-8) to address any concerns that might be raised under Fed.R.Civ.P. 65 regarding immediate and irreparable harm.

[5] At the first tribal engagement session either Plaintiff Tribe (and only Colville) was made aware of, Defendant Quan said:

any sound basis or explanation, as is shown below and going forward.

**B. The Tribes and Their Hatcheries**

While the Plaintiff Tribes will not belabor the centuries of maltreatment by the United States of tribes generally or the Plaintiff Tribes specifically, it is important to understand a little of that history as it relates to the NOAA tribal hatchery funding grants. Some of that maltreatment relates to the creation of the hydrosystem in the Pacific Northwest, which supplies a substantial amount of power to the non-Indian infrastructure that makes modern life possible. The system of hydroelectric dams did unconscionable damage to tribes and their way of life, including by decimating fish populations, including salmon and steelhead. Brushwood Decl., Ex. 1 at ¶ 7. Today, various federal laws create obligations on the part of the United States to mitigate these effects, including, among others, the Endangered Species Act and the Northwest Power Act.[6] Brushwood Decl., Ex. 1 at ¶ 6. And tribes play a crucial

---

> I am just super excited about this unprecedented funding level for tribal hatcheries. I think we all can recognize that we haven't seen this kind of federal funding go into hatchery systems, and specifically as a commitment to support federally-reserve[d] fishing rights ***and*** treaty rights before.

Ex. 6-B-2 at 3:8-13 (emphasis added). Given the level of funding provided by the Inflation Reduction Act in 2022, a $240 million fund for tribal hatcheries may not only be "unprecedented," it may also be unique going forward.

[6] Under the statutory scheme, the dams in the hydrosystem are generally owned and operated by the Army Corps of Engineers and/or the Bureau of Reclamation, but

role in mitigation efforts, as underfunded and inadequate as they may be.

With respect to the Colville Tribes specifically, both the Grand Coulee and Chief Joseph dams are at least partially on tribal land, and their construction flooded and displaced entire villages. Brushwood Decl., Ex. 1 at ¶ 7. Congress planned for the construction of four fish hatcheries to mitigate the damage done to fish populations by the Grand Coulee Dam, but only three were built initially. *Id.* at ¶ 8. Today, the Colville Tribes owns and operates the fourth hatchery, the Chief Joseph Hatchery, an on-Reservation salmon hatchery facility located near Bridgeport, Washington that produces Chinook salmon for conservation, harvest, and reintroduction purposes. Brushwood Decl., Ex. 1 at ¶¶ 4, 8-9. Congress specifically authorized the construction of the Chief Joseph Hatchery in 2007, and Colville completed construction of the hatchery in May 2013 with funding from the Bonneville Power Administration ("BPA") and the involvement of the U.S. Army Corps of Engineers. *See* Pub. L. 110-161 (Dec. 26, 2007), 121 Stat. 1964. The

---

Congress designed the statutory structure so that the Bonneville Power Authority ("BPA"), also a federal instrumentality, would bear the costs of some mitigation efforts (because BPA is the one of the three federal agencies that actually sells electricity to power distributors and therefore generates revenue).

It is important to understand that BPA is not a benevolent benefactor when it comes to paying for tribal fish-related projects, it is part of a congressionally-designed federal structure that owes duties to the public, to the tribes, (and to the fish). NOAA's allocation of a small fraction of the Section 40001 Inflation Act funds to tribal needs is therefore not an act of beneficence, it is part of a much larger context of environmental, moral, and legal trust responsibilities to Northwest tribes, Chehalis and Colville no less than the others and arguably more.

Corps' involvement included Hatchery permitting, engineering design review, and construction oversight. Brushwood Decl., Ex. 1 at ¶ 5. The Chief Joseph Hatchery was built, at least in part, to fulfill the United States' commitment to build that fourth hatchery (albeit some 75 years after the dam was built). *Id.* at ¶ 8 and Ex. 1- A.

### C. NOAA's "Consultation" with Tribes.

It is beyond dispute that Plaintiff Tribes are federally recognized Indian tribes which own and operate hatcheries that benefit Pacific Salmon. As best as the Plaintiff Tribes can discern, NOAA held numerous "general" tribal engagement sessions. Of those, Colville was proactively notified by NOAA only once (regarding the June 21-23, 2023 session). Brushwood Decl., Ex. 1 at ¶¶ 12, 16-17. NOAA did email Charissa Eichman from Colville several days before a December 4, 2023 meeting in Seattle, but ***only after*** Ms. Eichman heard about the meeting from a third party and contacted NOAA first. Eichman Decl., Ex. 4 at ¶¶ 11-13. Chehalis was notified by NOAA only twice. *See* Ex. 6 at ¶¶ 1,6.

In contrast to the continual (albeit not complete) failure by NOAA to involve the Plaintiff Tribes, compare NOAA's affirmative and apparently unsolicited effort to reach out to the Metlakatla Indian Community, Annette Island Reserve ("Metlakatla") in Alaska. Kesler Decl., Ex. 5-B. NOAA deemed Metlakatla "eligible" for the Inflation Act tribal hatchery grant funding. Ex. 3-F at 4-5.

Based on the contacts that the Plaintiff Tribes did have with NOAA,

representatives of each believed that the Tribes were going to be deemed "eligible" to apply. After attending a NOAA session on October 11, 2023, and then having a separate phone conversation with Lelana Amiotte of NOAA the same day, Jesse McMahan, Chehalis' Hatchery Supervisor, concluded that NOAA had told him that "we qualified for the non[-]Mitchell act funding as federally recognized tribe, and at no point were we notified that we were not eligible." McMahan Decl., Ex. 6-F. Similarly, Charissa Eichman of Colville "was left with the impression that the Colville Tribes would be eligible to apply for IRA funding opportunity." Eichman Decl., Ex. 4 at ¶ 14.

**D. NOAA and BIA's Application Process, and the Plaintiff Tribes' Ardent Efforts to Be Included.**

Neither NOAA nor BIA solicited or allowed an application from either of the Plaintiff Tribes with its first RFP.[7] Presumably consistent with the Interagency Agreement, BIA issued the first RFP and became responsible for distributing the funds to tribes under what are called "638 contracts" and "638 compacts".[8] Both

---

[7] The first RFP, after some investigation, is on BIA's website, available at: https://www.bia.gov/sites/default/files/media_document/noaa_competitive_rfp.pdf (last visited March 2, 2026), had an application deadline of April 7, 2025. The Plaintiff Tribes do not know when it was sent to the twenty-seven "pre-selected" tribes listed on that RFP, but one would expect at least a couple months' notice.

[8] *See* April 3, 2024 Amiotte (NOAA) email attached to Kesler Decl., Ex. 5-D. "638" refers to Pub. L. 93-638, the Indian Self-Determination and Education Assistance Act, now codified at 25 U.S.C. §§ 5301 *et seq.* In simple terms, the act allows tribes to contract with the federal government to provide certain services

Plaintiff Tribes have such contracts, and both have received hatchery maintenance funds from BIA. *See, e.g.,* Connelly Decl., Ex. 2 at ¶ 4. In addition, the Colville Tribes has an Integrated Resource Management Plan, which includes the Chief Joseph Hatchery and which was approved by the BIA by Record of Decision.[9] (Those facts are significant because the Plaintiff Tribes' are similarly situated to the twenty-seven "eligible" tribes because the same funding mechanism could be used if the Plaintiff Tribes to receive hatchery grants and because they further show the United States' trust relationship to the hatcheries specifically and the Plaintiff Tribes generally.)

In March or April, 2024, both Plaintiff Tribes separately learned that they had in fact been excluded from the tribes "eligible" to apply for the Inflation Act tribal hatchery grant funds. Desautel Decl., Ex. 3 at ¶¶ 6-8. Defendant Quan notified Colville that she had "bad news" for the Tribe. *Id.* Chehalis apparently learned from another tribe that it had been excluded, not from NOAA. Kesler Decl., Ex. 5 at ¶ 6.

In an attempt to ascertain the rationale for their exclusion, the Plaintiff Tribes then reached out to members of Congress. Connelly Decl., Ex. 2 at ¶ 8; Desautel Decl., Ex. 3 at ¶¶ 10-11, 14-15. One of the offices that Colville met with during this

---

otherwise provided by the federal government. As a result, the act creates a direct conduit for funding between BIA and contracting and compacting tribes.

[9] Relevant documents can be found at: https://www.colvilletribes.com/irmp/ (last visited March 2, 2026).

time was the office of Senator Maria Cantwell, who the Colville Tribes understood was primarily responsible for securing the Inflation Act grant funds in the U.S. Senate by virtue of her position as Chair of the Senate Commerce Committee. Upon information and belief, from April through September 2024, Senator Cantwell's office engaged with NOAA in an attempt to discern any rationale for NOAA's decision to pre-select the twenty-seven tribes and to exclude the Plaintiff Tribes. *Id.,* Ex. 3 at ¶¶ 10-11, 14-15.

Apparently in response to Senator Cantwell's interest, Defendant Quan and then-Assistant Administrator of NOAA Fisheries Janet Coit visited the hatcheries at both Plaintiff Tribal reservations in September 2024. *See, e.g.,* Desautel Decl., Ex. 3 at ¶¶ 17-20; Connelly Decl., Ex. 2 at ¶¶ 9-13. Although NOAA expressed "regret" that Chehalis was excluded from the grant opportunity, Connelly Decl., Ex. 2 at ¶ 13, those site visits did not result in an invitation to apply for either Tribe. Colville started considering litigation, but plans were put on hold when it appeared that there might be a change in the federal administration and that the new Administration might try to claw back or otherwise repurpose the Inflation Act tribal hatchery grant funds. Desautel Decl., Ex. 3 at ¶ 21.

Also following the "bad news" in the spring of 2024 that the Plaintiff Tribes would not be deemed "eligible" by NOAA, Chehalis submitted a FOIA request to NOAA on June 11, 2024. Kesler Decl., Ex. 5-A. NOAA responded, Kesler Decl.,

Ex. 3 at ¶ 4, with an obviously underinclusive production.

In late summer 2025, the Plaintiff Tribes learned the Inflation Act tribal hatchery grant funds would not be rescinded or repurposed that the grants were likely (finally) to move forward.  In August 2025, the two Plaintiff Tribal Chairmen sent a joint letter to the political leadership at NOAA Fisheries and Indian Affairs at the Department of the Interior to yet again try to have the Tribes deemed "eligible".  Desautel Decl., Ex. 3-C.  After meetings in D.C. at the highest levels of NOAA and the BIA on September 17, 2025, *Id.*, Ex. 3 at ¶ 23, and after the government shut down last fall, the Chairmen sent a follow-up letter.  *Id.,* Ex. 3-D.  They received no response for many months, in fact until after this litigation was filed. *Id.,* Ex. 3-H.

Despite all of those efforts, when BIA issued the Updated RFP on or about November 18, 2025, only the original twenty-seven tribes were deemed "eligible".  Desautel Decl.*,* Exs. 3-E and 3-F.  In fact, Chairman Erickson of the Colville Tribes had to reach out to BIA to even receive a copy of the Updated RFP and accompanying Dear Tribal Leader letter, and that was some two weeks later.  *Id.*, Ex. 3 at ¶ 27.  Applications, *re*applications, or confirmations of application(s) under the first RFP were due December 18, 2025, after which BIA wrote, "After the closing date the eligible applications will undergo a technical review and ranking process to determine how well they meet the priorities and evaluation criteria." *Id.,* 3-E at 1.  On information and belief based on discussions with Defendants' counsel, that

review process is well underway and funding decisions are imminent, and accordingly the Plaintiff Tribes seek preliminary equitable relief to preserve (partially) the status quo until Plaintiffs can be declared "eligible" and their applications evaluated.

## II.    *A Summary of the Requested Sequencing of Equitable Relief*

Plaintiff Tribes find themselves in something of a quandary. BIA will make funding decisions soon, apparently within the next week or two, but Defendants have been unwilling to agree to withhold a small fraction of the funds available or allow Plaintiff Tribes to apply for funding now that this litigation is pending.

By motion, therefore, the Plaintiff Tribes seek 1) an emergency TRO that would only enjoin Defendants from issuing award letters to the twenty-seven tribes totaling more than $162 million until a hearing(s) before this Court can be held, 2) a TRO (if necessary) that would continue to enjoin from awarding $22 million of the $184 million only until the Court rules on the preliminary injunction, and 3) a preliminary injunction continuing the reservation of $22 million and containing a declaration that the Plaintiff Tribes are eligible to apply (and therefore that each is eligible to receive a $2 million non-competitive grant like the other tribes), and outlining the "rules" and timing for those applications and their evaluation by BIA.

## III.   *Legal Standard*

This Court observed in *Hernandez v. Lyons,* 2025 U.S. Dist. LEXIS 109160;

2025 LX 114108; 2025 WL 1640719, "The standard for issuing a temporary restraining order is the same as the standard for issuing a preliminary injunction," and set forth the legal standard for both:

> The proper legal standard for preliminary injunctive relief requires a party to demonstrate: (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20). These four factors apply whenever a preliminary injunction is sought. *Winter, 555* U.S. at 20; *see All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) ("a showing on all four prongs" is required).

*Id.* at *4.

## IV.    Argument

The Plaintiff Tribes address each of the factors in turn and assert that all four strongly support a grant of the sequential injunctive and declaratory relief sought.

### A. Likelihood of Success on the Merits

For a host of reasons, the Plaintiff Tribes are very likely to succeed on the merits.   The Defendants have ignored the fundamental tenets of the APA by engaging in a process that is the antithesis of fair and reasoned decision-making. They have treated the Plaintiff Tribes differently than similarly situated tribes, in violation of the Indian Reorganization Act, 25 U.S.C. § 5123(f).

Compelling evidence of these abject failures is found in Defendants' own document and the Inflation Reduction Act itself.   In June 2023, NOAA wrote:

"Tribal governments, as defined by the statute, are eligible for IRA funding." Tribal Input on Inflation Reduction Act: NOAA Executive Summary and Response, June 5, 2023 ("NOAA Executive Summary").[10]

In turn, Section 40001(b) of the Inflation Act specifically defined a "Tribal Government":

> (b)     TRIBAL GOVERNMENT DEFINED.—In this section, the term ''Tribal Government'' means the recognized governing body of any Indian or Alaska Native tribe, band, nation, pueblo, village, community, component band, or component reservation, individually identified (including parenthetically) in the list published most recently as of the date of enactment of this subsection pursuant to section 104 of the Federally Recognized Indian Tribe List Act of 1994 (25 U.S.C. 5131).

Both of the Plaintiff Tribes are "tribal governments" under the Inflation Act because they were on the BIA's "most recent" list at the time the Inflation Act was enacted. (*See* 87 Fed. Reg. 4636, 4637 (Jan. 28, 2022).[11] To the Tribes' knowledge, there are no other federally recognized Indian tribes in NOAA's Northwest Region, not already on NOAA's list of twenty-seven tribes, that both

---

[10] Available at: https://www.noaa.gov/sites/default/files/2023-06/IRA_Tribal_NOAA_Executive_Summary_and_Response_060523_508_0.pdf (last visited March 2, 2026)

[11] Plaintiff Tribes mistakenly referred to the most recent version of the recognized tribes list, 91 Fed. Reg. 4102, Jan. 30, 2026, in their Complaint, ECF No. 1 at ¶ 196, rather than the 2022 version. Their federal recognition never having been disputed by the United States, the Plaintiff Tribes are each on both lists. It does not seem worth amending the Complaint to correct such an error, but if Defendants at any point allege that that error by counsel is material, Plaintiff Tribes will of course seek leave to amend.

have adjudicated federally reserved fishing rights and own and/or operate a Pacific salmon hatchery.  (In fact, on information and belief, a substantial portion of the twenty-seven pre-selected tribes do not own and/or operate a hatchery.)

That should be the end of the inquiry.  Despite the statute's unmistakable definition and NOAA's own statement in 2023, NOAA somehow deemed the Plaintiff Tribes **not** "eligible" despite indisputably being "tribal governments as defined by the statute."  Especially in view of this admission by NOAA, excluding the Plaintiff Tribes was the epitome of a process that was "arbitrary, capricious, and not in accordance with law," the APA standard.  *See* 5 U.S.C. § 706(2)(A).

The NOAA Executive Summary describes a March 1, 2023, letter to "federally recognized tribes . . . to provide verbal input at two sessions in March 2023 and written input during a 30-day comment period." NOAA Executive Summary at 3.  On information and belief, neither of the Plaintiff Tribes received that letter, so neither was able to participate.  The failure to include the two Plaintiff Tribes was continual from that point forward.  *See supra* 7-8.  Nevertheless, the Plaintiff Tribes diligently participated in any NOAA tribal meetings they were made aware of, *see, e.g.,* Brushwood Decl., Ex. 1 at ¶¶ 16-17, and even ultimately pursued the issue with the Washington congressional delegation and at the highest level of NOAA Fisheries and the BIA.

Along the way, they were misled by Defendants, whether or not

intentionally.  Regarding a telephone conversation on October 11, 2023 between

NOAA Fisheries' West Coast Region Tribal Coordinator Lelana Amiotte and Jesse

McMahan, Chehalis' Tribal Hatchery Supervisor, Mr. McMahan states:

> I then plainly asked her if [the Chehalis Tribe] qualified for funding and she
> said that since we are a federally recognized tribe there was no reason we
> should not be eligible funding.

McMahan Decl., Ex. 6 at ¶ 5.  Similarly, Charissa Eichman, a natural resources

attorney for the Colville Tribes, emerged from a December 2023 NOAA tribal

engagement session in Seattle "with the impression that the Colville Tribes would

be eligible to apply for IRA funding opportunity."  Eichman Decl., Ex. 4 at ¶ 14.

Despite all of their efforts, neither NOAA (nor BIA) ever issued a written

decision explaining why the Plaintiff Tribes have been excluded.  *See* 5 U.S.C.

§ 706(1)(a reviewing court "compel agency action unlawfully withheld or

unreasonably delayed.")  When congressional offices questioned NOAA about the

tribes' exclusion, NOAA's explanation "shifted multiple times and NOAA could

not articulate a reasoned basis" for the two tribes' exclusion.  Desautel Decl., Ex.

3-C at 3.

The Plaintiff Tribes have difficulty envisioning what rationale – likely *post*

*hoc* – Defendants may advance to explain their exclusion of the Plaintiff Tribes,

both from eligibility and from much of the consultation, but any rationale cannot

remedy the APA violations or the violation of the Plaintiff Tribes' privileges and

immunities.  25 U.S.C. § 5123(f), often referred to as the "Privileges and Immunities" clause of the Indian Reorganization Act, provides, in pertinent part, that:

> Departments or agencies of the United States shall not … make any decision or determination pursuant to … any … Act of Congress, with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.

In perhaps the most thorough treatment of that provision, the District Court for the District of Columbia held that the Koi Nation, a federally recognized tribe, was similarly situated to other tribes under § 5123(f) and the Indian Gaming Regulatory Act. *Koi Nation of N. Cal. v. United States DOI*, 361 F. Supp. 3d 14, 52 (D.D.C. 2019).  In reaching that conclusion, the Court held that "§ 5123(f) [is] applicable to 'any' agency regulation or decision, pursuant to the IRA or 'any other Act of Congress,' and without limiting the 'privileges and immunities' protection to particular powers of self-governance as the defendants urge," and it noted, "The defendants do not dispute that § 5123(f) prohibits disparate treatment between similarly situated recognized tribes." *Id.* at 52, 54.

Of course, in this context, "any other Act of Congress" includes not only the Inflation Act's definition of a "Tribal Government" (quoted above) but also the APA and arguably the network of statutes and regulations governing power generation in the Northwest and mitigation of its environmental effects, not to

mention the federal trust responsibility to tribes that underlies all.

Moreover, each of the Plaintiff Tribes is similarly situated to one or more of the "eligible" tribes. Again, without a written decision, the Plaintiff Tribes cannot refute any reasoned agency position that might assert the contrary. Having left the Plaintiff Tribes to tilt at windmills, the Defendants cannot argue (at least for purposes of temporary injunctive relief) that there is some distinguishing factor.

"Under the APA, an agency must give adequate reasons for its decision . . .." *City of L.A. v. Barr*, 929 F.3d 1163, 1182 (9th Cir. 2019). Defendants have given *no* written reasons for their decision to exclude the Plaintiff Tribes from even applying for funding. To the extent oral reasons were given, primarily by Defendant Quan, they were inconsistent and irrational. For example, she told Colville Executive Director Desautel that NOAA only included tribes that participated throughout the tribal engagement sessions. Desautel Decl., Ex. 3 at ¶ 19. But that is nonsensical because the Plaintiff Tribes attended the sessions to which they were invited. In other words, Defendant Quan admitted that NOAA unilaterally narrowed the scope of agency's record when she said that while NOAA publicly announced a consultation with a larger group of tribes, as discussions evolved, those consultations narrowed to a smaller group of tribes. *Id*. It is perhaps not surprising, then, when the Colville Chairman asked Defendant Quan if there would be a written determination from NOAA for why the eligibility

was limited to the pre-selected tribes, Defendant Quan responded "no." *Id*. at ¶ 7.

Under the APA, this pattern of favoring one group of tribes over another (the Plaintiff Tribes) is either facially arbitrary and capricious (if the Court concludes that there was a "decision") or it was agency action "unlawfully withheld or unreasonably delayed" under 5 U.S.C. § 706(1)(if the Court concludes that the Defendants' *fait accompli* selection of twenty-seven tribes was not a "decision").

In light of § 5123(f), coupled with the APA violation(s), Plaintiff Tribes are highly likely to succeed on the merits, and all-but-certain to succeed based on what is known without a reasoned decision to which to respond.

**B. Irreparable Harm**

The Plaintiff Tribes, and Pacific salmon, will suffer all-but-certain irreparable harm if the "unprecedented" Inflation Act tribal hatchery grant funds are distributed to other tribes without the Plaintiff Tribes even being able to apply. The Plaintiff Tribes will also be immediately and irreparably harmed if the Defendants are allowed to take the next step – the issuance of award letters to other tribes – which the Plaintiff Tribes understand from Defendants' counsel will happen as soon as March 6, 2026. Desautel Aff., Ex. 7 at ¶ 71; Connelly Aff., Ex. 8 at ¶ 9. In short, immediate and intermediate preliminary relief is necessary to first protect $22 million in funding until the Court can consider a preliminary injunction declaring the Plaintiff Tribes "eligible" to apply and prescribing the contours of the

application and evaluation process.  It may well be that this case is effectively

resolved at the preliminary injunctive relief stage because there simply may not be

time for it to proceed to a final judgment even if the Court were to accelerate the

schedule for this litigation at a lightning pace.    Assuming the Plaintiff Tribes'

applications are meritorious, and the projected increase in salmon production

suggests they are, Complaint, ECF No. 1 at ¶¶ 151-185, Pacific salmon production

will be diminished, and that shortfall can never be recovered.[12]  The Tribes will

also be harmed, as, for example, Tribal members cannot catch fish that are not

there.

One unfortunately can imagine Defendants arguing to the contrary, however.

Defendants might, for example, assert that money damages are adequate.  They

would be wrong.[13]  The remedy sought – being ***allowed*** to apply – is equitable in

_____

[12] This case is ***not*** primarily about money.  All the Plaintiff Tribes want is to be able to submit their proposals and for them to be compared fairly with those of the other tribes.  If the Plaintiff Tribes are successful, Pacific salmon and the public at large are the primary beneficiaries.  Benefits to the Plaintiff Tribes are real, but secondary.  It is not as though a successful result in this litigation will line the pockets of Tribal leaders or members.  It will result in modernization of the Plaintiff Tribes' hatcheries.

[13] The Plaintiff Tribes did file a prophylactic action in the United States Court of Federal Claims (Case No. 26-cv-00151) to avoid the subject matter jurisdiction pitfalls of 28 U.S.C. § 1500, but Plaintiff Tribes have filed a motion to stay that action pending progress, and hopefully resolution, in this case.

Ironically, if the Defendants were to distribute the funds to other tribes and if the Plaintiff Tribes had to resort to and were successful in the Court of Federal Claims, it would do irreparable damage to the United States to the tune of $22

nature, and the agency support available to successful grantees could well be invaluable, and that is not money either.

In short, while Plaintiff Tribes cannot state with absolute certainty that irreparable harm will result if preliminary injunctive relief (presumably starting with an emergency TRO followed by a TRO if necessary) is not granted, many things would have to go absolutely right for irreparable harm *not* to result. This factor clearly weighs in favor of a TRO and then a preliminary injunction.

### C. Balance of Equities

The equities overwhelmingly weigh on the side of granting preliminary injunctive relief. Assuming the Plaintiff Tribes' projects are in fact worthy of funding relative to the other tribal projects, not funding the Plaintiff Tribes' projects would harm the Tribes, the environment, sports fishermen, and the public generally. And it would be an injustice – to the Plaintiff Tribes, to the intent of Congress, to the trust responsibility, to § 5123(f), and to exercise of reasoned decision-making.

In contrast, the Defendants have nothing to lose if injunctive relief is granted. They promptly will be able to send award letters to the twenty-seven

---

million. Presumably, damages would come out of the Judgment Fund, at the cost of the American taxpayer. That result frankly seems ludicrous given the massive infusion of funds, including the Inflation Act tribal hatchery funds, provided by the Inflation Act.

"eligible" tribes allocating $162 million and begin working on agreements that will

obligate those funds.  Prior to the commencement of this litigation and on

information and belief, the BIA was informed of the Tribes' plan to file (this) suit

and to seek injunctive relief to hold back a small portion of the $184 million from

immediate awards.  Implicit is the understanding that if any money is left over

from the amount held back, the BIA could readily modify any grant agreements

that had been entered into with the 27 tribes to upwardly adjust the award amount.

Desautel Aff., Ex. 7 at ¶¶ 9-11; Connelly Aff., Ex. 8 at ¶¶ 11-13. At the time and

on information and belief, the BIA did not express concerns or reservations that

this plan would be unworkable from the agencies' perspective.  While there may

be a political or other reason that NOAA excluded the Plaintiff Tribes, any such

reason Defendants might advance here cannot affect the weighing of the equities

by this Court.  Unfortunately, in analyzing the Defendants' course of behavior in

the face of the Tribes' consistent and vigorous advocacy that they be deemed

"eligible" suggests that the Defendants "need" a court to order their inclusion to

provide the Defendants "cover" for whatever caused their very odd behavior in the

first instance.[14]

---

[14] So that the Court can understand how surreal this situation is, on information and belief, a representative of one of the "27 tribes" told NOAA after the Complaint was filed that NOAA should just deem the Plaintiff Tribes "eligible" to keep the grant process moving.  As should be apparent from the limited equitable relief sought by the Plaintiff Tribes, it is not the Plaintiffs' intent to slow down the

In short, it is hard to imagine what equities Defendant might possibly advance, but this factor intrinsically and strongly weighs in favor of preliminary relief for the Plaintiff Tribes.[15]

**D. Public Interest**

The public interest also weighs in favor of preliminary equitable relief. This is the public's money, literally, and the public has an interest in the funds being spent on the best tribal hatchery projects available. If Plaintiff Tribes' projects are worthy of awards, which the Plaintiff Tribes are confident they are, then the public has a strong interest in their completion. For example, one of the projects the Colville Tribes seeks to apply for would, if funded, add a third water source to the Chief Joseph Hatchery, which would add 900,000 more juvenile salmon per year

---

distribution of some 90 percent of the grant funds, but it is understandable that other tribes might fear that **any** litigation, no matter how focused, **might** affect how the Defendants proceed.

[15] There is one other layer in this case that may obviate entirely the need to balance the equities. In *San Luis Obispo Coastkeeper v. City of San Luis Obispo*, 161 F.4th 590, 593 (9th Cir. 2025), the Ninth Circuit stated that, because of the importance Congress placed on endangered species, "This court, therefore, does not consider the balance of equities and the public interest when deciding whether to issue preliminary injunctions under the ESA." Spring-run Chinook salmon are endangered in the Upper Columbia River and NOAA acknowledges the role the Chief Joseph Hatchery plays in their recovery. *See* Endangered Species Conservation: Upper Columbia River Spring-Run Chinook Salmon, https://www.fisheries.noaa.gov/west-coast/endangered-species-conservation/upper-columbia-river-spring-run-chinook-salmon (last visited March 2, 2026).

into the Columbia River system. Desautel Decl., Ex. 3-D at 1. But preliminary

relief from this Court is the only way that NOAA or the Plaintiff Tribes or the

public can know how the Plaintiff Tribes' projects stack up against those of the

other tribes already deemed "eligible."

The public also has a strong interest in the fair and equitable execution of

federal law.  If, as the Plaintiff Tribes' assert, the Defendants have contorted this

grant process unlawfully, then the public has an interest in righting that wrong.

The Plaintiff Tribes simply cannot imagine what credible assertion Defendants

might advance on this point – one would hope it would not be something vague

about amorphous and unconstrained agency discretion.  (And again, the rule

reiterated in *San Luis Obispo Coastkeeper*, *supra* at fn. 15, means that the Court

should consider this factor already satisfied.)

Either way, Plaintiff Tribes assert that the public interest strongly favors the

Court's granting preliminary equitable relief in this case.

### V.    Conclusion

The Plaintiff Tribes have done everything they could to avoid litigation and

obviate the need for preliminary equitable relief, but efforts with Defendants were

unsuccessful in that regard, over years and in the past weeks.  In that vein, the

Plaintiff Tribes have made every attempt to request preliminary relief that will

minimize the effects on the pre-selected tribes and their pending applications while

also protecting the rights of the Plaintiff Tribes (and Pacific salmon). While the Plaintiff Tribes sincerely wish it were unnecessary, they respectfully request that the Court grant an emergency temporary restraining order (if necessary), a temporary restraining order, and a preliminary injunction, each as requested in the accompanying motions.

Dated: March 2, 2026

Attested and respectfully submitted,

/s Thomas J. Peckham
Thomas J. Peckham
Nordhaus Law Firm LLC
6739 Academy Rd. NE, Ste. 256
Albuquerque, NM 87109
(505) 243-4275
tpeckham@nordhauslaw.com
*Counsel for the Plaintiff Tribes*
*(admitted pro hac vice)*


And signed by local counsel as required by local rule:

| | |
|---|---|
| /s Robbi Kesler | /s Marty Raap |
| Robbi Kesler | Marty Raap |
| Lead Attorney | Managing Attorney |
| Confederated Tribes | Office of Reservation Attorney |
|  of the Chehalis Reservation | Confederated Tribes |
| 420 Howanut Rd. |  of the Colville Reservation |
| Oakville, WA 98568 | 21 Colville St. |
| telephone: (360) 709-1835 | Nespelem, WA 99155 |
| *Counsel for the Confederated* | (509) 634-2381 |
|   *Tribes of the Chehalis Reservation* | *Counsel for the Confederated* |
| |   *Tribes of the Colville Reservation* |

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on March 2, 2026, Plaintiff's counsel electronically filed the

3

foregoing memorandum with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all

4

parties in the case who are registered users of the CM/ECF system. The NEF for the foregoing specifically identifies recipients of electronic notice.

5

I hereby certify that I have mailed by United States Postal Service the document

6

and the related proposed order to the following non-CM/ECF participants:

7

None:  All Defendants are now represented by a registered CM/ECF user

8

9

  /s Thomas J. Peckham
Thomas J. Peckham

10

11

12

13

14

15

16

17

18

19

20

21