EXHIBIT 1 - Brushwood Declaration

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| CONFEDERATED TRIBES OF THE COLVILLE RESERVATION; CONFEDERATED TRIBES OF THE CHEHALIS RESERVATION,<br><br>Plaintiffs,<br>v.<br><br>NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; SECRETARY OF COMMERCE HOWARD LUTNICK, in his official capacity; JENNIFER QUAN, Regional Administrator, NOAA Fisheries West Region, in her official capacity; BUREAU OF INDIAN AFFAIRS; SECRETARY OF THE INTERIOR DOUGLAS BURGUM, in his official capacity.<br><br>Defendants. | No. 2:26-cv-00061-RLP |

**Declaration of Charles T. Brushwood**

I, Charles T. Brushwood, declare under penalty of perjury that the following facts and observations, except where noted to be based on reasoned information and belief, are true and correct:

1. I serve as a Senior Policy Advisor/Policy Division Manager for the Fish and Wildlife Program of the Confederated Tribes of the Colville Reservation ("Colville Tribes" or "Colville"). In that role, I advise the Program Director and key staff on fish and wildlife policy, funding, and program implementation, including hatchery operations and salmon recovery efforts.

2. I began working for the Colville Tribes as a Fish and Wildlife Policy Analyst in May of 2009. In that role my responsibilities included, among other things, assisting with regulatory compliance and permitting for the Chief Joseph Hatchery Program, specifically including water rights permitting.

3. In my position, I routinely interact with federal agencies, including NOAA Fisheries ("NOAA"), on issues relating to Columbia Basin salmon management, hatcheries, and tribal rights and interests.

4. The Colville Tribes owns and operates the Chief Joseph Hatchery, a salmon hatchery facility located near Bridgeport, Washington that has produced millions of Chinook salmon for conservation, harvest, and reintroduction purposes.

5. Colville completed construction of the Chief Joseph Hatchery in May 2013 with funding from the Bonneville Power Administration (BPA) and the involvement of the U.S. Army Corps of Engineers (Corps). The Corps'

involvement included Hatchery permitting, engineering design review, and construction oversight.

6.  The Corps and the U.S. Bureau of Reclamation own and operate the federal Columbia River System, including Columbia River mainstem hydropower dams, and BPA markets and transmits the power produced therefrom. All three federal agencies have legal mitigation obligations arising from the federal Endangered Species Act, and BPA has unique fish and wildlife mitigation and funding obligations arising from the Northwest Power Act.

7.  The two hydropower facilities in the Columbia River System, Grand Coulee and Chief Joseph Dams, are partially constructed on the Colville Indian Reservation, inundating Reservation land and communities and completely blocking salmon migration to approximately one-third of the Columbia River Basin, including upstream Tribal communities who have relied on salmon for ceremonial and subsistence use since time immemorial.

8.  In 1939 Congress authorized the Grand Coulee Fish Maintenance Project that included funding for the construction and operation of salmon hatcheries to mitigate for Grand Coulee Dam that completely blocked upstream salmon migration. Three salmon hatcheries, Leavenworth, Entiat, and Winthrop National Fish Hatcheries, were constructed to meet this mitigation purpose. A fourth mitigation hatchery was planned for construction in the Okanogan

River Basin but was never constructed due to the outbreak of World War II and inadequate water supply at the planned hatchery location.

9. Colville reached out to the U.S. Bureau of Reclamation in 2000 to inquire about the fate of the fourth Grand Coulee salmon mitigation hatchery. *See* Attachment A, a true and correct copy of the letter received in the normal course of Tribal business, and archived, by Colville, Letter from Kenneth Pedde, Deputy Regional Director, U.S. Bureau of Reclamation, to Joe Peone, Director, Colville Tribal Fish & Wildlife Department, June 8, 2000. Subsequent negotiations resulted in a commitment by the Bonneville Power Administration to fund the construction of the Chief Joseph Hatchery through the 2008 Columbia Basin Fish Accords (although the negotiated amount ultimately was inadequate to fund the entire project for several reasons, which is why Colville urgently needs the IRA hatchery funding to complete the Relief Tunnel Water Source that was included in the original design but in the end not constructed).

10. For several years, I and other staff in the Colville Tribes' Fish and Wildlife Program have worked closely with NOAA and other federal agency staff on efforts to reintroduce salmon into the "blocked area" of the upper Columbia River Basin above Chief Joseph and Grand Coulee Dams. These interactions occur on at least a weekly basis and often more frequently. They include

emails, phone calls, and meetings focused on planning, funding, permitting, and technical issues relating to salmon reintroduction in the blocked area.

11. In 2023 and 2024, NOAA conducted tribal consultation on how it would use funds appropriated to NOAA under section 40001 of the Inflation Reduction Act ("IRA") for Pacific salmon hatcheries.

12. I, and several of my colleagues, received notice of NOAA-hosted IRA virtual hatchery funding engagement meetings to be held June 21- 23, 2023 by way of an email I received on June 20, 2023. This email originated from Julie Weeder of NOAA Fisheries.

13. On June 21, 2023, I participated in a virtual NOAA Fisheries Tribal Engagement Session concerning the use of Inflation Reduction Act funds for Pacific salmon hatcheries. The session was hosted by NOAA Fisheries' West Coast Region as part of a series of tribal engagement meetings held on June 21 - 23, 2023. I attended the June 21 session on behalf of the Colville Tribes, as did my colleagues Kirk Truscott and Charissa Eichman.

14. The June 21, 2023 session included presentations and discussion regarding NOAA's proposed approach to allocating approximately $240 million in IRA funding for tribal hatchery maintenance, modernization, and potential expansion. NOAA officials participating in the session included Jennifer Quan, West Coast Regional Administrator; Dr. Scott Rumsey, Deputy

Regional Administrator; Dr. Zach Penney, NOAA Senior Advisor for Tribal Issues; and other NOAA West Coast Region staff. A representative of the Bureau of Indian Affairs, Bryan Mercier, Northwest Regional Director, also participated in the session.

15. During the June 21, 2023 session, NOAA informed participating Tribes that it intended to continue tribal engagement through the summer of 2023, accept written tribal comments through July 23, 2023, and later determine the scope and allocation approach for the tribal hatchery funds. NOAA also stated that the funds would ultimately be transferred to the Bureau of Indian Affairs for distribution through Indian Self-Determination and Education Assistance Act contracts.

16. I received no notice or additional information about this matter from NOAA or otherwise until November 2023 when I became aware of an in-person meeting at the NOAA Seattle offices on December 4, 2023.

17. I have been a primary point-of-contact for internal communications at Colville regarding IRA funding issues, and I am not aware that anyone from the Colville Tribes received any prior notice from NOAA of either the October 11, 2023 or the October 20, 2023 sessions reportedly held by NOAA regarding IRA funding. Given the history of internal communications and

therefore on information and belief, it would be extraordinary if someone at Colville had received notice of those sessions and did not inform me.

18.  I did not receive prior notice of the December 4, 2023 meeting directly from NOAA, and to my knowledge, neither did any other representative of the Colville Tribes.  As stated above, it would be extraordinary if a Colville representative had received such a notice without informing me.

19.  On December 4, 2023 I attended an in-person meeting at NOAA Fisheries' offices in Seattle, Washington concerning the allocation and administration of IRA funding for Tribal hatcheries. The meeting included discussion of NOAA's proposed approach to distributing IRA tribal hatchery funds and the anticipated role of the Bureau of Indian Affairs in administering those funds.

20.  On December 12, 2023, I participated in a Tribal roundtable meeting concerning the allocation and administration of Inflation Reduction Act funding for Tribal hatcheries. The meeting was organized by NOAA Fisheries as a follow-up to the December 4, 2023 in-person meeting at NOAA's Seattle offices. The meeting covered NOAA's developing approach to IRA Tribal hatchery funding, including eligibility, allocation concepts, and the anticipated administrative role of the Bureau of Indian Affairs.

21. In these meetings, I and other Colville staff described our salmon programs and hatchery operations, including our role in blocked-area salmon reintroduction efforts and our interest in IRA funding to support these efforts.

22. In addition to the June 2023 session discussed above, I attended all of the subsequent meetings regarding IRA Tribal hatchery funding about which I received notice or was made aware of by NOAA or others. I would have attended or made best efforts to attend any or all of such subsequent meetings that I did not attend had I been made aware of them and/or been invited to attend. Had I been made aware of any such meeting or meetings, I would also have notified my colleagues with whom I was working on this issue (including specifically Kirk Truscott, Charissa Eichman, and Cody Desautel, and likely others) and urged them to attend, regardless of whether I could attend.

23. As a follow-up to NOAA's December meetings and being concerned that NOAA might not deem Colville Tribes eligible to apply for the IRA hatchery funds, I sent an email on December 19, 2023 to Lalena Amiotte, NOAA Tribal Relations Coordinator, and Rudy Peone, BIA Natural Resource Officer offering insights and clarifications regarding Colville's eligibility for IRA hatchery funding and technical staff engagement on this matter. My email described Colville's federally-recognized and adjudicated on- and off-

Reservation fishing rights, Colville's ownership and operation of the Chief Joseph Hatchery, and Colville technical staff participation in several meetings related to IRA hatchery funding. I concluded my email by stating my conclusion that accordingly, Colville is eligible for IRA hatchery funding alongside with other eligible West Coast Tribes. See Attachment B, a true and correct copy of the email referenced in this paragraph and the emails discussed in the next paragraph.

24.     In response to another email I sent on January 3, 2024 both Ms. Amiotte and Mr. Peone acknowledged receipt of my December 19, 2023 email. Ms. Amiotte also confirmed that she had shared my email with NOAA's Regional Administrator on December 22, 2023. *Id.*

25.     Rather than issue a general funding opportunity that allowed any tribal government with qualifying hatchery operations to apply, NOAA decided to pre-select 27 Indian tribes as the only tribes eligible to compete for these IRA hatchery funds. NOAA further decided that each of the 27 pre-selected tribes would receive $2 million in "capacity building" funding, with the remaining funds to be distributed competitively among those same 27 tribes.

26.     The 27 pre-selected tribes include all of the treaty tribes that are parties to the *U.S. v. Washington* and *U.S. v. Oregon* litigation, as well as three non-treaty tribes: the Hoopa Valley Tribe and Yurok Tribe in California, and the

Metlakatla Indian Community in Alaska. Based on NOAA's materials I reviewed and information shared during consultation, I understand that NOAA did not include the Colville Tribes on this list of 27 eligible tribes, despite the fact that Colville owns and operates a Pacific salmon hatchery and has federally-reserved fishing rights.

27. NOAA officials, including NOAA West Coast Regional Administrator Jennifer Quan and then-Assistant Administrator for NOAA Fisheries Janet Coit, among others, met with representatives of the Colville Tribes on September 18, 2024 at the Chief Joseph Hatchery. I participated in the September 18 meeting with Ms. Quan, Ms. Coit, and other NOAA staff.

28. During the September 18 meeting, Tribal officials and staff, including me, asked Ms. Quan and Ms. Coit to explain why NOAA had excluded Colville from the list of 27 pre-selected tribes despite our hatchery operations and our having participated in NOAA's consultations. In response, Ms. Quan and Ms. Coit offered explanations that did not, in my view, follow a coherent or consistent rationale, and that did not explain why other similarly situated non-treaty tribes had been included while Colville had not.

29. The Bonneville Power Authority has been and continues to be a significant source of funding for operation and maintenance of the Chief Joseph Hatchery

and also was the major contributor to the original capital construction costs for the hatchery.

30. On information and belief, I understand that this is because BPA and the other federal agencies that own and manage the federal hydro system (i.e., U.S. Army Corps of Engineers and U.S. Bureau of Reclamation) (e.g., dams) adversely affect the production and survival of, among other fish and wildlife species, Pacific salmon, by operating and maintaining the hydrosystem; accordingly BPA has ethical and legal responsibilities arising under several federal statutes (e.g. the federal Endangered Species Act and Northwest Power Act) to implement and fund actions mitigating such adverse impacts.

31. The Colville Tribes has discussed with BPA the projects for which the Tribes would seek NOAA Inflation Act tribal hatchery grant funding if deemed eligible to apply. Receipt of NOAA funding likely would help Colville immeasurably with the BPA negotiations to have BPA cover all or much of any shortfall on the CJH projects because BPA has historically (and recently) insisted that the Tribes identify a cost-share source for the capital construction costs of the Relief Tunnel Water Source for the CJH.

32. The Inflation Act tribal hatchery grant funding provides a rare, and perhaps unique, opportunity for Colville to leverage BPA funding and therefore complete the Relief Tunnel Water Source, an express goal for the Tribes since

the CJH was built and that third water source was not completed as specified in the original design for the facility.

February 18, 2026

Charles T. Brushwood, Senior Policy Advisor
The Confederated Tribes of the Colville Reservation

EXHIBIT 1-A



United States Department of the Interior

BUREAU OF RECLAMATION
Pacific Northwest Region
1150 North Curtis Road, Suite 100
Boise, Idaho 83706-1234

IN REPLY
REFER TO:
PN-1080
ADM-1.10

JUN 08 2000

Mr. Joe E. Peone, Director
Fish and Wildlife Department
Confederated Tribes of the Colville Reservation
PO Box 150
Nespelem WA 99155

Dear Mr. Peone:

This letter is in response to a question you raised with me at a meeting in Spokane on March 24. You spoke of an anadromous fish hatchery "authorized" for the Okanogan River which was never built but was intended to partially mitigate for losses incurred by the construction of Grand Coulee Dam. As I understand it, you are concerned that the Colville Tribe did not receive its appropriate share of the "salmon allocation" due to a failure to construct this hatchery which was intended to bring anadromous fish to the Colville Reservation via the Okanogan River.

Responding to your question required some rather indepth research into old records on our part. As you may be aware, the history of decision making concerning Grand Coulee Dam was rather muddled. Originally authorized as a "low dam" and then reauthorized as a "high dam" (the one that was eventually built) the original project planning envisioned that anadromous fish passage would be accommodated similar to Bonneville Dam. However, when Grand Coulee Dam was reauthorized under the Act of August 30, 1935, the reauthorization did not specify fish and wildlife mitigation requirements but merely authorized "incidental works necessary to such projects."

According to our records, in April of 1937 an agreement was signed between the Bureau of Reclamation and the Washington State Department of Fisheries to confirm an arrangement whereby the State would supply the necessary biological and "experimental information" to propose the best means for protecting and continuing the propagation of migratory fish. Reclamation's assigned task was to construct those facilities proposed by the biological agencies. In January 1938, the State provided a preliminary investigation report that was prepared in cooperation with the Department of Game and the U.S. Bureau of Fisheries (which later became the U.S. Fish and Wildlife Service).

The 1938 report included several evaluations. These included options to develop a system of hatcheries and also an appraisal of the possibility of fish passage above Grand Coulee Dam. The latter possibility was rejected due to the physical constraints of the high dam and an inability to engineer solutions to the probable biological effects on fish. A hatchery system including a fish trapping facility at Rock Island Dam with a hatchery at Leavenworth and sub-stations on the Entiat, Methow, and Okanogan Rivers were proposed. From the records available to us, this proposal appears to have emerged as the preferred mitigation plan.

What is clear from the 1938 report is that the hatcheries were to be used to mitigate for the loss of "upper Columbia River migratory fishruns" by providing greater production in the "lower tributaries"–the Wenatchee, Entiat, Methow, and Okanogan. In particular, the Okanogan was considered to be the best location for the replacement of blueback (sockeye) salmon lost from the upper Columbia runs because Lake Osoyoos was considered to be a biologically favorable resource for rearing sockeye when compared to the other site--Lake Wenatchee. In fact, Entiat Hatchery records show that blueback salmon were released into Lake Osoyoos in 1942 and 1944. It then appears that a decision was made to substitute chinook for sockeye as being of greater benefit to sport anglers.

In a letter from the Director of Fisheries, State of Washington, to the Chief Engineer, Bureau of Reclamation, dated August 24, 1938, the Director reported that the Okanogan Substation of the Grande Coulee Salmon Hatchery System would need to be located at the northern end of Lake Osoyoos, in Canada. The Director found there was a "complete absence of a suitable water supply" in the lower portion of Lake Osoyoos within the United States. It appears that the hatchery was not pursued due to subsequent complications in negotiating with Canada coupled with limited funding from the onset of World War II. The result, of course, is that the Okanogan hatchery was never constructed. The three constructed fish hatcheries were turned over to the U.S. Fish and Wildlife Service for operation.

This brings us to where we are today. We see two potential approaches toward developing an Okanogan hatchery if you wish to pursue it. The first approach would be to prepare a formal request by the Colville Tribal Council to the Regional Director, Bureau of Reclamation, for an investigation to ascertain the engineering and biological feasibility of a hatchery. Reclamation could seek funding for an investigation, in partnership with the Colville Tribe, if you wish. Following successful completion of an investigation and environmental impact evaluation in accordance with the National Environmental Policy Act, we could explore funding options for construction of the hatchery. As a requirement of any investigation, Reclamation would need to consult with the National Marine Fisheries Service and U.S. Fish and Wildlife Service concerning Endangered Species Act issues.

Another approach might be to include an Okanogan hatchery in proposals under the Blocked Area Management Plan. However, we are not well enough informed about the scope and content of the Blocked Area Management Plan to evaluate the prospects of this approach.

I hope this has answered your question from our March 24 meeting. I am looking forward to working with you and other members of the Colville Tribe on this issue.

Sincerely,

Kenneth R. Pedde

Kenneth R. Pedde
Deputy Regional Director

cc: Ms. Alex Smith
Bonneville Power Administration
PO Box 3621
Portland OR 97208

EXHIBIT 1-B

Charles Brushwood <charles.brushwood@colvilletribes.com>

**IRA non-Mitchell Act Tribal hatchery infrastructure funding and CTCR eligibility**

**Charles Brushwood** <charles.brushwood@colvilletribes.com> Tue, Dec 19, 2023 at 11:48 AM
To: rudy.peone@bia.gov, Lalena Amiotte - NOAA Federal <lalena.amiotte@noaa.gov>

Hi Rudy and Lalena,

As a follow-up to the IRA Tribal hatchery infrastructure funding round table meeting that Lalena hosted on Tuesday, December 12, 2023 I offer the following insights and clarifications regarding Confederated Tribes of the Colville Reservation ("CTCR" or "Colville") eligibility for funding and technical staff engagement in discussions relating to this funding opportunity for BIA's and NOAA's consideration:

Several Tribal participants referred in their remarks to "27 Tribes" eligible for funding under the Inflation Reduction Act non-Mitchell Act hatchery allocation for Tribal anadromous fish hatchery infrastructure needs on the West Coast. The number twenty-seven presumably includes twenty Western Washington/Puget Sound and Washington Coastal/NWIFC Tribes, four lower Columbia River/CRITFC Tribes, the Hoopa Valley and Yurok Tribes of California, and the Metlakatla Indian Community of Alaska but notably does not include CTCR. This omission is in error for at least the following reasons:

**Colville possesses federally-recognized fishing rights both on- and off-Reservation**

1. The 1891 Agreement and U.S. Supreme Court case *Antoine v. Washington* (1975) confirms CTCR's reserved hunting and fishing rights on the North Half or the original Colville Reservation of July 2, 1872;
2. *Colville Confederated Tribes v. Walton* (9th Cir. 1981) affirms that one of the purposes of the original Colville Reservation was to preserve access to the Tribes' traditional fishery locations on the Columbia River and elsewhere; and
3. The right of CTCR's P'sqosa/Wenatchi Tribe to harvest salmon at Icicle Creek in the Wenatchee River sub-basin was secured in an 1894 Agreement and affirmed in *U.S. v. Oregon* (9th. Cir. 2010).

**Colville owns and operates the Chief Joseph Hatchery on the Colville Indian Reservation located near Bridgeport, WA**. This hatchery program produces UCR summer Chinook and UCR spring Chinook salmon and will be used to support the Phase 2 Implementation Plan studying the feasibility of restoring Pacific salmon to the blocked areas of the Columbia River above Chief Joseph and Grand Coulee Dams.

**Colville technical staff have participated in several meetings related to IRA hatchery infrastructure funding**. Such meetings include a NOAA Tribal engagement session held on June 21, 2023, an in-person meeting in Seattle on Monday, December 4, 2023, and the Tribal hatchery infrastructure round table on Tuesday, December 12, 2023.

Accordingly CTCR is eligible for IRA non-Mitchell Act hatchery infrastructure funding alongside other eligible West Coast Tribes.

Please let me know if you have any questions about this or if you want or need anything else.

Thank you,

Charles (Chuck) Brushwood

Fish & Wildlife Policy Advisor

Colville Confederated Tribes

Office: (509) 422-7749

**Charles Brushwood** <charles.brushwood@colvilletribes.com>                    Wed, Jan 3, 2024 at 4:59 PM
To: rudy.peone@bia.gov, Lalena Amiotte - NOAA Federal <lalena.amiotte@noaa.gov>
Cc: Cody Desautel <cody.desautel@colvilletribes.com>

Good afternoon Rudy and Lalena,

I haven't received a response from either of you regarding receipt of my 12/19 email below or otherwise any updates on
transfer of the IRA non-Mitchell Act Tribal hatchery infrastructure funding from NOAA to BIA before allocation to eligible Tribal
governments by way of 638 contracts. Can you please acknowledge receipt of this email and provide an update on the IRA
non-Mitchell Act Tribal hatchery infrastructure funds when you have any such updates to share?

I've also copied Cody Desautel, CTCR's Executive Director, for his situational awareness.

Thanks,

**Lalena Amiotte - NOAA Federal** <lalena.amiotte@noaa.gov>                    Thu, Jan 4, 2024 at 10:14 AM
To: Charles Brushwood <charles.brushwood@colvilletribes.com>
Cc: rudy.peone@bia.gov, Cody Desautel <cody.desautel@colvilletribes.com>

Good Morning Mr Brushwood.
Thank you for your most recent email, I appreciate the ping. I went back and looked and indeed did not respond to your initial
email. I apologize for that error. I did however share with our regional administrator on 12/22.
The only update that I have right now is that our regional administrator is working with our headquarters leadership on
decision making and am aware of several meetings this week however I am not a participant/higher level.
I am aware of multiple tribes sending inquiry on status of the funding but there is no direction as of yet as to what that will be.
The Inter Agency Agreement with the BIA for the distribution of funds/This morning I was told that the IAA is in draft and likely
to be moved early February.
I am keeping track of inquiries coming in and will alert you as we hear more but that's all I know for this morning.
-Lalena
[Quoted text hidden]

**Charles Brushwood** <charles.brushwood@colvilletribes.com>                    Thu, Jan 4, 2024 at 10:28 AM
To: Lalena Amiotte - NOAA Federal <lalena.amiotte@noaa.gov>
Cc: rudy.peone@bia.gov, Cody Desautel <cody.desautel@colvilletribes.com>

Thanks Lalena. I appreciate the prompt response and update. We look forward to any additional updates you can provide as
they become available.

Best,

Charles (Chuck) Brushwood

Fish & Wildlife Policy Advisor

Colville Confederated Tribes

Office: (509) 422-7749

Cell: (509) 631-4605

Fax: (509) 422-7443

[Quoted text hidden]

**Peone, Rudy J** <Rudy.Peone@bia.gov>                    Thu, Jan 4, 2024 at 11:18 AM
To: Charles Brushwood <charles.brushwood@colvilletribes.com>, Lalena Amiotte - NOAA Federal <lalena.amiotte@noaa.gov>
Cc: Cody Desautel <cody.desautel@colvilletribes.com>, "Harp, Ashton R" <ashton.harp@bia.gov>

Good Morning Chuck,
I apologize for not responding earlier, Yes we also received your email. I agree with Lalenas summary below and would add that you can also reach out to Taylor Debevec of NOAA, who is working closely on development of the IAA with BIA ( taylor.debevec@noaa.gov )

Thanks

Rudy Peone
Natural Resource Officer,
Department of Interior
Northwest Regional Office
Bureau of Indian Affairs
Office 360-614-5895

**From:** Charles Brushwood <charles.brushwood@colvilletribes.com>
**Sent:** Thursday, January 4, 2024 10:28 AM
**To:** Lalena Amiotte - NOAA Federal <lalena.amiotte@noaa.gov>
**Cc:** Peone, Rudy J <Rudy.Peone@bia.gov>; Cody Desautel <cody.desautel@colvilletribes.com>
**Subject:** [EXTERNAL] Re: IRA non-Mitchell Act Tribal hatchery infrastructure funding and CTCR eligibility

**This email has been received from outside of DOI - Use caution before clicking on links, opening attachments, or responding.**

[Quoted text hidden]

**Charles Brushwood** <charles.brushwood@colvilletribes.com> Thu, Jan 4, 2024 at 11:21 AM
To: "Peone, Rudy J" <Rudy.Peone@bia.gov>
Cc: Lalena Amiotte - NOAA Federal <lalena.amiotte@noaa.gov>, Cody Desautel <cody.desautel@colvilletribes.com>, "Harp, Ashton R" <ashton.harp@bia.gov>

Thanks Rudy!

Charles (Chuck) Brushwood
Fish & Wildlife Policy Advisor
Colville Confederated Tribes
Office: (509) 422-7749
Cell: (509) 631-4605
Fax: (509) 422-7443

[Quoted text hidden]

**Cody Desautel** <cody.desautel@colvilletribes.com> Wed, Jan 17, 2024 at 7:55 AM
To: JARRED Erickson <jarred.erickson.cbc@colvilletribes.com>, Joe Peone <joe.peone.fnw@colvilletribes.com>, Charles Brushwood <charles.brushwood@colvilletribes.com>, Rebecca Hunt <rebecca.hunt.adm@colvilletribes.com>, Cindy Marchand

Just an FYI on the hatchery funding. I will forward any other updates I get from Jen.

---------- Forwarded message ---------
From: **Jennifer Quan - NOAA Federal** <jennifer.quan@noaa.gov>
Date: Wed, Jan 17, 2024 at 7:46 AM
Subject: Re: IRA non-Mitchell Act Tribal hatchery infrastructure funding and CTCR eligibility
To: Cody Desautel <cody.desautel@colvilletribes.com>
Cc: <scott.rumsey@noaa.gov>, Lalena Amiotte - NOAA Federal <lalena.amiotte@noaa.gov>, Taylor Debevec - NOAA Federal <taylor.debevec@noaa.gov>

Hello Cody -

As you may know - we have been actively working on this funding allocation process since June of 2023 with tribes in the west coast region. We have received Colvilles comments and did engage in facilitated government to government consultation with the Tribe in the fall and had representation at our in person and online forums. Your input has been valuable.

For the last several weeks I have been engaging and briefing our NMFS Headquarters and DOC regarding this funding and the timing for distribution. No decisions on allocations have been made yet, but as they are I will communicate directly with Tribes. I am hopeful that will be in the coming weeks.

I hope this information is helpful and don't hesitate to reach out if you have more questions.

Jen

On Wed, Jan 10, 2024 at 7:55 AM Cody Desautel <cody.desautel@colvilletribes.com> wrote:
Thanks for the update Jen. Will we have an opportunity to provide feedback or consult on the recommendations?

On Thu, Jan 4, 2024 at 3:17 PM Jennifer Quan - NOAA Federal <jennifer.quan@noaa.gov> wrote:
Hi Cody -

Thanks for reaching out. I do not have anything specific to report right now. We are simultaneously working with BIA on the development of an IAA for transfer of the funds and working our regional recommendations for process and allocation through NMFS HQ, NOAA HQ and DOC (the Secretaries office) - all of whom may make their own set of recommendations along the way. I expect that it will be at least a couple more weeks before we can share anything more substantive.

Jen

--

**Jennifer Quan**
she/her/hers (why is this important?)
*Regional Administrator | West Coast Region*
NOAA Fisheries | U.S. Department of Commerce
Office: 562-980-4001

https://www.fisheries.noaa.gov/region/west-coast
Sign up for West Coast Region public notices & newsletters

NOAA FISHERIES

On Wed, Jan 3, 2024 at 5:11 PM Cody Desautel <cody.desautel@colvilletribes.com> wrote:
Hey Jennifer and Scott,

Colville's chairman stopped by today asking for an update on this funding. I also see we have a P2IP check-in meeting coming up, and hatcheries were an important tool in those reintroduction efforts. Can you provide an update on how NOAA plans to allocate the funding, and when tribes should expect to see funding? thanks

Cody Desautel
Executive Director
Confederated Tribes of the Colville Reservation
cody.desautel@colvilletribes.com
Office 509-634-2238
Cell 509-690-1259

---------- Forwarded message ---------
From: **Charles Brushwood** <charles.brushwood@colvilletribes.com>
[Quoted text hidden]
[Quoted text hidden]

--

**Charles Brushwood** <charles.brushwood@colvilletribes.com> Tue, Jan 23, 2024 at 9:00 AM
To: Brian Gruber <bgruber@ziontzchestnut.com>

FYI - see below.

Charles (Chuck) Brushwood

Fish & Wildlife Policy Advisor

Colville Confederated Tribes

Office: (509) 422-7749

Cell: (509) 631-4605

Fax: (509) 422-7443

[Quoted text hidden]

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

CONFEDERATED TRIBES OF THE COLVILLE RESERVATION; CONFEDERATED TRIBES OF THE CHEHALIS RESERVATION,

Plaintiffs,

v.

NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; SECRETARY OF COMMERCE HOWARD LUTNICK, in his official capacity; JENNIFER QUAN, Regional Administrator, NOAA Fisheries West Region, in her official capacity; BUREAU OF INDIAN AFFAIRS; SECRETARY OF THE INTERIOR DOUGLAS BURGUM, in his official capacity.

Defendants.

No. 2:26-cv-00061-RLP

**Declaration of Glen Connelly**

I, Glen Connelly, declare under penalty of perjury that the following facts and observations, except where noted to be based on information and belief, are true and correct:

1. I am the Director of the Department of Natural Resources for the Confederated Tribes of the Chehalis Reservation ("Tribe").

2. I have worked for the Tribe since 2004 and have been the Director since 2017.

3. The Tribe has had a Fish and Wildlife Program since 1982 and has had a Fish Hatchery Program since they constructed a hatchery in 2010.

4. The Tribe has been awarded several years of Hatchery Maintenance funding from the BIA to support operations of the Chehalis Tribal hatchery.

5. In late 2023, some of my staff from the Chehalis Tribal Fisheries Program contacted NOAA officials to discuss a potential funding opportunity for Tribal hatcheries.

6. After those discussions, our Hatchery Supervisor Jesse McMahan told me that he believed the Chehalis Tribe was going to be eligible for the funding and we were excited at the chance to get some additional funds for our hatchery improvements.

7. The funding announcement occurred in mid-2024 and for some reason the Chehalis Tribe was not invited to submit an application.

8. Tribal officials visited Washington DC to voice their frustration to elected officials and NOAA agency staff about being left out of the funding announcement and requested to be included in any future funding announcements.

9. On September 17, 2024, several NOAA staff members visited the Chehalis Reservation to tour the fish hatchery, meet the staff and discuss future funding opportunities.

10. The NOAA staff included Janet Coit - Assistant Administrator, Jen Quan - West Coast Regional Administrator, and Lalena Amiotte - Tribal Relations West Coast Region. There were two or three other NOAA officials who attended, but I cannot recall their names.

11. Tribal Chairman Dustin Klatush hosted the group and other Tribal staff attended including: myself, Jeff Warnke - Tribal Government Liaison, Robbi Kessler – Tribal Attorney, Shawn Ortivez – Fisheries Manager, Tara Livingood-Schott – Fish and Wildlife Biologist, Colleen Parrott – Environmental Programs Manager and Dan Penn - Tribal Historic Preservation Officer.

12. We took the NOAA visitors to the Fish Hatchery on the Reservation and gave them a tour. We also took them to a site on the Chehalis River where the Tribe hopes to someday build a new hatchery that can better meet the needs of the Tribal community and provide even more support to the salmonid species that are in jeopardy in the Chehalis Watershed.

13. We then brought them to the Tribal Community Center where the Tribe hosted a luncheon that included salmon cooked over an open fire in the traditional manner.

14. The feedback I got from Assistant Administrator Coit was that her staff was impressed by our technical staff, and that they recognized that the Tribe has a solid hatchery program going and could benefit from additional funds.

15. While none of the NOAA staff made any guarantees about future funding, they did express regret that we were not declared "eligible" to receive Inflation Act tribal hatchery grant funds and promised to do what they could to ensure the Tribe would be included in any future funding announcements.

16. I reviewed emails and other documents to refresh my recollection of some of the facts asserted herein, and all of those emails and documents (whether or not attached) were received or produced in the normal course of Tribal business.

February 16, 2026

Glen Connelly

Glen Connelly, Director of Natural Resources
The Confederated Tribes of the Chehalis Reservation

EXHIBIT 3 - Desautel Declaration

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON**

| | | |
|---|---|---|
| CONFEDERATED TRIBES OF THE COLVILLE RESERVATION; CONFEDERATED TRIBES OF THE CHEHALIS RESERVATION,<br><br>Plaintiffs,<br>v.<br><br>NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; SECRETARY OF COMMERCE HOWARD LUTNICK, in his official capacity; JENNIFER QUAN, Regional Administrator, NOAA Fisheries West Region, in her official capacity; BUREAU OF INDIAN AFFAIRS; SECRETARY OF THE INTERIOR DOUGLAS BURGUM, in his official capacity.<br><br>Defendants. | ) | No. 2:26-cv-00061-RLP |

**Declaration of Cody M. Desautel**

I, Cody M. Desautel, declare under penalty of perjury that the following facts and observations, except where noted to be based on reasoned information and belief, are true and correct:

1. I serve as the Executive Director for the Confederated Tribes of the Colville Reservation ("Colville Tribes"). In that role, I am responsible for oversight of all operations within the tribal government, which includes the Natural Resource Division and Fish & Wildlife Program. Prior to becoming Executive Director, I served as the Colville Tribes' Natural Resource Director.

2. In my current position, I interact with federal agencies, including NOAA Fisheries ("NOAA"), on issues relating to Columbia Basin salmon management, hatcheries, Columbia River Treaty, and tribal rights and interests.

3. The Colville Tribes owns and operates the Chief Joseph Hatchery, a pacific salmon hatchery located near Bridgeport, Washington, that produces approximately two million Chinook salmon for conservation, harvest, and reintroduction purposes. The facility is built to produce 2.9 million Chinook annually, but is unable to reach those production goals due to limited quantities of cold water needed for fish health and regulation of growth rates. Chief Joseph Hatchery production includes Upper Columbia Spring Chinook salmon, a species of Pacific salmon.

4. In 2023 and 2024, NOAA conducted tribal consultation on how it would use funds appropriated to NOAA under section 40001 of the Inflation Reduction Act ("IRA") for Pacific salmon hatcheries.

5. In January 2024, I exchanged emails with Jennifer Quan, Regional Administrator for NOAA Fisheries for the West Coast Region, regarding the IRA tribal hatchery grant funds. In one of those emails, Ms. Quan wrote (in part):

> We have received Colvilles [sic] comments and did engage in facilitated government to government consultation with the Tribe in the fall and had representation at our in person and online forums. Your input has been valuable.
>
> For the last several weeks I have been engaging and briefing our NMFS Headquarters and DOC regarding this funding and the timing for distribution. No decisions on allocations have been made yet, but as they are I will communicate directly with Tribes.

Attachment A is a true and correct copy of several emails I exchanged with Ms. Quan in January 2024.

6. On March 29, 2024, Chairman Jarred Erickson and I attended a 20-year habitat conservation plan celebration event hosted by the mid-Columbia Public Utility Districts (PUD) at Rocky Reach dam, which is operated by Chelan PUD. Ms. Quan was also present at this event. Ms. Quan mentioned to Chairman Erickson at the event that she had some "bad news" to share with him, and that she would be in contact. She did not state what the news was regarding.

7. On April 3, 2024, I was in the Chairman's office for a call with Ms. Quan, where she shared that Colville would not be included as one of the 27 tribes eligible for the IRA tribal hatchery grant funds. Chairman Erickson was not

pleased about the decision and asked for more information. Ms. Quan did not elaborate on the reasoning for limiting the number of tribes. Chairman Erickson asked Ms. Quan if there would be a written determination from NOAA for why the eligibility was limited to those 27 tribes. Ms. Quan responded "no" to Chairman Erickson's question.

8. On April 4, 2024, Chairman Erickson and I participated in a call with the Bureau of Indian Affairs (BIA) Northwest Regional Director to learn more about the decision to exclude the Colville Tribes from eligibility for the IRA tribal hatchery funds. The Regional Director explained that NOAA, not the BIA, decided which tribes would be eligible. The Regional Director indicated that three Indian tribes that did not have treaty-based federal fishing rights were included on the list of 27 tribes, which included the Hoopa Valley Tribe, the Yurok Tribe, and the Metlakatla Indian Community. The Hoopa Valley and Yurok Tribes are located in California and Metlakatla in Alaska.

9. In my role as executive director of the Colville Tribes, I often provide technical assistance and advice to the Colville Business Council and the Chairman on a variety of issues. When I am able and requested to do so, I also accompany to the Chairman and/or members of the Colville Business Council on visits Washington, D.C., to meet with congressional representatives and agency officials on the Colville Tribes' behalf.

10. At various times beginning in April 2024, I was present in meetings with Chairman Erickson with federal officials and congressional offices where he raised concerns about NOAA's decision to exclude the Colville Tribes from eligibility for the IRA hatchery funding. The Colville Tribes became aware that the Chehalis Tribe was also excluded from the IRA hatchery funds and was similarly situated to the Colville Tribes in that it also owned and operated a pacific salmon hatchery.

11. One of the offices that I met with during this time was the office of Senator Maria Cantwell, who the Colville Tribes understood was primarily responsible for securing the IRA hatchery funds in the U.S. Senate. Upon information and belief, from April through September 2024, Senator Cantwell's office engaged with NOAA to understand the rationale for NOAA's decision to pre-select the 27 tribes and to exclude the Colville Tribes and the Chehalis Tribe.

12. On July 24, 2025, NOAA announced in a press release that it would be providing $240 million to 27 Indian tribes for Pacific salmon hatcheries. The press release is available on the internet, https://www.commerce.gov/news/press-releases/2024/07/commerce-and-interior-departments-announce-240-million-president-bidens and a printed version of the webpage is attached as Attachment B. The release stated that an initial $54 million would be available to the 27 with the

remaining amount being awarded competitively. Upon information and belief, NOAA has never publicly identified the 27 tribes it selected.

13.     Upon information and belief, at some point between April 2024 and July 2024, NOAA and the BIA entered into an agreement whereby NOAA transferred the IRA hatchery funds to the BIA for the BIA to distribute to the 27 tribes that NOAA selected.

14.     The Colville Tribes learned from Senator Cantwell's office in August 2024 that NOAA would not change its decision to exclude the Colville and Chehalis tribes. Upon information and belief, the NOAA's purported reason for not adding the tribes was that doing so could delay distribution of the IRA hatchery funds and that NOAA was concerned that the funds could be rescinded by a new Presidential administration.

15.     After NOAA's refusal to include the two tribes, Senator Cantwell's office indicated to us that it would encourage NOAA Fisheries leadership to visit both the Colville Tribes' and the Chehalis Tribe's hatcheries to discuss potential alternative sources of funds outside the IRA hatchery funds that NOAA may be able to provide or that the tribes could apply for.

16.     On August 27, 2024, the Colville Business Council approved my sending a letter to NOAA officials, including Ms. Quan and then-Assistant

Administrator for NOAA Fisheries Janet Coit, among others, asking for a meeting and consultation.

17. NOAA officials, including Ms. Quan and then-Assistant Administrator for NOAA Fisheries Janet Coit and other NOAA staff, travelled to Bridgeport, Washington, to meet with representatives of the Colville Tribes on September 18, 2024, at the Chief Joseph Hatchery. I participated in this meeting and accompanied them on a tour of the hatchery. During the visit, Ms. Quan and Ms. Coit were informed of the Colville Tribes' desire to install a third water source to allow the hatchery to operate at its full potential. Neither Ms. Quan nor Ms. Coit identified any other sources of NOAA funds that might be applicable for its desired hatchery upgrades. They instead suggested that the Colville Tribes pursue congressional appropriations with its congressional delegation.

18. During the September 18 meeting, Chairman Erickson, staff, and I, discussed NOAA's decision to limit the eligible tribes to 27 with Ms. Quan and Ms. Coit. The discussion began with Chairman Erickson stating his disappointment NOAA's decision to exclude the Colville Tribes from the list of eligible tribes. During that meeting, I noted that the Colville Tribes had never received an explanation for its exclusion. I asked NOAA officials to explain why Colville had not been included on the list of 27 pre-selected tribes despite the

Colville Tribes' ownership and operation of the Chief Joseph hatchery and its participation in those NOAA's consultations that we were made aware of.

19.    In response to my question, Ms. Quan stated that I would "not like the answer." I responded by stating that we still wanted to know why. Ms. Quan proceeded to explain that while NOAA publicly announced a consultation with a larger group of tribes, as discussions evolved, those consultations narrowed to a smaller group of tribes. Ms. Quan added that NOAA only included those tribes that participated in the consultations.

20.    The Colville Tribes' Anadromous Fisheries program manager, Kirk Truscott, also participated in the September 18 meeting. Mr. Truscott asked why the Colville Tribes was not included in or invited to all the consultation sessions hosted by NOAA. Neither Ms. Quan nor Ms. Coit answered Mr. Truscott's question.

21.    After the site visit by Ms. Quan and Ms. Coit, the Colville Business Council discussed litigation options to challenge NOAA's decision to exclude the Colville Tribes from the IRA hatchery funds. That activity was put on hold after the November 2024 election because it appeared that the incoming federal administration could rescind the IRA hatchery funds. This holding pattern continued until early August 2025, when the Colville Tribes became aware that the

Department of the Interior had determined that the IRA hatchery funds would not be subject to rescission by Congress or reallocated for other purposes.

22. Upon learning that the IRA hatchery funds would not be rescinded, the chairmen of the Colville Tribes and the Chehalis Tribe sent a joint letter dated August 13, 2025, to Eugenio Piñeiro Soler, Director of NOAA Fisheries, and Scott Davis, Acting Assistant Secretary-Indian Affairs. A true and correct copy of that letter is appended to this declaration at Exhibit C. The August 13 letter provided background on the issue and requested that NOAA reconsider its decision and add the Colville Tribes and the Chehalis Tribe to the list of the 27 tribes that NOAA selected. The letter also requested meetings on the tribes' joint request.

23. On September 17, 2025, Chairman Erickson and Dustin Klatush, Chairman of the Chehalis Tribe, met in Washington, D.C. with NOAA Director Soler and Acting Assistant Secretary Davis, to provide further information and background on the tribes' joint request. I participated in both meetings. Based on follow-up conversations with officials who attended the meetings, the Colville Tribes believed that the Department of the Interior have been amenable to adding the tribes had NOAA concurred.

24. Having not received any response or follow-up from NOAA from our September 17 meeting, the Colville Tribes and the Chehalis Tribe sent another

joint letter dated October 2, 2025. A true and correct copy of that letter is attached hereto as Exhibit D.

25. The federal government was shut down due to a lapse in congressional appropriations from October 1, 2025, to November 12, 2025. The federal government reopened on November 13, 2025, and that same day the Colville Tribes requested a follow-up meeting with NOAA in hopes of getting an update on the status of the tribes' joint request.

26. I was informed that the Colville Tribes followed up on the meeting request on November 14, 2025. I was informed that we again followed up on the request on November 20, 2025, to which NOAA responded and indicated that the request was proceeding through the review process.

27. On December 3, 2025, I telephoned the BIA's Northwest Regional Office to inquire whether the BIA had issued the updated RFP to the 27 tribes for the competitive portion of the IRA hatchery funds and learned that the updated RFP had gone out in November. Chairman Erickson e-mailed the Northwest Regional Office inquiring if the Colville Tribes could get a copy of the updated RFP. The Northwest Regional Office responded via email that same day and provided electronic copies of the Dear tribal leader letter and the updated RFP. True and correct copies of the Dear Tribal Leader letter and the RFP are attached hereto as Exhibit E and F, respectively.

28. On February 18th, 2026 Chairman Erickson received a letter response via email to Colville Tribe's October 2, 2025 letter to NOAA. The letter was dated February 11, 2026. The letter notes that the Inflation Reduction Act Tribal Hatchery Funds were allocated and transferred to the Bureau of Indian Affairs to facilitate a non-competitive and competitive funding process for 27 tribes. The letter notes that Colville and Chehalis were not included. True and correct copies of the NOAA's February letter and email, which I reviewed in the normal course of Tribal business, are attached hereto as Exhibit G and H, respectively.

29. Based on my information and belief, there are no other federally recognized Indian tribes in NOAA's Northwest Region that both (1) have adjudicated federally reserved fishing rights, and either (2)(a) own and/or operate a Pacific salmon hatchery, or (2)(b) are already on NOAA's list of eligible tribes.

30. The Colville Tribe has consistently advocated, starting in 2023 and through late 2025, for the tribe's inclusion on the list of tribes eligible for the IRA hatchery funding. Despite those efforts Colville has been excluded without any consistent or coherent explanation from NOAA, either oral or written.

February 18, 2026

Cody M. Desautel, Executive Director
Confederated Tribes of the Colville Reservation

EXHIBIT 3-A

From: **Jennifer Quan - NOAA Federal** <jennifer.quan@noaa.gov>
Date: Wed, Jan 17, 2024 at 7:46 AM
Subject: Re: IRA non-Mitchell Act Tribal hatchery infrastructure funding and CTCR eligibility
To: Cody Desautel <cody.desautel@colvilletribes.com>
Cc: <scott.rumsey@noaa.gov>, Lalena Amiotte - NOAA Federal <lalena.amiotte@noaa.gov>, Taylor Debevec - NOAA Federal <taylor.debevec@noaa.gov>

Hello Cody -

As you may know - we have been actively working on this funding allocation process since June of 2023 with tribes in the west coast region. We have received Colvilles comments and did engage in facilitated government to government consultation with the Tribe in the fall and had representation at our in person and online forums. Your input has been valuable.

For the last several weeks I have been engaging and briefing our NMFS Headquarters and DOC regarding this funding and the timing for distribution. No decisions on allocations have been made yet, but as they are I will communicate directly with Tribes. I am hopeful that will be in the coming weeks.

I hope this information is helpful and don't hesitate to reach out if you have more questions.

Jen

On Wed, Jan 10, 2024 at 7:55 AM Cody Desautel <cody.desautel@colvilletribes.com> wrote:

> Thanks for the update Jen. Will we have an opportunity to provide feedback or consult on the recommendations?
>
> On Thu, Jan 4, 2024 at 3:17 PM Jennifer Quan - NOAA Federal <jennifer.quan@noaa.gov> wrote:
>
>> Hi Cody -
>>
>> Thanks for reaching out. I do not have anything specific to report right now. We are simultaneously working with BIA on the development of an IAA for transfer of the funds and working our regional recommendations for process and allocation through NMFS HQ, NOAA HQ and DOC (the Secretaries office) - all of whom may make their own set of recommendations along the way. I expect that it will be at least a couple more weeks before we can share anything more substantive.
>>
>> Jen
>>
>> --
>>
>> **Jennifer Quan**
>> she/her/hers (why is this important?)
>> *Regional Administrator | West Coast Region*
>> NOAA Fisheries | U.S. Department of Commerce
>> Office: 562-980-4001
>>
>> https://www.fisheries.noaa.gov/region/west-coast
>> Sign up for West Coast Region public notices & newsletters



EXHIBIT 3-B

An official website of the United States government Here's how you know

Freedom 250: Celebrating the Triumph of the American Spirit

U.S. Department of Commerce

MENU

- All news
- Press releases
- Blog
- Speeches
- Fact sheets
- Op-eds
- Photos and videos
- Livestreams
- Archives
- Media contacts

Home » News » Press Releases

# Commerce and Interior Departments Announce $240 Million from President Biden's Investing in America Agenda for Fish Hatcheries to Support Pacific Northwest Tribes

Fisheries and aquaculture

*Cross-agency partnership supports Tribal self-*

FOR IMMEDIATE RELEASE

*determination, advances
accessibility, flexibility and equity
for Tribes*

Thursday, July 25, 2024

Office of Public
Affairs

publicaffairs@doc.gov

The Departments of Commerce and the Interior today announced a $240 million investment from President Biden's Investing in America agenda to support fish hatcheries that produce Pacific salmon and steelhead, underscoring the Biden-Harris administration's commitment to empowering Tribal Nations and fulfilling the federal government's trust and treaty responsibilities. Fish hatcheries in the Pacific Northwest support essential subsistence, ceremonial and economic benefits for Tribal communities, as well as fulfilling Treaty-reserved fishing rights. The Commerce Department's National Oceanic and Atmospheric Administration (NOAA) will partner with the Interior Department's Bureau of Indian Affairs (BIA) to deliver this funding to regional Tribes.

Today's investments build on the Biden-Harris administration's unprecedented agreement to restore salmon in the Columbia River Basin and follow the Interior Department's recently released report documenting the historic, ongoing and cumulative impacts of federal Columbia River dams on Columbia River Basin Tribes. These investments also further the Biden-Harris administration's historic progress to empower Tribal sovereignty and self-determination and align with Executive Order 14112, which President Biden signed at the 2023 White House Tribal Nations Summit, requiring federal agencies to take action to ensure that federal funding for Tribes is accessible, flexible, and equitable. By executing these awards through Indian Self-Determination and Education Assistance Act contracts and compacts, the Department will lift a significant administrative burden from the awardee Tribes. NOAA plans to continue building on this partnership with BIA for future work opportunities to address Tribal needs throughout the United States.

"Thanks to the Biden-Harris Administration's Investing in America agenda and commitment to guaranteeing equitable access to federal funding for Tribes, this cross-agency partnership will ensure Tribal

communities have the resources they need to sustain Pacific salmon and steelhead fisheries that are essential to their economic development," said **U.S. Secretary of Commerce Gina Raimondo.** "There's also more to be done, and I look forward to working with all Tribes and Congressional champions to find future opportunities to support salmon hatcheries."

"Since time immemorial, Tribes in the Pacific Northwest have relied on Pacific salmon, steelhead and other native fish species for sustenance and their cultural and spiritual ways of life," said **Secretary Deb Haaland.** "This funding will help us deliver historic investments from the President's Investing in America agenda that will empower Indigenous communities and safeguard resources they have stewarded since time immemorial."

Tribal fish hatchery production in the Pacific Northwest benefits subsistence fishers as well as both local and global markets, supporting commercial, subsistence and recreational fishing, tourism and the broader ecosystem from California to Alaska. Millions of fish are produced in Tribal hatcheries each year, driving Tribal employment and subsistence, nutrition for Tribal families, and the preservation of cultural traditions and recreation. As habitat is restored and reconnected to better support natural fish production, hatcheries will remain a critical tool to supplement fish for Tribal and non-Tribal fisheries, as well as other salmon-dependent animals and ecosystems in the Pacific Northwest.

As part of today's announcement, an initial $54 million is available to 27 Tribes in the Pacific Northwest and Alaska to address current hatchery facility maintenance and modernization necessities, and to support Tribal capacity needs. The remaining funding will be made available competitively to help Tribes address the long-term viability and effectiveness of critical infrastructure for the propagation of Pacific salmon and steelhead.

BUREAUS AND OFFICES

National Oceanic and Atmospheric Administration

## Explore

Issues

News

Data and reports

Work with us

## About us

Our mission

Bureaus and offices

Privacy program

## Get in touch

Contact us

Open government

FOIA

1401 Constitution Ave NW
Washington, DC 20230

Archives • Agency Financial Report • Comment policy • Digital strategy • Information quality • No Fear Act • Inspector General • Plain language • Privacy policy • Payment Integrity • Section 508 Accessibility Statement • USA.gov • Vote.gov • Vulnerability Disclosure Policy • Whistleblower Protection • WhiteHouse.gov

**Sign up for email updates**

To receive the latest updates from the Department of Commerce, please enter your email address below. We offer a complimentary email subscription service through GovDelivery. When you submit the form, you will leave the Department's website.

*Email Address

**Subscribe**




August 13, 2025

Eugenio Piñeiro Soler
Director of NOAA Fisheries
U.S. Department of Commerce
1315 East-West Highway
Silver Spring, MD 20910

Scott Davis
Acting Assistant Secretary-Indian Affairs
U.S. Department of the Interior
1849 C Street, NW
Washington, DC 20240

Dear Director Soler and Acting Assistant Secretary Davis:

On behalf of both the Confederated Tribes of the Colville Reservation and the Confederated Tribes of the Chehalis Reservation, we write to urge you to correct a Biden Administration decision made by National Oceanic Atmospheric Administration (NOAA) Fisheries. The decision arbitrarily and unlawfully excluded both tribes from the 27 Indian tribes NOAA pre-selected to be eligible to compete for certain pacific salmon hatchery funds that Congress appropriated in the Inflation Reduction Act (IRA).

After several months of consultations in 2023, NOAA announced in April 2024 that out of funds appropriated to it under section 40001 of the IRA, it would set aside $240 million for tribes for fish hatcheries that produce pacific salmon and steelhead. Unlike most grant solicitations, NOAA did not develop application criteria that would allow any qualifying Indian tribe to apply for these funds. Instead, NOAA made the highly unusual decision to *pre-select* 27 Indian tribes that would each receive $2 million from the $240 million for capacity building activities, with the remainder of the funds to be distributed among those 27 tribes on a competitive basis.

We understand that NOAA officials, not Department of the Interior (DOI) officials, decided which tribes would be eligible for the funding. NOAA has since, however, transferred these funds to DOI through an interagency funds transfer agreement. Congress targeted the unobligated balances of these IRA funds for rescission in section 40008 of the One Big Beautiful Bill Act of 2025. We understand, however, that the Administration recently determined that these funds were, in fact, obligated and are not subject to rescission. Given this determination, we assume that DOI intends to proceed to make grant awards and, eventually, distribute the competitive portion of the funds to the tribes that NOAA pre-selected.

The 27 tribes that NOAA pre-selected include all the *U.S. v. Washington* and *U.S. v. Oregon* treaty fishing tribes, together with three non-treaty tribes—the Hoopa Valley and Yurok Tribes in California, and the Metlakatla Indian Community in Alaska. Of these 27 tribes, some do not have hatchery operations or otherwise participate in hatchery management. Both the Colville and Chehalis Tribes have tribally owned and operated pacific salmon hatcheries, and both participated in the NOAA facilitated consultation sessions that NOAA made both tribes aware of. The Colville and Chehalis

Tribes understand that NOAA facilitated other meetings and consultation sessions on the tribal hatchery funds that our tribes were neither invited to nor made aware of. At one of the consultations that Chehalis attended, a NOAA official verbally indicated that Chehalis would be eligible to participate in the IRA hatchery funds.

Apart from the two tribes' participation in the consultations that they were made aware of on the hatchery funding issue, NOAA had prior, independent knowledge of the tribes' legal status and fish management and hatchery operations based on ongoing initiatives for which the tribes and NOAA participate. For example, for the last several years, the Colville Tribes' fish and wildlife staff have engaged with NOAA personnel on a daily, if not weekly, basis, on issues related to the Colville Tribes' ongoing efforts to reintroduce salmon in the blocked areas above the Chief Joseph and Grand Coulee Dams.

Federal courts have held that the Chehalis Tribe possesses on-reservation fishing rights arising from the Executive Order that created the Chehalis Reservation. *U.S. v. Washington*, 18 F.Supp.3d 1172, 1196 (W.D. Wash. 1991), *aff'd, Confederated Tribes of the Chehalis Reservation v. Washington*, 96 F.3d 334 (9th Cir. 1996). Chehalis is, therefore, comparable to both the Hoopa and Yurok Tribes, both of which NOAA included on its list of 27 pre-selected tribes and were similarly established by executive orders that courts also have construed to provide those tribes on-reservation fishing rights. Unlike the Hoopa and Yurok Tribes, however, the Chehalis Tribe owns and operates an on-reservation pacific salmon hatchery.

Like the Chehalis Reservation, the Colville Reservation was established by executive order. In an 1891 Agreement with the United States, Colville agreed to receive compensation for a 1.6 million acre area called the "North Half" that is bounded on the north by the U.S.-Canadian border, on the east by the Columbia River, and on the west by the Okanogan River. Article 6 of that 1891 Agreement reserved to the Colville Indians hunting and fishing rights throughout the North Half. Congress ratified the 1891 Agreement in a series of appropriations acts from 1906 through 1910.

The history of the 1891 Agreement is described in detail in the U.S. Supreme Court's decision in *Antoine* v. *Washington*. 420 U.S. 194 (1975). The Court in *Antoine* held that the hunting and fishing rights reserved by the Colville Tribes in the 1891 Agreement were in full force and effect, that Congress's method of ratifying the agreement had the same Supremacy Clause effect as a treaty to preempt state regulation of tribal hunting and fishing activities, and the Colville Tribes is the exclusive regulator of tribal member hunting and fishing in the North Half. *Id.* at 201–08.

As highlighted in *Antoine*, members of the Colville Tribes possess off-reservation federally reserved rights on the North Half which, for legal purposes, are substantively identical to the off-reservation fishing rights reserved to the treaty tribes in *U.S. v. Washington* and *U.S. v. Oregon*.[1] For this reason alone, NOAA should have included Colville as an eligible tribe for purposes of the IRA hatchery funds. But if this reason were not enough, Colville is substantively identical to the Metlakatla Indian Community in that both are non-treaty tribes with federally reserved fishing rights, and both operate pacific salmon hatcheries.

---

[1] Separate from the 1891 Agreement involving the North Half, the Ninth Circuit Court Appeals held that an 1894 agreement between the United States and the Yakama Nation grants joint fishing rights to Colville members of the Wenatchi Band, one of the 12 constituent tribes of the Colville Confederacy, at an off-reservation fishery near present-day Leavenworth, Washington. *U.S. v. Confederated Tribes of Colville Indian Reservation*, 606 F.3d 698 (9th Cir. 2010).

When NOAA announced its decision that only the 27 tribes it pre-selected would be eligible in April 2024, both the Colville and Chehalis Tribes voiced objections to NOAA leadership and to our congressional delegation, including Senator Maria Cantwell. At that time, Senator Cantwell chaired the Senate Commerce Committee, which has legislative jurisdiction over NOAA in the U.S. Senate. Senator Cantwell's personal and committee offices engaged in multiple discussions with NOAA to ascertain NOAA's rationale for selecting the 27 tribes and excluding Colville and Chehalis despite both being similarly situated to the other, non-treaty tribes that were selected.

We understand that, when questioned about the Colville and Chehalis Tribes' exclusion, NOAA's explanation for its decision shifted multiple times and NOAA could not articulate a reasoned basis for its April 2024 decision. We understand that NOAA ultimately concluded in August 2024 that it could not add Colville and Chehalis to the list of 27 tribes out of concern that doing so could delay the distribution of funds and that the funds could be rescinded by an incoming Trump Administration depending on the outcome of the November 2024 elections.

Even if NOAA's assertion had merit—which it did not as evidenced by the fact that neither NOAA nor DOI distributed the competitive portion of the hatchery funds even without Colville and Chehalis being added—circumstances have since changed dramatically. With the new Administration now apparently having made the policy decision to spare these funds from rescission by Congress, NOAA's purported reason for not adding Colville and Chehalis has evaporated.

After NOAA asserted that Colville and Chehalis could not be added to the pre-selected list of 27 tribes, Senator Cantwell's office urged NOAA West Coast Region's regional administrator Jennifer Quan, and Janet Coit, who was the Biden Administration's Assistant Administrator for NOAA Fisheries, to travel to Washington state to visit both the Chehalis and Colville tribes and their tribal hatcheries. Those visits occurred on September 16 and 17, 2024, respectively.

During the site visits, tribal officials questioned Ms. Quan and Ms. Coit in-person about NOAA's decision to exclude Colville and Chehalis from the 27 tribes that NOAA pre-selected despite both having hatcheries and being similarly situated to the three non-treaty tribes that NOAA pre-selected. Their responses made clear that both the substance of the decision to exclude the two tribes and the process by which the decision was made would not withstand judicial scrutiny. This conclusion has since been reinforced based on documents relating to the decision that the two tribes obtained through Freedom of Information Act requests.

For all these reasons, we urge you to correct NOAA's arbitrary and unlawful decision that the Biden Administration made. **Specifically, we request (1) that DOI transfer $2 million to both Colville and Chehalis for capacity building purposes like the 27 other NOAA pre-selected tribes have either received or will soon receive; and (2) allow both tribes to compete for the competitive portion of the IRA hatchery funds.**

Correcting this error will not only remedy the arbitrary and misguided decision of NOAA officials in the Biden Administration, but it will effectuate the goals of the pacific salmon hatchery funds by allowing two Indian tribes that own and operate on-reservation pacific salmon hatcheries to put more salmon into the ocean.

On the other hand, failure to correct this error will memorialize a decision that would otherwise be straightforward to correct, and for no public benefit. Given the issues highlighted in this letter, failure to correct the decision and treat Colville and Chehalis on equal footing with the 27 other eligible tribes also implicates the privileges and immunities prohibitions on administrative actions in Section 16(f) of the Indian Reorganization Act. That provision, codified at 25 U.S.C. § 5123(f), provides, in pertinent part, that:

> Departments or agencies of the United States shall not … make any decision or determination pursuant to … any … Act of Congress, with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.

As written, this provision applies not only to DOI, but also to other "Departments or agencies" of the federal government, including NOAA.

Neither of our tribes have any desire for the award and distribution of the IRA tribal hatchery funds to be delayed further, which is why we hope the April 2024 decision can be corrected and this issue resolved as quickly as possible. Both tribes will be in Washington, D.C. next month and we would like to meet with both of you on this issue. Our representatives will be reaching out to your respective offices.

We appreciate your consideration of this important matter.

Sincerely,

Jarred-Michael Erickson, Chairman
Confederated Tribes of the Colville Reservation

Dustin Klatush, Chairman
Confederated Tribes of the Chehalis Reservation



October 2, 2025

Eugenio Piñeiro Soler
Assistant Administrator
NOAA Fisheries
U.S. Department of Commerce
1315 East-West Highway
Silver Spring, MD 20910

Robert McLeod
Director of Intergovernmental Affairs
Office of the Secretary
U.S. Department of Commerce
1401 Constitution Ave., NW
Washington, DC 20230

Dear Assistant Administrator Soler and Director McLeod:

On behalf of both the Confederated Tribes of the Colville Reservation and the Confederated Tribes of the Chehalis Reservation, we thank you for making the time to meet with both of us and our respective tribal representatives on September 17, 2025. During the meeting, we discussed the background of both tribes' joint request that National Oceanic Atmospheric Administration (NOAA) Fisheries add both tribes to the list of 27 Indian tribes that NOAA pre-selected during the last Administration to be eligible to apply for certain funds that Congress appropriated in the Inflation Reduction Act for Pacific salmon hatcheries. The tribes also request that each receive the $2 million pro rata payment that the 27 tribes that NOAA pre-selected received. We provided the chronology of events and the request itself in our August 13, 2025, joint letter to NOAA.

As we noted during the meeting, the projects that both tribes seek eligibility to apply for represent a high return on investment. The Colville Tribes owns and operates the Chief Joseph Hatchery (CJH), which is located next to the Chief Joseph Dam on the Columba River. While the construction of the CJH was completed in 2013, the absence of a third water supply has meant that the hatchery cannot operate at full capacity. The CJH currently produces approximately two million smolts a year but, at full capacity, would produce 2.9 million. The addition of a third water supply, the engineering of which has already been completed and reviewed by the U.S. Army Corps of Engineers, would cost between $6 and $8 million and would allow the CJH to produce an additional 900,000 smolts annually.

As we noted during our meeting, the Colville Tribes fish for ceremonial and subsistence purposes and do not have a commercial harvest. This means that the beneficiaries of the 900,000 additional salmon in the Columbia River system would be commercial fisherman, sportfishermen, and the lower Columbia Indian tribes that do fish commercially.

The Chehalis Tribe has a modest hatchery that, if upgraded, would increase its current production by approximately 35,000 smolts annually. The Chehalis Tribe estimates the cost of the upgrades, if fully funded, to be between $2 and $2.5 million, meaning that the project cost could be

covered in its entirety if Chehalis received the $2 million pro rata payment that the other 27 pre-selected tribes received.

If fully funded, both the Colville and Chehalis Tribes' respective projects collectively represent less than 1/18 (about 5.5 percent) of the approximately $180 million that would be available in competitive funds if NOAA added both tribes. There is a high return on investment by adding both tribes and allowing NOAA to weigh our projects against those put forward by the other 27 tribes.

If NOAA were to agree to add both tribes, we believe that the Department of the Interior would similarly be amenable to the tribes' joint request. Logistically, we understand that adding both tribes would require an amendment to the interagency funds transfer agreement that NOAA and the Department of the Interior entered into in 2024 that enabled NOAA to transfer the money to the Bureau of Indian Affairs.

Please feel free to contact us directly with your response. Chairman Erickson can be reached at Jarred.Erickson.cbc@colvilletribes.com or by phone at (509) 429-2085. Chairman Klatush is reachable at dklatush@chehalistribe.org or by phone at (360) 870-4980.

Sincerely,

Jarred-Michael Erickson, Chairman
Confederated Tribes of the Colville Reservation

Dustin Klatush, Chairman
Confederated Tribes of the Chehalis Reservation

cc: Rep. Michael Baumgartner

# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Northwest Regional Office
911 Northeast 11th Avenue
Portland, Oregon 97232

**IN REPLY REFER TO:**
REGIONAL DIRECTOR

November 18, 2025

Dear Tribal Leader:

The Bureau of Indian Affairs (BIA) is announcing the re-opening of a competitive funding opportunity for the maintenance and modernization of hatchery facilities (tribal, state and/or federal) that produce Pacific salmon and steelhead. BIA seeks applications from eligible Tribes for projects that support a Tribe's explicit federally reserved and/or adjudicated fishing right.

Along the west coast this initiative will benefit the vibrant fishing sectors (subsistence, Indian, commercial and recreational), which often rely on salmon and steelhead hatchery production. Through strategic investments in upgrades to aging facilities, incorporation of innovative technologies, and enhancement of biosecurity measures, this one-time funding allows hatcheries to optimize fish health, streamline production and increase survival rates.

This funding opportunity is the result of an interagency agreement between BIA and the National Oceanic and Atmospheric Administration, which transferred $240 million to the BIA to distribute through Indian Self-Determination and Education Assistance Act contracts and compacts. The BIA anticipates approximately $184 million in funding will be available through this initiative.

Please refer to the enclosed application guidance document when putting together your proposal. All applications should be submitted by email to ashton.harp@bia.gov by **Thursday, December 18, 2025**. As applications come in there will be an administrative review. After the closing date the eligible applications will undergo a technical review and ranking process to determine how well they meet the priorities and evaluation criteria.

If you have questions, please reach out to Ashton Harp, Fisheries Biologist at 971-378-2302 or ashton.harp@bia.gov.

Sincerely,

RUDY PEONE
Digitally signed by RUDY PEONE
Date: 2025.11.18 09:32:34 -08'00'

Kurt Fredenberg
Acting Northwest Regional Director
Bureau of Indian Affairs

Enclosure

EXHIBIT 3-F

# PACIFIC SALMON AND STEELHEAD HATCHERY MAINTENANCE AND MODERNIZATION

1) Description ... 2
   a) Objective ... 2
   b) Priorities ... 3
   c) Authority ... 3
2) Award Information ... 4
   a) Funding Availability ... 4
   b) Project Award Period ... 4
   c) Type of Funding Instrument ... 4
3) Eligibility Information ... 4
   a) Eligible Applicants ... 4
   b) Cost Sharing or Matching Requirement ... 5
4) Application and Submission Information ... 5
   a) Requesting Application Package Assistance ... 5
   b) Content and Form of Application ... 5
   c) Unique Entity Identifier and System for Award Management (SAM) ... 10
   d) Submission Dates and Times ... 10
   e) Funding Restrictions ... 10
   f) Other Submission Requirements ... 10
5) Application Review Information ... 10
   a) Evaluation Criteria For Merit Review ... 10
   b) Review and Selection Process ... 12
   c) Anticipated Announcement and Award Dates ... 13
6) Award Administration Information ... 13
   a) Award Notices ... 13
   b) Administrative and National Policy Requirements ... 14
   c) Reporting ... 14
7) Agency Contacts ... 15
8) Other Information ... 15
   a) Permits and Approvals ... 15
   b) Writing a Competitive Proposal ... 15
   c) Highlighting Events ... 17
9) Definitions ... 17

# 1) DESCRIPTION

## A) OBJECTIVE

The Bureau of Indian Affairs (BIA), in coordination with NOAA Fisheries (NMFS), is pleased to re-announce the availability of funds for Pacific salmon and steelhead hatchery maintenance and modernization. This is a unique and one-time merit-based competitive opportunity that ensures the long-term viability and effectiveness of critical infrastructure for the propagation and reintroduction of Pacific salmon and steelhead in support of tribal fisheries. Under this opportunity, BIA seeks applications for projects from eligible Tribes to support existing fish hatchery facilities that support Pacific salmon and steelhead.

This one-time funding aims to:

- Improve the efficiency and effectiveness of fish hatcheries in rearing healthy Pacific salmon and steelhead, and
- Modernize hatchery infrastructure , and
- Support tribal co-management of Pacific salmon and steelhead resources, ensuring the health of these culturally and economically vital species for future generations.

Hatcheries play a critical role in safeguarding Pacific salmon and steelhead populations. Through strategic investments in upgrades to aging facilities, incorporation of innovative technologies, and enhancement of biosecurity measures, this one-time funding allows hatcheries to optimize fish health and increase survival rates.

Pacific salmon and steelhead are culturally and economically significant species for many Tribes throughout the Pacific Northwest. These fish sustain tribal communities, hold cultural significance, and are deeply woven into tribal traditions and beliefs. This opportunity fosters self-determination by focusing on hatcheries that support federally reserved and/or adjudicated fishing rights for Tribes.

***Applicants who submitted proposals in April 2025 will need to take additional actions,*** *including reading this entire Notice of Funding Opportunity (NOFO). If an applicant would like their April 2025 application to be re-considered, please submit a memorandum naming the application, certifying you have read the 'Pre-Application Requirements' and stating there are no changes to the proposal that was initially submitted – in this example you do not need to re-submit the full application. If you applied in April 2025 and would like to submit new or revised materials, then all documents will need to be re-submitted. If you have not previously submitted an application for this NOFO then follow the instructions below.*

To apply, submit your application following the guidelines in section 4.B. If submitting more than one application for a single hatchery facility, rank the applications in order of priority. Do not submit an application covering more than one hatchery facility. Within an application, the proposal may

include multiple projects for a single hatchery facility. It is recommended to combine related maintenance and modernization tasks (and all phases of a project) into one proposal, so long as the total funding requested for each proposal does not exceed the maximum funding limitation in section 3.C.

The types of projects BIA expects to fund includes:

- Repair and upgrade of hatchery infrastructure such as water intake systems, rearing ponds, and incubation facilities.
- Improvements to hatchery operations that enhance fish health and survival such as biosecurity measures and disease prevention programs.
- Acquisition of equipment and technology to modernize hatchery operations such as automated feeding systems and monitoring equipment.

Certified Local Governments are encouraged to prioritize projects in support of the celebration of America's 250th birthday (American250). This may include, but is not limited to, preservation, planning, interpretation, public engagement, and rehabilitation projects that recognize and honor the nation's founding, history, and cultural heritage.

## B) PRIORITIES

Proposals will be evaluated based on the criteria in Section 5.A. Successful proposals will address some or all the following priorities:

1) **Supporting Tribal Fishing Rights** - Supporting best management practices in hatcheries that raise stocks in areas where Tribes have federal adjudicated or treaty-reserved rights.
2) **Sustainability** - Ensuring hatchery infrastructure is maintained and functions effectively for future generations.
3) **Modernization through Innovative Technologies** - Effectively implement cutting-edge technology and innovation to optimize operations and data collection for informed decision-making.
4) **Infrastructure Upgrades for Improved Efficiency** - Streamlining operations, promoting water conservation, and optimizing productivity within hatcheries.

## C) AUTHORITY

This funding is authorized by Pub. L. 117-169 (August 16, 2022), and available via an Interagency Agreement between NMFS and BIA.

## 2) AWARD INFORMATION

### A) FUNDING AVAILABILITY

BIA anticipates approximately $184 million in funding will be available under this notice. The amount of funds available for competitive awards may increase or decrease based on the availability of funding appropriated to NMFS and provided to BIA via an Interagency Agreement. BIA will not accept proposals less than $250,000 or greater than $6,000,000.

BIA is not responsible for direct costs of application preparation. Publication of this notice does not oblige BIA to award any specific project or to obligate any available funds. The number of awards made as a result of this notice is estimated between 30 and 60. The actual number of awards will depend on the number of eligible applications received, the amount of funds requested, and the ranking and selection of the applications as described in Section 5.

### B) PROJECT AWARD PERIOD

This funding will be awarded to projects to be conducted for up to a 5-year period, with an anticipated start date occurring no later than June 1, 2026. No project should have a period of performance that extends past September 30, 2031.

### C) TYPE OF FUNDING INSTRUMENT

Awards will be funded via a self-governance compact, or self-determination contract as described by the Indian Self-Determination and Education and Assistance Act (ISDEAA), meaning that BIA will not be substantially involved in carrying out the activities contemplated by the award.

## 3) ELIGIBILITY INFORMATION

### A) ELIGIBLE APPLICANTS

Only the following federally recognized Tribes are eligible to apply for an award:

- Lummi Nation
- Stillaguamish Tribe
- Tulalip Tribes of Washington
- Suquamish Tribe
- Squaxin Island Tribe
- Puyallup Tribe of Indians
- Nisqually Indian Tribe
- Makah Tribe
- Quileute Indian Tribe
- Quinault Indian Nation
- Nooksack Tribe
- Port Gamble S'Klallam
- Jamestown S'Klallam Tribe
- Sauk-Suiattle Indian Tribe
- Lower Elwha Klallam Tribe
- Upper Skagit Indian Tribe
- Skokomish Indian Tribe
- Hoh Indian Tribe

- Swinomish Indian Tribal Community
- Hoopa Valley Tribe
- Yurok Tribe
- Metlakatla Indian Community
- Muckleshoot Indian Tribe

- Confederated Tribes of Warm Springs
- Yakama Nation
- Nez Perce Tribe
- Confederated Tribes of the Umatilla Indian Reservation

### B) COST SHARING OR MATCHING REQUIREMENT

Cost sharing and matching are voluntary and not required to receive funds under this opportunity. BIA encourages applicants to seek funds from other sources to enhance the quality and scope of projects.

To the extent that other federal programs require matching funds from Tribes, and the project is identified in an existing plan, award amounts received through this opportunity via ISDEAA can be used as a federal match.

## 4) APPLICATION AND SUBMISSION INFORMATION

### A) REQUESTING APPLICATION PACKAGE ASSISTANCE

Information regarding application package requirements is shown in Section 4.B. For questions or assistance with application materials, please contact BIA through the contacts listed in Section 7.

### B) CONTENT AND FORM OF APPLICATION

#### PRE-APPLICATION REQUIREMENTS

Prior to applying, applicants should review presidential actions found at: https://www.whitehouse.gov/presidential-actions/ and DOI Secretary's Orders found at: https://www.doi.gov/document-library/secretary-order. By applying in response to this NOFO, the applicant certifies awareness and compliance with all currently effective and applicable executive orders and secretary's orders, including but not limited to the Executive Order titled Ending Radical and Wasteful Government DEI Programs and Preferencing as well as the Executive Order and Secretary's order titled Restoring Truth and Sanity to American History. Applicants are responsible for ensuring their proposed activities are consistent with the intent and requirements of these directives.

## APPLICATION REQUIREMENTS

A complete application package is comprised of the following five components:

1) Cover Page
2) Detailed Hatchery Facility Description
3) Tribal Resolution or Cover Letter
4) Project(s) Proposal
5) Detailed Budget and Budget Narrative

Each component should be submitted digitally in a format compatible with Microsoft Word, Adobe Acrobat (PDF), or Microsoft Excel with pages composed in at least 11-point font with 1-inch margins. Please use descriptive file names to ensure the BIA quickly locates specific components of the application. You are encouraged to review Section 8.B. Writing a Competitive Proposal.

The application should address the evaluation criteria in Section 5.A to receive a consistent review against competing applications. Consideration will only be given to material that is physically included in an application. Information provided via an internet link will not be considered nor will it influence the application evaluation. Content requirements are described in further detail below.

### CONTENT REQUIREMENT 1: COVER PAGE

Include the following information in the cover page:

1) **Applicant Name -** The full name of the proposing Tribe
2) **Unique Entity Identifier -** The official identifier for doing business with the U.S. Government, and provided when registering with the System for Award Management (SAM) at SAM.gov
3) **Title -** A succinct but descriptive project title that will distinguish it from other proposals and indicate project purpose (400 character limit, including spaces). Please do not call your project "Hatchery Maintenance" or "Maintenance and Modernization Proposal".
4) **Summary Description -** A concise summary to be made public if awarded. The summary should focus on what the project will accomplish including the benefits and impacts and should be two sentences long in most cases. The first sentence should clearly state the main activity being used to address the specific need and the hatchery name. The second sentence should state the expected outcome from the investment and relevance to hatchery modernization. The summary should use clear, straightforward language that can be easily understood by a diverse audience. Please refrain from using pronouns such as I, we, our, etc. (1,000 character limit, including spaces)
5) **Abstract -** Should be three to four sentences and derived from the Summary Description. Provide a more detailed description of your project including location, purpose, major activities, target species, outcomes (deliverables at the end of the project) and partners. Please refrain from using pronouns such as I, we, our, etc. (2,000 character limit, including spaces)

6) **Requested amount -** The total amount of funding requested in the proposal, not including any amounts requested for sources outside of this opportunity. Contract Support Costs are not available to be added on top of these one-time funding awards. Indirect costs may be included within a project budget. Note: Applications requesting less than the minimum or more than the maximum amount stated in section 2.A will not be considered for review.

7) **Point of Contact -** Provide the name, title, office address, phone, and e-mail address for the point of contact responsible for the application.

8) **Project Ranking (if applicable) -** If you are submitting multiple project proposals for the same fish hatchery, please rank them. 1 would be the highest priority, with lesser priority projects numbered sequentially (2, 3, 4, etc.).

## CONTENT REQUIREMENT 2: HATCHERY FACILITY DETAILS

Provide the following information describing the hatchery facility in detail:

1) **Hatchery facility name –** Name commonly used to refer to the hatchery.

2) **Owner(s) of the hatchery facility –** The legal owner(s) of the hatchery facility along with a description (tribal, federal government, state government, etc.).

3) **Ownership status of the land on which the hatchery is situated –** The legal owner of the land, such as tribal, federal, state, private, etc.

   a. **If hatchery is on tribal land, describe tribal land status –** Identify if it is trust, allotment or fee land.

4) **Hatchery operator -** The name(s) of the hatchery operator(s) and describe the entity(s) such as tribal, federal, state, commercial, etc.

5) **Hatchery manager –** The contact information for the hatchery manager to include name, title, office address, phone, and e-mail address.

6) **Hatchery location –** The address, city, state, and zip code.

7) **Water source –** Describe the water source for the hatchery (ground, surface, etc.).

8) **Year(s) of construction –** The year(s) in which the existing facility was built.

9) **Funding sources(s) for hatchery construction –** The name of the entity that funded initial construction.

10) **Estimated total investment in total hatchery facilities and equipment**

11) **Current operating funding source(s)**

12) **Current estimate of deferred maintenance**

13) **Benefiting Tribes –** A list of Tribes whose members derive benefits from hatchery production.

14) **Benefiting population –** A description of non-tribal entities that derive benefits from hatchery production.

15) **Estimated tribal economy value -** The estimated value of hatchery fish to the tribal economy. Provide the calendar year or period for which the value is being provided.

16) **Estimated hatchery output value -** The estimated value of hatchery fish output (i.e. number released). Provide the calendar year or period for which the value is being provided.
17) **Hatchery output limitation -** The estimated maximum hatchery capacity limitation.
18) **Species of fish produced –** A listing of the current fish species being produced at the facility.
19) **Purpose of the hatchery program(s) –** Describe all purposes of the hatchery, such as recovery, subsistence, sport fishing, etc.
20) **Annual estimated target production –** The target output (i.e. number released) by species and size class for the current calendar year.
21) **Location where fish are released –** The name of the river, stream, etc. and transportation method for getting the fish there.
22) **Number of employees –** The current number of staff employed by the hatchery program, provided by volunteer, seasonal, part-time, and full-time.

## CONTENT REQUIREMENT 3: TRIBAL RESOLUTION OR COVER LETTER WITH SIGNATURE

Tribal resolutions are required to enter into ISDEAA contracts if the proposal is selected for award. Signed Tribal resolutions must summarize interest and intent. Self-governance (compact) Tribes should submit a cover letter summarizing interest and leadership support with the application but do not need to submit a resolution. Resolutions will be required from all participating Tribes for joint proposals.

### CONTENT REQUIREMENT 4: PROPOSAL DESCRIBING THE PROPOSED PROJECT(S)

Your proposal shall be clear and concise and should not exceed ten (10) pages in length. Pages exceeding the 10-page limit will not be taken into consideration when reviewing the application. Tribal resolutions, cover letters, budget tables, budget narratives, and the hatchery facility details are part of the application but not subject to the proposal length limit. Supplemental materials such as letters of support, charts, graphs, maps, photographs, graphics, planning documents, and other relevant information may be included in an appendix and do not count against the ten-page project proposal limit.

The proposal should be a descriptive document. If proposing more than one project within the application, project descriptions must describe the anticipated outcomes for each project. You are encouraged to review Section 8.B Writing a Competitive Proposal.

**Your proposal must describe:**

1. Reasoning for the proposed work, describing what infrastructure limitations or requirements the project is intended to address (e.g., water quality, water quantity, rearing and incubation capacity, regulatory requirements, etc.) along with anticipated timelines.
2. Anticipated measurable outcomes, benefits, impacts, and those who are expected to benefit.
3. Evidence to support the feasibility of the proposed project and address whether the project is technically sound and safe.
4. Proposed project timeline, including commencement, major milestones, and completion.
5. Any portion of the project that has already commenced, the existing efforts and status to date.

a. If detailed project plans are already completed, you should disclose such and attach project planning documents as an appendix.

6. The status of project permitting and anticipated permitting requirements.
7. How design and construction will be managed (e.g., contracted engineer/project manager, in-house employee(s), etc.).
8. Any other hatchery infrastructure funding dedicated to the project.
9. If the project is dependent on any other funding sources or entities for the completion of the project.
10. Future management, beyond the award period, including mechanisms to protect, maintain, or sustain the proposed project(s).

### CONTENT REQUIREMENT 5: A DETAILED BUDGET TABLE AND BUDGET NARRATIVE

Budgets should identify funds requested for the work, including identification of the hatchery programs, functions, services, or activities specified in the proposal. You should:

1) Attach the budget table in a spreadsheet as a separate attachment.
2) Ensure the requested amount indicated accurately reflects the requested amount summarized in the budget table and is at or below the maximum allowable award. Note:

Total amounts should only include those requested from this opportunity and should not include tribal match, in-kind, or leveraged funds from other agencies or organizations.

### C)  UNIQUE ENTITY IDENTIFIER AND SYSTEM FOR AWARD MANAGEMENT (SAM)

You should be registered in the federal System for Award Management (SAM) before applying. Your valid unique entity identifier should be supplied on your application, and you should always maintain an active SAM registration with current information during which you have an active federal award or an application under consideration by a federal awarding agency. BIA may not make an award to an applicant until the applicant has complied with all applicable unique entity identifier and SAM requirements and, if an applicant has not fully complied with the requirements by the time BIA is ready to make an award, BIA may determine that the applicant is not qualified to receive a federal award and use that determination as a basis for declining to make an award. You should allow a minimum of two weeks to complete the SAM registration which is required only once but must be periodically renewed.

### D)  SUBMISSION DATES AND TIMES

The application deadline is December 18, 2025, at 11:59 PM Pacific time. Applications must be submitted by the deadline and late applications will not be accepted or considered.

### E)  FUNDING RESTRICTIONS

This funding is part of a multi-faceted approach to conserve Pacific salmon and steelhead and focuses on fish hatchery facilities. Other activities such as those that directly protect, restore, or conserve habitats are not covered under this opportunity. Additionally, this funding may not be used towards construction of a brand new (not previously existing) facility, or for land acquisitions.

### F)  OTHER SUBMISSION REQUIREMENTS

Your complete application package should be submitted via email to ashton.harp@bia.gov no later than the due date specified in section 4.d. Attached files should be labeled clearly, saved without passwords, and each email must be less than 25 megabytes in size. Files larger than 25 megabytes can be split into smaller sizes and transmitted via multiple emails. After email submission of the application, you will receive an acknowledgment of receipt.

## 5)  APPLICATION REVIEW INFORMATION

### A)  EVALUATION CRITERIA FOR MERIT REVIEW

Reviewers will assign scores to applications ranging from 0-100 points based on the following evaluation criteria.

| Category | Points | Criteria |
|---|---|---|
| Relevance to Objectives and Priorities | 25 | • Proposal clearly demonstrates a strong connection to the stated objectives in section 1.A.<br>• Project directly supports priorities in section 1.B.<br>• Proposal outlines how the project will benefit the cultural and economic well-being of the Tribe. |
| Strength of Project Design and Methodology | 20 | • Proposal clearly outlines a well-defined project with specific, measurable activities and goals.<br>• The expected outcomes of the facility investments show a strong cost to benefit ratio.<br>• Methodology is sound, logical, and directly addresses the proposed activities.<br>• The proposal clearly identifies the maintenance and modernization needs of the facility, and directly addresses those needs. |
| Feasibility of Project Completion and Continuation | 20 | • Proposal demonstrates a clear understanding of potential challenges and potential mitigation strategies.<br>• Project timeline is realistic and achievable.<br>• Project integrates sustainable practices to hatchery operations that provide ongoing benefits that extend beyond the initial investment period (such as task automation, using long- lasting low maintenance materials, or investing in systems that reduce or optimize energy use). |
| Project Readiness | 20 | • For larger projects, evidence of a feasibility study or preliminary assessment demonstrates project viability.<br>  ○ For smaller or routine projects, the nature of the project lends to general readiness and availability of workforce to perform such activities.<br>• Projects involving collaboration with other organizations clearly outline the roles and responsibilities of each party.<br>• Projects clearly indicate if permitting is already in place or if future permits are necessary in order for project to begin. |
| Budget Justification and Cost Effectiveness | 10 | • Budget is realistic and justifies proposed costs.<br>• Budget breakdown is clear and detailed.<br>• Proposal explores cost-saving measures or alternative funding sources. |
| Tribal Co-management Involvement | 5 | • Proposal clearly outlines how Tribes will be involved in all stages of project planning, implementation, and evaluation.<br>• Project promotes collaboration with other stakeholders. |

Scoring will then be applied a weighted multiplier based on hatchery ownership and operation status as follows:

| Owner and Operator Status | Weighted Multiplier |
|---|---|
| Projects at Tribally owned and operated facilities | 1.2 |
| Projects at Tribally operated or co-managed facilities | 1.1 |
| Projects at state, federal, or public utility owned or operated facilities that support federally reserved or adjudicated fishing rights | 1 |

## B) REVIEW AND SELECTION PROCESS

### INITIAL REVIEW

Prior to conducting the comprehensive merit review, an initial review will be performed to determine whether: (1) the applicant is eligible for an award; (2) the information required by the NOFO has been submitted; (3) all mandatory requirements of the NOFO are satisfied; (4) the proposed project is responsive to the program objectives of the NOFO (program determination); and (5) the proposed project is in compliance with all applicable executive and secretary orders, including the President's executive order on Ending Radical and Wasteful Government DEI Programs and Preferencing as well as the executive order and Secretary order on Restoring Truth and Sanity to American History. If an applicant fails to meet the requirements or objectives of the NOFO, or does not provide sufficient information for review, the applicant will be considered nonresponsive and eliminated from further review.

### TECHNICAL REVIEW BY PANEL

Applications that satisfy the administrative review will advance for a technical review. Eligible applications will undergo a technical review and ranking process to determine how well they meet the priorities and evaluation criteria of this opportunity. Eligible applications will be independently evaluated by three or more technical reviewers based on the evaluation criteria listed in Section 5.A. The reviewers' ratings will be averaged to determine the final technical score for each application and produce a rank order of the proposals. Technical reviewers will be required to certify that they do not have a conflict of interest and that they will maintain confidentiality of the applications.

### FINAL SELECTION

After the proposals have been evaluated and ranked, the BIA Northwest Regional Director will perform the final selection. The Regional Director will review the rank order, funding recommendations and comments from the Technical Review and determine the applications to be funded. In making the final selections, the Regional Director will recommend awarding in rank order

unless the proposal is justified to be selected out of rank order based upon one of the selection factors below:

1. Availability of funding
2. Objectives and priorities identified in Sections 1.A. and 1.B.
3. The distribution of awards by:
    a. Benefiting Tribe(s)
    b. Geographical location
    c. Type of facility
    d. Type of Project
    e. Fish species affected
4. Applicant's prior award performance

### C) ANTICIPATED ANNOUNCEMENT AND AWARD DATES

Successful applicants will be notified by email and letter through the U.S. mail. Notifications of selection are expected to begin in February 2026.

## 6) AWARD ADMINISTRATION INFORMATION

### A) AWARD NOTICES

Upon completion of the review and selection process, successful applicants will receive notification from a BIA representative. This notification is not an authorization to begin project operations and is not a guarantee of funding.

After selection notification, you will be expected to prepare and submit all documentation required per ISDEAA within 90 days. The official award document, signed by a BIA or Office of Self Governance (OSG) Awarding Official and the designated tribal official, is the authorizing document that allows a project to begin. Projects should not be initiated in expectation of federal funding. Unsuccessful applicants will be notified that their proposal was not recommended for funding or was not reviewed because it did not meet the minimum requirements described in section 4.B.

Applicants may be asked to modify proposal components, objectives, work plans, or budgets prior to final selection to address technical review or panel review comments, and to conform to priorities (as stated in Section 1.B) or requirements. The exact amount of funds to be awarded, the final scope of activities, the project duration, and specific requirements of each project will be determined through negotiations with BIA regional Self-Determination or OSG staff as part of the awarding process. Award documents may contain special award conditions for activities outlined within the proposal.

## B) ADMINISTRATIVE AND NATIONAL POLICY REQUIREMENTS

The recipient and any sub-recipients, in addition to the assurances made as part of the application, must comply and require each of its contractors and subcontractors employed in the completion of the project to comply with all applicable statutes, regulations, Executive Orders, etc.

## C) REPORTING

You will be required to submit financial and performance (technical) reports. Financial and performance reports are to be submitted electronically via email. All financial reports should be submitted directly to the Awarding Official's Technical Representative (AOTR) identified at the time of award.

Reporting requirements will be determined by the Awarding Official and AOTR with input from you. Reporting dates will be established by the AOTR and written into the agreement once the award has been made but will coincide with the federal fiscal year calendar.

You will be required to provide the following information in a written report and send it to the BIA's technical contact(s) by November 30th of each year until the project is completed. This information will be collated and sent to NOAA per the terms of the Interagency Agreement.

- Status of the project
- Description of expenses rendered to date and remaining budget
- Description of accomplishments achieved to date
- Any modifications made to the awarded proposal
- Expected completion date for each project

You will deliver all products and data generated under the project to BIA's technical contact(s) within 120 days of project completion or award expiration as required by the signed agreement. You may withhold sensitive information (e.g., proprietary tribal data) that may be redacted at the tribal government's discretion. Information in the possession of the BIA or submitted to the BIA throughout the process, including final work product, constitute government records and may be subject to the disclosure to third parties under the Freedom of Information Act (FOIA), 5 U.S.C. 552, and the Department of the Interior's FOIA regulations at 43 CFR part 2, unless a FOIA exemption or exception applies or other provisions of law protect the information. The final report shall serve as an overall evaluation of your success in achieving the goals and objectives of the approved project, specifically describing the work that was performed and its resulting benefit to Pacific salmon and steelhead as described in the proposal. The level of detail should allow for BIA's assessment of the overall success of the project.

## 7) AGENCY CONTACTS

If you have questions, please contact the following individual:

| **Ashton Harp** |
|---|
| Fisheries Biologist, BIA Northwest Region |
| Ashton.Harp@bia.gov |
| 971-378-2302 |

## 8) OTHER INFORMATION

### A) PERMITS AND APPROVALS

You are required to obtain any necessary permits on projects funded under this announcement. This includes, but is not limited to, any necessary permits or consultations required under the Endangered Species Act (ESA), Magnuson-Stevens Fishery Conservation and Management Act, Marine Mammal Protection Act, the National Historic Preservation Act, as well as compliance with the National Environmental Policy Act (NEPA).

### B) WRITING A COMPETITIVE PROPOSAL

BIA believes in supporting projects that are transparent, accountable, and demonstrate measurable impact. We strongly encourage you to incorporate data, performance, and storytelling elements into your proposal. This information helps BIA understand the need, potential impact, and effectiveness of your project, as well as providing BIA the ability to demonstrate unmet tribal needs when justifying any potential future funding opportunities. Incorporating these elements increases your chances of receiving an award and provides you with a roadmap to execute your project, ultimately resulting in a more successful project.

**Data:**

- **Quantify the problem:** Use relevant data and statistics to clearly define the issue your project addresses and the community that is impacted. Use available statistics, reports, research findings, or local data to illustrate the need.
  - Example: Instead of stating "The fish hatchery is in need of upgrades," use data like "According to a 2023 Pacific Northwest fish population assessment, [Hatchery Name] has seen a [percentage] decline in smolt survival rates over the past five years, impacting wild salmon and steelhead populations."
  - Note: We recognize that complete data sets regarding specific needs to your community may not always be available. Proposals will not be penalized for data gaps beyond your control. Our focus is on identifying strong proposals that demonstrate a clear understanding of the problem you aim to address, even if comprehensive data isn't available. We encourage you to identify known data gaps in your proposal and if feasible, propose solutions for future data collection.

- **Plan for data collection:** Outline your plan for gathering relevant data throughout the duration of your project. The plan should include the types of data, how you will collect it, frequency of collection, how you will ensure its quality, and any planned data analysis.
  - Example: Explain how you will gather data on water quality, hatchery infrastructure condition, and fish health through regular monitoring, equipment readings, and collaborating with fish and wildlife agencies. Ensure data accuracy through established protocols and procedures.
- **Leverage data for decision-making:** Describe how you will use data to inform key project decisions and track progress towards your goals.
  - Example: Describe how you will use data on water flow, hatchery capacity, and fish health to identify critical maintenance and modernization needs, selecting appropriate upgrades and adjusting them as needed. Track progress with metrics like improved water quality parameters, increased hatchery capacity, and higher survival rates.

**Performance:**

- **Set "SMART" goals:** SMART stands for Specific, Measurable, Achievable, Relevant, and Time-Bound. Establish clear SMART goals aligned with the objectives (as stated in Section 1a) and supported by data.
  - Example: Set a SMART objective like "Increase smolt survival rates at [Hatchery Name] by 20% within three years, as measured by the number of healthy fish released and verified by NFMS biologists."
- **Track progress with key performance indicators (KPIs):** Develop a performance measurement plan with KPIs to monitor your progress towards objectives. Your KPIs should align with the goals and objectives of your project. Clearly define the metrics you will use to assess progress and ensure the metrics are feasible given your data collection plan. Regularly tracking KPIs will provide valuable insights throughout implementation of your project and allow you to make data-driven decisions to optimize impact.
  - Example: Identify KPIs like the volume of clean water delivered to rearing ponds, the number of fry successfully hatched, and the reduction in disease outbreaks within the hatchery. Outline how you will collect and analyze this data regularly in collaboration with stakeholders.
- **Adapt and improve:** Explain how you will use performance data to adapt your project activities and ensure optimal effectiveness. We understand that challenges and opportunities may arise throughout your project, and therefore encourage you to demonstrate a commitment to continuous learning and improvement through evidence-building.
  - Example: Explain how you will analyze data to identify bottlenecks in the hatchery system or unforeseen challenges and adapt maintenance or modernization strategies accordingly. This could involve modifying water treatment procedures, exploring alternative rearing methods, or collaborating with other hatcheries to share best practices.

**Storytelling:**

- **Sharing a compelling narrative:** Explain how you will share stories that describes your project, its goals, and the positive impact it has or will have on the community. This is an opportunity to

get creative and integrate culturally relevant and meaningful mediums to showcase the real-life impact of your project.

  - Example: Media such as blog posts, podcasts, videos, photo essays, and infographics along with data such as those collected from surveys, focus groups, and interviews are great methods to demonstrate project impacts. These types of activities demonstrate project importance while resonating with the audience.

- **Focus on the human element:** Highlight the individuals and communities who will benefit from your work, adding a personal touch to your proposal. Meaningful data is not only limited to numbers and statistics. Incorporating information that speaks to how your project has impacted or improved the lives of people is important.
  - Examples: Feature quotes and testimonials from tribal members expressing their concerns about the decline of salmon, and their hope for the project's success in restoring these vital resources.
- **Integrate data and performance metrics:** Use data and evidence to support your narrative and make it more impactful and convincing.
  - Example: Weave data points like the number of fish released, the improvement in smolt survival rates, and the economic benefits for local communities into your narrative to demonstrate the project's tangible impact.

### C) HIGHLIGHTING EVENTS

You are encouraged to work with BIA and NMFS to identify potential opportunities for agency officials to participate in on the ground events, such as ground-breaking ceremonies or project completion ribbon cuttings. Additionally, you are encouraged to support the development of promotional materials by providing pictures and narratives that help us craft impactful stories that resonate with stakeholders, including Congress, the media, and most importantly, the communities we serve.

When possible, Tribes are encouraged to provide notice to BIA and NMFS at least two months prior to major milestones such as ground-breaking and project completion so agency personnel can coordinate visitation to project sites and involvement in activities as appropriate. Your objection to participating in elevation your project's narrative will not affect your eligibility for award.

## 9) DEFINITIONS

**Co-management -** Co-management of hatcheries may refer to the collaborative involvement of a Tribe or Tribes in the preparation, modification, or implementation of a Hatchery Genetic Management Plan (HGMP), or in the operation or management of a hatchery facility.

**Hatchery facility -** Buildings and other equipment used by the operator or operators for adult collection, broodstock acquisition and utilization, spawning, juvenile hatching and rearing, holding/reconditioning/caring for/stocking, and juvenile releases of Pacific salmon and steelhead.

**Maintenance -** Work that is required to prolong the life of a hatchery facility including: delay of physical deterioration; enhancement or modernization of original function; application of new technological advances; or replacement of acquisition of associated capitalized equipment. Includes work and costs related to planning, design, engineering, permitting, construction, and construction management.

**Modernization -** Work that will upgrade, rehabilitate, or expand a hatchery facility, including planning, design, engineering, permitting, construction, and construction management.

**Pacific Salmon and Steelhead -** Pacific salmon and steelhead include the following species:

- Chinook Salmon *(Oncorhynchus tshawytscha)*
- Chum Salmon *(Oncorhynchus keta)*
- Coho Salmon *(Oncorhynchus kisutch)*
- Sockeye Salmon *(Oncorhynchus nerka)*
- Pink Salmon *(Oncorhynchus gorbuscha)*
- Steelhead Trout *(Oncorhynchus mykiss)*

2/18/26, 8:47 AM Case 2:26-cv-00061-SAB ECF No. 16-1 filed 03/02/26 PageID.247 Page 70 of 336
Confederated Tribes of the Colville Reservation Mail - Fwd: Inflation Reduction Act Tribal Hatchery Funds

EXHIBIT 3-G

Cody Desautel <cody.desautel@colvilletribes.com>

# Fwd: Inflation Reduction Act Tribal Hatchery Funds

1 message

**JARRED Erickson** <jarred.erickson.cbc@colvilletribes.com> Wed, Feb 18, 2026 at 6:26 AM
To: Cody Desautel <cody.desautel@colvilletribes.com>, "Gunn, Brian" <Brian.Gunn@powerslaw.com>

Jarred-Michael Erickson
Colville Confederated Tribes Chairman
509-634-2210
509-429-2085

SNSAYCKSTX
SINIXT

THE CONFEDERATED TRIBES OF THE COLVILLE RESERVATION
1872

---------- Forwarded message ---------
From: **Becky Lizama - NOAA Federal** <becky.lizama@noaa.gov>
Date: Wed, Feb 18, 2026, 6:25 AM
Subject: Inflation Reduction Act Tribal Hatchery Funds
To: <jarred.erickson.cbc@colvilletribes.com>, John, Natasha <Natasha.John@powerslaw.com>
Cc: <neeka.somday@colvilletribes.com>, OLIA Tribal - NOAA Service Account <olia.tribal@noaa.gov>

Hafa Adai Chairman Erickson,

I hope you are well.

Attached is NOAA's response to your letter dated October 2, 2025.

Sincerely,

Becky
--

***I am Native Chamorro.***

--
***Becky Cruz Lizama***
**NOAA Senior Tribal Liaison and Congressional Affairs Specialist**
Office of Legislative and Intergovernmental Affairs

https://mail.google.com/mail/u/0/?ik=b8b4a8e19b&view=pt&search=all&permthid=thread-f:1857473563099423613&simpl=msg-f:1857473563099423613 1/2

U.S. Department of Commerce
National Oceanic and Atmospheric Administration
1401 Constitution Ave. NW
Herbert C. Hoover Building
Washington, DC 20230
becky.lizama@noaa.gov

Becky Cruz Lizama
NOAA Senior Tribal Liaison
National Oceanic and Atmospheric Administration
becky.lizama@noaa.gov
+1 202 480 6694
Hi
SAVE CONTACT

25-0097617_ Chehalis_Colville Tribes - Erickson signed.pdf
112K

EXHIBIT 3-H

UNITED STATES DEPARTMENT OF COMMERCE
National Oceanic and Atmospheric Administration
NATIONAL MARINE FISHERIES SERVICE
1315 East-West Highway
Silver Spring, Maryland 20910

February 11, 2026

Jarred-Michael Erickson, Chairman
Confederated Tribes of the Colville Reservation

Dear Chairman Erickson:

Thank you for your October 2, 2025 letter following up on your initial letter (sent August 13, 2025) and the subsequent meeting we had on September 17, 2025.

The Inflation Reduction Act Tribal Hatchery Funds were allocated and transferred to the Bureau of Indian Affairs to facilitate a non-competitive and competitive funding process for 27 tribes. That program was administered and closed on December 18, 2025. While the Confederated Tribes of the Colville Reservation and the Confederated Tribes of the Chehalis Reservation were not part of the 27 tribes, we recognize your related funding and resource needs and will keep them in mind as future funds may be made available by Congress.

If you have any questions, please contact Jennifer Quan, West Coast Regional Administrator, jennifer.quan@noaa.gov.

Sincerely,

Eugenio Piñeiro Soler
Assistant Administrator
for Fisheries



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

CONFEDERATED TRIBES OF THE COLVILLE RESERVATION; CONFEDERATED TRIBES OF THE CHEHALIS RESERVATION,

Plaintiffs,

v.

NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; SECRETARY OF COMMERCE HOWARD LUTNICK, in his official capacity; JENNIFER QUAN, Regional Administrator, NOAA Fisheries West Region, in her official capacity; BUREAU OF INDIAN AFFAIRS; SECRETARY OF THE INTERIOR DOUGLAS BURGUM, in his official capacity.

Defendants.

No. 2:26-cv-00061-RLP

**Declaration of Charissa A. Eichman**

I, Charissa A Eichman, declare under penalty of perjury that the following facts and observations are true and correct:

1. I am a Senior Staff Attorney for the Confederated Tribes of the Colville Reservation (Colville Tribes) in the Office of the Reservation Attorney. I

primarily work with the Natural Resources Programs, including the Fish & Wildlife Department.

2. In my position, I often interact with federal agencies, including NOAA Fisheries ("NOAA"), on issues relating to Columbia Basin salmon management, hatcheries, and tribal rights and interests.
3. The Colville Tribes own and operate the Chief Joseph Hatchery, a salmon hatchery facility located near Bridgeport, Washington that produces Chinook salmon for conservation, harvest, and reintroduction purposes.
4. For several years, I and staff working for the Fish & Wildlife Department have worked with NOAA and other federal agency staff on efforts to reintroduce salmon into the "blocked area" of the upper Columbia River Basin above Chief Joseph and Grand Coulee Dams.
5. I have also participated in the Pacific Fisheries Management Council meetings on behalf of the Colville Tribes regarding federally protected salmon fishing rights held by the Colville Tribes.
6. In 2023 and 2024, NOAA conducted tribal consultation on how it would use funds appropriated to NOAA under section 40001 of the Inflation Reduction Act ("IRA") for Pacific salmon hatcheries.
7. In June 2023, I received multiple notifications regarding the Hatchery Engagement Session to be held on June 21, 2023.

8. I, along with staff from the Fish & Wildlife Department, participated in the June 2023 meetings.

9. I then received no notifications about any other upcoming meetings or sessions on this topic until October 23, 2023, when I received Notice of a discussion that occurred with the *US v Oregon* policy committee (a group that the Colville Tribes is not a part of, despite their federally protected fishing rights) that occurred earlier in October 2023.

10. Based on NOAA's own announcements and materials I reviewed in my official capacity and in the ordinary course of business, NOAA decided to set aside $240 million of IRA funds for Indian tribes to support fish hatcheries that produce Pacific salmon and steelhead. During the June meetings, NOAA indicated it would be focusing the IRA funds on hatchery maintenance and modernization.

11. While discussing other issues with one of the Colville Tribes' outside counsel on November 29, 2023, I was made aware of a meeting set in Seattle, WA, on December 4, 2023. He asked whether I was aware of the meeting and would I be available. I was not aware of the meeting, but said I would be available to attend in person if needed.

12. Other Fish & Wildlife staff reached out for more information and to get the Colville Tribes more information about the meeting.

13. On November 30, 2023, I received emails with general information for the meeting from NOAA and an RSVP list that now showed Colville Tribes staff who would be attending (including myself).

14. Based on discussions at the meeting with the federal agency representatives, although some of the other tribes continued to discuss the "27 Tribes," I was left with the impression that the Colville Tribes would be eligible to apply for IRA funding opportunity. Much of the meeting focused on what type of projects should be included and how much weight should be given to proposals based on a tribe owning and operating a hatchery versus just ownership or just operating. Nothing in the meeting indicated that the Colville Tribes, which has federally protected rights and owns and operates a salmon hatchery, would be excluded from the opportunity and funding now that the Colville Tribes was again engaged in the discussions and informed about what was occurring.

15. After the meeting on December 4, 2023, I spoke with NOAA West Coast Regional Administrator Jennifer Quan and asked specifically why I received such late notice, and she told me that the email list had been narrowed down to those tribes who had participated in meetings over the fall. When I asked why I had not received notice of those meetings, she told me she wasn't sure, that other staff might have received notice and not forwarded the information on.

16. Based on these interactions, I worked with staff regarding next steps. Staff reached out individually to their contacts to continue educating them on the adjudicated fishing rights maintained by the Colville Tribes, and to discuss its ongoing hatchery operations.

17. However, rather than issue a general funding opportunity that allowed any tribal government with qualifying hatchery operations to apply, NOAA decided to pre-select 27 Indian tribes as the only tribes eligible to compete for these IRA hatchery funds. NOAA further decided that each of the 27 pre-selected tribes would receive $2 million in "capacity building" funding, with the remaining funds to be distributed competitively among those same 27 tribes.

18. The 27 pre-selected tribes include all of the treaty tribes in/parties to the *U.S. v. Washington* and *U.S. v. Oregon* litigation, as well as three non-treaty tribes: the Hoopa Valley Tribe and Yurok Tribe in California, and the Metlakatla Indian Community in Alaska.

19. Based on NOAA's materials I reviewed and information shared during consultation, I understand that NOAA did **not** include the Colville Tribes on this list of 27 eligible tribes, despite the fact that Colville owns and operates a Pacific salmon hatchery and has federally-protected fishing rights.

20. Based on this, I had discussions and email exchanges with other attorneys for the Colville Tribes and Fish & Wildlife staff to discuss options. On August 27,

2024, I met with the Colville Business Council and received approval to send a letter to NOAA officials, including Ms. Quan and then-Assistant Administrator for NOAA Fisheries Janet Coit, among others asking for a meeting and consultation.

21. I met with Ms. Quan and Ms. Coit, along with members of the Colville Business Council and Fish & Wildlife Staff at the Chief Joseph Hatchery on September 18, 2024.

22. During the September 18 meeting, Tribal officials and staff, including me, asked Ms. Quan and Ms. Coit to explain why NOAA had excluded Colville from the list of 27 pre-selected tribes despite our hatchery operations and our having participated in NOAA's consultations. The answers were incomplete, and varied.

23. One of the reasons they used was that the Colville Tribes had other funding

    options, however, when asked about specific alternative funding

    options/opportunities the NOAA representatives discussed going to ask

    Congress for funding, and existing funding that either the Colville Tribes or its

    projects were ineligible to receive. There was one temporary option offered that

    the Colville Tribes' project may have been eligible for, but would not have been

    significant enough to actually help complete the projects.

February 11, 2026

Charissa Eichman, Senior Staff Attorney
The Confederated Tribes of the Colville Reservation

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WASHINGTON**

CONFEDERATED TRIBES OF THE COLVILLE RESERVATION; CONFEDERATED TRIBES OF THE CHEHALIS RESERVATION,

Plaintiffs,

v.

NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; SECRETARY OF COMMERCE HOWARD LUTNICK, in his official capacity; JENNIFER QUAN, Regional Administrator, NOAA Fisheries West Region, in her official capacity; BUREAU OF INDIAN AFFAIRS; SECRETARY OF THE INTERIOR DOUGLAS BURGUM, in his official capacity.

Defendants.

No. 2:26-cv-00061-RLP

**Declaration of Robbi Kesler**

I, Robbi Kesler, declare under penalty of perjury that the following facts and observations, except where noted to be based on information and belief, are true and correct:

1. I am the Lead Attorney for the Confederated Tribes of the Chehalis Reservation and have held this position since January 2025. Prior to that, I was a staff attorney for the Tribe for three years. I was also Lead Attorney from 2010 to

2014, and started working for the Tribe as an in-house attorney in 2007. During my time away from Chehalis, I was an attorney for the executive and legislative branches of the State of Washington.

2. My recent predecessor as Lead Attorney was Harold Chesin, and as it appeared that this matter might need to proceed to litigation, I reviewed his emails and other Tribal documents related to this matter and stored in the normal course of Tribal business.

3. In that review, I read the Tribe's FOIA request to NOAA for records related to the Inflation Act tribal hatchery grant funds. *See* Attachment A, Letter from Dustin Klatush, Chairman, Confederated Tribes of the Chehalis Reservation to Mark Graff, FOIA Officer, NOAA, June 11, 2024.

4. Attached hereto are true and correct copies of records from that collection of some 1,300 pages produced as part of that FOIA request:

    a. Attachment B: Email from Julie Weeder, Outgoing West Coast Region NOAA Fisheries Tribal Coordinator, to Jennifer Quan, West Coast Regional Administrator, NOAA Fisheries, July 17, 2023.

    b. Attachment C: NOAA email chain including email from Lelana Amiotte, West Coast Region NOAA Fisheries Tribal Coordinator to numerous tribal representatives, Sept. 27, 2023.

c. Attachment D: NOAA email chain (April 2024), including email from Lelana Amiotte, West Coast Region NOAA Fisheries Tribal Coordinator to two tribal chairs regarding interagency agreement with BIA.

5. From my current personal involvement in this matter and from my review of Tribal business records, including documents and emails, I am aware that the Tribe viewed and views inclusion in the Inflation Act tribal hatchery funding grant opportunity as an extremely important matter and has consistently had Tribal representatives attend NOAA tribal consultations regarding this matter when the Tribe was given notice of such consultations.

6. From that review, I conclude on information and belief that the Tribe learned in early April 2024 from another tribe that, despite its concerted efforts, Chehalis had not been added to the list of twenty-seven tribes eligible for NOAA's Inflation Act tribal hatchery funding. I believe that news led to the FOIA request (see ¶ 3 above) and the subsequent joint efforts with the Confederated Tribes of the Colville Reservation to have both tribes included.

February 18, 2026

Robbi Kesler, Lead Attorney
The Confederated Tribes of the Chehalis Reservation

# CONFEDERATED TRIBES of the CHEHALIS RESERVATION

EXHIBIT 5-A

June 11, 2024

Mark Graff, FOIA Officer
National Oceanic and Atmospheric Administration
1315 East-West Highway
Room 9700, SSMC3
Silver Spring, MD 20910
Email: FOIA@noaa.gov

Ryan McQuighan, FOIA Liaison
National Marine Fisheries Service
National Oceanic and Atmospheric Administration
Email: Ryan.Mcquighan@noaa.gov

Dear Messrs. Graff and McQuighan:

On behalf of the Confederated Tribes of the Chehalis Reservation (the "Tribe"), please consider this request under the Freedom of Information Act for certain records in the custody of the Department of Commerce ("Commerce") and the National Oceanic and Atmospheric Administration ("NOAA").

The requested records all relate to Commerce's and NOAA's decision to provide a "$240 million tribal set-aside for fish hatcheries that produce Pacific Salmon and Steelhead to be administered through the Bureau of Indian Affairs,"[1] which was the subject of an April 12, 2024, virtual question and answer session hosted by NOAA (hereinafter "Funding Decision") with various Indian tribes.

The Tribe requests—

(1) records that constitute, comprise, or otherwise relate to the Funding Decision, including, but not limited to—

[1] Quoted text from the Inflation Reduction Act section of NOAA's website, available at https://www.noaa.gov/inflation-reduction-act/inflation-reduction-act-climate-ready-coasts-and-communities/tribal-priorities (retrieved June 11, 2024).

P.O. BOX 536 • OAKVILLE, WA. 98568
AC 360-273-5911 • FAX 360-273-5914



(a) records transmitted from, or received by, Jennifer Quan (Regional Administrator for NOAA Fisheries, West Coast Region); Renee Stone (NOAA Senior Advisor for Infrastructure); and Janet Coit (Assistant Administrator for NOAA Fisheries);

(b) methodologies, eligibility criteria, or any other factual or legal consideration of how the 27 Indian tribes included in the Funding Decision were selected and other Indian tribes were excluded; and

(c) justifications, bases, or any other explanation for the Funding Decision including, but not limited to, those transmitted to congressional offices or committees.

(2) records that constitute, comprise, or relate to any interagency agreement between Commerce and any entity therein (including NOAA) and the Department of the Interior and any entity therein (including the Bureau of Indian Affairs).

The Tribe seeks all responsive records from August 1, 2022, to the date of this letter.

The Tribe requests a waiver for any fees or charges that would otherwise be associated with this request. Disclosure of the requested information is in the public interest because disclosure is likely to contribute significantly to public understanding of the operations or activities of NOAA.

(i) The subject of the request: The Tribe's request seeks records that concern identifiable operations or activities of the federal government, specifically the Funding Decision. The Tribe's interest in the request is direct and clear because the Tribe was directly affected by the Funding Decision by not being selected by NOAA to compete for the non-Mitchell Act hatchery funding despite being similarly situated with other non-Mitchell Act Indian tribes that were selected to compete.

(ii) The informative value of the information to be disclosed: Disclosure of the records requested by the Tribe is likely to contribute to an increased public understanding of government operations or activities because the records will reveal the rationale for the Funding Decision. Knowing how and why NOAA chose the 27 tribes to compete for the non-Mitchell Act hatchery funding will inform the Tribe and other Indian tribes on NOAA's eligibility criteria for future Commerce or NOAA solicitations of grant funds.

(iii) The contribution to an understanding of the subject by the public likely to result from disclosure: Disclosure of the requested records will contribute to the understanding of a reasonably broad audience of persons interested in federal agency practices regarding implementing congressionally appropriated grant funds. The Funding Decision is unique in that NOAA chose to select a finite list of potential applicants for competitive grant funds before issuing a notice of funds

availability. Given the unique and possibly unprecedented nature of the decision, how NOAA arrived at the Funding Decision will be informative to the public and other federally recognized Indian tribes.

(iv) The significance of the contribution to public understanding: Disclosure of the Tribe's requested records will contribute significantly to public understanding of Government operations or activities. As noted above, the Funding Decision is potentially the first instance where NOAA or another federal agency preselected individual applicants to apply for competitive grant funds where it had no congressional direction to do so. Awareness of government operations will contribute to the public's understanding of why federal agencies may choose to preselect individual applicants.

Disclosure of the Tribe's requested records is not primarily in the commercial interest of the Tribe. The Tribe is a federally recognized tribal government, not a for-profit entity. The Tribe seeks the records to ascertain how NOAA differentiates between individual Indian tribes that share the same legal status, sources of fishing rights, and geographic proximity, but were treated differently in the Funding Decision. The public and other Indian tribes will gain knowledge of federal agencies' considerations when making such decisions.

Because the Tribe's request is not furthering a commercial interest, disclosure of the records is not "primarily in the commercial interest of the requester," and a fee waiver should be granted.

Records responsive to this request and any questions related to this request should be directed to:

Harry Chesnin, Legal Counsel
Confederated Tribes of the Chehalis Reservation
420 Howanut Road
Oakville, WA 98568
Email: hchesnin@chehalistribe.org
Phone: (360) 273-5911

The Tribe appreciates your prompt attention to this request.

Sincerely,

Dustin Klatush, Chairman
Confederated Tribes of the Chehalis Reservation

**From:** Julie Weeder - NOAA Federal <julie.weeder@noaa.gov>
**Subject:** Metlakatla (Alaska) plans to submit comments on IRA hatchery funding
**To:** Jennifer Quan - NOAA Federal; Lalena Amiotte - NOAA Federal; Scott Rumsey - NOAA Federal; Penny Ruvelas; Natasha Preston - NOAA Federal
**Sent:** July 17, 2023 1:10 PM (UTC-07:00)

Hello all,

Recall that we included the Metlakatla Indian Community (MIC), the only Alaska tribal community with federally-reserved fishing rights, in our scoping and outreach for the IRA hatchery funds after I coordinated with Amilee. Lalena and I noticed that MIC didn't participate in the tribal engagement sessions and hadn't emailed us about the funds, and we weren't sure if they had received the email notifications about the IRA hatchery funds. We decided I should reach out directly, and I spoke with the tribal leader, Mayor Albert Smith, on or about July 10. He was happy to hear from us and indicated the MIC would provide written comments.

Today, Mayor Smith and their hatchery lead called me and I answered some further questions for them about what we were asking for their input on. I mentioned that I thought the NWIFC may be preparing a proposal for how to allocate the funds. I'm not sure if MIC is on the radar of the NWIFC.

I expect that we will receive written comments from MIC. I offered to set up a time for them to speak with Jen, and they might take us up on that.

Julie

--

><((((º>`·.¸¸.·´¯`·...¸><((((º>¸.·´¯`·...¸><((((º>`·.¸¸.·´¯`·...><((((º>

Julie Weeder

she/her/hers (why is this important?)

Recovery Coordinator/Ecologist

Outgoing acting WCR Tribal Coordinator

NOAA Fisheries

707-702-1584 (call or text)

julie.weeder@noaa.gov

**From:** Lalena Amiotte - NOAA Federal <lalena.amiotte@noaa.gov>
**Subject:** Re: Inflation Reduction Act Tribal Hatchery (Non-Mitchell Act) Engagement Opportunity 10-11-23
**To:** Natasha Preston - NOAA Federal
**Cc:** Ruth Howell - NOAA Federal
**Sent:** September 29, 2023 3:01 PM (UTC-07:00)

I think Ruth is right on the NON-Mitchell Act email. I will just send that out on Monday morning. FYI

I did send the clarifying apology email to the Mitchelle Act tribes and the CRITFC in this last hour so that's done.
Thanks for the help gals
If anything comes up just let me know. I guess we will be in until noon monday. She what happens.
-Lalena

On Fri, Sep 29, 2023 at 2:23 PM Lalena Amiotte - NOAA Federal <lalena.amiotte@noaa.gov> wrote:

> I spoke with JQ this morning. We will NOT be holding the NON-mitchell act meetings if we have a government shut down. I will work with Bev to reschedule if needed.
>
> the meetings that Natasha are scheduled for with the Mitchell Act tribes, I don't know. I haven't heard.
>
> On Fri, Sep 29, 2023 at 2:02 PM Natasha Preston - NOAA Federal <Natasha.Preston@noaa.gov> wrote:
>
>> Looks good to me. Have we looped Jen in just in case we are still trying to hold these during the shutdown?
>> Thanks!
>>
>> On Fri, Sep 29, 2023 at 1:41 PM Lalena Amiotte - NOAA Federal <lalena.amiotte@noaa.gov> wrote:
>>
>>> Here is draft language up date for Non-Mitchell Act update
>>>
>>> Good Afternoon Tribal Leaders and Staff:
>>>
>>> I am reaching out with an update to NOAA Fisheries West Coast Region status as of 9/29/2023. Due to unfortunate circumstances with federal budgets, we may be shutting down over the weekend.
>>> While we are optimistic that resolutions for funding the federal government are quick, we do want to let you know we have considerable uncertainty if we will be able to hold scheduled meeting on 10/11/2023.
>>> I will provide email updates sporadically if the shut down is prolonged.
>>> Thank you for your understanding.
>>> -Lalena Amiotte
>>>
>>> ---------- Forwarded message ---------
>>> From: **Lalena Amiotte - NOAA Federal** <lalena.amiotte@noaa.gov>
>>> Date: Wed, Sep 27, 2023 at 2:59 PM
>>> Subject: Inflation Reduction Act Tribal Hatchery (Non-Mitchell Act) Engagement Opportunity 10-11-23
>>> To: <dklatush@chehalistribe.org>, <shall@chehalistribe.org>, <sortivez@chehalistribe.org>, <gconnelly@chehalistribe.org>, <Dawn.Gomez@hohtribe-nsn.org>, <Maria.Lopez@hohtribe-nsn.org>, <Julie.Koehlinger@hohtribe-nsn.org>, <bob.smith@hohtribe-nsn.org>, <rallen@jamestowntribe.org>, <hhals@jamestowntribe.org>, <lbarbee@jamestowntribe.org>, <rknapp@jamestowntribe.org>, <fgcharles@elwha.org>, <russell.hepfer@elwha.org>, <matt.beirne@elwha.org>, <robert.elofson@elwha.org>, Anthony Hillaire <anthonyh@lummi-nsn.gov>, <libchr@lummi-nsn.gov>, <travisb@lummi-nsn.gov>, Lisa A. Wilson <LisaW@lummi-nsn.gov>, <bens@lummi-nsn.gov>, <merlej@lummi-nsn.gov>, Timothy Greene <timothy.greene@makah.com>, <chad.bowechop@makah.com>, Russell Svec <russell.svec@makah.com>, <Ray.Colby@makah.com>, <jaison.elkins@muckleshoot.nsn.us>, Isabel Tinoco <Isabel.Tinoco@muckleshoot.nsn.us>, <fisheries@muckleshoot.nsn.us>, <AStay@muckleshoot.nsn.us>, <choke.ken@nisqually-nsn.gov>, <troutt.david@nisqually-nsn.gov>, <smith.craig@nisqually-nsn.gov>, <slape.jamesjr@nisqually-nsn.gov>, <rlaclair@nooksack-nsn.gov>, <acharles@nooksack-nsn.gov>, <ncurrence@nooksack-nsn.gov>, <dwellman@pgst.nsn.us>, <paulm@pgst.nsn.us>, <romac@pgst.nsn.us>, <bill.sterud@puyalluptribe-nsn.gov>, <CouncilOffices@puyalluptribe-nsn.gov>, <russ.ladley@puyalluptribe-nsn.gov>, <char.naylor@puyalluptribe-

nsn.gov>, <Doug.Woodruff@quileutenation.org>, <executive.secretary@quileutenation.org>, <Zach.Jones@quileutenation.org>, <qnr.director@quileutenation.org>, <dwayne.pecosky@quileutenation.org>, <chris.wagemann@quileutenation.org>, <jennifer.hagen@quileutenation.org>, <Guy.Capoeman@quinault.org>, <Cynthia.Ralston@quinault.org>, <FSharp@quinault.org>, <BBryson@quinault.org>, <DBingaman@quinault.org>, Jackson, Cleve <Cleve.Jackson@quinault.org>, <delbert.boyer@quinault.org>, Tweed, Chet <Chet.Tweed@quinault.org>, Gary Morishima <morikog@aol.com>, <tomwooten@samishtribe.nsn.us>, <twoodard@samishtribe.nsn.us>, <njoseph@sauk-suiattle.com>, <chairman@sauk-suiattle.com>, <gkirby@sauk-suiattle.com>, <gmiller@skokomish.org>, <dherrera@skokomish.org>, <jwolf@skokomish.org>, <jpavel@skokomish.org>, <kpeters@squaxin.us>, <awhitener@squaxin.us>, <esparkman@squaxin.us>, <jdickison@squaxin.us>, <ewhite@stillaguamish.com>, <jsmith@stillaguamish.com>, <syanity@stillaguamish.com>, <lforsman@suquamish.nsn.us>, <rpurser@suquamish.nsn.us>, <pwilliams@suquamish.nsn.us>, <cschmidt@suquamish.nsn.us>, <sedwards@swinomish.nsn.us>, <ehaley@swinomish.nsn.us>, <twilbur@swinomish.nsn.us>, <tmitchell@swinomish.nsn.us>, <trgobin@tulaliptribes-nsn.gov>, <jgobin@tulaliptribes-nsn.gov>, <jasongobin@tulaliptribes-nsn.gov>, <darylwilliams@tulaliptribes-nsn.gov>, <dholmgren@tulaliptribes-nsn.gov>, <marilyns@upperskagit.com>, <scotts@upperskagit.com>, <hoopa.receptionist@gmail.com>, <executiveassistant49@gmail.com>, <hoopachairman@gmail.com>, <hupafish@hoopa-nsn.gov>, Mike Orcutt <mworcutt@gmail.com>, <jjames@yuroktribe.nsn.us>, <fmyers@yuroktribe.nsn.us>

Good Afternoon
NOAA Fisheries Regional Administrator Jennifer Quan will be hosting a tribal engagement and information sharing session on webex on **October 11, 2023 from 10-11am.** Updated information on Inflation Reduction Act Tribal Hatchery funding specific to Non-Mitchell Act tribal hatcheries will be provided as well as a question and answer session. Please RSVP at your earliest convenience. Webex log in information is provided below.

https://noaanmfs-meets.webex.com/noaanmfs-meets/j.php?MTID=m1386e66a653a442125875c8fce4c95f5
Meeting number: 2762 250 3516
Password: 5032312200

Join by phone
+1-415-527-5035 US Toll
Access code: 2762 250 3516

Respectfully,
Lalena Amiotte
*Tribal Relations Coordinator-West Coast Region*
NOAA Fisheries | U.S. Department of Commerce
Office: 360-519-4222



**From:** Amy Trainer <atrainer@swinomish.nsn.us>
**Subject:** Re: NOAA Fisheries is signing an interagency agreement with the Bureau of Indian Affairs to administer funds to select tribes made available by the Inflation Reduction Act (IRA). These funds are to enable such tribes to implement deferred maintenance a..
**To:** Lalena Amiotte - NOAA Federal
**Cc:** taylor.debevec@noaa.gov
**Sent:** April 17, 2024 9:00 AM (UTC-07:00)

Hi Lalena,

We were all in conflicting meetings last Friday morning and unable to attend the webinar. Would you have notes and/or webinar slides that you could please share?

Any additional relevant information would be much appreciated.

Thank you!
Amy

Amy Trainer
Environmental Policy Director
Swinomish Indian Tribal Community
11404 Moorage Way
La Conner, WA 98257
Cell: 360-399-5804

From: Lalena Amiotte - NOAA Federal <lalena.amiotte@noaa.gov>
Date: Wednesday, April 3, 2024 at 4:18 PM
To: Chairman Steve Edwards <sedwards@swinomish.nsn.us>, Tandy Wilbur <tandywilbur@swinomish.nsn.us>, Amy Trainer <atrainer@swinomish.nsn.us>
Cc: Taylor Debevec - NOAA Federal <taylor.debevec@noaa.gov>
Subject: NOAA Fisheries is signing an interagency agreement with the Bureau of Indian Affairs to administer funds to select tribes made available by the Inflation Reduction Act (IRA). These funds are to enable such tribes to implement deferred maintenance and m...

CAUTION: This email originated from outside of the Swinomish organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Chairman Edwards and Directors Wilbur & Trainer:

Today, NOAA Fisheries and Bureau of Indian Affairs signed an interagency agreement to transfer $240 million of Inflation Reduction Act funding to the Bureau of Indian Affairs to support tribal treaty fishing rights and to tackle the impacts of climate change on Pacific salmon and steelhead. This funding was first announced in June 2023 as part of the historic $3.3 billion in investments<https://www.fisheries.noaa.gov/feature-story/inflation-reduction-act-historic-investment-americas-climate-resilience> focused on ensuring America’s communities and economies are ready for and resilient to climate change. The Bureau of Indian Affairs already has contracts and compacts with tribes which facilitate tribal self-governance and the efficient distribution of funds to tribes. Through

the agreement, NOAA Fisheries will provide technical assistance and monitor project progress through completion. This coordination across federal departments aligns with President Biden’s Executive Order 14112 to reform federal funding and support for tribal nations.

The Bureau of Indian Affairs will distribute these funds to 27 tribes through non-competitive and competitive programs for deferred maintenance and repairs at hatchery facilities that produce Pacific salmon and steelhead. The structure of this funding distribution, including the transfer of funds to Bureau of Indian Affairs and a non-competitive and competitive process, was widely supported by participating tribes. The non-competitive process will allow for these tribes to plan for and participate in the competitive process, as well as start working on the most dire repair and maintenance needs at hatchery facilities. The competitive process will follow the non-competitive process some months later. The focus of this funding is to address shovel-ready and high priority projects and support the salmon and steelhead hatchery infrastructure that supports tribal treaty fishing rights.

To include only for Committees:

For the noncompetitive funding, the Bureau of Indian Affairs will begin the disbursement process by May 31, 2024 with the goal of having funds distributed by August 31, 2024.

* Each of the 27 tribes will receive up to $2 million in the non-competitive process:
    * Up to $500,000 for administrative and capacity needs like planning, proposal development for the competitive process, permitting, and more.
    * The rest of the $2 million per tribe would be allocated non-competitively to maintenance and modernization projects at hatchery facilities that benefit tribal fisheries.

For the inter-tribal competitive process, the Bureau of Indian Affairs will begin the process by August 31, 2024 with the goal of having funds distributed by August 31, 2025.

* A minimum of $184 million will be for the competitive process where 27 tribes can apply for funding.

The structure of this funding distribution, including the transfer of funds to Bureau of Indian Affairs and a non-competitive and competitive process, was strongly supported by participating tribes.

BIA will use $2 million for administration and direct program support including, but not limited to: contracting services, staff salaries and benefits, and programmatic functions such as distributing funds through 638 contracts or self-governance compacts, facilitating inter-tribal coordination, and more.

None of the $240 million will be used to support NOAA Fisheries direct program support, technical assistance or regulatory compliance needs.

Respectfully,

Lalena Amiotte

Tribal Relations Coordinator-West Coast Region (Oglala Sioux Tribe)

NOAA Fisheries | U.S. Department of Commerce

[https://lh6.googleusercontent.com/yVxQUAog_z6inDGrgpW2EFAw5AaIk1CwlyEzB-ncTuiPPjfusnjabaO_pyYIeqn1U1_TzKzycl3_rkKesnN-_axHJ_UYq8HDLJJh3t1eVM1eF7drQh7Vp0bI7QkpH46vNNKF_QDe]

EXHIBIT 6 - McMahan Declaration

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WASHINGTON**

CONFEDERATED TRIBES OF THE COLVILLE RESERVATION; CONFEDERATED TRIBES OF THE CHEHALIS RESERVATION,

Plaintiffs,

v.

NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; SECRETARY OF COMMERCE HOWARD LUTNICK, in his official capacity; JENNIFER QUAN, Regional Administrator, NOAA Fisheries West Region, in her official capacity; BUREAU OF INDIAN AFFAIRS; SECRETARY OF THE INTERIOR DOUGLAS BURGUM, in his official capacity.

Defendants.

No. 2:26-cv-00061-RLP

**Declaration of Jesse McMahan**

I, Jesse McMahan, declare under penalty of perjury that the following facts and observations are true and correct:

1. On October 11, 2023, NOAA conducted multiple tribal engagement sessions regarding Inflation Reduction Act (IRA) Tribal Hatchery funding. Separate sessions were held for Tribes that are party to *U.S. v. Oregon (Mitchell Act)* and for Tribes that are not party to that litigation.

2. Later on October 11, 2023, NOAA, through Lalena Amiotte, NOAA Fisheries' West Coast Region Tribal Coordinator, distributed several emails to tribes providing IRA Tribal Hatchery materials. The emails, and attachments, included:

    a. An Oct. 11, 2023 email from Ms. Amiotte to dozens of tribal representatives, including me (Attachment A), in turn attaching "1) Today's IRA Tribal Hatcheries Presentation [(Powerpoint);] 2) Summary of notes from our tribal consultations and written comments received through the summer of 2023," Attachments A-1 and A-2, respectively.

    b. An Oct. 11, 2023 email from Ms. Amiotte to dozens of tribal representatives, including me (Attachment B), in turn attaching the transcripts of three tribal engagement sessions held online by NOAA June 21-23, 2023 for non-Mitchell Act tribes regarding IRA hatchery funding. See Attachment B-1 (June 21), B-2 (June 22), and B-3 (June 23).

    c. An Oct. 11, 2023 email from Ms. Amiotte to dozens of tribal representatives, including me (Attachment C), which in turn attached the transcripts of two tribal engagement sessions held online by NOAA June 21-23, 2023 for Mitchell Act tribes regarding IRA hatchery funding. I

am not attaching those transcripts to save space, but I can provide them if the Court or Defendants would like them on the record.

3. Shortly after the meeting on October 11, 2023, I initiated an email inquiry to Ms. Amiotte at NOAA seeking clarification regarding the IRA Tribal Hatchery funding process, information concerning the timing of proposal submissions, the purpose of prior allocation meetings, eligibility requirements, and whether the Chehalis Tribe was included among the Tribes referenced during the meeting. I also identified two potential projects for which the Tribe sought funding: (1) remodeling the existing hatchery facility and (2) development of a proposed new hatchery facility. See Attachment D for my email.

4. Lelena Amiotte of NOAA responded by email the same day, indicating that due to the complexity of the funding process, a telephone conversation would be preferable. We coordinated schedules, and she confirmed a telephone call with me for that afternoon. Again, see Attachment D.

5. At the scheduled time that afternoon on October 11, 2023, I took the planned phone call from Lalena Amiotte. She asked me to briefly describe my background and my work experience. I gave her a quick explanation and then she asked for a brief history of the Tribe's hatchery program. I gave her the quick history of the Tribe's hatchery, what we hoped to do with our program in the future, and what work we thought we needed to do. I then plainly asked her

if we qualified for funding and she said that since we are a federally recognized tribe there was no reason we should not be eligible funding. She encouraged me to continue in the process and said that she would keep us informed and that she would make sure that we continued to receive emails about the grant process. At no point did she say that we were not eligible.

6. On October 20, 2023, representatives of the Chehalis Tribe attended another NOAA Inflation Reduction Act (IRA) meeting concerning Tribal Hatchery funding.

7. Following the meeting, the Chehalis Tribe prepared written comments expressing support for a hybrid funding allocation approach. The Tribe stated that such an approach would allow Tribes with smaller hatchery projects or those in feasibility and planning stages to access funding, with remaining funds distributed through a competitive process. See Attachment E for email to Ms. Amiotte and Attachment E-1 for Chehalis' written comments.

8. The Chehalis Tribe further described intended uses of any funds received, including remodeling its existing hatchery facility by converting the effluent pond into additional rearing space and constructing an adult fish collection facility, as well as developing a feasibility study for a proposed new hatchery facility on the Chehalis River located outside the floodplain. The Tribe indicated it would seek additional funding for construction costs and requested

continued participation in discussions regarding allocation of IRA funds. Again, see Attachments E and E-1.

9. On October 24, 2023, Jesse McMahan submitted the Chehalis Tribe's official written comments to NOAA, including the Tribe's position on funding allocation and a description of proposed uses of funds. Again, see Attachments E and E-1.

10. Ms. Amiotte of NOAA acknowledged receipt of the comments on the same date. NOAA advised that no additional meetings or webinars were scheduled at that time, that the agencies were continuing to receive comments, and that NOAA was working with the Bureau of Indian Affairs on an "inter-federal agency agreement." NOAA further indicated that updates to tribes were anticipated in December 2023, subject to federal budget considerations, including the possibility of a government shutdown on November 17. NOAA confirmed that the Chehalis Tribe had been added to the distribution list for future communications. See Attachment E.

11. On April 4, 2024, Chehalis Tribal counsel Harold Chesin emailed me to ask if we had been included in the distributions list and if we qualified for funding. I informed Harry that I had been sitting in on the meetings of which I was informed and that we were told by NOAA (Ms. Amiotte) that we qualified and that we would be included in any further communications. I also informed him

that we had sent in the Tribe's official comments on how we thought the funds should be allocated. See Attachment F.

12. I reviewed emails and other documents to refresh my recollection of some of the facts asserted herein, and all of those emails and documents (whether or not attached) were received or produced in the normal course of Tribal business. The attachments to this declaration are true and correct copies of relevant emails and documents.

February 17, 2026

Jesse McMahan, Hatchery Supervisor
The Confederated Tribes of the Chehalis Reservation

EXHIBIT 6-A

**From:** Lalena Amiotte - NOAA Federal
**To:** Dustin Klatush; Sharon Hall; Shawn Ortivez; Glen Connelly; Dawn.Gomez@hohtribe-nsn.org; Maria.Lopez@hohtribe-nsn.org; Julie.Koehlinger@hohtribe-nsn.org; bob.smith@hohtribe-nsn.org; rallen@jamestowntribe.org; hhals@jamestowntribe.org; lbarbee@jamestowntribe.org; rknapp@jamestowntribe.org; fgcharles@elwha.org; russell.hepfer@elwha.org; matt.beirne@elwha.org; robert.elofson@elwha.org; Anthony Hillaire; libchr@lummi-nsn.gov; travisb@lummi-nsn.gov; Lisa A. Wilson; bens@lummi-nsn.gov; merlej@lummi-nsn.gov; Timothy Greene; chad.bowechop@makah.com; Russell Svec; Ray.Colby@makah.com; jaison.elkins@muckleshoot.nsn.us; Isabel Tinoco; fisheries@muckleshoot.nsn.us; AStay@muckleshoot.nsn.us; choke.ken@nisqually-nsn.gov; troutt.david@nisqually-nsn.gov; smith.craig@nisqually-nsn.gov; slape.jamesjr@nisqually-nsn.gov; rlaclair@nooksack-nsn.gov; acharles@nooksack-nsn.gov; ncurrence@nooksack-nsn.gov; dwellman@pgst.nsn.us; paulm@pgst.nsn.us; romac@pgst.nsn.us; bill.sterud@puyalluptribe-nsn.gov; CouncilOffices@puyalluptribe-nsn.gov; Russ Ladley; char.naylor@puyalluptribe-nsn.gov; Doug.Woodruff@quileutenation.org; executive.secretary@quileutenation.org; Zach.Jones@quileutenation.org; qnr.director@quileutenation.org; dwayne.pecosky@quileutenation.org; chris.wagemann@quileutenation.org; jennifer.hagen@quileutenation.org; Guy.Capoeman@quinault.org; Cynthia.Ralston@quinault.org; FSharp@quinault.org; BBryson@quinault.org; Bingaman, Dave; Cleve; delbert.boyer@quinault.org; Chet; Gary Morishima; tomwooten@samishtribe.nsn.us; twoodard@samishtribe.nsn.us; njoseph@sauk-suiattle.com; chairman@sauk-suiattle.com; gkirby@sauk-suiattle.com; gmiller@skokomish.org; dherrera@skokomish.org; jwolf@skokomish.org; jpavel@skokomish.org; kpeters@squaxin.us; awhitener@squaxin.us; esparkman@squaxin.us; jdickison@squaxin.us; ewhite@stillaguamish.com; jsmith@stillaguamish.com; syanity@stillaguamish.com; lforsman@suquamish.nsn.us; rpurser@suquamish.nsn.us; pwilliams@suquamish.nsn.us; cschmidt@suquamish.nsn.us; sedwards@swinomish.nsn.us; ehaley@swinomish.nsn.us; twilbur@swinomish.nsn.us; tmitchell@swinomish.nsn.us; trgobin@tulaliptribes-nsn.gov; jgobin@tulaliptribes-nsn.gov; jasongobin@tulaliptribes-nsn.gov; darylwilliams@tulaliptribes-nsn.gov; dholmgren@tulaliptribes-nsn.gov; marilyns@upperskagit.com; scotts@upperskagit.com; hoopa.receptionist@gmail.com; executiveassistant49@gmail.com; hoopachairman@gmail.com; hupafish@hoopa-nsn.gov; Mike Orcutt; jjames@yuroktribe.nsn.us; fmyers@yuroktribe.nsn.us; Mike Crewson; Albert Smith; Dustin Winter; Jesse McMahan
**Cc:** Ruth Howell - NOAA Federal
**Subject:** IRA Tribal Hatchery Information Todays Presentation and Notes Summary
**Date:** Wednesday, October 11, 2023 5:17:43 PM
**Attachments:** Copy of NOAA IRA Funding Tribal Engagement Session 10.11.pdf
NOAA IRA Hatchery Funding Summary Report 2023-10-11.pdf

---

Attached are copies:
1)Today's IRA Tribal Hatcheries Presentation
2) Summary of notes from our tribal consultations and written comments received through the summer of 2023

Respectfully,
Lalena Amiotte
*Tribal Relations Coordinator-West Coast Region*
NOAA Fisheries | U.S. Department of Commerce
Office: 360-519-4222



EXHIBIT 6-A-1

NOAA

# Inflation Reduction Act (IRA): Tribal (Non-Mitchell) Hatchery Funds

**West Coast Region (WCR)**
**Tribal Engagement Sessions: Follow - up from June 2023 meetings**
**October 11, 2023**









# Welcome



**Helpful Information:** Participants will be in listen only mode during the introductions and brief presentation.

This meeting is being recorded.

**To ask a question or provide a comment after the presentation:**

- **Raise your virtual hand**. The moderator will call on each person in the order the hands were raised and will unmute you. You will not be unmuted until you click the affirmative response on the notification. Please state your name and affiliation first.

- **On the phone:** Press *3 to raise your hand. The moderator will call on you and select to unmute you. Please ensure that your phone is not muted as well. Please state your name and affiliation first.



# Agenda

- Introductions
- Review of Process and Summary of Tribal Engagement to Date
- Proposed Process and Allocation
- Proposed Priorities and General Criteria
- Next Steps
  - Two-week Tribal review



# Introductions

## NOAA Fisheries - West Coast Region

- **Jennifer Quan**, Regional Administrator
- **Dr. Scott Rumsey**, Deputy Regional Administrator
- **Natasha Preston**, Branch Chief for Anadromous Production South
- **Jeromy Jording,** Branch Chief for Anadromous Production North
- **Lalena Amiotte**, Tribal Coordinator

## Bureau of Indian Affairs

- **Bryan Mercier**, Northwest Regional Director

NOAA
Thank You for Your Contributions!

# Summary of Tribal Consultations



- **Regional Approach**
  - Tribally directed allocation of funds toward existing prioritized list
    - Allowance for funds to go to state-operated and federally-operated hatcheries
  - Metrics that include (but not limited to):
    - location of fish releases
    - number and species of fish produced
    - contribution to fisheries (treaty and non-treaty),
    - contribution to tribal restoration programs,
    - importance as broodstock source to other hatchery programs








# Summary of Tribal Consultations



- **Hybrid Approach**
  - Non-Competitive: $2M to each eligible tribe
  - Competitive: $200M (or remaining funds)
    - Tiered Priorities
    - Project eligibility - hatchery maintenance and expansion
    - Tribal Evaluation Committee

# Summary of Tribal Consultations



- **BIA-like allocation formula**
  - Economic Dependance of the Tribe on Fishery Resources
  - Magnitude of the Tribal Fishery
  - Reliance on Hatchery Fish and Size of Hatchery Production

- **ESA Priority Proposal**
  - Prioritize facilities recovering ESA listed salmon

NOAA
Proposal

# Proposed Process and Allocation



- Interagency Agreement transfers funding to BIA to:
    - Allocate $1-2M to each eligible Tribe for capacity and project development
    - Administer competitive process
        - Based on Funding Priorities
        - Establish a Tribal Evaluation Committee (TEC) (members from all eligible tribes) to:
            - Further refine and set ranking criteria
            - Ranks projects (tribes cannot evaluate their own projects)
        - BIA set aside for administering and 3rd party contract to facilitate competition

- BIA transfers project funds through self-governance compacts or 638 contracts to individual tribes based on TEC rankings

- Tribes report progress










# Proposed Funding Priorities

**(in preferred order)**

1. Tribally-owned or operated facility upgrades, rehabilitations, and expansions.
2. New (future) construction of tribally-owned or operated hatchery facilities, with an emphasis on responding to climate change.
3. Funding to tribes to pay for improvements to state or federal hatchery facilities located on their tribal reservations.
4. Funding to tribes to pay for improvements at state or federal hatcheries that support treaty-reserved fishing rights.











# Proposed Overall Criteria - General

- **Eligible Tribes:**
  - Tribes that possess federally reserved or adjudicated treaty-reserved rights to harvest and manage pacific salmon and steelhead.

- **Eligible expenses:** Hatchery improvement or expansion.
  - Competitive: Project management, feasibility, planning, design, engineering and construction costs that are directly related to projects
  - Non-competitive: Capacity and proposal development

# Proposed Overall Criteria - General



- **Regulatory Review:**
  - Tribes allocated funding for a project will attain applicable authorization or permits and comply with federal laws.
    - NOAA will maintain options to work with BIA on regulatory streamlining efforts where applicable
    - NOAA set aside $5M for technical assistance regulatory review of these projects

- **Climate Change:**
  - Projects that benefit species or populations most vulnerable to climate change and/or
  - Address the potential climate risks to hatchery facilities through improvements, modifications, or new construction









# Proposed Reporting Criteria



- **Tribes submit progress report (s) for each of the project/activity**
  - First progress report due December 31, 2025
  - Additional progress reports due December 31st each year, for duration of the project funding
- **Progress reports include:**
  - Status of the project
  - Status of regulatory permits and authorizations
  - Description of expenses rendered to date and remaining budget
  - Description of accomplishments and benefits achieved to date
  - Expected completion date





# Discussion and Questions

# Helpful Information

This meeting is being recorded.

To ask a question or provide a comment during today's session:



- **Raise your virtual hand**. The moderator will call on each person in the order the hands were raised and will unmute you. You will not be unmuted until you click the button that appears on your screen. Please state your name and affiliation first.

- **On the phone:** Press *3 to raise your hand. The moderator will call on you and select to unmute you. Please ensure that your phone is not muted as well. Please state your name and affiliation first.

# When it's your turn to speak:



- If you are calling in via phone and not on the computer, the moderator will unmute you.

- If you are on the computer, a box like this will appear on your screen.

  You should click the oval labeled 'Unmute me'.











# Thank you for your time.

**Next steps:**

- **October 11 to 25, 2023:**
  - Tribal engagement sessions, follow up meetings with WCR leadership and Tribal leaders, and written comments accepted
- **November to December 2023:**
  - NOAA and BIA finalize IAA
- **Winter/Spring 2023:**
  - NOAA transfers funding to BIA

**Request a separate virtual meeting:**

Lalena Amiotte-Tribal Relations Coordinator Lalena.Amiotte@noaa.gov
360-519-4222

**Submit written comments by October 25, 2023, to:**

tribalinput.hatcheryfunding@noaa.gov

EXHIBIT 6-A-2

# Tribal Input on Inflation Reduction Act Investments: Tribal Hatchery Provisions

# Notes Summary

*West Coast Region*

**October 11, 2023**



**Table of Contents**

| | |
|---|---|
| **I. Background** | **Page 3** |
| **II. NOAA Tribal Engagement and Consultation** | **Page 3** |
| **III. Tribal Engagement Sessions** | **Page 4** |
| **IV. Mitchell Act Tribal Hatcheries** | **Page 4** |
| **V. Notes Summary of Tribal Input** | **Page 5** |
| **VI. Conclusion & Next Steps** | **Page 15** |

## I. Background

Inflation Reduction Act and NOAA Spend Plan

On August 16, 2022, President Biden signed the Inflation Reduction Act (IRA, H.R. 5376, PL 117-169) into law. The IRA is a historic, federal government-wide investment that furthers the National Oceanic and Atmospheric Administration's (NOAA) efforts to build a Climate-Ready Nation. Among its many provisions, NOAA is providing a $300 million tribal set-aside for investments in deferred maintenance and repairs to fish hatcheries that produce Pacific Salmon and Steelhead.

This funding has been split into two parts: $240 million for Pacific salmon hatcheries that support tribes and Alaska Native communities with federally-reserved fishing rights, and $60 million for Mitchell Act hatcheries. Mitchell Act Tribal Hatchery Funding will be allocated to hatcheries that produce Mitchell Act fish. Mitchell Act funding recipients are parties to the ongoing *United States v. Oregon* federal court proceeding, and some of the production is included in the 2018-2027 *United States v. Oregon* management agreement. Eligibility for the $240 million non-Mitchell Act hatchery funding includes all other hatcheries in California, Oregon, Washington, and Alaska.

These funds will be administered through the Bureau of Indian Affairs (BIA) and through NOAA's Mitchell Act tribal hatchery program. To expedite non-Mitchell Act funding to tribes, NOAA Fisheries will establish an inter-agency agreement with the BIA in the fall of 2023. BIA has existing mechanisms through Self Governance 638 contracting which is anticipated to be the most efficient and timely approach to funding allocations and reporting.

## II. NOAA Tribal Engagement and Consultation

It is NOAA Fisheries West Coast Region's ongoing priority to gather input from tribal leadership and staff on the important opportunities and NOAA Fisheries decisions that affect them. . On June 12, 2023, NOAA Fisheries West Coast Regional Administrator Jennifer Quan distributed a letter to leaders of tribes and Alaska Native communities with federally-reserved fishing rights to engage interested tribal nations in a sustained dialogue about this funding. The letter sought input on the preferred tribal priorities for these two programs, as well as the tribes' recommendations for how to administer these funds most effectively.

The letter invited attendance to one or more of five live virtual tribal engagement sessions on IRA tribal hatchery funding, announced a written comment period closing on July 23, 2023, and invited further, individual conversations with the West Coast Regional Administrator. Three of the sessions focused on the $240 million for Pacific salmon hatcheries that support tribes and Alaska Native communities with federally-reserved fishing rights, and two of the webinars focused on the $60 million for Mitchell Act hatcheries.

This document is a notes summary of the verbal and written tribal input NOAA received during the consultation and comment period. NOAA considered all the input we received, verbally, or in written comments, or both.

## III. Tribal Engagement Sessions

The engagement sessions were held on June 21, 22, and 23, 2023. NOAA Fisheries Regional Administrator for the West Coast Region and other NOAA Fisheries leadership and staff welcomed the tribal representatives and participated in the sessions. Each of the five engagement sessions (two Mitchell Act sessions, and three non-Mitchell Act sessions) began with a list of questions from NOAA to the tribes.

Mitchell Act sessions:

- What factors or framing questions would you recommend we consider when determining how to allocate and administer the Mitchell Act funds?
- What should the scope of eligible activities be?
- How should the funding amounts to Mitchell Act parties be determined?

Non-Mitchell Act sessions:

- What factors or framing questions would you recommend we consider when determining how to allocate and administer these funds?
- What should the scope of eligible activities be?
- How should funding amounts be determined?
- What process must be in place for establishing BIA 638 contracts?

Forty-three tribal nations and their affiliates participated across the five sessions. Transcripts and presentation slides for the sessions are attachments to this notes summary.

## IV. Mitchell Act Tribal Hatchery Funding Allocation

Mitchell Act funding recipients are parties to the ongoing *United States v. Oregon* federal court proceeding. Some Mitchell Act hatchery production is included in the 2018-2027 *United States v. Oregon* management agreement. NOAA will facilitate meetings with Mitchell Act funding recipients to determine funding priorities for the sixty million dollars. Then, Mitchell Act recipients will present a proposal for use allocation of the sixty million dollars to the *United States v. Oregon* Production Advisory Committee (PAC). With consensus in PAC, the proposal will be presented to the *United States v. Oregon* policy committee for approval. Following PAC approval, the proposal will be submitted to NOAA for final consideration.

## V. Summary of Tribal Input

Tribal nations and tribal commissions provided comments on administrative considerations and prioritization of activities for funding, for both Mitchell Act and non-Mitchell Act funds. Within these four broad categories, NOAA Fisheries summarized the comments provided by the tribes.

From June to September 2023, NOAA Fisheries conducted 12 government to government formal consultations with Tribes in California, Oregon, Washington and Alaska. Four meetings occurred from June to August with the Northwest Indian Fish Commission and the Columbia River Inter-Tribal Fish Commission. NOAA Fisheries received 17 comment letters on IRA Tribal Hatchery Funding during the comment period.

This document summarizes individual verbal and written input NOAA Fisheries received during the 60-day comment period. NOAA considered all the input that was received. We recognize that some of the individual comments did not represent consensus input from a tribal nation or might not reflect a tribal endorsement of specific ideas.

Although this request focused on the specific provisions in the hatchery funding , we welcomed verbal and written input on other NOAA Fisheries programs and priorities as well. NOAA Fisheries also received a few comments that were outside the scope of the hatchery funding and we will follow up with the respective tribes on those issues.

### Mitchell Act Hatcheries: Scope, Scale, and Associated Work

NOAA received comments regarding how IRA funding will be implemented for hatcheries that produce fish for the Mitchell Act in regards to the scope, scale, and associated work. These comments are summarized below.

- One tribe mentioned that *United States v. Oregon* parties have compiled a list of deferred maintenance and infrastructure projects for Columbia River basin anadromous hatcheries, with cost estimates per facility.
    - This list was updated in June 2023.
    - Within this list the parties have compiled a record of which projects are shovel-ready and high priority.
    - Multiple tribes and one tribal commission also emphasized across multiple forums that working to facilitate these repairs through the *United States v. Oregon* Production Advisory Committee (PAC) seems beneficial for the Mitchell Act operators.
- Multiple tribes acknowledged, over multiple forums, that the $60 million obligated to hatchery programs through the Mitchell Act is just a small portion of the $281 to $282 million needed to fully fund backlogged necessary repairs and critical and urgent deficiencies, as hatchery facilities that produce fish for the Mitchell Act are some of the oldest and most in disrepair in the basin.
    - One tribe was particularly concerned about deferred maintenance and facilities being at the end of their useable life span.

- One tribe was also concerned about time limits on funding, as necessary contracting work may need to be scheduled far in advance.
    - One tribe and one tribal commission proposed prioritizing those hatchery facilities that produce fish for the Mitchell Act receiving funds by location of fish releases and the number and species of fish produced.
- Multiple tribes reiterated in multiple forums, along with one tribal commission, that many Columbia River hatchery facilities above Bonneville Dam are not tribally-owned and funds are very needed and should be a priority in these mainly United States Fish and Wildlife Service (USFWS)-owned hatchery facilities in the basin, particularly due to the importance to tribes of the fish these facilities produce.
    - One tribe additionally mentioned that, generally speaking, upper river tribes and entities seem to be lacking funding compared to lower river tribes.
- One tribe acknowledged that these IRA-funded expenditures will help them with combating climate change challenges and achieving recovery goals through these fish propagation programs.
- Multiple tribes mentioned documents which could be helpful for reference related to IRA scope, scale, and associated work, or to which the tribes were generally not receptive. Questions also arose about what regulatory documentation will be necessary once IRA funds have been disbursed:
    - One tribe suggested referencing the Columbia Basin Upper Columbia Management Plan for suggestions of goals to follow.
    - One tribe referenced "Rebuilding Interior Columbia Basin Salmon and Steelhead" and noted that Lower Columbia River tribes have not been very responsive to this assessment.
    - One tribe asked what supplementary NEPA work is needed with respect to reception of funding. Additionally, the tribe asked if there will be a delay in IRA funding related to NEPA work currently in progress for Mitchell Act programs.

## Mitchell Act Hatcheries: Allocation and Funding Process

NOAA received comments regarding how the agency will allocate and administer funding to tribal priorities for hatchery facilities that produce fish for the Mitchell Act. These comments are summarized below.

Funding Prioritization:

- A few tribes, and one tribal commission, recommended utilizing the existing *United States v. Oregon* PAC's eligible project list, developed by *United States v. Oregon* parties and co-managers, to prioritize facility infrastructure needs for funding.
    - One tribe stated there should be additional support and emphasis for tribal preferences to support treaty and tribal needs.
    - Multiple tribes questioned how to further prioritize this existing list and how the application process will be implemented, particularly as the $60 million obligated under the IRA to hatcheries that produce fish for the Mitchell Act is approximately a fifth of what is needed to fund the list in its entirety.
    - One tribe stated a hope that all the Columbia River tribes could get together and create an agreed upon subset of the *United States v. Oregon* PAC's eligible projects list within the *United States v. Oregon* prioritization framework to submit to NMFS for

consideration (i.e. create a list of treaty tribes' priorities for the list of facility infrastructure needs).
    - One tribe suggested that the group that meets through PAC would be an appropriate forum to discuss prioritization of funding among tribes that are party to *United States v. Oregon.*
    - One tribe stated a need to review the co-managers' list of eligible projects for hatcheries that produce fish for the Mitchell Act prior to funding prioritization, as some projects may need to be added and are currently being compiled to be submitted.
- Multiple tribes stated a preference to prioritize projects above Bonneville Dam in order to mitigate fish stocks lost above the dam, and as that is the source of most of the fish caught by tribal fishers. They stated that this is where the majority of tribal fishing occurs.
- One tribe mentioned that hatcheries that produce spring Chinook salmon should be prioritized for funding due to: how poorly the species is doing overall; their general tribal, cultural, and religious importance (i.e., for ceremonial fisheries); and their utility as an indicator species for the health of the basin.

Funding Eligibility:

- Multiple tribes mentioned that many hatcheries in the Columbia River basin are not tribally owned.
    - One tribe indicated that many federally owned mitigation hatcheries are in dire need of infrastructure repairs and replacement due to deferred maintenance.
    - One tribe stated that many of these hatchery programs have asset management plans and projects that could be implemented immediately with appropriate funding, however the total list of these repairs would cost approximately $1.2 billion.
    - Multiple tribes would like to know if funds can be made available to non-tribally-owned hatcheries (i.e., state or federally owned) that tribes still have significant influence over (through *United States v. Oregon* and co-management).
    - Multiple tribes also commented that the BIA funding pathway may not make the most sense for Columbia River hatcheries as they do not all necessarily want to obligate funds only to tribally-owned hatcheries.
    - One tribe asked if there are non-tribal funds included in the IRA or otherwise that may help fund these specifically state and federally-owned hatcheries.

Funding Timeline and Logistics:

- A few tribes had specific requests and questions about the logistics of allocating funds.
    - One tribe requested a streamlined funding and reporting process.
    - One tribe requested a clarification of the timeframe during which funds may be used, stated a preference for a five year timeline (similar to the Mitchell Act funding), and requested that tribal funding matches should not be required.
    - One tribe asked what NOAA's top priorities are in the implementation of the Mitchell Act funding package.
    - One tribe asked for specifics as to how the funding pathway for the IRA will differ from the current funding process under the Mitchell Act, and if the funds will be standalone or included in the regular Mitchell Act funds.

## Non-Mitchell Act Funding: Scope, Scale, and Associated Work

NOAA received comments regarding how IRA funding will be implemented in regards to the scope, scale, and associated work for tribal programs that do not exclusively produce fish for the Mitchell Act, and are therefore categorized as Non-Mitchell Act hatchery programs. These comments are summarized below.

Climate Change:

- Several tribes suggested projects that combat climate change should be prioritized.
    - One tribe shared that warmer water temperatures and lower flows are reducing the production at existing hatcheries. Climate change is one factor that is driving the need for hatchery improvements.

ESA Listed Species:

- Multiple tribes said they would prioritize projects that conserve and recover ESA listed salmon.
    - One tribe shared that hatcheries are preserving ESA-listed stocks and are integral parts of salmonid recovery plans.
    - One tribe stated that these funds will be used to address much needed deferred maintenance that has plagued Columbia River Pacific salmon and steelhead hatcheries, many of which have not been able to meet mitigation obligations due to failing infrastructure.

Treaty Rights to Fish:

- Multiple tribes shared that they are dependent on hatcheries for subsistence.
    - One tribe expressed concern regarding blow back the tribe or NOAA may receive from ‘environmental groups’ who are ‘anti-hatchery.’
    - One tribe shared that all of their treaty reserved rights to fish come from their tribally-owned hatchery. Without the hatchery the tribe would have no treaty rights to fishing.
    - One tribe stated that the fishery has become more dependent on hatchery production. Without fish to harvest, we cannot have a meaningful treaty right. Hatchery fish are recognized by a federal court ruling as treaty fish.

Hatchery Genetics Management Plans:

- Many tribes have HGMPs in process and would like to know if the availability of funds will be tied to the completions of the HGMPs.
- Multiple tribes are curious what role HGMPs will play in the awarding of funding.
    - One tribe expressed that a more efficient operation would probably reduce the terms and conditions in a HGMP.

- There is concern by one tribe that NOAA does not have the necessary staff to approve the influx of HGMPs in a timely manner. There is also a desire to utilize the funding for the developments of HGMPs.

Aging Facilities and Overdue Maintenance:

- Many tribes have expressed that their tribally owned hatcheries are in disrepair and need funding before they are no longer functional.
- Many tribes have expressed the desire to use the funds for maintenance of existing hatcheries.
- One tribe stated that the longer we delay in fixing these aging hatcheries, the more expensive it will be to do so; and the more likely it is that a facility could experience an equipment failure that would have devastating impacts on their fish production.
- Several tribes noted that all of the federally-reserved fishing rights tribally owned and co-Managed operating hatchery facilities are aging. Significant upgrades need to be made to address deferred maintenance to produce fish that support tribal treaty reserved rights to harvest and manage salmon.

Monitoring:

- Multiple tribes would like to use the funds for monitoring the successes of hatchery fish.

Permitting:

- Multiple tribes would like to know how permitting factors into the allocation of funds, and if the permitting process needs to be completed or if it can be in progress at the time that the funds are awarded.
  - One tribe noted that new construction will require regulatory approvals, which can take a long time. There needs to be flexibility with any time constraints attached to the funding since construction projects may take several years.

Reporting:

- Multiple tribes requested minimal reporting requirements.
  - One tribe said that annual reporting should be sufficient.
  - One tribe stated that on the reporting side we don't want to do something onerous.

Types of Projects & Eligibility:

- Many tribes highlighted the need to prioritize facilities that are about to fail.
- Many tribes noted that tribally owned facility upgrades, rehabilitations, and expansions should be prioritized above non-tribally owned facilities.

- Multiple tribes noted that land acquisition for hatchery construction should be eligible for funding.
- Multiple tribes note that water infrastructure is a significant issue for tribal hatcheries. There is a high volume of water needed; often recirculation pumps are involved which require frequent maintenance and replacement; acclamation ponds are often used and also require a lot of water. Being able to address water sourcing and systems with this funding would be beneficial.
- Multiple tribes suggested that NOAA should consider referencing salmon and steelhead recovery plans as part of their funding criteria. Grant funding should be consistent with recovery plan goals and objectives.
- One tribe noted that tribes may need the flexibility to use funds to provide operational support for hatcheries that are owned by the states.
- One tribe requested that NOAA designate the necessary funding to support salmon production projects in the blocked habitats above Chief Joseph and Grand Coulee Dams.
- One tribe said that NOAA should consider allowing planning, engineering, and drawings as part of the allowable use of the funds. Considerable expense and time go into either designing or redesigning hatchery facilities.
- One tribe stated that allocations from the IRA for tribal hatcheries should be set aside funds exclusively for Upper Columbia River hatcheries as the challenges are unique and complex.
- Several tribes have said that the use of these funds should not be limited to just shovel-ready projects.

## Non-Mitchell Act Funding: Allocation and Administration

NOAA received comments concerning how the agency will allocate and administer funding to tribal programs that do not exclusively produce fish for the Mitchell Act, and are therefore categorized as Non-Mitchell Act hatchery programs. These comments are summarized below.

Funding and Allocation Pathways:

- Many tribes, across multiple forums, indicated their support for the BIA funding model as it would be the most seamless and streamlined way to distribute funds expeditiously and standardize reporting, while hopefully lessening administrative burden.
    - One tribe, across multiple forums, supported the BIA funding pathway and further suggested use of the existing allocation formula for hatchery funding that the BIA already uses in order to expedite distribution of funds.
        - In contrast, one tribe stated that allocations should not be based on the existing BIA formulas.
    - One tribal commission offered, and one tribe supported, to facilitate dispersal of BIA 638 funds to their member tribes if that is the most efficient method of dispersal.
    - One tribe, across multiple forums, supported the BIA 638 funding process, particularly as it excludes non-tribally owned programs.
    - One tribe mentioned the potential necessity for BIA funds to help with sovereign issues and shield tribes from litigation.

- One tribe expressed support for a funding pathway more similar to NOAA's Pacific Coastal Salmon Recovery Fund (PCSRF) funding process as it would be more expeditious, equitable, and efficient.
    - The tribe further detailed that the process should:
        - Be semi-competitive and tied to a more general maintenance proposal (that would implement hatchery maintenance from an accepted guideline list).
        - Distribute $5 million to $8 million to each facility initially.
        - Allow competition for the remaining funds.
    - Many tribes supported a similar model that would initially allocate $2 million to each tribe equally before allowing a competitive process for the remaining funds.
- A few tribes recommended a non-competitive application process with an equal award for all qualifying tribes with federally-reserved fishing rights that apply.
- Multiple tribes, across multiple forums, expressed their support for an open competitive process.
    - One tribe clarified if an across the board allocation is unavoidable that they favor $200 million still be reserved for competitive funding.

Funding Eligibility:

- Multiple tribes expressed concern about, or objected to, any of the $240 million IRA Non-Mitchell Act exclusive hatchery-obligated funds being used for hatcheries that produce fish for the Mitchell Act due to the great need in areas outside of the Columbia River basin, and as $60 million is already obligated specifically to Mitchell Act hatchery programs.
- One tribe stated that, as Non-Mitchell Act funding must be split by a large number of tribes, hatchery programs eligible for Mitchell Act funds should not be eligible for the other $240 million in IRA hatchery funds. Hatchery program funding should be limited to only the $60 million obligated to hatchery programs that produce fish for the Mitchell Act
- Many tribes indicated, in multiple forums, their support for IRA Non-Mitchell Act hatchery funding to prioritize, or only go to, those tribes with federally-reserved fishing rights that own and operate existing hatcheries.
    - Six tribes particularly mentioned that tribes have not previously had funding dedicated to larger tribal hatchery capital improvement projects, new construction, modernization, expansion, or facility upgrades.
    - One tribe also specifically mentioned the great financial need and shortfall of the existing tribal-owned programs, and that state and federally-owned programs have historically had more funding opportunities.
- Several tribes, across multiple forums, and one tribal commission mentioned the importance of funding being available for state-owned, USFWS-owned, Bureau of Reclamation-owned, or Army Corps of Engineers-owned hatcheries operated in partnership with tribes, or that benefit tribal priorities.
    - Many tribes stated that the majority of this funding should be prioritized for tribal-owned facilities or that a tier system should exist for the various levels of tribal ownership and benefits vs. state and other agency ownership.

- One tribal commission expressed, and one tribe supported, their willingness to explore, with the BIA, avenues for tribally directed funds to go to state-owned/operated or federally-owned/operated Non-Mitchell Act hatcheries in a way that maintains tribal priorities.
  - One tribe suggested fixing primarily federal hatcheries, particularly those that significantly meet tribal needs

Funding Prioritization:

- One tribal commission provided and multiple tribes supported, a list of Columbia River basin hatchery infrastructure needs that was compiled with state and federal co-managers to assist in prioritizing IRA Non-Mitchell Act funds in order to repair hatcheries that support treaty-reserved fishing rights.
- One tribal commission and one tribe supported the tribally directed allocation of funds for Columbia River basin hatcheries and will work with *United States vs. Oregon* parties and operators of Non-Mitchell Act hatcheries to prioritize those actions. The tribal commission, and tribal commission member tribes, can obligate $120 million of deferred maintenance and infrastructure funds identified in the attachment for high priority Columbia River hatcheries by 2026.
- One tribe commented that prioritization of new hatchery construction is very important to them as this has not previously been a funding priority.
  - One tribe acknowledged that while new hatchery construction is an exciting prospect, that funding for necessary upgrades and prescriptive improvements in order to reach existing approved production goals is much needed.
- One tribe suggested that funding should be prioritized to large rehabilitation, upgrade, expansion, and new construction projects.
  - This tribe further suggested large projects be classified as those that cost more than $1,000,000 and are generally outside the scope of the existing BIA Hatchery Maintenance Program.
- One tribe suggested state of the art hatchery facilities should be funded across the board, particularly as an effort to address the impacts of climate change.
- One tribe discussed that funding prioritization should consider location, or remoteness, of a particular tribal location as tribes located higher in the watershed may be totally dependent on hatchery fish returns to complete any sort of harvest.
  - One tribe additionally suggested prioritizing funding for smaller, more rural, and historically underfunded hatchery programs.
- Multiple tribes and one tribal commission, across multiple forums, commented that priority should be given to programs that leverage federal funding to support ESA recovery, support their individual watershed recovery plans, or provide harvest opportunities while salmon habitat recovery is underway.
- One tribe asked for NOAA's expectation for how projects will be prioritized for funding (i.e. does NOAA expect the tribes to apply individually, or come to a consensus on priority projects together?).

- This tribe stated that it will likely be difficult for Non-Mitchell Act tribes to come to a consensus on project and facility funding priorities due to the large inter-watershed diversity in needs, issues, and capacity.
    - One tribe stated the importance that tribes have a strong voice in how these funds are directed to support tribal interests.
    - One tribe suggested funding allocations between tribes be based on the merit and eligibility of proposed projects, the consistency of eligible projects with common priorities, and the probability of eligible projects to successfully accomplish proposed outcomes with regulatory approval in a timely manner.
    - One tribe indicated that the Puget Sound and Washington coastal tribes are planning to set up a Tribal Enhancement Ranking Committee, similar to the Tribal Hatchery Reform ranking process that distributes PCSRF funds to tribes, in order to further develop funding distribution and proposal criteria, and to write, present, and rank proposals for policy approval.
        - Multiple tribes, across multiple forums, expressed support for an unbiased, peer-reviewed, committee ranking process similar to the one suggested above, that must include input from as many impacted tribes as possible.
- One tribe commented that they are pleased to see that funding will be going to hatchery aspects of hydropower systems, particularly given they are meant to mitigate for hydropower projects, given that their maintenance has often been deferred in order to prioritize maintenance of other hydropower facility operations.

Funding Timeline and Logistics:

- One tribe asked for clarification on the timeline for when funds must be used (i.e. five or six years) and asked for a clearer distinction between timelines for when funds must be obligated or expended.
    - Multiple tribes expressed a similar interest in clarifying how the funding process works through the BIA process and asked if there is a project proposal format finalized.
    - Many tribes would prefer that funds be awarded through 2026. Many tribes suggested that after that time period funds should remain obligated to the BIA and applicable tribes.
        - One tribe particularly mentioned how long construction takes to schedule and how busy contractors are, thus further necessitating flexibility in the time period available to spend these funds.
        - One tribe expressed an interest in quick allocation of funds and flexibility in funding implementation.
        - One tribe suggested this should be a cyclical process and not just one-time funding.
- One tribe asked NOAA for clarification if permitting will be required prior to approval for “shovel-ready” projects and if funding may be available for the necessary permitting.

- A few tribes requested that project management, planning, and engineering costs that are directly related to projects be eligible expenses within reason. One tribe suggested 5% of total award.
- Multiple tribes specified that all programs should have necessary applicable permits and comply with federal laws.
- One tribe requested HGMPs be excluded from this requirement.

## General Comments on Scope, Scale, and Associated Work

Some tribal comments NOAA received spanned, and were relevant to, scope, scale, and associated work for hatchery programs that do and do not produce fish for the Mitchell Act. These comments are summarized below.

- One tribe and one tribal commission commented on the many significant outstanding maintenance needs for Columbia River basin hatcheries due to deferred maintenance.Both stated that:
    - Many hatcheries are 50-60+ years old and several are nearing 100 years old
    - Issues include: crumbling concrete; dilapidated rearing ponds; old and failing electrical systems; antiquated water intake, screening, and treatment systems
    - Many hatcheries do not meet mitigation obligations or goals

## General Comments on Allocation and Funding

Some tribal comments NOAA received spanned, and were relevant to, allocation and funding for hatchery programs that do and do not produce fish for the Mitchell Act. These comments are summarized below.

Tribal Context for Necessity of Funding:

- Many tribes, across multiple forums, reiterated their treaty right, guaranteed by the federal government upon ceding millions of acres of land, to First Foods (water, fish, big game, roots, berries, and other plants) and the habitats and environmental conditions that support and sustain them, and the importance of this funding to help maintain these.
    - Six tribes emphasized in multiple forums the importance of this funding due to the magnitude and importance of hatchery supported fisheries to their tribal economy and culture.
    - One tribe also specifically mentioned the importance of these hatchery facilities in the recovery of ESA listed salmon species.
    - One tribe emphasized that needing to provide funds for much needed hatchery capital improvements creates a deficit in tribal healthcare, education, housing, chemical dependency, and child and elder services programs.

- Additionally, one tribe emphasized the importance of hatchery employment to tribal members and mentioned that hatchery employees have gone on to tribal leadership and policy roles in several instances.

## VI. Conclusion & Next Steps

NOAA appreciates the thoughtful engagement, comments, and feedback received from tribal nations and their affiliated organizations. Both verbal and written comments will help direct NOAA with funding intended for federally recognized tribes.

NOAA Fisheries intends to continue this discussion on how to modify the implementation of these provisions to address tribal nations' needs. Subsequent engagement is expected to evolve throughout the implementation of these provisions, and NOAA Fisheries will be responsive to tribal nations' preferred methods of communication, including formal consultations per the NOAA Tribal Consultation Handbook.

NOAA Fisheries remains committed to fulfilling the federal trust responsibility to tribal nations and communities. We look forward to a productive relationship between our agency and tribal sovereign governments.

**From:** Lalena Amiotte - NOAA Federal
**To:** Dustin Klatush; Sharon Hall; Shawn Ortivez; Glen Connelly; Dawn.Gomez@hohtribe-nsn.org; Maria.Lopez@hohtribe-nsn.org; Julie.Koehlinger@hohtribe-nsn.org; bob.smith@hohtribe-nsn.org; rallen@jamestowntribe.org; hhals@jamestowntribe.org; lbarbee@jamestowntribe.org; rknapp@jamestowntribe.org; fgcharles@elwha.org; russell.hepfer@elwha.org; matt.beirne@elwha.org; robert.elofson@elwha.org; Anthony Hillaire; libchr@lummi-nsn.gov; travisb@lummi-nsn.gov; Lisa A. Wilson; bens@lummi-nsn.gov; merlej@lummi-nsn.gov; Timothy Greene; chad.bowechop@makah.com; Russell Svec; Ray.Colby@makah.com; jaison.elkins@muckleshoot.nsn.us; Isabel Tinoco; fisheries@muckleshoot.nsn.us; AStay@muckleshoot.nsn.us; choke.ken@nisqually-nsn.gov; troutt.david@nisqually-nsn.gov; smith.craig@nisqually-nsn.gov; slape.jamesjr@nisqually-nsn.gov; rlaclair@nooksack-nsn.gov; acharles@nooksack-nsn.gov; ncurrence@nooksack-nsn.gov; dwellman@pgst.nsn.us; paulm@pgst.nsn.us; romac@pgst.nsn.us; bill.sterud@puyalluptribe-nsn.gov; CouncilOffices@puyalluptribe-nsn.gov; Russ Ladley; char.naylor@puyalluptribe-nsn.gov; Doug.Woodruff@quileutenation.org; executive.secretary@quileutenation.org; Zach.Jones@quileutenation.org; qnr.director@quileutenation.org; dwayne.pecosky@quileutenation.org; chris.wagemann@quileutenation.org; jennifer.hagen@quileutenation.org; Guy.Capoeman@quinault.org; Cynthia.Ralston@quinault.org; FSharp@quinault.org; BBryson@quinault.org; Bingaman, Dave; Cleve; delbert.boyer@quinault.org; Chet; Gary Morishima; tomwooten@samishtribe.nsn.us; twoodard@samishtribe.nsn.us; njoseph@sauk-suiattle.com; chairman@sauk-suiattle.com; gkirby@sauk-suiattle.com; gmiller@skokomish.org; dherrera@skokomish.org; jwolf@skokomish.org; jpavel@skokomish.org; kpeters@squaxin.us; awhitener@squaxin.us; esparkman@squaxin.us; jdickison@squaxin.us; ewhite@stillaguamish.com; jsmith@stillaguamish.com; syanity@stillaguamish.com; lforsman@suquamish.nsn.us; rpurser@suquamish.nsn.us; pwilliams@suquamish.nsn.us; cschmidt@suquamish.nsn.us; sedwards@swinomish.nsn.us; ehaley@swinomish.nsn.us; twilbur@swinomish.nsn.us; tmitchell@swinomish.nsn.us; trgobin@tulaliptribes-nsn.gov; jgobin@tulaliptribes-nsn.gov; jasongobin@tulaliptribes-nsn.gov; darylwilliams@tulaliptribes-nsn.gov; dholmgren@tulaliptribes-nsn.gov; marilyns@upperskagit.com; scotts@upperskagit.com; hoopa.receptionist@gmail.com; executiveassistant49@gmail.com; hoopachairman@gmail.com; hupafish@hoopa-nsn.gov; Mike Orcutt; jjames@yuroktribe.nsn.us; fmyers@yuroktribe.nsn.us; Mike Crewson; Albert Smith; Dustin Winter; Jesse McMahan
**Cc:** Ruth Howell - NOAA Federal
**Subject:** Re: IRA Tribal Hatchery Information Todays Presentation and Notes Summary
**Date:** Wednesday, October 11, 2023 5:26:29 PM
**Attachments:** IRA Listening Session 06-23-2023.pdf
IRA Listening Session 06-21-2023.pdf
IRA Listening Session 06-22-2023.pdf

---

Attached are the three transcripts of tribal engagement sessions in June 2023. These three meetings were specific to Tribes NOT party to the U.S. v. Oregon (Mitchell Act).

Respectfully,
Lalena Amiotte
*Tribal Relations Coordinator-West Coast Region*
NOAA Fisheries | U.S. Department of Commerce
Office: 360-519-4222



EXHIBIT 6-B-1

Powerful
LITIGATION SUPPORT

COURT REPORTING
LEGAL VIDEOGRAPHY
VIDEOCONFERENCING
TRIAL PRESENTATION
MOCK JURY SERVICES
LEGAL TRANSCRIPTION
COPYING AND SCANNING
LANGUAGE INTERPRETERS

N
NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800) 528-3335
NAEGELIUSA.COM

**INFLATION REDUCTION ACT (IRA):**

**TRIBAL HATCHERY FUNDS**

**WEST COAST REGION (WCR)**
**TRIBAL ENGAGEMENT SESSIONS**

**HELD ON**
**WEDNESDAY, JUNE 21, 2023**

**INFLATION REDUCTION ACT (IRA):**

**TRIBAL HATCHERY FUNDS**

**WEST COAST REGION (WCR)**

**TRIBAL ENGAGEMENT SESSIONS**

**HELD ON**

**WEDNESDAY, JUNE 21, 2023**

**MS. WEEDER:** (Recording started) -- to discuss IRA hatchery funding not related to the Mitchell Act.

My name's Julie Weeder, and I'm the outgoing acting West Coast Region Tribal Coordinator. And I'm here providing some just, kind of, technical logistic assistance today.

So welcome everyone. Thank you for taking the time to join us today. I wanted to share some helpful information. You will being in listen-only mode during the introductions and a brief presentation. The meeting is being recorded. Just wanted to give you a preview of once we are done with the presentation, how you would ask a question or provide a comment.

So if you're on your computer, and participating on your computer, you would raise your virtual hand. And when we get to that point, I'll

show you a screenshot showing you the button that you need to press to do that. And then our moderator, Zach Penney, will call on each person in the order that the hands are raised, and he will unmute you. Now, he will unmute you on his end, but you will not be unmuted until you click the actual unmute button on your end. And again, we'll show you a screenshot of what that looks like. And please, state your name and affiliation first.

And if you're on the phone, you'll need to press *3 to raise your hand, and then Zach will call on you and select you to unmute you. And then you just want to make sure that your phone is not also muted, that you haven't accidentally muted yourself. And again, please state your name and affiliation first.

So Zach, would you like to jump in?

**DR. PENNEY:** Sure.

Good morning, everybody. I'm pretty sure it's morning for most of you. Let's see mostly West Coast folks.

So for those that don't know me, I'm Zach Penney, and I'm NOAA's Senior Advisor on fisheries and tribal engagement, and I'm going to help the West Coast region facilitate today's meeting. Today

we're talking about the IRA set-aside of hatchery funding, the 240 million. So thank you all for joining us.

Before we start, I just want to make sure we take time, if anybody on the phone wants to offer an opening prayer. The first hand that raises gets to offer the prayer. But nobody -- assuming like the last call, folks just want to get down to brass tacks and talk about this, but I do want to give at least 10 seconds to give folks to pray or, you know, meditate in whatever way they choose to do. So I'm going to go ahead and do that now before we get going.

**(Pause in proceedings.)**

**DR. PENNEY:** All right. So let's do this. I'm just going to quickly -- go quickly over our agenda. So if we move to the next slide, please.

So I'm going to hand this over to Jen here in a second, but essentially, what we're going to do is we're going to quickly cover sort of how we got here with this IRA set-aside. Where NOAA and the tribes want to go next, and some ideas that we have there, and then have a conversation about this. That's what today is about, having actual dialogue. And then we'll offer a closing once no more

 questions have -- if there's no more questions from the audience.

So next slide, please.

So I just want to note that today, you're joined by Jennifer Quan, Regional Administrator for the West Coast region, and she'll introduce herself a little bit more here in a second. But also Dr. Scott Rumsey, Deputy Regional Administrator for the West Coast region, Natasha Preston, who is our Branch Chief for Anadromous Production and Inland Fisheries in the West Coast region. Julie Weeder, who is currently our outgoing coordinator for the West Coast region.

And we're also sad to see Julie go, but we're also thankful to have Lalena Amiotte, who is our brand new Tribal Coordinator who is just actually on her second day today, joining us. And we're also honored to have Bryan Mercier, the Northwest Regional Director for the Bureau of Indian Affairs joining the conversation today.

So with that, Jen, I'm going to hand the floor over to you, so the floor is yours.

**MS. QUAN:** Great.

Well, good morning, almost early afternoon, but welcome. Thank you for taking your

time and for your willingness to join.

I am Jen Quan. If I haven't met you yet, I look forward to meeting you, both either through this process or through other engagements. So again, thank you and welcome.

So today, we are here to talk about IRA tribal hatchery funding. Personally, I am just super excited about this unprecedented funding level for tribal hatcheries. I think we all can recognize that we haven't seen this kind of federal funding go into hatchery systems, and specifically as a commitment to support federally-reserve fishing rights and treaty rights before. So I am just really excited about this process and getting the funds out the door and to you as quickly as possible.

So it is my expectation that the session today is really only the beginning of the engagement on these funds. We will share with you what we know and what we're thinking about. We invite you to do the same. If we don't know the answers, we're going to tell you we don't know the answers and get back to you. And as I said before, this is just the beginning of the conversation. We'll talk about how to engage further and really are going to rely on you for heavy engagement on how to shape this.

Okay. So how did we get here?

All right. Go ahead next slide.

So just a quick level recap -- I think we'll move to the next slide -- is through -- you know, really I want to say is that it's through your efforts and engagement on the IRA tribal consultation meetings that occurred with NOAA headquarters leadership in March that we are here in this situation. Your voices were heard. And today, we're going to be discussing the resulting 240 million to be allocated to tribal hatcheries. We will work with the tribes to determine the scope and -- the scope of eligible projects and processes for the allocation of these funds. The funds themselves will be distributed through the BIA and the 638 contracts.

All right. Can you put that in presentation mode, Julie? It might come out a little more clear.

Great.

So one thing I would just note -- this is what I just said. Here are some words on the screen to go with it. Here I'm talking about determining scope, eligible projects, and criteria, and allocation for funding. You will hear me, later in

the presentation, refer maybe to this as program, and the program is really loose -- loosely termed, but when I say program, talking about eligible project funding and criteria, the allocate -- you know, how we determine the allocation of funding. When we get to administration, there will probably be some level of reporting, just on the accountability side.

Okay. Next slide.

All right. So where do we go from here?

I think we can good to the next slide.

All right. Great.

As I mentioned earlier, this week, we intend to just begin the conversation here today. This slide lays out a framework of our thinking around a timeline, and it really is only a way for us to put some structure and motivation around the discussion. From our side, it's driven largely by urgency and desire, like I said, to get these funds out the door and into the hands of the tribes as soon as possible.

We understand that we may have to have more conversations. And so, you know, to the extent this timeline shifts or evolves and adapts to the conversations we need to have, there's probably a

little bit of flexibility in there, but I want to be optimistic and encourage us to strive to work towards these time frames.

As I discussed earlier, we'll continue through mid August and late summer, if necessary, either through additional one-on-one meeting after this, group meetings, or any other configuration of meetings that we need to have to get to a common understanding of how we're going to move forward.

Can you go back to that slide?

Thanks.

By late summer, ideally, we'd be able to come to some agreement on the scope and distribution of these funds. If we able to do that, we would then quickly move in to kind of developing that program. Again, loosely, program for administration. And I think this will make more sense as we move through the conversation.

Concurrently, we'll be working on an interagency agreement with BIA. If we can get to program administration by the end of this year, we'd be looking to allocating the funds next year. And I would note that -- and reiterate here that ongoing tribal engagement and tribal consultation is

requested -- is available and invited throughout this process.

Okay. Next slide.

So the next slide is how we will determine funding. This is really high level. I just want to reiterate, this is a new set -- a new pot of funding. We don't have processes in place to put -- to do this. We've never had to do this before. We are really going to rely on you, on tribal input, to shape this. There -- you know, NOAA and BIA will also have to weigh-in in light of their administrative processes and depending on how this is shaped. So it's really kind of an iterative conversation with you on how this happens.

At this point, I'm going to stop for a second and see if Bryan wants to weigh-in on any thoughts or comments so far.

**DIRECTOR MERCIER:** Yeah, thanks, Jen.

And to all the attendees, I'm Bryan Mercier, Regional Director for the BIA. And we are engaged here to really try to reduce the administrative burden of disbursing these funds to you all through our 638 contracts and Title IV compact, so our self-governance compact. It doesn't absolve us of all the various requirements for

 environmental review. So NEPA and other requirements will still be required. But it should make it much easier for us to move the funds from the federal government to you all through our existing contracts and compacts.

We've done it recently with some Bipartisan Infrastructure Law funding, and it's been very successful for many of our regional tribes. So we offered and NOAA has accepted of the offer of assistance. And we're looking forward to working with you all to get this funding to you all through your -- through 638, through the Self-Determination Act.

It is one-time funding. So it's not a traditional PFSA program function, service, or activity that would be standing up here. We would largely be modifying our existing contracts and compacts with you all with this one-time funding as -- as we move forward. So I think it can be a very successful partnership, and my understanding, the tribes are very supportive as well.

So I appreciate the opportunity to say a few words about it, Jen. Thanks.

**MS. QUAN:** Thanks, Bryan. We really appreciate your partnership in this, and excited to

 have it be successful.

Okay. One more, kind of, administrative side and then we will start moving into discussions. So there are multiple ways to engage in this conversation. I just keep reiterating, this is really about engagement. Today's session, obviously, there are now four other sessions that we have -- or no, I guess we'll be down to three other sessions later this week. One more that's Mitchell Act explicit, and two more that are non-Mitchell Act hatchery explicit.

If you want to engage in a one-on-one, a consultation, please -- and/or a consultation, however we want that to look, please reach out to Julie Weeder. She can help get that scheduled. You also have the option, and this link is also in the letter that we sent you, to provide written comments by July 23rd.

Okay. So beginning the discussion, slide 11.

So for these next slides, I'm going to present two discussion areas. And these are no way -- we're no way limited to these discussion points. These are really to catalyze the conversation. They're kind of what we're thinking about right now,

so there's some transparency on what we're thinking about, but really, simply, here to start the conversation.

We will also share with you some proposed questions and considerations we've been thinking about. So we'll go through those three slides. Then I will switch to Julie, who will give you some instructions on how to unmute yourself. And then we'll open up the floor and hear your ideas. And we can go back to any of these slides when we move into discussion phase. And just, you know, feel free to ask for that in the chat.

Okay. So first discussion point -- so the first discussion point I think that we're starting to get our head around is -- again, I'm using "program" very loosely, what is the scope and criteria of projects that we should be considering and that should be eligible for this level of funding?

A couple of areas that jump right out to us is the -- is maintenance and expansion projects, hatchery projects. And then the blue is kind of like what kind of criteria? These are loose level criteria. We can dig down. We can get more specific. We can keep them high level. But, you

 know, what -- what criteria should we be thinking about if -- if we want to step down these kind of projects.

One thing I do want to be really transparent about right now, because I think it's come up in some of the earlier conversations already, if we are looking at a program that's going to expand production, whether it's an upgrade through a maintenance project, or it's an actual expansion of the facility, if that's something that we want to consider here, it will trigger a conversation about HGMPs. And I know a lot of you are probably not feeling good about me saying that out loud, but that is -- that's the truth.

I think that as we move forward in the conversation -- I bring it up now because as we move forward in the conversation, there's -- you know, there is some urgency of getting the funding on the ground. You all know what it takes to engage in an HGMP conversation. We're not afraid to do it. We just need to go in eyes wide open, and realities on what we can deliver in the time frames associated with this funding.

Okay. And then we also want to hear from you, other ideas, programs, scope, and criteria.

Okay. Next slide, next discussion point.

All right. Our next discussion point is how do we allocate this? How does it get distributed among the tribes?

These are just some high-level, you know, throw-spaghetti-at-the-wall ideas. We are open to other ideas. We're not wed to any of these. Again, this is just for the purpose of catalyzing a conservation about, you know, what's in the art of possible in this particular case. But I will say that ideally, and I know some of you have already laughed at me about this idea, but I'm still optimistic, you know, if the tribes with federally-reserve fishing rights were able to agree to a universal approach to the distribution of this funding, that's going to be the quickest and easiest way.

We also know Bryan talked about, and they have recent experience with hatchery funding through Fish and Wildlife Service. If that's a model that you're familiar with, and you like th criteria and the way things were set up there, we can look to model something similar. We can also go with something more complicated, like a tiered approach. But these are just, again, ideas to begin the

 conversation.

All right. Next slide.

Okay. Finally, these are some of the questions that we have for you all. We want to hear what yours are. What question -- what other questions we might want to be thinking and considering. But ultimately, the first one at the top of the list is what are your priorities?

It would be interesting for us to know if we move forward too, with this concept of trying to identify project scopes, you know, how many projects do you have in those? What other categories should we be considering? Other ideas about as we think globally, are there areas we want to target more strategically? We're open to those conversations. And then what factors -- what other factors do we need to be considering, should NOAA and the BIA be considering in the allocation of these funds?

So these are our ideas. As -- and we're open to more conversation, so I guess I'll stop there. And we will, like I said, be able to pull any of these back up if you want to see them, if they help you form your questions or advance the conversation.

And Julie, at this point, I'm going to

 turn it over to you to let everybody know now to make this WebEx thing work.

**MS. WEEDER:** Thank you, Jen.

So let's see here, I'm going to pull up a slide. So this is the same information that was on the earlier slide, but the difference is that there's a screen shot.

So we're now at the point where we're wanting to begin this dialogue with you. So in order to ask a question or provide a comment, you would need to raise your virtual hand if you're on the computer. So what you'll be looking at here, if we can look at this image on the upper right, there is a little hand icon and it has a little line around it, and that is what you need to click. And when you do that, it's going to show up on Zach's screen that your hand is raised. And Zach will be calling on people in the order that the hands were raised, that the program tells him the order.

Now, he will -- when he calls on you, he will unmute you, but then you won't be unmuted on your end until you click another button that appears on your screen that looks like this. So this box will appear, it will say "Unmute yourself. You're being asked to unmute yourself."

So what you want to do is click on the oval that's labeled "unmute me." Once you've done that, then everybody will be able to hear you, and we just ask that you -- that you first state your name and affiliation. And again, if you're on the phone, there's -- you wouldn't be doing this. You'd be pressing *3 to raise your hand, and then Zach will call on you and select you to unmute you, and just make sure that you haven't yourself muted your phone on your end, because that's not something we can help with. And then also, please state your name and affiliation.

And a couple of things to note is, you know, we may potentially have many people having comments and questions today, so we can keep that in mind. And also, we'll call on everybody first before we have repeat comments from anyone. And that's where we're at.

So here is -- here's a discussion slide that kind of summarizes some of what Jen said. And I will turn it back over to -- I'll turn it back to you, Zach, and you can guide us in terms of who is up next in line. Thank you.

**DR. PENNEY:** Okay. Thanks, Julie. Thanks, Jen.

 So they gave me the power of the mute button. And so, yeah, just like Julie said, you know, we ask when you're providing your comments, that everybody is mindful that there's potentially many voices that need to be heard today. So that hand-raise function is next to -- right between the record function, down on the lower screen. So if you have a question, go ahead and press that. What will happen is on my attendees list, I'll see the hand go up, and it actually arranges you based on the time that the hand does go up.

So now is the time for questions. Just to add on a little bit of what Jen said, you know, while this, I'd say, you know, this 240 million is a huge slug of funding for deferred maintenance and other hatchery needs in Indian Country, we also realize that the needs definitely far outweigh, you know, the amount of funding that was provided. So I just want to acknowledge that up front. And so, you know, today we definitely need your guidance. You know, this is a consultation. This is a conversation with the tribes about how we best do that. So we really do appreciate and need your input today.

So with that, for folks that have

 questions, please go ahead and raise your hand, and we'll go ahead and have a conversation.

And don't be shy. So I have not seen anybody's hand yet. Go for it.

**MS. WEEDER:** Also, if you are having any technical issues, please type into the chat that that's happening, and we will attempt to help you with that.

I see Brent has raised a hand. Brent Hall.

**DR. PENNEY:** Go for it, Brent.

**MR. HALL:** Thank you.

Brent Hall representing the Warm Springs Tribes. First, I really want to express our appreciation for these funds being allocated to the Pacific Northwest. They are direly needed, and we are very grateful.

I want to speak to the Columbia Basin hatcheries. We have this situation in the Columbia Basin where we have many federal hatcheries that have a purpose of mitigating for lost fish and making up for those treaty promises. And so they have mitigation goals associated with their production. And they are, I believe, universally not meeting those mitigation goals.

     We have deferred maintenance, repairs, replacement, infrastructure needs for these hatcheries that is tremendous. The co-managers have worked through U.S. v. Oregon for several years now on a spreadsheet detailing those needs and they total approximately $1.2 billion.

All of these hatcheries have asset management plans and identified infrastructure needs which translates to a list of items that are ready to go, that could be implemented if the funds were made available to fix them. The issue is that most of these hatcheries are not owned or operated by tribes. We do have significant influence over their operation through U.S. v. Oregon or through co-manager status. So getting the funds to the agencies that own the hatcheries could be an issue. I think if the funds are provided to tribes, and the tribes can provide it to the agencies, we could do it that way. I'm not sure about the details.

The BIA, Fish and Wildlife service model, for that reason, I think, does not work well in the Columbia hatchery. Because my understanding is one of the requirements for that model is the tribes have to own the hatchery, and that just doesn't work in this instance.

In terms -- another priority issue is that those hatcheries that produce spring Chinook, we believe, should be prioritized. The spring Chinook are one of the species that is doing the poorest. The runs seem to decline nearly every year, even when they're forecast to be higher, such as this year. Additionally, it is such an honored and important fish to the tribes, important to the culture, religion, all of our ceremonies. It is the only fish that we actually have a ceremonial fishery on every year before the subsistence fishery starts. And it is considered an indicator fish in the basin for the health of the basin.

In terms of process, we do recommend a streamlined-as-possible process. And Bryan, appreciate you stepping in. Doing the 638 process may help with that. We understand that there will be reporting requirements, but ask that they be streamlined as well.

I know some tribes did have some issues with the NOAA fishery disaster funding process administered by PCSRF.

We assume that the funds will be available for a five year timeline, or something along those lines, as with the Mitchell Act funds, and that

tribal matches should not be required.

We will follow up with more detailed, written comments. And appreciate the opportunity for the -- I think in a prior slide it said consultation directly with the tribes and NOAA this fall as we move forward.

So I think that's it for now, but I can't promise not to raise my hand again. Thanks.

**MS. QUAN:** I'll just jump in.

Thanks, Brent, for those comments. Appreciate all your questions.

The one thing that I would most immediately respond to, because I'm guessing a bunch of you have similar questions, was the point that you raised around -- about your partnerships and agreements regarding production at non-tribal hatcheries. And we have anticipated that that is likely the case.

We will be giving funds to tribes, and I think as we structure, you know, the projects they go out to, we envision that if the tribes then wanted to spend that money on a project in partnership with a state hatchery, for instance, that that is how we would want to structure it. So hopefully that helps.

And yes, on the five-year piece, we may -- it's five years at the end -- what we've been told is that probably the agreement that we end up making with BIA, at the termination of that agreement plus five years is when it's over. So we've got -- we maybe have one or two years, in addition to the one we have right now, that could help us get this funding out. So just a little bit more flexibility on this pot of funding.

**MR. HALL:** Thanks, Jen. That's really great to hear. You mentioned, you know, hatcheries that are owned by states. I assume you're using states as an example, but the same type of arrangement would be envisioned with Fish and Wildlife Service or Reclamation or the Corps.

**MS. QUAN:** Yeah. I think we're definitely open to those conversations. I think we cannot directly allocate our NOAA IRA funds through another federal agency, but we can work on -- I mean, that's how we -- again, when we're talking about how do we scope this and shape it, if we're explicit that, you know, funding goes to the tribes, and the tribes work with their partners, whether their state and federal, we just need to capture all the nuances that we need to.

 **MR. HALL:** Understood. Thanks.

**DR. PENNEY:** Okay. Thanks, Jen, and thanks, Brent.

Let me check my queue. We have -- okay. I see Mike Crewson from Tulalip. I'm going to go ahead and unmute you.

Go ahead, Mike.

**MR. CREWSON:** Yeah. I actually support the hatchery maintenance funding model through BIA as probably the most seamless way that we could distribute these funds. In the suggestion from Lummi, which I hundred percent agree with, they talk about ideas like the nexus to other hatchery -- you know, agency programs that are linked, like were just mentioned. So there would be someway to work that into that process, potentially.

And then the prioritization of projects that leverage other funds or that are re-enlisted fish, like was just mentioned too, because we're doing that in Washington state just as well. And in the end, I do think that funding model would potentially work well for this.

Anyway, that's my two cents worth.

**DR. PENNEY:** Thanks, Mike.

We have 20-some attendees, so let's see

the hands. We got lots of folks on. We have plenty of time left.

**MS. WEEDER:** So while we're giving people a chance to raise their hands, I'll just mention that we have been asked to share the slides from these presentations. And those will be going out Friday afternoon, so you can keep an eye out for those.

**DR. PENNEY:** A quiet crew. I still don't see any hands. I see -- Mike, that might be a legacy hand.

**MS. QUAN:** Julie, maybe we can pop up the questions too, and see if that helps.

Thanks.

**MS. WEEDER:** And we do recognize that, you know, this is a lot of information to throw at you, and a lot of questions, and a lot of bullets. And it's understandable that, you know, you're going to take a minute to consider these things. And, you know, this is the beginning of these conversations we're hoping that will continue on through the other listening sessions, but also through any one-on-one meetings.

So recall that, you know, you can definitely contact me if you'd like to set up a one-

on-one conversation with Jen to really convey a lot of your thoughts, especially once you've had time to consider these specific questions and get back with everybody you work with.

**DR. PENNEY:** Okay. We've got some hands.

All right. Jerimiah, I'm going to go ahead and unmute you.

Go ahead and go for it.

**MR. BONIFER:** I'd like to second Brent's comment in thanking you for making this funding available or having this funding available.

One of the maintenance categories, I think, should be considered is some in water work. Some of these facilities have intake structures that require a lot of maintenance and a lot of potential redesign to make them more efficient under current conditions. And so, I think that's something that should be considered as a category for funding purposes. Thank you.

**DR. PENNEY:** Definitely -- thanks, Jerimiah.

On top of deferred maintenance, definitely also catching up with hatchery foreman following the science in terms of where hatcheries have come since when a lot of these facilities were built.

Mike, I see your hand back up, so let me go ahead and unmute you.

**MR. CREWSON:** Thank you.

So prioritization of new hatchery construction is -- is really important in this because we have never had that. And we've always had to, you know, fit that into maintenance, which, you know, when you're replacing something that's broken and can't be repaired or whatever, it's the right way to do maintenance too, but it's never really been something we've had to tiptoe around. You can't use the word "new" when you're talking about hatchery maintenance and stuff like that.

And projects that conduct priority research for listed species, and that have permits, and that have designs should be considered as important because they're shovel-ready versus not. And so, those matter, too, for us to consider it. But I thank you, too.

I mean, we need -- this is long overdue, but we really need this money more than anything right now because there's no other funding for it. And it's substantial monies that you need to do anything like this. If anybody has done any construction lately, you know what I mean. But

anyway, thank you for that. And I think those are other important considerations because to do anything, you actually have to get the permits, and you have to actually have the final design in order to launch construction. Thank you.

**DR. PENNEY:** Thanks.

Jen, Scott, and I don't know if we still have Natasha, is there any comments you want to offer on -- outside of the deferred maintenance question for construction that's either new or hasn't been done?

**MS. QUAN:** Yeah. I think that we -- I think, like I said earlier, we're open to those conversations. You know, anything new that starts to look at increased production, again, triggers HGMPs. So I guess as you're thinking about that, you might want to think about what the timelines associated with that. I know that we've got a bunch in the works right now, so maybe there's opportunity to do some small amendments there, if you've got a shovel-ready project that hasn't already been accounted for in those conversations. But we're open to seeing how we can make all this mesh together. But want to be transparent, especially for new construction and expansions that increase production. We're going to

want to have a more detailed conversation around the HGMP piece.

**DR. PENNEY:** Okay. Thanks, Jen.

Brent's hand is up.

So Brent I'm going to go ahead and unmute. Go for it.

**MR. HALL:** Thank you, Zach.

Yeah. Thinking about the new construction piece and the experience we had at the Umatilla Tribe when I helped them with their spring Chinook hatchery in the Walla Walla Basin, I think that was a 30 year project. And we were very grateful to finally get it constructed.

But Jen, you're absolutely right, getting the approvals and permits necessary, including the HGMPs, at least in the Columbia going through the Council process is a very, very long undertaking.

And as Natasha knows from her work in U.S. v. Oregon, we do have these shovel-ready identified list of projects for deferred maintenance in the Columbia Basin for hatcheries that are not meeting their mitigation obligations and never have. So, thank you.

**DR. PENNEY:** Thanks, Brent.

I'm not showing any new hands in the



queue, so still plenty of time. So if you have a question, go ahead and ask it, but I'm going to take stab, though, and maybe since we have Bryan on the line -- and, you know, Indian Affairs and BIA has been great to work with thus far in terms of getting this together. You know, one of the things that we've discussed internally is, you know, in order for these -- you know the 638 -- to go through 638, you know, we can't just place this all on the shoulders of trust services with BIA.

And so we'll have -- once we figure out how we want to do this with the tribes, our West Coast region and folks here in DC are going to need to -- are, you know, subject matter experts that are familiar, particularly with the hatchery pieces, are going to need to have that set up well in advance for BIA, so we can make this as seamless as possible. So I just wanted to throw that out there for this group, since we're having this discussion.

But also, would welcome Bryan or anybody else who has a bit more experience in terms of how we've done this before because, you know, this is -- as far as understanding outside of, you know, the CARES Act funding where I think NOAA has done this before, I mean, this is something that's pretty new

 for us, for NOAA. And, of course, there's going to be some shaky steps going forward. But we want to make sure that this is successful because this is definitely something that NOAA heard from tribes in the larger and broader consultations we had with IRA.

So we definitely welcome places where, you know, from the -- comments from the tribes where things that worked really well getting these in place. And as I think I heard a couple of people say, you know, seamless or, you know, perhaps expedited. Because we definitely want to -- you know, as Jen said earlier, get this money out on the ground as soon as possible.

**DIRECTOR MERCIER:** Zach, if I could piggy-back on that, you're absolutely right. Because this is something new, especially for NOAA, so on the BIA side with all our programs that have been contracted, we typically have what's called an AOTR, an awarding official technical representative, that works closely with the tribes on the cyclical maintenance program, for example, that I think Mike mentioned earlier. And so, Ashton Harp and Rudy Peone from my team are on, and they all do what they can to help. But because of the scale of funding

that we're talking about here, and the scopes that will be defined by you all, we're going to need some technical support from NOAA. So we've had conversations with Jen and Scott about that. We just -- with our small staff, we're not going to be able to tag along with all of these scopes of work that are likely to be funded here.

We have been encouraging -- to Brent questions earlier about reporting, to leverage the existing reporting requirements that we have in our 638 contracts and compacts. So the quarterly financial SF425s, and an annual narrative to be sufficient for NOAA. And early indications are, I think, you know, that they're open to it. So I'm hoping that that will be sufficient in the streamlining on the reporting of the use of these funds.

But you're absolutely right, Zach, we are going to need some technical representatives from the federal side to ensure that the scopes that are approved, and the funding that's allocated, that that's, in fact, the work that is performed per the contract. So we'll need to work with the tribes on that as well. And I imagine the tribal technical team and the federal technical team will work on

 each of these scopes of work together to make sure that we accomplish what we intend to accomplish. So thanks, Zach.

**DR. PENNEY:** Thank you, Bryan.

As I heard somebody say sometimes it's easy to get the money out there. It can be a lot harder to track it. So if there are places -- I mean, we've heard, I'd say, in different place from the different tribes during the, you know, the conversations, consultations that we've had that if there are specifics about kind of what reporting works best for the tribes, I mean, that's definitely something that we'd love to hear more on, either today or in your written comments. So I'll leave it at that.

The queue right now, it's handless. I see no hands up so I want to give it a bit more time. So, like I said, if you have a question right now, please pose it. If not, there will be two more, after this one, sessions. One dedicated to the Mitchell Act funding and another one dedicated to, you know, the broader 240 million for hatchery funding. So you'll have more chances if you think of something after today's engagement session.

So I'm going to give it another minute or

so. If we don't have another cluster of hands, we might call it early because I can only take so much awkward silence.

All right. Well, I'm not seeing any new hands.

So Jen, if you're okay with it, I'd say maybe we close out for today and, you know, give you the final word here and close this out.

**MS. QUAN:** Sure.

Hey, Julie do you want to take to us our closing slide?

Okay. So once again, really appreciate your time, jumping in on this and any of our sessions that we have coming up. And again, just invite you to reach out. Let's keep this conversation going. And hopefully, we can get some shape to this program and administration of it very soon.

So I will end it there, and we can all have few minutes back in our lives. Thank you.

**DR. PENNEY:** Thanks, Jen. Thanks, everybody. Really appreciate it.

**(WHEREUPON, listening session concluded.)**

CERTIFICATE

I, Kimberly R. McLain, do hereby certify that the proceeding named herein was professionally transcribed on the date set forth in the certificate herein; that I transcribed all testimony adduced and other oral proceedings had in the foregoing matter; and that the foregoing transcript pages constitute a full, true, and correct record of such testimony adduced and oral proceeding had and of the whole thereof.

IN WITNESS HEREOF, I have hereunto set my hand this 17th day of July, 2023.

Kimberly R. McLain

$

**$1.2** 21:6

1

**10** 4:10

**11** 12:20

2

**2023** 2:6

**20-some** 25:25

**21** 2:6

**23rd** 12:18

**240** 4:2 7:10 19:14 34:22

3

**3** 3:11 18:7

**30** 30:12

6

**638** 7:15 10:23 11:12 22:16 31:8 31:8 33:11

A

**able** 9:13 9:15 15:14 16:21 18:3 33:6

**absolutely** 30:14 32:16 33:18

**absolve** 10:25

**accepted** 11:9

**accidentally** 3:14

**accomplish** 34:2 34:2

**accountability** 8:8

**accounted** 29:21

**acknowledge** 19:19

**Act** 2:1 2:10 11:13 12:9 12:10 22:25 31:24 34:21

**acting** 2:12

**activity** 11:16

**actual** 3:6 4:24 14:9

**actually** 5:17 19:10 22:10 25:8 29:3 29:4

**adapts** 8:24

**add** 19:13

**addition** 24:6

**additional** 9:6

**Additionally** 22:7

**administered** 22:22

**administration** 8:6 9:18 9:22 35:17

**administrative** 10:12 10:22 12:2

**Administrator** 5:5 5:8

**advance** 16:23 31:16

**Advisor** 3:23

**Affairs** 5:20 31:4

**affiliation** 3:9 3:15 18:5 18:12

**afraid** 14:20

**afternoon** 5:25 26:7

**agencies** 21:16 21:18

**agency** 24:19 25:14

**agenda** 4:17

**agreement** 9:14 9:21 24:3 24:4

**agreements** 23:16

**ahead** 4:12 7:2 19:8 20:1 20:2 25:6 25:7 27:7 27:8 28:2 30:5 31:2

**allocate** 8:4 15:3 24:18

**allocated** 7:11 20:15 33:21

**allocating** 9:23

**allocation** 7:14 7:25 8:5 16:18

**already** 14:7 15:11 29:21

**am** 6:2 6:7 6:13

**amendments** 29:20

**Amiotte** 5:15

**among** 15:4

**amount** 19:18

**Anadromous** 5:10

**and/or** 12:13

**annual** 33:12

**answers** 6:20 6:21

**anticipated** 23:17

**anybody** 4:5 28:24 31:20

**anybody's** 20:4

**anyone** 18:17

**anything** 28:21 28:24 29:3 29:14

**anyway** 25:23 29:1

**AOTR** 32:19

appear 17:24
appears 17:22
appreciate 11:22 11:25 19:23 22:16 23:3 23:11 35:12 35:22
appreciation 20:15
approach 15:15 15:24
approvals 30:15
approved 33:21
approximately 21:6
areas 12:22 13:20 16:14
arrangement 24:14
arranges 19:10
art 15:9
Ashton 32:23
asset 21:7
assistance 2:14 11:10
associated 14:22 20:23 29:17
assume 22:23 24:12
assuming 4:7
attempt 20:7
attendees 10:19 19:9 25:25
audience 5:2
August 9:5
available 10:1 21:11 22:23 27:11 27:11
awarding 32:20
awkward 35:3

B

based 19:10
basin 20:18 20:20 22:12 22:13 30:11 30:21
begin 8:14 15:25 17:9
beginning 6:17 6:23 12:19 26:20
believe 20:24 22:3
best 19:22 34:12
BIA 7:15 9:21 10:10 10:20 16:17 21:20 24:4 25:9 31:4 31:10 31:17 32:17
billion 21:6
Bipartisan 11:7
bit 5:7 9:1 19:13 24:8 31:21 34:17
blue 13:22
BONIFER 27:9
box 17:23
Branch 5:10
brand 5:16
brass 4:8
Brent 20:9 20:9 20:11 20:13 23:10 25:3 30:5 30:24 33:8
Brent's 27:9 30:4
brief 2:18
bring 14:16
broader 32:5 34:22
broken 28:9
Bryan 5:18 10:16 10:19 11:24 15:18 22:15 31:3 31:20 34:4
built 27:25
bullets 26:17
bunch 23:13 29:18
burden 10:22
Bureau 5:19
button 3:1
3:7 17:22 19:2

C

capture 24:24
CARES 31:24
case 15:10 23:18
catalyze 12:24
catalyzing 15:8
catching 27:23
categories 16:12 27:12
category 27:18
cents 25:23
ceremonial 22:10
ceremonies 22:9
chance 26:4
chances 34:23
chat 13:12 20:6
check 25:4
Chief 5:10
Chinook 22:2 22:3 30:10
choose 4:11
clear 7:19
click 3:6 17:15 17:22



18:1
**close** 35:7 35:8
**closely** 32:21
**closing** 4:25 35:11
**cluster** 35:1
**co** 21:14
**Coast** 2:3 2:12 3:21 3:25 5:6 5:9 5:11 5:13 31:13
**Columbia** 20:18 20:19 21:22 30:16 30:21
**co-managers** 21:3
**coming** 35:14
**comment** 2:22 17:10 27:10
**comments** 10:17 12:17 18:15 18:17 19:3 23:3 23:10 29:8 32:8 34:14
**commitment** 6:12
**common** 9:8
**compact** 10:24 10:24
**compacts** 11:5 11:18 33:11
**complicated** 15:24
**computer** 2:23 2:24 17:12
**concept** 16:10
**concluded** 35:23
**Concurrently** 9:20
**conditions** 27:17
**conduct** 28:14
**configuration** 9:7
**conservation** 15:9
**consider** 14:11 26:19 27:3 28:18
**considerations** 13:5 29:2
**considered** 22:12 27:13 27:18 28:16
**considering** 13:17 16:7 16:13 16:17 16:18
**constructed** 30:13
**construction** 28:5 28:25 29:5 29:10 29:24 30:8
**consultation** 7:7 9:25 12:13 12:13 19:21 23:5
**consultations** 32:5 34:10
**contact** 26:25
**continue** 9:4 26:21
**contract** 33:23
**contracted** 32:19
**contracts** 7:16 10:23 11:5 11:17 33:11
**conversation** 4:23 5:20 6:23 8:14 9:19 10:14 12:5 12:24 13:3 14:12 14:16 14:17 14:20 16:1 16:20 16:24 19:22 20:2 27:1 30:1 35:16
**conversations** 8:23 8:25 14:6 16:15 24:17 26:20 29:14 29:22 33:4 34:10
**convey** 27:1
**coordinator** 2:13 5:12 5:16
**Corps** 24:15
**Council** 30:17
**Country** 19:16
**couple** 13:20 18:13 32:10
**course** 32:1
**cover** 4:20
**crew** 26:9
**Crewson** 25:5 25:8 28:3
**criteria** 7:24 8:4 13:17 13:23 13:24 14:1 14:25 15:21
**culture** 22:9
**current** 27:16
**currently** 5:12
**cyclical** 32:21

D

**day** 5:17
**DC** 31:13
**decline** 22:5
**dedicated** 34:20 34:21
**deferred** 19:15



21:1 27:22 29:9 30:20
**defined** 33:2
**definitely** 19:17 19:20 24:16 26:25 27:20 27:22 32:4 32:7 32:12 34:12
**deliver** 14:22
**depending** 10:12
**Deputy** 5:8
**design** 29:4
**designs** 28:16
**desire** 8:19
**detailed** 23:2 30:1
**detailing** 21:5
**details** 21:19
**determine** 7:12 8:5 10:4
**determining** 7:23
**developing** 9:16
**dialogue** 4:24 17:9
**difference** 17:6
**different** 34:8 34:9
**dig** 13:24
**directly** 23:5 24:18
**Director** 5:19 10:18 10:20 32:15
**direly** 20:16
**disaster** 22:21
**disbursing** 10:22
**discuss** 2:9
**discussed** 9:4 31:7
**discussing** 7:10
**discussion** 8:18 12:19 12:22 12:23 13:11 13:13 13:14 15:1 15:2 18:19 31:19
**discussions** 12:3
**distribute** 25:11
**distributed** 7:15 15:4
**distribution** 9:14 15:15
**done** 2:20 11:6 18:2 28:24 29:11 31:22 31:24
**door** 6:15 8:20
**Dr** 3:18
4:15 5:7 18:24 20:11 25:2 25:24 26:9 27:5 27:20 29:6 30:3 30:24 34:4 35:21
**driven** 8:18
**during** 2:18 34:9

E

**earlier** 8:13 9:4 14:6 17:6 29:13 32:13 32:23 33:9
**early** 5:24 33:13 35:2
**easier** 11:3
**easiest** 15:16
**easy** 34:6
**efficient** 27:16
**efforts** 7:6
**either** 6:3 9:6 29:10 34:13
**eligible** 7:13 7:24 8:3 13:18
**else** 31:21
**encourage** 9:2
**encouraging** 33:8
**engage** 6:24
12:4 12:12 14:19
**engaged** 10:21
**engagement** 2:4 3:24 6:17 6:25 7:6 9:25 12:6 34:24
**engagements** 6:4
**ensure** 33:20
**environmental** 11:1
**envision** 23:21
**envisioned** 24:14
**especially** 27:2 29:24 32:17
**essentially** 4:19
**everybody** 3:19 17:1 18:3 18:16 19:4 27:4 35:22
**everyone** 2:15
**evolves** 8:24
**example** 24:13 32:22
**excited** 6:8 6:14 11:25
**existing** 11:5 11:17 33:10
**expand** 14:8

**expansion** 13:21 14:10
**expansions** 29:25
**expectation** 6:16
**expedited** 32:12
**experience** 15:19 30:9 31:21
**experts** 31:14
**explicit** 12:10 12:11 24:21
**express** 20:14
**extent** 8:23
**eye** 26:7
**eyes** 14:21

F

**facilitate** 3:25
**facilities** 27:14 27:25
**facility** 14:10
**fact** 33:22
**factors** 16:16 16:16
**fall** 23:6
**familiar** 15:21 31:15
**federal** 6:10 11:4 20:20 24:19 24:24 33:20 33:25
**federally** 15:13
**federally-reserve** 6:12
**feel** 13:11
**feeling** 14:13
**figure** 31:11
**final** 29:4 35:8
**finally** 16:3 30:13
**financial** 33:12
**first** 3:9 3:16 4:6 13:13 13:14 16:7 18:4 18:16 20:14
**fish** 15:20 20:21 21:20 22:8 22:10 22:12 24:14 25:19
**fisheries** 3:23 5:11
**fishery** 22:10 22:11 22:21
**fishing** 6:12 15:14
**fit** 28:7
**five** 22:24 24:2 24:5
**five-year** 24:1
**fix** 21:11
**flexibility** 9:1 24:8
**floor** 5:22 5:22 13:9
**folks** 3:21 4:8 4:10 19:25 26:1 31:13
**forecast** 22:6
**foreman** 27:23
**form** 16:23
**forward** 6:3 9:9 11:10 11:19 14:15 14:17 16:10 23:6 32:2
**frames** 9:3 14:22
**framework** 8:15
**free** 13:11
**Friday** 26:7
**front** 19:19
**function** 11:15 19:6 19:7
**funded** 33:7
**funding** 2:9 4:2 6:7 6:8 6:10 7:25 8:4 8:5 10:5 10:7 11:7 11:11 11:14 11:18 13:19 14:18 14:23 15:16 15:19 19:15 19:18 22:21 24:8 24:9 24:22 25:9 25:21 27:10 27:11 27:18 28:22 31:24 32:25 33:21 34:21 34:23
**funds** 2:2 6:14 6:18 7:14 7:14 8:19 9:15 9:23 10:22 11:3 16:18 20:15 21:10 21:15 21:17 22:23 22:25 23:19 24:18 25:11 25:18 33:17

G

**gets** 4:6
**getting** 6:14 14:18 21:15 30:14 31:5 32:9
**giving** 23:19 26:3
**globally** 16:14
**goals** 20:23 20:25
**government** 11:4

**grateful** 20:17 30:12
**great** 5:23 7:20 8:12 24:11 31:5
**ground** 14:19 32:14
**group** 9:7 31:19
**guess** 12:8 16:20 29:16
**guessing** 23:13
**guidance** 19:20
**guide** 18:22

H

**Hall** 20:10 20:12 20:13 24:10 25:1 30:7
**hand** 2:25 3:11 4:6 4:18 5:21 17:11 17:14 17:17 18:7 19:10 19:11 20:1 20:4 20:9 23:8 26:11 28:1 30:4
**handless** 34:16
**hand-raise** 19:6
**hands** 3:4 8:20 17:18 26:1 26:4 26:10 27:5 30:25 34:17 35:1 35:5
**happen** 19:9
**happens** 10:14
**harder** 34:7
**Harp** 32:23
**hatcheries** 6:9 7:11 20:19 20:20 21:3 21:7 21:12 21:16 22:2 23:17 24:11 27:24 30:21
**hatchery** 2:2 2:9 4:1 6:7 6:11 12:11 13:22 15:19 19:16 21:22 21:24 23:23 25:9 25:13 27:23 28:4 28:13 30:11 31:15 34:22
**haven't** 3:14 6:2 6:10 18:9
**having** 4:24 18:14 20:5 27:11 31:19
**head** 13:15
**headquarters** 7:8
**health** 22:13
**hear** 7:25 13:9 14:24 16:4 18:3 24:11 34:13
**heard** 7:9 19:5 32:4 32:10 34:5 34:8
**heavy** 6:25
**HELD** 2:5
**help** 3:24 12:15 16:23 18:11 20:7 22:17 24:7 32:25
**helped** 30:10
**helpful** 2:17
**helps** 23:25 26:13
**here's** 18:19
**herself** 5:6
**Hey** 35:10
**HGMP** 14:20 30:2
**HGMPs** 14:12 29:15 30:16
**high** 10:5 13:25
**higher** 22:6
**high-level** 15:5
**honored** 5:18 22:7
**hopefully** 23:25 35:16
**hoping** 26:21 33:15
**huge** 19:15
**hundred** 25:12

I

**icon** 17:14
**I'd** 19:14 27:9 34:8 35:6
**idea** 15:12
**ideally** 9:13 15:11
**ideas** 4:22 13:9 14:25 15:6 15:7 15:25 16:13 16:19 25:13
**identified** 21:8 30:19
**identify** 16:11
**I'll** 2:25 16:20 18:21 19:9 23:9 26:4 34:14
**I'm** 2:11 2:13 3:19 3:22 3:23 3:24 4:11 4:16 4:18 5:21 7:23 10:15 10:19 12:21 13:15



15:12 16:25 17:4 21:19 23:13 25:5 27:6 30:5 30:25 31:2 33:14 34:25 35:4
**image** 17:13
**imagine** 33:24
**immediately** 23:13
**implemented** 21:10
**important** 22:8 22:8 28:5 28:17 29:2
**including** 30:15
**increase** 29:25
**increased** 29:15
**Indian** 5:19 19:16 31:4
**indications** 33:13
**indicator** 22:12
**INFLATION** 2:1
**influence** 21:13
**information** 2:17 17:5 26:16
**infrastructure** 11:7 21:2 21:8
**Inland** 5:10
**input** 10:9 19:23
**instance** 21:25 23:23
**instructions** 13:8
**intake** 27:14
**intend** 8:14 34:2
**interagency** 9:21
**interesting** 16:9
**internally** 31:7
**introduce** 5:6
**introductions** 2:18
**invite** 6:19 35:15
**invited** 10:1
**IRA** 2:1 2:9 4:1 4:21 6:6 7:6 24:18 32:6
**issue** 21:11 21:16 22:1
**issues** 20:6 22:20
**items** 21:9
**iterative** 10:13
**IV** 10:23

J

**Jen** 4:18 5:21 6:2 10:18 11:23 17:3 18:20 18:25 19:13 24:10 25:2 27:1 29:7 30:3 30:14 32:13 33:4 35:6 35:21
**Jennifer** 5:5
**Jerimiah** 27:6 27:21
**join** 2:16 6:1
**joined** 5:5
**joining** 4:3 5:17 5:20
**Julie** 2:11 5:11 5:14 7:18 12:15 13:7 16:25 18:24 19:2 26:12 35:10
**July** 12:18
**jump** 3:17 13:20 23:9
**jumping** 35:13
**JUNE** 2:6

L

**labeled** 18:2
**Lalena** 5:15
**largely** 8:18 11:17
**larger** 32:5
**last** 4:8
**late** 9:5 9:13
**lately** 28:25
**later** 7:25 12:9
**laughed** 15:12
**launch** 29:5
**Law** 11:7
**lays** 8:15
**leadership** 7:8
**least** 4:10 30:16
**leave** 34:14
**legacy** 26:11
**let's** 3:20 4:15 17:4 25:25 35:15
**letter** 12:17
**level** 6:8 7:3 8:7 10:5 13:18 13:23 13:25
**leverage** 25:18 33:9
**light** 10:11
**likely** 23:18 33:7
**limited** 12:23
**line** 17:14 18:23 31:4
**lines** 22:25



**link** 12:16
**linked** 25:14
**list** 16:8 19:9 21:9 30:20
**listed** 28:15
**listening** 26:22 35:23
**listen-only** 2:17
**little** 5:7 7:19 9:1 17:14 17:14 19:13 24:8
**lives** 35:20
**logistic** 2:14
**long** 28:20 30:17
**loose** 8:2 13:23
**loosely** 8:2 9:17 13:16
**lost** 20:21
**lot** 14:12 26:16 26:17 26:17 27:1 27:15 27:15 27:25 34:6
**lots** 26:1
**loud** 14:14
**love** 34:13
**lower** 19:7
**Lummi** 25:12

M

**maintenance** 13:21 14:9 19:15 21:1 25:9 27:12 27:15 27:22 28:7 28:10 28:13 29:9 30:20 32:22
**management** 21:8
**manager** 21:15
**March** 7:8
**matches** 23:1
**matter** 28:18 31:14
**may** 8:22 18:14 22:17 24:1
**maybe** 8:1 24:6 26:12 29:19 31:3 35:7
**mean** 24:19 28:20 28:25 31:25 34:8 34:12
**meditate** 4:11
**meeting** 2:19 3:25 6:3 9:6 20:25 30:21
**meetings** 7:7 9:7 9:8 26:23
**mention** 26:4
**mentioned** 8:13 24:11 25:15 25:19 32:23
**Mercier** 5:18 10:18 10:20 32:15
**mesh** 29:23
**met** 6:2
**mid** 9:5
**Mike** 25:5 25:7 25:24 26:10 28:1 32:22
**million** 4:2 7:11 19:14 34:22
**mind** 18:16
**mindful** 19:4
**minute** 26:19 34:25
**minutes** 35:20
**Mitchell** 2:10 12:9 22:25 34:21
**mitigating** 20:21
**mitigation** 20:23 20:25 30:22
**mode** 2:18 7:18
**model** 15:20 15:23 21:20 21:23 25:9 25:21
**moderator** 3:3
**modifying** 11:17
**money** 23:22 28:21 32:13 34:6
**monies** 28:23
**morning** 3:19 3:20 5:24
**mostly** 3:20
**motivation** 8:17
**move** 4:17 7:4 9:9 9:16 9:19 11:3 11:19 13:10 14:15 14:16 16:10 23:6
**moving** 12:3
**multiple** 12:4
**mute** 19:1
**muted** 3:14 3:14 18:9

N

**name's** 2:11
**narrative** 33:12
**Natasha** 5:9 29:8 30:18
**nearly** 22:5
**necessary** 9:5 30:15
**NEPA** 11:1
**nexus** 25:13

**NOAA** 4:21 7:7 10:10 11:9 16:17 22:21 23:5 24:18 31:24 32:1 32:4 32:17 33:3 33:13
**NOAA's** 3:23
**nobody** 4:7
**non-Mitchell** 12:10
**non-tribal** 23:16
**Northwest** 5:19 20:16
**note** 5:4 7:21 9:24 18:13
**nuances** 24:24

O

**obligations** 30:22
**obviously** 12:6
**occurred** 7:7
**offer** 4:5 4:7 4:25 11:9 29:9
**offered** 11:9
**official** 32:20
**okay** 7:1 8:9 10:3 12:2 12:19 13:13 14:24 15:1 16:3 18:24 25:2 25:4 27:5 30:3 35:6 35:12
**one-on-one** 9:6 12:12 26:22
**one-time** 11:14 11:18
**ongoing** 9:24
**on-one** 27:1
**open** 13:9 14:21 15:6 16:15 16:20 24:17 29:13 29:22 33:14
**opening** 4:6
**operated** 21:12
**operation** 21:14
**opportunity** 11:22 23:3 29:19
**optimistic** 9:2 15:13
**option** 12:16
**order** 3:4 17:10 17:18 17:19 29:4 31:7
**Oregon** 21:4 21:14 30:19
**outgoing** 2:12 5:12
**outside** 29:9 31:23
**outweigh** 19:17
**oval** 18:2
**overdue** 28:20
**owned** 21:12 24:12

P

**Pacific** 20:16
**participating** 2:24
**particular** 15:10
**particularly** 31:15
**partners** 24:23
**partnership** 11:20 11:25 23:23
**partnerships** 23:15
**Pause** 4:14
**PCSRF** 22:22
**Penney** 3:3 3:18 3:23 4:15 18:24 20:11 25:2 25:24 26:9 27:5 27:20 29:6 30:3 30:24 34:4 35:21
**Peone** 32:24
**people** 17:18 18:14 26:3 32:10
**per** 33:22
**percent** 25:12
**performed** 33:22
**perhaps** 32:11
**permits** 28:15 29:3 30:15
**person** 3:3
**Personally** 6:7
**PFSA** 11:15
**phase** 13:11
**phone** 3:10 3:13 4:5 18:6 18:10
**piece** 24:1 30:2 30:9
**pieces** 31:15
**piggy** 32:15
**places** 32:7 34:7
**plans** 21:8
**please** 3:9 3:15 4:17 5:3 12:13 12:14 18:11 20:1 20:6 34:19
**plenty** 26:1 31:1



**plus** 24:4
**point** 2:25 10:15 13:13 13:14 15:1 15:2 16:25 17:8 23:14
**points** 12:23
**poorest** 22:4
**pop** 26:12
**pose** 34:19
**possible** 6:15 8:21 15:10 31:18 32:14
**pot** 10:6 24:9
**potential** 27:15
**potentially** 18:14 19:4 25:16 25:22
**power** 19:1
**pray** 4:10
**prayer** 4:6 4:7
**present** 12:22
**presentation** 2:19 2:21 7:18 8:1
**presentations** 26:6
**press** 3:2 3:11 19:8
**pressing** 18:7
**Preston** 5:9
**pretty** 3:19 31:25
**preview** 2:20
**prior** 23:4
**priorities** 16:8
**prioritization** 25:17 28:4
**prioritized** 22:3
**priority** 22:1 28:14
**probably** 8:6 8:25 14:13 24:3 25:10
**proceedings** 4:14
**process** 6:4 6:14 10:2 22:14 22:15 22:16 22:21 25:16 30:17
**processes** 7:13 10:7 10:12
**produce** 22:2
**production** 5:10 14:8 20:24 23:16 29:15 29:25
**program** 8:1 8:2 8:3 9:17 9:17 9:22 11:15 13:16 14:7 17:19 32:22 35:17
**programs** 14:25 25:14 32:18
**project** 8:4 14:9 16:11 23:22 29:21 30:12
**projects** 7:13 7:24 13:17 13:21 13:22 14:3 16:11 23:20 25:17 28:14 30:20
**promise** 23:8
**promises** 20:22
**proposed** 13:4
**provide** 2:22 12:17 17:10 21:18
**provided** 19:18 21:17
**providing** 2:13 19:3
**pull** 16:21 17:4
**purpose** 15:8 20:21
**purposes** 27:19

Q

**Quan** 5:5 5:23 6:2 11:24 23:9 24:16 26:12 29:12 35:9
**quarterly** 33:11
**question** 2:21 16:5 17:10 19:8 29:10 31:2 34:18
**questions** 5:1 5:1 13:5 16:4 16:6 16:23 18:15 19:12 20:1 23:11 23:14 26:13 26:17 27:3 33:9
**queue** 25:4 31:1 34:16
**quick** 7:3
**quickest** 15:16
**quickly** 4:16 4:16 4:20 6:15 9:16
**quiet** 26:9

R

**raise** 2:24 3:11 17:11 18:7 20:1 23:8 26:4
**raised** 3:4



17:17 17:19 20:9 23:15
**raises** 4:6
**reach** 12:14 35:15
**ready** 21:9 29:21
**realities** 14:21
**realize** 19:17
**really** 6:13 6:17 6:24 7:5 8:2 8:16 10:5 10:9 10:13 10:21 11:24 12:6 12:24 13:2 14:4 19:23 20:14 24:10 27:1 28:5 28:11 28:21 32:9 35:12 35:22
**reason** 21:21
**recall** 26:24
**recap** 7:3
**recent** 15:19
**recently** 11:6
**Reclamation** 24:15
**recognize** 6:9 26:15
**recommend** 22:14
**record** 19:7
**recorded** 2:19
**Recording** 2:8
**redesign** 27:16
**reduce** 10:21
**REDUCTION** 2:1
**re-enlisted** 25:18
**refer** 8:1
**regarding** 23:16
**region** 2:3 2:12 3:25 5:6 5:9 5:11 5:13 31:13
**regional** 5:5 5:8 5:19 10:20 11:8
**reiterate** 9:24 10:6
**reiterating** 12:5
**related** 2:9
**religion** 22:9
**rely** 6:24 10:9
**repaired** 28:9
**repairs** 21:1
**repeat** 18:17
**replacement** 21:2
**replacing** 28:8
**reporting** 8:7 22:18 33:9 33:10 33:16 34:11
**representative** 32:20
**representatives** 33:19
**representing** 20:13
**requested** 10:1
**require** 27:15
**required** 11:2 23:1
**requirements** 10:25 11:2 21:23 22:18 33:10
**research** 28:15
**reserve** 15:14
**respond** 23:13
**resulting** 7:10
**review** 11:1
**rights** 6:13 6:13 15:14
**Rudy** 32:23
**Rumsey** 5:8
**runs** 22:5

S

**sad** 5:14
**scale** 32:25
**scheduled** 12:15
**science** 27:24
**scope** 7:12 7:13 7:24 9:14 13:16 14:25 24:21
**scopes** 16:11 33:1 33:6 33:20 34:1
**Scott** 5:8 29:7 33:4
**screen** 7:22 17:7 17:17 17:23 19:7
**screenshot** 3:1 3:8
**seamless** 25:10 31:17 32:11
**second** 4:19 5:7 5:17 10:16 27:9
**seconds** 4:10
**seeing** 29:22 35:4
**seem** 22:5
**seen** 6:10 20:3
**select** 3:12 18:8
**Self-**



**Determination** 11:12
**self-governance** 10:24
**Senior** 3:23
**sense** 9:19
**sent** 12:17
**service** 11:15 15:20 21:20 24:15
**services** 31:10
**session** 6:16 12:6 34:24 35:23
**sessions** 2:4 12:7 12:8 26:22 34:20 35:14
**set-aside** 4:1 4:21
**several** 21:4
**SF425s** 33:12
**shaky** 32:2
**shape** 6:25 10:10 24:21 35:17
**shaped** 10:13
**share** 2:16 6:18 13:4 26:5
**she'll** 5:6
**shifts** 8:24
**shot** 17:7
**shoulders** 31:10
**shovel** 29:20
**shovel-ready** 28:17 30:19
**showing** 3:1 30:25
**shy** 20:3
**significant** 21:13
**silence** 35:3
**similar** 15:23 23:14
**simply** 13:2
**situation** 7:9 20:19
**slide** 4:17 5:3 7:2 7:4 8:9 8:11 8:15 9:10 10:3 10:4 12:19 15:1 16:2 17:5 17:6 18:19 23:4 35:11
**slides** 12:21 13:6 13:10 26:5
**slug** 19:15
**small** 29:20 33:5
**somebody** 34:5
**someway** 25:15
**sort** 4:20
**speak** 20:18
**species** 22:4 28:15
**specific** 13:25 27:3
**specifically** 6:11
**specifics** 34:11
**spend** 23:22
**spreadsheet** 21:5
**spring** 22:2 22:3 30:10
**Springs** 20:13
**stab** 31:3
**staff** 33:5
**standing** 11:16
**start** 4:4 12:3 13:2
**started** 2:8
**starting** 13:14
**starts** 22:11 29:14
**state** 3:9 3:15 18:4 18:11 23:23 24:23 25:20
**states** 24:12 24:13
**status** 21:15
**step** 14:2
**stepping** 22:16
**steps** 32:2
**stop** 10:15 16:20
**strategically** 16:15
**streamlined** 22:19
**streamlined-as-possible** 22:15
**streamlining** 33:16
**strive** 9:2
**structure** 8:17 23:20 23:24
**structures** 27:14
**stuff** 28:13
**subject** 31:14
**subsistence** 22:11
**substantial** 28:23
**successful** 11:8 11:20 12:1 32:3
**sufficient** 33:13 33:15
**suggestion** 25:11
**summarizes** 18:20
**summer** 9:5

9:13
**super** 6:8
**support** 6:12 25:8 33:3
**supportive** 11:21
**sure** 3:13 3:18 3:19 4:4 18:9 21:19 32:3 34:1 35:9
**switch** 13:7
**systems** 6:11

T

**tacks** 4:9
**tag** 33:6
**taking** 2:15 5:25
**talk** 4:9 6:6 6:23 25:12
**talked** 15:18
**talking** 4:1 7:23 8:3 24:20 28:12 33:1
**target** 16:14
**team** 32:24 33:25 33:25
**technical** 2:14 20:6 32:20 33:3 33:19 33:24

33:25
**termed** 8:2
**termination** 24:4
**terms** 18:22 22:1 22:14 27:24 31:5 31:21
**th** 15:21
**thank** 2:15 4:2 5:25 6:5 17:3 18:23 20:12 27:19 28:3 28:19 29:1 29:5 30:7 30:23 34:4 35:20
**thankful** 5:15
**thanking** 27:10
**thanks** 9:12 10:18 11:23 11:24 18:24 18:25 23:8 23:10 24:10 25:1 25:2 25:3 25:24 26:14 27:20 29:6 30:3 30:24 34:3 35:21 35:21
**themselves** 7:14

**there's** 5:1 8:25 13:1 14:17 17:7 18:6 19:4 28:22 29:19 32:1
**they're** 12:25 22:6 28:17 33:14
**thoughts** 10:17 27:2
**throughout** 10:1
**throw** 26:16 31:18
**throw-spaghetti-at-the-wall** 15:6
**thus** 31:5
**tiered** 15:24
**timeline** 8:16 8:24 22:24
**timelines** 29:17
**tiptoe** 28:11
**Title** 10:23
**today** 2:14 2:16 3:25 4:24 5:4 5:17 5:20 6:6 6:17 7:9 8:14 18:15 19:5 19:20 19:24 34:14 35:7

**today's** 3:25 12:6 34:24
**top** 16:8 27:22
**total** 21:6
**towards** 9:3
**track** 34:7
**traditional** 11:15
**translates** 21:9
**transparency** 13:1
**transparent** 14:5 29:24
**treaty** 6:13 20:22
**tremendous** 21:3
**tribal** 2:2 2:4 2:12 3:24 5:16 6:7 6:9 7:6 7:11 9:25 9:25 10:9 23:1 33:24
**Tribe** 30:10
**tribes** 4:22 7:12 8:20 11:8 11:21 15:4 15:13 19:22 20:14 21:13 21:17 21:18 21:23 22:8



22:20 23:5 23:19 23:21 24:22 24:22 31:12 32:4 32:8 32:21 33:23 34:9 34:12
**trigger** 14:11
**triggers** 29:15
**trust** 31:10
**truth** 14:14
**try** 10:21
**trying** 16:10
**Tulalip** 25:5
**turn** 17:1 18:21 18:21
**type** 20:6 24:13
**typically** 32:19

U

**U.S** 21:4 21:14 30:18
**ultimately** 16:7
**Umatilla** 30:9
**understand** 8:22 22:17
**understandable** 26:18
**understanding** 9:9 11:20 21:22 31:23
**Understood** 25:1
**undertaking** 30:17
**universal** 15:15
**universally** 20:24
**unmute** 3:5 3:5 3:7 3:12 13:8 17:21 17:24 17:25 18:2 18:8 25:6 27:7 28:2 30:5
**unmuted** 3:6 17:21
**unprecedented** 6:8
**upgrade** 14:8
**upper** 17:13
**urgency** 8:19 14:18

V

**various** 10:25
**versus** 28:17
**virtual** 2:25 17:11
**voices** 7:9 19:5

W

**Walla** 30:11 30:11
**Warm** 20:13
**Washington** 25:20
**water** 27:13
**ways** 12:4
**WCR** 2:3
**WebEx** 17:2
**wed** 15:7
**we'd** 9:13 9:22 34:13
**WEDNESDAY** 2:6
**Weeder** 2:8 2:11 5:11 12:15 17:3 20:5 26:3 26:15
**week** 8:13 12:9
**weigh-in** 10:11 10:16
**welcome** 2:15 5:25 6:5 31:20 32:7
**we'll** 3:7 4:25 6:23 7:4 9:4 9:20 12:8 13:6 13:9 18:16 20:2 31:11 33:23
**we're** 4:1 4:19 4:20 5:14 5:15 5:18 6:19 6:20 7:10 9:9 11:10 12:23 12:25 13:1 13:14 14:20 15:7 16:15 16:19 17:8 17:8 18:18 24:16 24:20 24:21 25:19 26:3 26:21 29:13 29:22 29:25 31:19 33:1 33:2 33:5
**West** 2:3 2:12 3:20 3:25 5:6 5:9 5:11 5:13 31:12
**we've** 10:8 11:6 13:5 24:2 24:5 27:5 28:6 28:11 29:18 31:7 31:22 33:3 34:8 34:10
**whatever** 4:11 28:9
**WHEREUPON** 35:23
**whether** 14:8 24:23
**wide** 14:21
**Wildlife** 15:20 21:20 24:15
**willingness** 6:1
**work** 7:12 9:2



17:2 21:21 21:24 24:19 24:23 25:15 25:22 27:4 27:13 30:18 31:5 33:6 33:22 33:23 33:25 34:1

**worked** 21:4 32:9

**working** 9:20 11:10

**works** 29:19 32:21 34:12

**worth** 25:23

**written** 12:17 23:3 34:14

Y

**yet** 6:2 20:4

**you'll** 3:10 17:12 34:23

**yours** 5:22 16:5

**yourself** 3:14 13:8 17:24 17:25 18:9

**you've** 18:2 27:2 29:20

Z

**Zach** 3:3 3:11 3:17 3:22 17:17 18:7 18:22 30:7 32:15 33:18 34:3

**Zach's** 17:16

EXHIBIT 6-B-2

Powerful
LITIGATION SUPPORT

COURT REPORTING
LEGAL VIDEOGRAPHY
VIDEOCONFERENCING
TRIAL PRESENTATION
MOCK JURY SERVICES
LEGAL TRANSCRIPTION
COPYING AND SCANNING
LANGUAGE INTERPRETERS

N
NAEGELI
DEPOSITION & TRIAL
CELEBRATING
40
YEARS IN BUSINESS
(800) 528-3335
NAEGELIUSA.COM

**INFLATION REDUCTION ACT (IRA):**

**TRIBAL HATCHERY FUNDS**

**WEST COAST REGION (WCR)**
**TRIBAL ENGAGEMENT SESSIONS**

**HELD ON**
**THURSDAY, JUNE 22, 2023**

**INFLATION REDUCTION ACT (IRA):**

**TRIBAL HATCHERY FUNDS**

**WEST COAST REGION (WCR)**

**TRIBAL ENGAGEMENT SESSIONS**

**HELD ON**

**THURSDAY, JUNE 22, 2023**

**MS. WEEDER:** Good morning, everybody, and welcome to the Inflation Reduction Act discussion about the tribal hatchery funds.

Today, we'll be talking about the Mitchell Act funds --

**MS. QUAN:** No. Sorry.

**MS. WEEDER:** No, I'm sorry. I misspoke.

We'll be speaking about the $240 million for non-Mitchell Act hatcheries.

And Jen, would you please advance the slide.

So I'm here to let you know that some helpful information here. We will be having some introductions, and then a brief presentation. And all participants will be in a listen-only mode during that portion of the meeting. The meeting is being recorded.

To ask a question or provide a comment

 when we move into that session -- that part of the session, please raise your virtual hand. The moderator will call on each of you in the order that the hands are raised and will unmute you. Now, please note that what you're unmuted -- when we unmute you, you won't be unmuted until you unmute yourself, and we'll show you a picture of what that little button looks like that you need to press. And please state your name and affiliation first.

And on the phone, if you're only on the phone and not on the computer, you'll need to press *3 to raise your hand. And please make sure that you're unmuted on your phone once the moderator unmutes you. Again, please state your name and affiliation. And we'll provide all of this again before we enter into the comment period of the session. Thanks.

So here we are -- I'm going to turn the presentation over to Jen Quan.

**MS. QUAN:** So, good morning. Thank you for your willingness to join our session and show up today. As Julie said, we are here to talk about the Inflation Reduction Act tribal hatchery funds. And personally, I would say, I am really excited to have this conversation. I think it's unprecedented in a

number of levels. Number one, we've never seen this amount of hatchery funds committed to tribal treaty trust support and commitment. And it's a new program and we are excited to shape it with you.

So today, we will -- the agenda today is really to get us to a discussion place as quick as possible. We'll do quick welcomes and introduction. Do a recap on how we got here. Where -- our current thinking on where we need to go next, and then, we'll post a couple of potential discussion points, but also open it up for others. And then, when we're done with that, we will close.

So as far as introductions go, for those of you who don't know me, I'm Jen Quan. I am the new Regional Administrator for the West Coast region. I started about oh, almost two months ago. With me today is also Dr. Scott Rumsey. He is the Deputy Regional Administrator.

Natasha Preston, our Branch Chief for Anadromous Production and Inland Fisheries. And Julie Weeder, who kicked us off, she is -- hopefully, a bunch of you have had the honor of interacting with Julie.

She's been our Acting Tribal Coordinator for the West Coast region. She is transitioning us

over to Lalena Amiotte, Amiotte, sorry, who is our brand new Tribal Coordinator. She just started this week. And so we're very excited about that. Hopefully, some of you have had some engagement with Lalena before, but you will get a chance to work with her more.

Also on the phone with us today, or on the video today, is Bryan Mercier from the Northwest -- from Bureau of Indian Affairs, the Northwest Regional Director.

Thanks for joining us, Bryan.

All right. So we will jump in. How did we get here?

Well, really it's through your efforts, engagements in the IRA tribal consultation meetings that occurred with headquarters back in March that really got us here. From my perspective, your voices were heard. And we're starting to maybe take a small -- I mean, it's big, but a step forward in addressing investments needed in our tribal hatcheries out here.

The administration and the agency have taken the perspective that this fund -- these funds -- and this was based on input we got from -- from those tribal consultations that we would focus this

funding to tribes with federal-reserve fishing rights, and specifically directed to enhancements or deferred maintenance, non-Mitchell Act hatchery projects that produce Pacific salmon and steelhead.

You will hear me talk very loosely about a program and setting up a program, going forward in the future slides. And that is -- when I talk about that today, I'm going to be talking initial conversations we need to have around determining scope, that is eligible projects and criteria, as well as for the allocation of those funds. So when I talk about program, again, very loosely, these are the components that I'm thinking of. There will likely be a component, I would say, of some sort of reporting. And I expect you all will have some comments on that as well, but again, nothing is baked. This is really about starting a discussion.

The other important part of this is NOAA will be transferring the funds to BIA, these funds to BIA, to be disbursed to tribes for distribution through the 638 contract process -- or compact process.

So where do we go next?

So I can't reinforce enough that my expectation today is that this session is only the

 beginning of engagement on these funds. We will share with you today what our current thinking, questions that we have. We invite you to do the same. If we don't know the answers, we're going to tell you, and we'll get back to you. I also expect that this is like as the beginning of it, that there will be additional conversations. We will have iterative and continuing engagements, whether it's one on one, through consultation, through group meetings, however we need to shape the conversation going forward, that's a commitment I'm here to make.

So where do we go from here?

Here is -- on this slide, this is -- slide lays out a framework of our thinking, right now. It's largely around the timeline, and we're putting up here as a way to structure the discussion and also motivate us to move towards a decision. It's largely driven because there's an urgency and desire for NOAA to get this funding out the door and into the hands of the tribes as soon as possibly. I think you can all appreciate that leaving large chunks of money on the table at this point in time is not a good thing to do. So we are -- we're very anxious about getting -- getting this program set up and moved through.

So what this looks like, starting today, with these engagement sessions, continuing, you know, through mid August, and longer if we need to, but hopefully, we can kind of wrap things up by mid August, we would like to start, you know, shaping what this program looks like. We will be accepting written comments through July 23rd. So I know we're going to throw a bunch at you today. We've got more conversations to be had. If you all want to sum that up and deliver them in a written format, we will accepting those through July 23rd.

By late summer, early fall, I'm hoping that we have the shape of what this program, that being the scope and criteria, how we're going to allocate between the tribes, done. And by fall, winter, you know, maybe early next year, we can start implementing that program.

Concurrently, we'll be working on what the interagency agreement looks like with BIA. Again, program administration next year. If all goes well, fingers crossed, we are moving this money out next summer. These are soft dates, but they're really set up here -- they can't be too soft. I want to encourage us and be optimistic to move within this time frame. And I just also would reiterate over

and over again, this isn't a one and done. I'm actually not coming to you with a baked process at all. This is ongoing tribal engagement and tribal request -- consultations requested throughout.

So how will we determine this?

I think I talked about -- this is again, we're shaping this with tribal input. I will just say that both NOAA and BIA need to -- need to consider, also, our ability to deliver the program. So as we shape it, if we're building out big things that are going to require a lot of NOAA or BIA staff time, some of this will have to be balanced with what the agency is able to deliver. But again, that's a commitment of transparency from me that we -- that's part of our back-and-forth.

At this time, I will just take a quick break and see -- let Bryan have a few words to talk about BIA perspectives.

**DIRECTOR MERCIER:** Yeah, thanks, Jen.

And hello to all the tribal staff and leaders that are on the call. I'm Bryan Mercier, Regional Director for the BIA, in the office today.

Yeah. So as Jen mentioned, I think our intent here, our partnership with NOAA, is to relieve the administrative burden of delivering

these funds to you all by leveraging our existing either Title I, 638 contracts, or Title IV self-government compacts to transfer the funds to the tribes through the BIA. We've -- we've offered, and NOAA has accepted, the use of our contracts to deliver the funds, and I think it will be beneficial to you all that we do that. We've got some recent experience and it's been successful.

There are some challenges with capacity, and so staffing is going to be an issue that we'll need to address with NOAA, especially for the technical representatives. But in our recent experience, it has been much easier on the tribes to use our existing contracts and compacts to deliver the funds. It doesn't waive any of the environmental review and compliance for NEPA, et cetera. And we'll want to make sure that as we scope out the projects that will be amended to these contracts and compacts, that we have a clear understanding of expectations for environmental compliance.

But we're looking forward to the partnership. It has been successful with other agencies. We've done this in recent history, so we hope this will alleviate some of the administrative

burden on you all.

So thanks for those few moments, Jen. And look forward to hearing from the tribal staff and leaders on the call.

**MS. QUAN:** Thanks, Bryan.

So just, again, to reiterate, there are multiple ways to provide input. We've got five virtual sessions, this is the third one. So we've got this one and two more after this, if you want to weigh back -- or jump back in on any of those, one more for the Mitchell Act and one more for non-Mitchell Act funding.

You can also, if you haven't seen in the letter, here's just a remainder, if you want to set up a one-on-one or a consultation with myself and West Coast region leadership, please contact Julie and she will get that set up right away.

You can also submit written comments. This email link is in the letter, and just so everyone knows, we will be sending out copies of this presentation by the end of the week. So don't feel like you have to jot things down. They'll be coming out to you to also have in print.

All right. So for these next few slides, I'm going to present kind of two proposed discussion

points. Again, this is just a way to catalyze the conversation. You all may have different questions or ideas that you want to bring forward at this time. And I will also share some proposed questions that we have as we've been thinking about how to best, kind of, shape this program and distribution of funds.

And then after that, I will switch to Julie. She will walk through how to unmute yourself, so that we can have some back-and-forth, and then open the floor to hear your ideas, comments, and questions.

All right. So discussion first point, and this is program scope and criteria. You know, is it -- the bulleted ones here, maintenance and expansion, might be what I consider a scope. Criteria might start looking like these things in blue with the square bullets. And one thing I do want to note here and not hide the ball on this one is that, you know, as far as whether it's a maintenance project or an expansion project that is going to consider increases in production, you can anticipate that it will trigger the HGMP question.

Just because it does that, it doesn't mean we shouldn't do it or shouldn't talk about it. We

just need to be thinking how that fits in timewise. You guys know -- a lot of you are acutely aware of what it takes to have an HGMP conversation. So we just want to make sure we're aware of that, especially given -- as we're looking at it right now, these funds -- our current guidance around these funds is that they'll probably be available and need to be spent within the next five to six years.

We also want to hear your ideas. What do you think this money should be available for, as far as projects and scope and criteria?

All right. Moving on to the next discussion point. Okay. Allocation options; how do we distribute this money between tribes? And again, from --- we've been looking at this with the lens of distribution to tribes with federally-reserved fishing rights. And these are -- what I've got here is just a brainstorm of ideas. There may be better ways to do this. There may be a mix of ways to do this that we're not thinking about. And we really think this is your opportunity to help shape this.

You know, while we're not wedded to any of these, I would say, like, my most favorite idea here is if the tribes with the reserve fishing --

federally-reserved fishing rights could agree to a universal approach to the funding distribution, that would be the quickest and easiest way. You know, absent that, some other recent models out here -- and I know Bryan just referenced this, was Fish and Wildlife Service recent BIL hatchery funding. That was a national competition. But we could look to just having a regional competition, would be one way. Or a tiered allocation, which is kind of a mix of those, where maybe a chunk goes out to all the eligible tribes, and then we compete the rest. So, again, open to other ideas.

We will put discussion slides like this back up when we open up the phones if it helps trigger more -- to help trigger more conversations.

And then, as we're thinking about this, these are some of the questions we have. We really want to know what yours are as well. Those questions also help us shape -- will help us shape where we go next with this development of this program and getting these funds out.

But first and foremost, what are your top priorities in NOAA's implementation of these funds? It would be good to know, like, if we are starting to get some coalescence around what types of

projects we want, how many do you have? You know, are there more maintenance? Are there more expansion? Are there other categories we should be considering? And then other, kind of, more strategic ways, is there an agreement across the region about a targeted place to put these funds, and what factors should NOAA and BIA be considering.

So at this point, I'm going to turn this over to Julie. She's going to tell you how to talk to us, and we'll move into discussion. Thanks.

**MS. WEEDER:** Hello, everyone.

So as I mentioned, we are going to now move into the part where you can raise your hand. And the -- you can raise your virtual hand. So if you're on the computer, you can raise your virtual hand by -- if you look at this picture in the upper right here, the little hand icon that has outline around it, what you would do is just click on that. Then that will show up on my screen as you having your hand raised.

Thank you, Robert. I see your hand up.

And then, I will -- I will call on people on the order that hands are raised. The program tells me what that order is. Now, please note that you will not be unmuted until you click the button

that appears on the screen, and that is that button here. So it will look like -- there's a box that says "Unmute yourself." And then it will say "You're being asked to unmute yourself." And there's a little oval that's labeled "unmute me." So you're going to want to click on that and then you'll be unmuted. And then please start -- lead with your name and affiliation.

I did want to mention that we have many people on the call today. There's a lot of voices to be heard, so please, let's just be mindful of that. And also, that we'll be calling on each person first before we take repeat comments or repeat hands, if you will.

And Jen, could you just go back to the previous slide for a moment?

And then, if you are on the phone and not on the computer, what you would do is press *3 to raise your hand. The moderator will call on you, that's me, and I'll select you to unmute you. Please make sure that your phone is not muted on your end. You would have done that if it was. Just make that that's not the case. And again, please state your name and affiliation first.

So Jen is going to put up the discussion

topic -- or the discussion slide here. And I see the first hand is Robert McClure.

So Robert, if would like to -- I believe I've just asked you to unmute yourself, and you should be free to speak.

**MR. MCCLURE:** Yeah. Good morning, everyone, and thank you for this webinar in the series. And I'm going to probably touch on a couple of things that we touched on previously, but I -- I'm hoping for expanded clarification and emphasis that these are important us.

On the Skagit River, we have a fairly -- well, some unique things and some common things to the state of Washington. Some of our hatcheries on the Skagit are co-management hatcheries. They're owned by the State of Washington and operated by the State of Washington, but managed by either two or three tribes cooperatively. So we have a co-manager type situation.

So one of the things that I noticed was that the wording this time states that programs that are important to tribal rights or tribal fishing are included, rather than just tribal hatcheries. That's great. Thank you very much.

We have HGMPs in process now, which brings

up two questions. The first is the timeline for NOAA's approval of those HGMPs, and the question about -- I have a question about whether we're going to be held to meet the compliance before fund are released. We had a situation here on the Skagit where we have a bundle of hatchery programs and HGMPs that were submitted initially, over 15 years ago, and they're still not approved.

They are in process. And a little over a year ago, NOAA finally heard my repeated cries that NOAA had awarded us funding for support of one of those hatchery programs, for which they were considering an HGMP, but we could not access those funds because we did not have NEPA compliance. And NOAA's criteria say that we can't access funds for a hatchery program, which does not -- has not received NEPA compliance. So they extracted the three chum programs from the bundle and pushed them through, and we got NEPA compliance at the end of last year, three and a half years after we had received the funding for that program, which gave us six months to expand two and a half years' worth of funding.

So, in summary, will NEPA be a constraint on distribution of these funds?

And finally, what are the considerations

for capital changes and hatchery modifications to address climate change? Will that be a criteria, and how will that be weighted?

That's all I've got. Thank you.

**MS. QUAN:** Thanks, Robert.

So a couple things, I'm taking your questions as the -- you know, how we -- you know, considerations that we need to do to build this program. Like I've stated up front, we do not -- we do not have explicit shape to this. So the questions you're asking are really helpful that way.

I will say, you know, right now, I think what is absolutely on the table, and what was envisioned by headquarters was deferred maintenance and infrastructure. And another big driver is also the climate resilience. So to the extent, you know, your -- whatever you do with these funds, or whatever we decide we're going to, you know, fund with these funds, if they are funding climate resiliency, that is, like, big time -- a big-time bonus, I would say.

So the NEPA piece -- and as Bryan said, you know, these funds and what we end up doing with them, are probably likely to trigger NEPA in one way or another. And how that is staged relative to the

release of the funding will be determined, really, on the types of projects that we fund with it. So I don't have a totally clear answer for you except that depending on what is done with the funds, NEPA will probably come into play at some point.

**MR. MCCLURE:** Okay.

**MS. QUAN:** And we'll get more clarity on that as we have more shape of, like, when and what that looks like when we have a little more shape to this program.

**MR. MCCLURE:** Yeah. Thank you. And I really didn't expect answers today. I just wanted to --

**MS. QUAN:** Okay.

**MR. MCCLURE:** -- make the points.

**MS. QUAN:** Thanks.

**DIRECTOR MERCIER:** Jen, can I jump in there just to share --

**MS. QUAN:** Yeah, please.

**DIRECTOR MERCIER:** -- from our perspective?

To answer the question the best, it depends, right? And, you know, that's the answer. And it really depends on what is agreed to on the scope here. So -- but yeah, environmental

compliance and NEPA is going to be required. I will say with our existing cyclical maintenance program, we do do quite a bit of categorical exclusions on projects where there's not a lot of change in the production. You know, you're essentially doing some nonrecurring maintenance. So I imagine it will run the whole gambit of CATEX, EAs, and EISs, based on what scopes -- which projects are funded here.

**MR. MCCLURE:** Thank you.

**MS. WEEDER:** Okay. Great. So I'm now going to unmute Mike Crewson from the Tulalip tribes.

**MR. CREWSON:** Thank you.

I'm just sort of offering a point of clarification to that -- to what Bob was saying and what I said yesterday about permitting and design, just because those are required. But they should be eligible -- they're necessary steps in doing this. And, you know, we have these HGMPs that get through the consultation process, but then you may have a construction project that still has to get permitted.

In addition to that, that those shouldn't be -- preclude the eligibility of a project, I would hope, because those are -- that's what everyone is

going to have to go through those. And new construction -- or expansion as you're calling it, does not necessarily mean additional to what the HGMP have in it. In other words, you're approved a program, even at a facility that you're improving on and adding new infrastructure to, but it's not actually different than what's approved. It's just improving the facilities that you're conducting those activities under.

So they would still get -- you know, go through a -- for a particular project on that facility, but the -- I think what Bryan was saying, there's no additional production associated necessarily. So don't -- you know, just clarifying that's not necessarily an additional thing with a new facility. It may just be to improve an existing production program that's already approved. Thank you.

**MS. QUAN:** I think we're in complete agreement with you there, Mike. Thanks.

**MS. WEEDER:** Absolutely. So I do see Robert -- Robert has his hand up. And I just wanted to ensure that everybody please raise your hands if you have a comment. Oh, I see Kirk had his and up.

So I'm going to unmute you, Kirk Truscott.

**MR. TRUSCOTT:** This is Kirk Truscott with the Colville Tribes. And, you, know I'm -- there's a bit to take in here, but a couple of observations, comments would be for sure the criteria, you know, for the use of these funds should not be limited to just shovel-ready projects. I think we've already heard from several commenters in that regard already.

And I think other considerations that are important would be whether or not the funds were going towards a, you know, tribally-funded hatchery program or a federally-funded hatchery program versus those programs that maybe are funded by public utilities, NGOs, et cetera. So that's something that probably needs to be discussed and figure out, you know, what the priority or hierarchy would be for this type of funding.

Also, as well as those programs that are, you know, rearing and producing, you know, ESA-listed species, whether that's an additional consideration from a priority standpoint. And I think, also, geographically, you know, I think that's -- you know, where do we expect we need to spend, you know, the most of the majority of the funds. Is it across the entire northwest region? Or

is it a higher priority to spend money in the Columbia River Basin? And is that, you know -- if it was -- as an example, if it was the Columbia River Basin as a priority, is that the entire basin, including blocked -- or the current extant anadromous zone and the blocked areas as well.

And others have already commented on, you know, the need to include or not exclude projects that either expand existing facilities, maybe build new facilities, or in case of some facilities, improving the infrastructure so that the facilities can actually meet their targeted production for those facilities that are unable to do that at this point in time. Thanks.

**MS. QUAN:** That was super helpful. Thank you.

**MS. WEEDER:** It really is. Thank you so much.

I don't see any hands up right now.

Oh, hello, Karl. I'm going to unmute you.

**MR. SEITZ:** Karl Seitz from the Hoopa Valley Tribe, down here in Northern California.

I was wondering -- you know, we have a small hatchery program we're starting up here to produce ESA-listed coho on Trinity. And we're doing

 a lot of remote releases to try and jumpstart runs where they have been lost on streams where we just did a bunch of restoration work. And I've been having -- you know, writing grants and looking for money to, A, build the hatchery up and expand it. That's all great. But there doesn't seem to be a place for, like, monitoring infrastructure on these remote streams. So, like, I'm going to need to go out there and have, like, PIT tag arrays, and things like that, and that's all super expensive too. But if I don't have any way to monitor the streams that I'm trying to, you know, jumpstart runs in, there's not -- it's hard to judge the success of the program, since, you know, we're not released yet.

The hatchery isn't on a river. We're using ground water, so everything is remote. And so there's no, like, oh, this many came back to the hatchery. I need to be out there. And so it would be really great if there was a way to fund that in this package as well.

You know, our hatchery is in disarray of being built back up and so we need all of those construction funds as well. But I think the monitoring portion, at least for our project, is a super important part that doesn't seem to fit in

with a lot of these other, you know, maintenance and construction funds that I've been applying for. So hopefully, that's get rolled into this as well. Thanks.

**DR. RUMSEY:** If I might Karl, could I ask sort of a follow-up question there?

For that hatchery on the Trinity, is there an associated HGMP that includes, you know, monitoring components and monitoring requirements? Like, I'm just wondering if, you know, a criteria --

**MR. SEITZ:** Yeah.

**DR. RUMSEY:** -- could be supporting infrastructure for implementation of HGMPs for facilities as a way to --

**MR. SEITZ:** Yeah. So as a facility, we have our own HGMP for our tribal little hatchery, but it's, like, butted off of the HGMP for the coho program for the Trinity River hatchery. And we do have a monitoring component in there. We have a plan we have to submit for monitoring, and it's part of the whole -- the whole deal. We're going to be rewriting our HGMP and resubmitting it for a full 4D. Right now, we're on section 7 compliance. Just so that we can do our own brood stock because that's also part of the plan to promote local adaptation to

catch the brood stock in the rivers where we've been releasing them, so that we get the fish that, you know, survived and came back. And then we're kind of promoting them into the different rivers. So we're going to be getting another HGMP, who knows how long that will take to do, but yeah.

We have an HGMP. It has an monitoring component. There's going to be another one, and have even more monitoring -- you know, and having to go out and capture fish in the river to bring back to the hatchery again. So there's a lot of complicated moving parts to our plan.

But, you know, my plan is to run myself out of business in this hatchery business. And, you know, close the hatchery at some point or move on to something else. That's the goal over here. I'm not trying to have this be in perpetuity, but yeah.

**DR. RUMSEY:** Thanks Karl.

**MS. WEEDER:** Thank you.

I see that Ryan Ekhart has his hand up.

I'm going to unmute you, Ryan.

**MR. SVEC:** Hi, Jen and Julie. This is Russell Svec, and I'm the Fisheries Director for the Makah Tribe.

First of all, I'd like to thank you guys

for setting up these -- these work sessions. These are going to be very helpful, not only to you, but, of course, to us. It kind of reminds me -- or maybe we learned a lesson on -- a lesson from what we experienced in trying to deal with the COVID funds a few years ago, and how to distribute and allocate. And so this is a good step in the right direction.

You know, I just felt like we needed to -- the Makah Tribe needed to say something. You know, we were -- we were excited when we got the announcement from NOAA on the 2.6 billion. I think the way that it was defined was for building climate resilience and support for coastal communities. So we took that as being a lot more broader than just hatchery funds.

I just wanted to remind everybody that the Makah Tribe is an ocean-going people. We spend most of our time in the ocean. Over 50 percent of our economy comes from the ocean. And so we're a proud ocean-going people, and we're able to maintain a very strong connection to our culture and our traditions up here on the Makah Indian Reservation.

You know, we definitely support these hatchery funds. And we support a lot of the Puget Sound tribes, and the other coastal tribes. And the

Mitchell Act funds, these are hatchery programs that not only support in-river treaty fishing rights, but also pre-terminal treaty fishing rights, which -- which is who we are. We are a pre-terminal fishery. And so, we definitely support those other tribes and their hatchery programs.

You know, I just want to remind everybody that the Makah Tribe also has some smaller hatcheries. We have the Makah National Hatchery, which is on the reservation. We have a Hoko hatchery, and we have the Umbrella Creek, hatchery which supports Lake Ozette's sockeye, which is listed as endangered.

I'm just -- you know, I'm just hoping that as we go through this process and start to develop how we -- how we allocate funds, we also recognize that, you know, the tribes are equal when it comes to treaty rights. And, you know, the Makah Tribe, we do have treaty in-river fisheries. And, you know, it's been a long time since we've been able to exercise those rights because of the -- the lack of Chinook, coho, and steelhead. And, you know, we're hoping to get back to that some day. And so we're looking at these funds as helping us in that -- that venture to reestablish these in-river fisheries.

So, yeah, I just wanted to say that. And once again, thank you all for the listening session.

And Jen and Julie, we will be in contact with you to set up some one-on-ones. Thank you very much.

**MS. QUAN:** Thank you, Russell.

**MS. WEEDER:** Thanks so much, Russell.

Let's see, Kirk, I'm going to unmute you.

**MR. TRUSCOTT:** Thank you. I've got a couple of questions, both for NOAA and BIA, relative to -- it sounded from -- like from Jen on the opening comments that these funds were expected to be either expended or obligated. I don't recall which Jen referenced, you know, in a five or six year period. The distinction would be important between actually expended and obligated. Definitely two different time frames in my mind.

And then the other question for both entities would be what's your plan for, you know, trying to staff up? So if you've got a project that's going to have to have new HGMP or even an amended HGMP, that can be a pretty lengthy process within NOAA, at least as it has been in the recent past. And then, of course, the NEPA can be lengthy. And, you know, my experience with at least BIA

grants that come through the 638 process, we can get an award letter, but we don't actually have access to the funds for sometimes 12 or 14 months. So all of those things are, I think, critical considerations when we're looking at expending at -- or at least obligating the funds in a five or six year period.

It may not be a whole lot of time to actually construct a new project if we take two years for an HGMP and 18 months for a NEPA and, you know, an additional 12 or 14 months before you actually have the funds to -- to put out a bid for a contractor, right? Let alone selecting a contractor and mobilizing and finishing the construction. Thank you.

**MS. QUAN:** Great questions. Great clarifying questions. I think with this set of funds, I think we have to have them obligated, and Scott Rumsey can correct me if I'm wrong, by fiscal year '26, and then it's probably five years after that that they need to be expended. That's our current understanding of the funding.

From my end, there's kind of this chicken and egg, and how we set up this program relative to staffing. You know, if there's a preponderance of

desire for this to be an expansion in a lot of new projects, we're going to have to staff up at this end. That may also mean that some of that 240 will go to helping us staff up on it. We will definitely have to also bring in some staffing considerations to help BIA in their administration of the program too.

So that -- beyond, you know -- as this process keeps going, you know, that will be in the -- in part of our conversations, like, how we can meet what you want when we put this thing on the ground. I'll turn to over to Bryan now.

**DIRECTOR MERCIER:** Yeah, thanks, Jen.

And it's a valid point that you're raising, Kirk. I will say that in the last four years is probably not a good baseline. On top of our reoccurring annual appropriations and contract support, we had two rounds of CARES, ARPA, BIL, IRA. We had a lot of money that was coming at our awarding officials. So those delays that you reference are largely just the fact of capacity. Our people were being asked to move a lot of money over the last five years or so, and so that caused some delays in getting the money out.

But I will say we've staffed up

significantly because of all that, and our capacity is greater now than it's ever been since I've been here in five years, as far as the 638 administration.

The bigger question that I think you're getting at is as we scope out these projects, and Jen was touching on this, expansion, HGMP, IHOPS, you know, there's -- depending on what you all want to do -- want us, the federal government to do with this money, it could cause additional capacity constraints. And so I think that's something we should consider as part of this consultation is the timing and the needs to deliver these funds should be a factor.

And so, you know, my opinion is -- I hope, I should say, we'll consider a lot of the nonrecurring maintenance needs that we have as one of those top priorities so -- because I think that will be easier to get on the ground and get the funding to you all than expansions or new projects. So that's just my 50,000-foot comment there. But yeah, valid points.

You know, there are going to be some administrative and technical requirements based on what we do here. And we'll have to -- you know,

we'll have to take that into consideration, both NOAA and BIA, as we move forward.

**MS. WEEDER:** I will now unmute Robert McClure.

**MR. MCCLURE:** Hi, me again. I'll keep this one really brief. I just want to really thank the representative from Hoopa and for Scott's response to that. And add emphasis to the desire that these fundings -- this funding be considered in support of research and monitoring requirements that are part of our HGMPs, should they be approved in time, and the terms and conditions of the HGMPs.

So yes, that is an important component, and we would definitely appreciate some clarity on that and confirmation that those activities within the HGMP would be considered. Thank you.

**MS. WEEDER:** Thank you. Those are great points. Bryan -- oh, sorry.

Steve R., I'm going to unmute you.

**MR. RODGERS:** Steve Rodgers, I'm with the Nez Perce Tribe.

My question is more kind of a technical education I'm trying to get. Out in the field, at least for us with the Nez Perce Tribe, it seems like there's lots of federal money out there. That's a

very common theme. But so far, I have not done very well in getting any federal entity to give us some of that money. And a lot of it, I think, is process stuff. You know, we're not trained professional grant writers. We're trying to do this, in a lot of cases, on the side or in addition to other duties.

Do you guys, at this point, have a vision or an idea of how -- you know, 638 doesn't mean a lot to me, but I do know that I've applied for a couple BIA projects with a pretty straightforward, simple, streamlined process of just basically describing what we wanted to get done, where it's going to occur, why we're trying to do it, but not a major, formal federal grant process.

Do you expect these NOAA funds will be awarded in that manner? Or do you expect some kind of federal, long, drawn out process that takes a lot of staff time and a lot of expertise we don't necessarily have out in the field.

**MS. QUAN:** So I'll tell you -- so how I'm hearing that question is you would like to see a very streamlined process for getting these funds to the tribes. And we would too. I think it's our goal is to try and make this as simple as possible. And so that's part of, you know, this allocate -- you

know, understanding what you want out of the allocation process and how we do it.

So if I got that wrong, you would like a streamlined easy process for accessing the funds, let me know, but otherwise, we've heard that a lot so far, and we can add that to the comments.

Bryan, I don't know if you have more to add?

**DIRECTOR MERCIER:** Yeah. I was just going to say -- so the gentleman -- I forgot the name. I'm sorry. Is that Robert? Robert again?

You know, we do have competitive annual programs that you're referring to. So there is a process for us to select your regionally -- or recommend regionally to the interior for the limited funds that we have for the cyclical maintenance program, for example, at our hatcheries here. And that is a, I'll say, burdensome, federal bureaucratic process.

What's great about this, that NOAA's having this consultation, is NOAA is asking you all, how do we do it? How do we allocate? And I think there's a slide earlier that's tribally directed, you know. So if all the tribes in the northwest can reach consensus and reach agreement on how to

allocate $240 million, this will be very streamlined. We'll essentially have all the scopes of work that we can modify to our existing contracts and compacts and get the money out right away.

But that's the challenge. Can we agree, regionally, how to spend $240 million when the need is probably closer to 2 billion. And so, I am hopeful that we can find a process that won't be bureaucratic to select and allocate the funds, but that's really, I think, the question we're asking you. The federal family is asking the tribes here. And it's one of the central ones from this consultation that we want to hear from you all is how do we -- how do we allocate these funds?

**MR. RODGERS:** Okay. I appreciate that. Can you guys still hear me?

**DIRECTOR MERCIER:** Yes. Yes, we can.

**MS. WEEDER:** Yes, we can.

**MR. RODGERS:** I appreciate both of those answers. And if you could briefly, again -- and maybe this is only for me, but maybe it's for other folks as well, explain at a very simple level how does that 638 -- if we come to agreement on how to get the money out there, how does that 638 process work?

**DIRECTOR MERCIER:** Yeah. So we have an awarding official for every tribe in the region. Either somebody that works on my team here in the Portland office, or somebody who works for the office of self-governance. Once they have a scope of work and a budget of how those funds will be spent, we will modify an existing contract or compact to add these one-time funds as a project. We will need, then, a either BIA or NOAA technical representative, an AOTR, and awarding official technical representative, to walk along the tribe to make sure that the funds are spent consistent with that scope and with that budget.

And reporting requirements, we haven't discussed that here today, but we did yesterday. We're hoping to leverage our existing 638 reporting requirements, which are currently quarterly financial reports for SF425s and an annual narrative of what was accomplished in the past year. So that, in my mind, is the ideal here, is that we reach agreement on $240 million and scopes, various projects, and we just essentially are modifying them into our existing contracts as a one-time funding for projects.

And again, depending on the complexity of

each of those scopes, there's going to be various requirements around NEPA. We do -- you know, all our work is done in NEPA tracker. So I'm sure your environmental staff and your THPOs are all aware of NEPA tracker for the BIA. We would be using or regular routine process that we do all the time for those one-time project funds from NOAA. So to me that -- the administration is pretty straightforward. It's going to be the allocation and project selection that's going to be the challenge in my mind.

**MR. RODGERS:** All right. Thank you very much. That really is a very good explanation. I appreciate it.

**MS. WEEDER:** I don't see any hands up right now.

Hello, Mike. I'm going to unmute you.

**MR. CREWSON:** Mike. So listening to this, I do have a couple of specific suggestion things that you probably already thought of, but even to help a categorize these to figure out what has to be done for a particular project for it to be executed even by BIA and their criteria. But in the end, the idea is that -- okay, here it is. So is a new HGMP required for the project should be one thing at some

point we identify. Because whether you have an expansion or a nonrecurring maintenance project, it could be already permitted HGMP, or it could be some new expansion that isn't, you know, an improvement of existing facilities that are already covered under an HGMP. So I just think -- is a new HGMP required, yes or no, is going to be important to understand for permitting.

And then, you know, before getting into the type of project, whether it's nonrecurring or a new expansion project, there's the permit -- permitting of the actual project that has to be identified too. And that -- you know, if there's a status of that somewhere acknowledged. For instance, we do -- it's in progress or it's completed. Like, that would seem to matter to me if that was done. Same with design. There's design from not even done -- started yet, or it could be, you know, the way it's done it's 30, 60, and 90, or something like that, is different stages of development of completion of that. Same with these permits.

And so I feel like trying to understand what permitting's going to have to happen for a project, as well as how far along it is in terms of

 being shovel-ready could be considered, even though all of those stages need to be supported. It still helps to understand, like, this is an existing facility. It's already got permitting, and the permit for the project is already done too, you know. Versus something that's a brand new facility that needs everything. And so that's -- that's what I was trying to get at before. So, thank you.

Can I add one more thing? Our director, Jason Gobin, is going to get on tomorrow and we care a lot about this stuff, but I think he wants to request a government-to-government consultation for Tulalip. But, you know, we get these contracts now for projects that have stipulations for permitting in there before you can do them. We had that with NOAA already where just because a project moves forward and gets funded, you can't actually start it until you provide the final permit paperwork that could be right in the contract itself for a larger project. Thank you.

**MS. WEEDER:** Thank you, Mike.

I don't have any hands up right now. I should say I don't see any hands up right now.

The intent here is really questions, comments, ideas, reflections, anything is welcome.

 So if you're really just trying to figure a point out, feel free to raise your hand and just mention that. We are here to have a great conversation with you.

And I do want to remind the phone people that the way you can unmute yourself is to press *3, and then you'll be unmuted. And you do need to make sure that you haven't muted yourself on your end. I've done that before.

Jen, I wonder if you might just want to say some of these questions again, or give some prompts to folks for things to think about?

**MS. QUAN:** Sure. So I just -- I put the slides back up about some of our questions. And maybe -- maybe if you have thoughts or responses or other questions we should adding to this list. The first one, you know, what are your top priorities for NOAA's implementation of this funding package?

We've been talking a lot -- where did it go -- we've been talking a lot about categories, maintenance, and expansion. We've heard a few other categories out there, research, monitoring equipment relative to HGMP implementation. That's a good one. What other categories should we be considering?

I think we heard a similar question about

is there a geographic consideration we should making. I think this is from Kirk from Colville brought up a similar question; should we be spreading these funds broadly? Is there a consensus around targeted areas that would bring the most benefit? And other factors NOAA and BIA should be considering.

**MS. WEEDER:** I do see Robert McClure. You have your hand up. I'm going to unmute you.

**MR. MCCLURE:** Yeah, me again.

A question for NOAA. Is there a non-tribal similar pot of funds for state hatcheries or other hatcheries under the Inflation Reduction Act or otherwise?

**MS. QUAN:** So right now there -- in NOAA's funding, there are two pots of funds for hatcheries. There is 240 million that go to tribal hatcheries. There's another 60 million that go to Mitchell Act hatcheries. So none of the -- so the Mitchell Act hatchery pot of funding, and we're going to be doing that session next, is really about distribution, you know, based on U.S. v. Oregon tribal parties' priorities being met, and then conversations with U. v. Oregon parties.

I would say that these funds, the IRA



funds, are not set up to directly go to other federal agencies. I mean, the transfer to BIA to transfer to you is an exception. But funding another federal agency directly is not -- we've been told is not okay with these funds.

So one thing, though, and I don't know if there is where your question is going, Robert, you know, I think you and others have brought up that there are co-manager hatcheries scattered throughout -- I know in Washington. I don't know so much about Oregon. It may be even in California. If tribes want to sponsor improvements or projects with this funding at those co-manager properties, I think we're willing -- I think that's totally on the table. I think when we're funding either federal projects that should have other federal funding come to it, we have to have that conversation. And I think under BIL, Fish and Wildlife Service had hatchery funding for their -- their projects, but that's all I know.

**MR. MCCLURE:** Okay. Thank you.

Yes. The co-manager funding was what I was wondering, whether the tribal co-managers and the state co-managers could go after separate pots of money for the same program, but it doesn't appear

that the state would have that option.

**MS. QUAN:** Not at this time.

**MR. MCCLURE:** Okay. Thank you.

**MS. WEEDER:** Hello, Steve. I'm about to unmute you.

I tried to unmute you, sorry. Let's see if that will work the next time.

**MR. RODGERS:** Thanks, Julie.

Yeah. So I was going to ask the same question. One of the projects that I'm trying to get funding for is at a U.S. Fish and Wildlife Service hatchery that's funded by the service, but it's operated by the Nez Perce Tribe. And it sounds like if the tribe wants to do something at that hatchery, even though the service owns and funds the hatchery, NOAA is supportive of at least going to the process. That's what I heard, correct, Jen?

**MS. QUAN:** Yeah. I think, if that's -- so I'm going to be collecting like -- we're collecting this information right now, so if there's a desire for funds -- for tribes to be funding federal hatcheries, let's put that as a category and talk about it. If that's -- if that is a huge need, we're not going to -- we're not going to say no, but we need to figure out how to make that work.

 **MR. RODGERS:** Okay. Yeah. At least, in my case, in my perspective, it's just one person working for the Nez Perce. We have multiple opportunities at federal facilities that tribe either co-manages or actually operates. So yeah, that would definitely be a criteria that we would be interested in.

And the other thing that I wanted to ask as a follow up is one of the, sort of, chicken before the egg problem that is I'm starting to pick up on is one of our projects requires permitting to be done before we can access "shovel-ready" federal funding. So we've got partners who say, yeah, we've got shovel-ready money that we could potentially give to the tribe, but you need to get that permitting done first, and we don't have authority to give you funding for permitting.

So is permitting sort of going to be a category at an advance part of actual construction? Or is it a better approach for us to just submit for permitting and construction, or either or, if that makes sense?

**MS. QUAN:** Yeah. I think those are really good questions. I think we've got a lot of these funds going out, kind of, answering those questions

right now. So I want to go back to our NOAA team and see how it's working, one way or the other.

The thing that makes me nervous on permitting, so I'm just going to be completely honest here, you know, is I think we're all acutely aware there are some people who are not very excited about hatcheries and hatchery production being on the ground. So I'm interested in making sure that whatever process we set up is bullet proof legally. And so that's going to be part of my consideration on how we, you know, structure and phase -- you know, how flexible we can be about permitting and tying it to funding.

**MR. RODGERS:** Okay. So just to conclude the conversation, at least from my perspective, hearing that, it sounds like it would not be out of line for the Nez Perce Tribe to have a direct conversation with NOAA and walk through some of the bigger projects we want to do so that we either know, yeah, that's worth our time to go down that road, or don't waste our time because we're not going to get the funding in the ends. So I will pass that on to my tribal leadership so we can initiate a conversation.

**MS. QUAN:** Absolutely. That'd be great.

**MS. WEEDER:** Yes, that would be wonderful. I think you're really right on, Steve. That's really what we're envisioning for having these one-on-one conversations.

So just a reminder to everyone, in case you didn't see it in the chat, I did cut and paste the information about how you can submit written comments, and also how you can request a one-on-one meeting. And it's in the chat. And the take-home message is you contact me to request a meeting. And then you also -- there's an email address established for submitting written comments. And I just want to clarify that we're not saying go ahead and just submit written comments and we'll get back to you. Like, we would love for you to do both things. You know, contact us. Have some conversations with us. Submit some written comments. I think all of those will really help us in what we're trying to accomplish here.

I did want to mention, Ryan, I do see your comment here in the chat. Ryan Erhart writes that the Makah also manages facilities in the U.S. with Fish and Wildlife, in particular, the Makah National Fish Hatchery. And this topic is of interest to the Makah as well.

 And Ryan, I'm partly mentioning that so everybody hears it, and also because there's a recording, and I want to make sure that ends up in our recording. So feel free to elaborate if you'd like, just raise your hand. And right now, we don't have any hands raised.

Jen, perhaps you'd want to go back to the questions. And I'll also note that those questions are also particularly helpful to people that are only on the phone because they can't see our slides.

I hope it's coming across that this is meant to be a very welcoming and open space. No question is going to be considered silly, or you should already know what the answer is. I think we're all figuring this out together.

Steve, I see your hand. I'm going to unmute you now.

**MR. RODGERS:** So I guess I'm not shy.

Just maybe a real broad question, and I'm just curious for some answers on this. Is NOAA and maybe BIA's expectation that the tribes will come together separately and come back to you with here's how we collectively think we should share these funds? Or is it more everybody gives you input, and then at the end of the day, you guys have to decide?

Or could it be either one?

**MS. QUAN:** Yeah. Really good question. Thank you for asking that. Yes, I think it could be either one, both, all of it.

**DIRECTOR MERCIER:** Jen, I would just say that my preference is that the tribes come together and make our lives -- everybody's lives easier. But that's quite a monumental task. We understand that.

So I think it's entirely up to you all, how you want to submit your comments to us. But I think we will be using the feedback as kind of our guiding stars or North Stars to try to triangulate which direction we head, based on all the feedback which receive. It'd be great if the feedback -- if we had one letter signed by 45 regional tribes, right? That would be ideal.

I don't think that's possible, logistically, so we'll get whatever feedback we get and try to use that as our guidance going forward.

**MS. WEEDER:** Jen has put up the slide here that talks about the scope, and criteria, and also, allocation options. And, you know, you recall that she described a few different allocation options that we just put out on the table.

I don't know, Jen, if you'd like to

elaborate on those once again?

**MS. QUAN:** Yeah. I'll move us back to where it's kind of -- we have a little more -- more meat to think about. Just kind of building off of Steve's comment and thought process. Again, this is about the potential allocation options, as Bryan indicated, we're both on the same page, that a tribally-directed approach would be our favorite, but realize that could be a big ask.

I think that, you know, we've looked at the Fish and Wildlife Service BIA model. I think that is a fairly -- pretty streamlined competition process from our end and how that looked. You know, if agreement can't be made. And then some other options for tiered allocation. And I know that some of our other IRA and BIL funds are doing this with initial allocations out to help sponsors, in particular, tribes or underserved communities to build capacity to be responsive to some of these things. You know, that -- if that's something that's needed, you know, we could build in tiered processes for that. But otherwise, tiered processes for, you know, equal allocation for something like that, but going to regional competitions for the rest of it, or again, other ideas.

And again, we understand that we're just throwing these at you right now, and that it will take sometime for some of this to sink in, and for you to actually maybe generate some other ideas, so understand that additional conversations will be needed.

**MS. WEEDER:** Steve, I do see your note of appreciation in the chat. "Thanks to all of you on the panel for answering these tough questions. I appreciate your listening and collaboration."

Thank you for that, Steve. You know, our intension here, really, is to figure this out all together, and we really appreciate all of you coming here today.

And Kirk, I had see you have your hand, so I'm going to unmute you.

**MR. TRUSCOTT:** Thank you. Thank you.

I think another consideration, you know, for the allocation options is to also consider the -- I'll use the term "remoteness" of, you know, where a particular tribe may be. As an example, the Colvilles are, at the very end of the extant anadromous zone. So the only fish we get back are the fish we release. And so meeting our current target production for existing salmons to go in

hatcheries is extremely important. We don't get the benefit -- we don't get benefit from a harvest standpoint of fish that are produced at Mitchell Act hatcheries, as an example, right? In the lower Columbia, we don't see those fish. And so from a geographic standpoint, I think that's an -- I've brought it up before as a consideration, I think, that needs to be looked at when we're looking at potential funding allocations.

**MS. QUAN:** Thanks. I hear that.

**MS. WEEDER:** I'll mention there was a question in the chat earlier and Jen addressed it. And I'll just mention again, that we are planning to send these slides out tomorrow afternoon, so you will have them to reference. And as Jen said, you know, we really are -- we recognize we're throwing a lot of information at you all at once, and it makes sense that you need to consider it and deliberate and get back to us. And we look forward to that happening.

**MS. QUAN:** Julie, the question was will slides include audio of the conversation?

**MS. WEEDER:** Oh, I believe in the short term, they will not. And I think we are preparing a transcript, but that will take some time to be

available because there needs to be somebody that generates that and looks at the one that's auto-generated. But, you know, we're definitely here to help clarify any particular points on anything, you know, that -- to supplement the slides that are sent to you.

Well, I'm not seeing any other hands. We're happy to hang out here for more time, but we also can consider moving to close. And looking forward to hearing from you very soon. We do have, I think, one or two last slides, Jen. You may want to put those up.

There it is, just that last one there.

So the last slide, basically, just reiterates, you know, what we can do -- what you can do to, kind of, continue to engage on this, the various options with submitting -- oh, sorry, here, Jen, please speak here. I don't mean to keep talking.

**MS. QUAN:** I'm sorry. I can't see -- is the slide up? I can't tell.

**MS. WEEDER:** It is. You're good.

**MS. QUAN:** There we go.

All right. Yeah. So thank you so much for your time today. And appreciate the input we've

received so far. Just every time we've had one of these, it's helped to shape and start to give some more shape to the work we have in front of us, and the opportunities, the really exciting opportunities we have in front of us.

So again, this is the time -- kind of our time frame. We will probably need to set up some sort of initial -- or additional engagements to kind of report out where we are. We will definitely keep engaging all of you on how this shapes up so people know how to access it and are ready to access these funds when they're ready.

Again, if you would like to request a one-on-one, please reach out to Julie, and submit written comments by July 23.

And it looks like Merle has a question.

**MS. WEEDER:** Yes. Hello, Merle.

I'm going to unmute you now.

Hang on. I'm hitting the unmute button and it is not actually responding.

And Merle, for whatever reason, your hand, it shows that it's raised, but it's crossed out. So you may just try lowering it and raising it again.

So sorry for these technical issues.

Okay. Let's try this again.

I'm so sorry, Merle. Oh, here we go. Here you are. Sorry about that.

**MERLE:** Can you hear me?

**MS. WEEDER:** Yep. We can hear you.

**MERLE:** Hello.

**MS. WEEDER:** Hi, there.

**MERLE:** Oh, yeah. Well, anyway, I want to thank everybody, you know, for this, and thank all the tribes, you know. This is a very good session here and -- you know, I was kind of thinking, you know, that it's good that we're able to get funding for all of our -- you know, for the hatcheries that are needed, you know. But I'm kind of wondering about the longer -- longer term on -- is there any thoughts about operation funds in the future or something of that nature? You know, because, you know, there is a need for operation funds. And I'm not sure if that's been thought about or not or talked about.

**MS. QUAN:** Yeah. Hi, Merle. Thank you for that question. You know, of course, I think that looms out there, is the operation's side. I will tell you the initial direction I've been given because these are one-time funds, we're being discouraged right now from funding operational

things. If there's a large cry for we have operational things that we could achieve on one-time funds, you know, I'm willing to have that conversation. But right now it's going to be -- I think we're going to be hard-pressed to fund things -- fund operations.

And I would also -- I guess, on that note, you know, when we're thinking about -- if you're thinking about building new facilities too, I think we have to be thoughtful about the operational costs of those new facilities and use of these funds for that. I think we have to -- we don't want to set anybody up for something that can't -- can't operate.

**MERLE:** Yeah. And -- and the reason I say this here is that, you know, is the habitat is not very good, you know. And we need hatcheries until the habitat recovers. So we're dependent more on hatcheries, but it's going to cost more for us to operate. And I'm looking somewhere to get help for operations somehow. I'm looking at the government to find if there's ways to do that somehow.

**MS. QUAN:** Great. We've got that down in our notes. Thank you.

**MERLES:** Thank you.

**MS. WEEDER:** Thank you, Merle.

Merle, I just want to confirm, is the hand that's up, is that from before or have you raised it again? No problem if you have.

Okay. It looks like it was from before.

Well, I see that we are almost at 10:30, so we do have the slide up here. And I'll just allow Jen -- turn it over to Jen for any closing remarks.

**MS. QUAN:** Yeah. Just reiterating my thanks from before, and look forward to further conversations. I see a bunch of you have reached out and are interested in one-on-ones, and so I look forward to those as well. I hope you all have a good rest of the day. Thank you for the conversation. It was a fun one.

**MS. WEEDER:** It was. Thanks to everyone.

**(WHEREUPON, listening session concluded.)**

# CERTIFICATE

I, Kimberly R. McLain, do hereby certify that the proceeding named herein was professionally transcribed on the date set forth in the certificate herein; that I transcribed all testimony adduced and other oral proceedings had in the foregoing matter; and that the foregoing transcript pages constitute a full, true, and correct record of such testimony adduced and oral proceeding had and of the whole thereof.

IN WITNESS HEREOF, I have hereunto set my hand this 17th day of July, 2023.

Kimberly R. McLain

$
**$240** 2:15 37:1 37:6 38:21

1
**10:30** 58:6
**12** 31:3 31:11
**14** 31:3 31:11
**15** 18:7
**18** 31:10

2
**2** 37:7
**2.6** 28:11
**2023** 2:6
**22** 2:6
**23** 55:15
**23rd** 8:7 8:11
**240** 32:3 43:17
**26** 31:20

3
**3** 3:12 16:18 42:6
**30** 40:19

4
**45** 50:15
**4D** 26:23

5
**50** 28:18
**50,000-foot** 33:21

6
**60** 40:19 43:18
**638** 6:21 10:2 31:1 33:3 35:8 37:23 37:24 38:16

7
**7** 26:23

9
**90** 40:19

A
**ability** 9:9
**able** 9:13 28:20 29:20 56:11
**absent** 14:4
**absolutely** 19:13 22:21 47:25
**accepted** 10:5
**accepting** 8:6 8:11
**access** 18:13 18:15 31:2 46:12 55:11 55:11
**accessing** 36:4
**accomplish** 48:19
**accomplished** 38:19
**achieve** 57:2
**acknowledged** 40:14
**across** 15:5 23:25 49:11
**Act** 2:1 2:9 2:12 2:16 3:23 6:3 11:11 11:12 29:1 43:13 43:18 43:19 53:3
**Acting** 4:24
**activities** 22:9 34:15
**actual** 40:12 46:19
**actually** 9:2 22:7 24:12 30:16 31:2 31:9 31:12 41:17 46:5 52:4 55:20
**acutely** 13:2 47:5
**adaptation** 26:25
**add** 34:8 36:6 36:8 38:8 41:9
**adding** 22:6 42:16
**addition** 21:23 35:6
**additional** 7:7 22:3 22:13 22:15 23:20 31:11 33:10 52:5 55:8
**address** 10:11 19:2 48:11
**addressed** 53:12
**addressing** 5:20
**administration** 5:22 8:20 32:6 33:4 39:8
**administrative** 9:25 10:25 33:24
**Administrator** 4:15 4:18
**advance** 2:17 46:19
**Affairs** 5:9
**affiliation** 3:9 3:15 16:8 16:24
**afternoon** 53:14
**agencies** 10:24 44:2
**agency** 5:22 9:13 44:4
**agenda** 4:5
**ago** 4:16 18:8 18:10 28:6
**agreed** 20:24
**agreement** 8:19 15:5

22:20 36:25 37:23 38:21 51:14
**ahead** 48:13
**alleviate** 10:25
**allocate** 8:15 28:6 29:16 35:25 36:22 37:1 37:9 37:14
**allocation** 6:11 13:14 14:9 36:2 39:9 50:22 50:23 51:6 51:15 51:23 52:19
**allocations** 51:17 53:9
**allow** 58:8
**alone** 31:13
**already** 22:17 23:6 23:8 24:7 39:20 40:3 40:5 41:4 41:5 41:16 49:14
**am** 3:24 4:14 37:7
**amended** 10:18 30:22
**Amiotte** 5:1 5:1
**amount** 4:2
**anadromous** 4:20 24:6 52:23
**announcement** 28:11
**annual** 32:17 36:12 38:18
**answer** 20:3 20:22 20:23 49:14
**answering** 46:25 52:9
**answers** 7:4 20:12 37:20 49:20
**anticipate** 12:23
**anxious** 7:24
**anybody** 57:13
**anything** 41:25 54:4
**anyway** 56:7
**AOTR** 38:10
**appear** 44:25
**appears** 16:1
**applied** 35:9
**applying** 26:2
**appreciate** 7:21 34:14 37:15 37:19 39:14 52:10 52:13 54:25
**appreciation** 52:8
**approach** 14:2 46:20 51:8
**appropriations** 32:17
**approval** 18:2
**approved** 18:8 22:4 22:7 22:17 34:11
**areas** 24:6 43:5
**ARPA** 32:18
**arrays** 25:9
**associated** 22:13 26:8
**audio** 53:22
**August** 8:3 8:5
**authority** 46:16
**auto** 54:2
**available** 13:7 13:11 54:1
**award** 31:2
**awarded** 18:11 35:16
**awarding** 32:20 38:2 38:10
**aware** 13:2 13:4 39:4 47:6
**away** 11:17 37:4

B

**back-and-forth** 9:15 12:10
**baked** 6:17 9:2
**balanced** 9:12
**ball** 12:19
**based** 5:24 21:7 33:24 43:22 50:13
**baseline** 32:16
**basically** 35:11 54:14
**basin** 24:2 24:4 24:4
**beginning** 7:1 7:6
**believe** 17:3 53:23
**beneficial** 10:6
**benefit** 43:6 53:2 53:2
**best** 12:6 20:22
**better** 13:19 46:20
**beyond** 32:8
**BIA** 6:19 6:20 8:19 9:8 9:11 9:18 9:22 10:4



15:7 30:10 30:25 32:6 34:2 35:10 38:9 39:5 39:23 43:6 44:2 51:11
**BIA's** 49:21
**bid** 31:12
**bigger** 33:5 47:19
**big-time** 19:20
**BIL** 14:6 32:18 44:18 51:16
**billion** 28:11 37:7
**bit** 21:3 23:3
**blocked** 24:5 24:6
**blue** 12:18
**Bob** 21:15
**bonus** 19:21
**box** 16:2
**brainstorm** 13:19
**Branch** 4:19
**brand** 5:2 41:6
**break** 9:17
**brief** 2:21 34:6
**briefly** 37:20
**bring** 12:3
27:10 32:5 43:5
**brings** 17:25
**broad** 49:19
**broader** 28:14
**broadly** 43:4
**brood** 26:24 27:1
**brought** 43:3 44:8 53:7
**Bryan** 5:8 5:11 9:17 9:21 11:5 14:5 19:22 22:12 32:12 34:18 36:7 51:6
**budget** 38:6 38:13
**build** 19:8 24:9 25:5 51:19 51:21
**building** 9:10 28:12 51:4 57:9
**built** 25:22
**bullet** 47:9
**bulleted** 12:15
**bullets** 12:18
**bunch** 4:22 8:8 25:3 58:12
**bundle** 18:6 18:18
**burden** 9:25
11:1
**burdensome** 36:18
**Bureau** 5:9
**bureaucratic** 36:19 37:9
**business** 27:14 27:14
**butted** 26:17
**button** 3:8 15:25 16:1 55:19

C

**California** 24:22 44:11
**capacity** 10:9 32:21 33:1 33:10 51:19
**capital** 19:1
**capture** 27:10
**care** 41:10
**CARES** 32:18
**case** 16:23 24:10 46:2 48:5
**cases** 35:6
**catalyze** 12:1
**catch** 27:1
**categorical** 21:3
**categories** 15:3 42:20 42:22 42:24
**categorize** 39:21
**category** 45:22 46:19
**CATEX** 21:7
**cause** 33:10
**caused** 32:23
**central** 37:12
**cetera** 10:17 23:14
**challenge** 37:5 39:11
**challenges** 10:9
**chance** 5:5
**change** 19:2 21:4
**changes** 19:1
**chat** 48:6 48:9 48:21 52:8 53:12
**chicken** 31:23 46:9
**Chief** 4:19
**Chinook** 29:22
**chum** 18:17
**chunk** 14:10
**chunks** 7:22
**clarification** 17:10 21:15
**clarify** 48:13 54:4
**clarifying** 22:14 31:17



**clarity** 20:7 34:14
**clear** 10:19 20:3
**click** 15:18 15:25 16:6
**climate** 19:2 19:16 19:19 28:12
**close** 4:12 27:15 54:9
**closer** 37:7
**closing** 58:8
**coalescence** 14:25
**Coast** 2:3 4:15 4:25 11:16
**coastal** 28:13 28:25
**coho** 24:25 26:17 29:22
**collaboration** 52:10
**collecting** 45:19 45:19
**collectively** 49:23
**Columbia** 24:2 24:3 53:5
**Colville** 23:2 43:2
**Colvilles** 52:22
**co-management** 17:15
**co-manager** 17:18 44:9 44:13 44:22
**co-managers** 44:23 44:24
**co-manages** 46:5
**comes** 28:19 29:17
**coming** 9:2 11:23 32:19 49:11 52:13
**comment** 2:25 3:16 22:24 33:21 48:21 51:5
**commented** 24:7
**commenters** 23:7
**comments** 6:16 8:7 11:18 12:11 16:13 23:4 30:12 36:6 41:25 48:8 48:12 48:14 48:17 50:10 55:15
**commitment** 4:3 7:11 9:14
**committed** 4:2
**common** 17:13 35:1
**communities** 28:13 51:18
**compact** 6:21 38:8
**compacts** 10:3 10:14 10:19 37:4
**compete** 14:11
**competition** 14:7 14:8 51:12
**competitions** 51:24
**competitive** 36:12
**complete** 22:19
**completed** 40:16
**completely** 47:4
**completion** 40:21
**complexity** 38:25
**compliance** 10:16 10:21 18:4 18:14 18:17 18:19 21:1 26:23
**complicated** 27:12
**component** 6:14 26:19 27:8 34:13
**components** 6:13 26:9
**computer** 3:11 15:15 16:18
**conclude** 47:14
**concluded** 58:18
**Concurrently** 8:18
**conditions** 34:12
**conducting** 22:8
**confirm** 58:2
**confirmation** 34:15
**connection** 28:21
**consensus** 36:25 43:4
**consider** 9:9 12:16 12:22 33:12 33:16 52:19 53:18 54:9
**consideration** 23:21 34:1 43:1 47:10 52:18 53:7
**considerations** 18:25 19:8 23:9 31:5 32:5
**considered**

34:9 34:16 41:1 49:13
**considering** 15:4 15:7 18:13 42:24 43:7
**consistent** 38:12
**constraint** 18:23
**constraints** 33:11
**construct** 31:9
**construction** 21:21 22:2 25:23 26:2 31:14 46:19 46:21
**consultation** 5:15 7:9 11:15 21:20 33:12 36:21 37:13 41:12
**consultations** 5:25 9:4
**contact** 11:16 30:3 48:10 48:16
**continue** 54:16
**continuing** 7:8 8:2
**contract** 6:21 32:17
38:7 41:19
**contractor** 31:13 31:13
**contracts** 10:2 10:5 10:14 10:19 37:3 38:23 41:13
**conversation** 3:25 7:10 12:2 13:3 42:3 44:17 47:15 47:18 47:24 53:22 57:4 58:16
**conversations** 6:9 7:7 8:9 14:15 32:10 43:23 48:4 48:17 52:5 58:12
**cooperatively** 17:18
**Coordinator** 4:24 5:2
**copies** 11:20
**correct** 31:19 45:17
**cost** 57:19
**costs** 57:10
**couple** 4:10 17:8 19:6 23:3 30:10 35:10 39:19
**course** 28:3
30:24 56:21
**covered** 40:5
**COVID** 28:5
**Creek** 29:11
**Crewson** 21:11 21:13 39:18
**cries** 18:10
**criteria** 6:10 8:14 12:14 12:17 13:12 18:15 19:2 23:4 26:10 39:23 46:6 50:21
**critical** 31:4
**crossed** 8:21 55:22
**cry** 57:1
**culture** 28:21
**curious** 49:20
**current** 4:8 7:2 13:6 24:5 31:22 52:24
**currently** 38:17
**cut** 48:6
**cyclical** 21:2 36:16

D

**dates** 8:22
**day** 29:23 49:25 58:15
**deal** 26:21 28:5
**decide** 19:18 49:25
**decision** 7:17
**deferred** 6:3 19:14
**defined** 28:12
**definitely** 28:23 29:5 30:16 32:4 34:14 46:6 54:3 55:9
**delays** 32:20 32:24
**deliberate** 53:18
**deliver** 8:10 9:9 9:13 10:6 10:14 33:13
**delivering** 9:25
**dependent** 57:18
**depending** 20:4 33:8 38:25
**depends** 20:23 20:24
**Deputy** 4:18
**described** 50:23
**describing** 35:12
**design**



21:16 40:17 40:17
**desire** 7:18 32:1 34:8 45:20
**determine** 9:5
**determined** 20:1
**determining** 6:9
**develop** 29:15
**development** 14:20 40:21
**different** 12:2 22:7 27:4 30:17 40:20 50:23
**direct** 47:17
**directed** 6:2 36:23
**direction** 28:7 50:13 56:23
**directly** 44:1 44:4
**director** 5:10 9:19 9:22 20:17 20:20 27:23 32:13 36:9 37:17 38:1 41:9 50:5
**disarray** 25:21
**disbursed** 6:20
**discouraged** 56:25
**discussed** 23:15 38:15
**discussion** 2:9 4:6 4:10 6:17 7:16 11:25 12:13 13:14 14:13 15:10 16:25 17:1
**distinction** 30:15
**distribute** 13:15 28:6
**distribution** 6:20 12:6 13:17 14:2 18:24 43:21
**done** 4:12 8:15 9:1 10:24 16:22 20:4 35:1 35:12 39:3 39:22 40:17 40:18 40:19 41:5 42:9 46:12 46:16
**door** 7:19
**Dr** 4:17 26:5 26:12 27:18
**drawn** 35:17
**driven** 7:18
**driver** 19:15
**during** 2:23
**duties** 35:6

E

**earlier** 36:23 53:12
**early** 8:12 8:16
**EAs** 21:7
**easier** 10:13 33:19 50:7
**easiest** 14:3
**easy** 36:4
**economy** 28:19
**education** 34:23
**efforts** 5:14
**egg** 31:24 46:10
**EISs** 21:7
**either** 10:2 17:17 24:9 30:13 38:3 38:9 44:15 46:5 46:21 47:19 50:1 50:4
**Ekhart** 27:20
**elaborate** 49:4 51:1
**eligibility** 21:24
**eligible** 6:10 14:11 21:18
**else** 27:16
**email** 11:19 48:11
**emphasis** 17:10 34:8
**encourage** 8:24
**endangered** 29:13
**engage** 54:16
**engagement** 2:4 5:4 7:1 8:2 9:3
**engagements** 5:15 7:8 55:8
**engaging** 55:10
**enhancements** 6:2
**ensure** 22:23
**enter** 3:16
**entire** 23:25 24:4
**entirely** 50:9
**entities** 30:19
**entity** 35:2
**environmental** 10:16 10:20 20:25 39:4
**envisioned** 19:14
**envisioning**



48:3
**equal** 29:17 51:23
**equipment** 42:22
**Erhart** 48:21
**ESA** 23:19
**ESA-listed** 24:25
**especially** 10:11 13:5
**essentially** 21:5 37:2 38:22
**established** 48:12
**et** 10:16 23:14
**everybody** 2:8 22:23 28:16 29:7 49:2 49:24 56:8
**everybody's** 50:7
**everyone** 11:20 15:11 17:7 21:25 48:5 58:17
**everything** 25:16 41:7
**example** 24:3 36:17 52:21 53:4
**except** 20:3
**exception** 44:3
**excited** 3:24 4:4 5:3 28:10 47:6
**exciting** 55:4
**exclude** 24:8
**exclusions** 21:3
**executed** 39:22
**exercise** 29:21
**existing** 10:1 10:14 21:2 22:16 24:9 37:3 38:7 38:16 38:23 40:5 41:3 52:25
**expand** 18:22 24:9 25:5
**expanded** 17:10
**expansion** 12:16 12:21 15:3 22:2 32:1 33:7 40:2 40:4 40:11 42:21
**expansions** 33:20
**expect** 6:15 7:5 20:12 23:23 35:15 35:16
**expectation** 6:25 49:21
**expectations** 10:20
**expected** 30:12
**expended** 30:13 30:16 31:21
**expending** 31:5
**expensive** 25:10
**experience** 10:8 10:13 30:25
**experienced** 28:5
**expertise** 35:18
**explain** 37:22
**explanation** 39:13
**explicit** 19:10
**extant** 24:5 52:22
**extent** 19:16
**extracted** 18:17
**extremely** 53:1

F

**facilities** 22:8 24:9 24:10 24:10 24:11 24:13 26:14 40:5 46:4 48:22 57:9 57:11
**facility** 22:5 22:12 22:16 26:15 41:4 41:6
**fact** 32:21
**factor** 33:14
**factors** 15:7 43:6
**fairly** 17:12 51:12
**fall** 8:12 8:15
**family** 37:11
**favorite** 13:24 51:8
**federal** 33:9 34:25 35:2 35:14 35:17 36:18 37:11 44:2 44:4 44:15 44:16 45:21 46:4 46:12
**federally-funded** 23:12
**federally-reserved** 13:17 14:1
**federal-**



reserve 6:1
**feedback** 50:11 50:13 50:14 50:18
**feel** 11:22 40:23 42:2 49:4
**felt** 28:8
**field** 34:23 35:19
**figure** 23:16 39:21 42:1 45:25 52:12
**figuring** 49:15
**final** 41:18
**finally** 18:10 18:25
**financial** 38:18
**fingers** 8:21
**finishing** 31:14
**first** 3:9 12:13 14:22 16:13 16:24 17:2 18:1 27:25 42:17 46:16
**fiscal** 31:19
**fish** 14:5 27:2 27:10 44:18 45:11 48:23 48:24 51:11 52:23 52:24
53:3 53:5
**fisheries** 4:20 27:23 29:19 29:25
**fishery** 29:4
**fishing** 6:1 13:18 13:25 14:1 17:22 29:2 29:3
**fit** 25:25
**fits** 13:1
**five** 11:7 13:8 30:14 31:6 31:20 32:23 33:3
**flexible** 47:12
**floor** 12:11
**focus** 5:25
**folks** 37:22 42:12
**follow-up** 26:6
**foremost** 14:22
**forgot** 36:10
**formal** 35:14
**format** 8:10
**forward** 5:19 6:6 7:11 10:22 11:3 12:3
34:2 41:17 50:19 53:19 54:10 58:11 58:14
**frame** 8:25 55:7
**frames** 30:17
**framework** 7:14
**free** 17:5 42:2 49:4
**front** 19:9 55:3 55:5
**full** 26:22
**fun** 58:16
**fund** 5:23 18:4 19:18 20:2 25:19 57:5 57:6
**funded** 21:8 23:13 41:17 45:12
**funding** 6:1 7:19 11:12 14:2 14:6 18:11 18:21 18:22 19:19 20:1 23:17 31:22 33:20 34:9 38:23 42:18 43:16 43:20 44:3 44:13 44:15 44:16 44:19
44:22 45:11 45:21 46:13 46:17 47:13 47:22 53:9 56:11 56:25
**fundings** 34:9
**funds** 2:2 2:10 2:12 3:23 4:2 5:23 6:11 6:19 6:19 7:1 10:1 10:3 10:6 10:15 12:7 13:6 13:7 14:21 14:23 15:6 18:14 18:15 18:24 19:17 19:19 19:23 20:4 23:5 23:10 23:25 25:23 26:2 28:5 28:15 28:24 29:1 29:16 29:24 30:12 31:3 31:6 31:12 31:18 33:13 35:15 35:22 36:4 36:16 37:9 37:14 38:6 38:8 38:12 39:7 43:4 43:12 43:16



43:25 44:1 44:5 45:15 45:21 46:25 49:24 51:16 55:12 56:15 56:17 56:24 57:3 57:11
**future** 6:7 56:15

G

**gambit** 21:7
**generate** 52:4
**generated** 54:3
**generates** 54:2
**gentleman** 36:10
**geographic** 43:1 53:6
**geographically** 23:22
**gets** 41:17
**getting** 7:24 7:24 14:21 27:5 32:24 33:6 35:2 35:22 40:9
**given** 13:5 56:23
**gives** 49:24
**goal** 27:16 35:23
**Gobin** 41:10
**government** 10:3 33:9 57:21
**government-to-government** 41:12
**grant** 35:5 35:14
**grants** 25:4 31:1
**great** 17:24 21:10 25:6 25:19 31:16 31:16 34:17 36:20 42:3 47:25 50:14 57:23
**greater** 33:2
**ground** 25:16 32:12 33:19 47:8
**group** 7:9
**guess** 49:18 57:7
**guidance** 13:6 50:19
**guiding** 50:12
**guys** 13:2 27:25 35:7 37:16 49:25

H

**habitat** 57:16 57:18
**half** 18:20 18:22
**hand** 3:2 3:12 15:13 15:14 15:16 15:17 15:20 15:21 16:19 17:2 22:22 27:20 42:2 43:9 49:5 49:16 52:15 55:21 58:2
**hands** 3:4 7:20 15:23 16:14 22:23 24:19 39:15 41:22 41:23 49:6 54:7
**hang** 54:8 55:19
**happen** 40:24
**happy** 54:8
**hard** 25:13
**hard-pressed** 57:5
**harvest** 53:2
**hatcheries** 2:16 5:21 17:14 17:15 17:23 29:9 36:17 43:12 43:13 43:16 43:17 43:19 44:9 45:22 47:7 53:1 53:4 56:12 57:17 57:19
**hatchery** 2:2 2:10 3:23 4:2 6:3 14:6 18:6 18:12 18:16 19:1 23:11 23:12 24:24 25:5 25:15 25:18 25:21 26:7 26:16 26:18 27:11 27:14 27:15 28:15 28:24 29:1 29:6 29:9 29:11 29:11 43:20 44:19 45:12 45:15 45:16 47:7 48:24
**haven't** 11:13 38:14 42:8
**having** 2:20 14:8 15:19 25:4 27:9 36:21 48:3
**head** 50:13
**headquarters** 5:16 19:14
**hear** 6:5 12:11 13:10 37:13 37:16



53:10 56:3 56:4
**heard** 5:18 16:11 18:10 23:7 36:5 42:21 42:25 45:17
**hearing** 11:3 35:21 47:16 54:10
**hears** 49:2
**held** 2:5 18:4
**hello** 9:20 15:11 24:20 39:17 45:4 55:17 56:5
**help** 13:22 14:15 14:19 14:19 32:6 39:21 48:18 51:17 54:4 57:20
**helped** 55:2
**helpful** 2:20 19:11 24:15 28:2 49:9
**helping** 29:24 32:4
**helps** 14:14 41:3
**here's** 11:14 49:22
**HGMP** 12:23 13:3 18:13 22:4 26:8 26:16 26:17 26:22 27:5 27:7 30:21 30:22 31:10 33:7 34:16 39:24 40:3 40:6 40:6 42:23
**HGMPs** 17:25 18:2 18:7 21:19 26:13 34:11 34:12
**Hi** 27:22 34:5 56:6 56:20
**hide** 12:19
**hierarchy** 23:16
**higher** 24:1
**history** 10:24
**hitting** 55:19
**Hoko** 29:10
**honest** 47:5
**honor** 4:22
**Hoopa** 24:21 34:7
**hope** 10:25 21:25 33:15 49:11 58:14
**hopeful** 37:8
**hopefully** 4:22 5:4 8:4 26:3
**hoping** 8:12 17:10 29:14 29:23 38:16
**huge** 45:23

I

**icon** 15:17
**I'd** 27:25
**idea** 13:24 35:8 39:24
**ideal** 38:20 50:16
**ideas** 12:3 12:11 13:10 13:19 14:12 41:25 51:25 52:4
**identified** 40:13
**identify** 40:1
**IHOPS** 33:7
**I'll** 16:20 32:12 34:5 35:20 36:18 49:8 51:2 52:20 53:11 53:13 58:7
**I'm** 2:14 2:19 3:18 4:14 6:8 6:13 7:11 8:12 9:1 9:21 11:25 15:8 17:8 17:10 19:6 21:10 21:14 22:25 23:2 24:20 25:8 25:12 26:10 27:16 27:21 27:23 29:14 29:14 30:8 31:19 34:19 34:20 34:23 35:20 36:11 39:3 39:17 43:9 45:4 45:10 45:19 46:10 47:4 47:8 49:1 49:16 49:18 49:19 52:16 54:7 54:20 55:18 55:19 56:1 56:13 56:17 57:3 57:20 57:21
**imagine** 21:6
**implementation** 14:23 26:13 42:18 42:23
**implementing** 8:17
**important** 6:18 17:11 17:22 23:10 25:25 30:15 34:13 40:7 53:1
**improve** 22:16
**improvement**



40:4
**improvements** 44:12
**improving** 22:5 22:8 24:11
**include** 24:8 53:22
**included** 17:23
**includes** 26:8
**including** 24:5
**increases** 12:22
**Indian** 5:9 28:22
**indicated** 51:7
**Inflation** 2:1 2:9 3:23 43:13
**information** 2:20 45:20 48:7 53:17
**infrastructure** 19:15 22:6 24:11 25:7 26:13
**initial** 6:8 51:17 55:8 56:23
**initially** 18:7
**initiate** 47:24
**Inland** 4:20
**input** 5:24 9:7 11:7 49:24 54:25
**in-river** 29:2 29:19 29:25
**instance** 40:15
**intension** 52:12
**intent** 9:24 41:24
**interacting** 4:23
**interagency** 8:19
**interest** 48:24
**interested** 46:7 47:8 58:13
**interior** 36:15
**introduction** 4:7
**introductions** 2:21 4:13
**investments** 5:20
**invite** 7:3
**IRA** 2:1 5:15 32:18 43:25 51:16
**isn't** 9:1
25:15 40:4
**issue** 10:10
**issues** 55:24
**It'd** 50:14
**iterative** 7:8
**IV** 10:2
**I've** 13:18 17:4 19:4 19:9 25:3 26:2 30:9 33:2 35:9 42:9 53:6 56:23

J

**Jason** 41:10
**Jen** 2:17 3:19 4:14 9:19 9:23 11:2 16:15 16:25 20:17 27:22 30:3 30:11 30:14 32:13 33:7 42:10 45:17 49:7 50:5 50:20 50:25 53:12 53:15 54:11 54:18 58:8 58:8
**join** 3:21
**joining** 5:11
**jot** 11:22
**judge** 25:13
**Julie** 3:22 4:21 4:23 11:16 12:9 15:9 27:22 30:3 45:8 53:21 55:14
**July** 8:7 8:11 55:15
**jump** 5:12 11:10 20:17
**jumpstart** 25:1 25:12
**JUNE** 2:6

K

**Karl** 24:20 24:21 26:5 27:18
**kicked** 4:21
**Kirk** 22:24 22:25 23:1 30:8 32:15 43:2 52:15

L

**labeled** 16:5
**lack** 29:21
**Lake** 29:12
**Lalena** 5:1 5:5
**large** 7:21 57:1
**largely** 7:15 7:18 32:21
**larger** 41:19
**last** 18:19 32:15 32:23 54:11 54:13

54:14
**late** 8:12
**lays** 7:14
**lead** 16:7
**leaders** 9:21 11:4
**leadership** 11:16 47:23
**learned** 28:4
**least** 25:24 30:23 30:25 31:6 34:24 45:16 46:1 47:15
**leaving** 7:21
**legally** 47:9
**lengthy** 30:22 30:24
**lens** 13:16
**lesson** 28:4 28:4
**let's** 16:11 30:8 45:6 45:22 55:25
**letter** 11:14 11:19 31:2 50:15
**level** 37:22
**levels** 4:1
**leverage** 38:16
**leveraging** 10:1
**likely** 6:14 19:24
**limited** 23:5 36:15
**line** 47:17
**link** 11:19
**list** 42:16
**listed** 23:20 29:13
**listening** 30:2 39:18 52:10 58:18
**listen-only** 2:22
**little** 3:8 15:17 16:5 18:9 20:9 26:16 51:3
**lives** 50:7 50:7
**local** 26:25
**logistically** 50:18
**long** 27:6 29:20 35:17
**longer** 8:3 56:14 56:14
**looms** 56:22
**loosely** 6:5 6:12
**lost** 25:2
**lot** 9:11 13:2 16:10 21:4 25:1 26:1 27:11 28:14 28:24 31:8 32:1 32:19 32:22 33:16 35:3 35:5 35:9 35:17 35:18 36:5 41:11 42:19 42:20 46:24 53:17
**lots** 34:25
**love** 48:15
**lower** 53:4
**lowering** 55:23

M

**maintain** 28:20
**maintenance** 6:3 12:15 12:21 15:2 19:14 21:2 21:6 26:1 33:17 36:16 40:2 42:21
**major** 35:14
**majority** 23:24
**Makah** 27:24 28:9 28:17 28:22 29:8 29:9 29:18 48:22 48:23 48:25
**managed** 17:17
**manages** 48:22
**manner** 35:16
**March** 5:16
**matter** 40:16
**may** 12:2 13:19 13:20 21:20 22:16 31:8 32:3 44:11 52:21 54:11 55:23
**maybe** 5:18 8:16 14:10 23:13 24:9 28:3 37:21 37:21 42:15 42:15 49:19 49:21 52:4
**McClure** 17:2 17:6 20:6 20:11 20:15 21:9 34:4 34:5 43:8 43:10 44:21 45:3
**mean** 5:19 12:24 22:3 32:3 35:8 44:2 54:18
**meant** 49:12
**meat** 51:4
**meet** 18:4 24:12 32:11
**meeting** 2:23 2:23 48:9 48:10 52:24
**meetings** 5:15

7:10
**mention** 16:9 42:2 48:20 53:11 53:13
**mentioned** 9:23 15:12
**mentioning** 49:1
**Mercier** 5:8 9:19 9:21 20:17 20:20 32:13 36:9 37:17 38:1 50:5
**Merle** 55:16 55:17 55:21 56:1 56:3 56:5 56:7 56:20 57:15 58:1 58:2
**MERLES** 57:25
**message** 48:10
**met** 43:23
**mid** 8:3 8:4
**Mike** 21:11 22:20 39:17 39:18 41:21
**million** 2:15 37:1 37:6 38:21 43:17 43:18
**mind** 30:17 38:20 39:11
**mindful** 16:11
**misspoke** 2:14
**Mitchell** 2:11 11:11 11:12 29:1 43:18 43:19 53:3
**mix** 13:20 14:9
**mobilizing** 31:14
**mode** 2:22
**model** 51:11
**models** 14:4
**moderator** 3:3 3:13 16:19
**modifications** 19:1
**modify** 37:3 38:7
**modifying** 38:22
**moment** 16:16
**moments** 11:2
**money** 7:22 8:21 13:11 13:15 24:1 25:5 32:19 32:22 32:24 33:10 34:25 35:3 37:4 37:24 44:25 46:14
**monitor** 25:11
**monitoring** 25:7 25:24
26:9 26:9 26:19 26:20 27:7 27:9 34:10 42:22
**months** 4:16 18:21 31:3 31:10 31:11
**monumental** 50:8
**morning** 2:8 3:20 17:6
**motivate** 7:17
**move** 3:1 7:17 8:24 15:10 15:13 27:15 32:22 34:2 51:2
**moved** 7:25
**moves** 41:16
**moving** 8:21 13:13 27:12 54:9
**multiple** 11:7 46:3
**muted** 16:21 42:8
**myself** 11:15 27:13

N

**narrative** 38:18
**Natasha** 4:19
**national** 14:7 29:9 48:23
**nature** 56:16
**necessarily** 22:3 22:14 22:15 35:19
**necessary** 21:18
**NEPA** 10:16 18:14 18:17 18:19 18:23 19:22 19:24 20:4 21:1 30:24 31:10 39:2 39:3 39:5
**nervous** 47:3
**Nez** 34:21 34:24 45:13 46:3 47:17
**NGOs** 23:14
**NOAA** 6:18 7:19 9:8 9:11 9:24 10:5 10:11 15:7 18:10 18:11 28:11 30:10 30:23 34:2 35:15 36:21 38:9 39:7 41:16 43:6 43:11 45:16 47:1 47:18 49:20
**NOAA's** 14:23 18:2 18:15 36:20



42:18 43:15
**non** 11:11 43:11
**none** 43:19
**non-Mitchell** 2:16 6:3
**nonrecurring** 21:6 33:17 40:2 40:10
**North** 50:12
**Northern** 24:22
**northwest** 5:8 5:9 23:25 36:24
**note** 3:5 12:19 15:24 49:8 52:7 57:7
**notes** 57:24
**nothing** 6:16
**noticed** 17:20

O

**obligated** 30:13 30:16 31:18
**obligating** 31:6
**observations** 23:3
**occur** 35:13
**occurred** 5:16
**ocean** 28:18 28:19
**ocean-going** 28:17 28:20
**offered** 10:4
**offering** 21:14
**office** 9:22 38:4 38:5
**official** 38:2 38:10
**officials** 32:20
**oh** 4:16 22:24 24:20 25:17 34:18 53:23 54:17 56:1 56:7
**okay** 13:14 20:6 20:14 21:10 37:15 39:24 44:5 44:21 45:3 46:1 47:14 55:25 58:5
**one-on-one** 11:15 48:8
**one-on-ones** 30:4 58:13
**ones** 12:15 37:12
**one-time** 38:8 38:23 39:7 56:24 57:2
**ongoing** 9:3
**on-one** 48:4 55:14
**open** 4:11 12:11 14:12 14:14 49:12
**opening** 30:12
**operate** 57:14 57:20
**operated** 17:16 45:13
**operates** 46:5
**operation** 56:15 56:17
**operational** 56:25 57:2 57:10
**operations** 57:6 57:21
**operation's** 56:22
**opinion** 33:15
**opportunities** 46:4 55:4 55:4
**opportunity** 13:22
**optimistic** 8:24
**option** 45:1
**options** 13:14 50:22 50:23 51:6 51:15 52:19 54:17
**order** 3:3 15:23 15:24
**Oregon** 43:22 43:24 44:11
**others** 4:11 24:7 44:8
**otherwise** 36:5 43:14 51:22
**outline** 15:17
**oval** 16:5
**owned** 17:16
**owns** 45:15
**Ozette's** 29:12

P

**Pacific** 6:4
**package** 25:20 42:18
**page** 51:7
**panel** 52:9
**paperwork** 41:18
**participants** 2:22
**particular** 22:11 39:22 48:23 51:18 52:21 54:4
**particularly** 49:9
**parties** 43:22 43:24
**partly** 49:1
**partners** 46:13
**partnership** 9:24 10:23
**pass** 47:23



**past** 30:24 38:19
**paste** 48:6
**people** 15:22 16:10 28:17 28:20 32:22 42:5 47:6 49:9 55:10
**Perce** 34:21 34:24 45:13 46:3 47:17
**percent** 28:18
**perhaps** 49:7
**period** 3:16 30:15 31:7
**permit** 40:11 41:5 41:18
**permits** 40:22
**permitted** 21:22 40:3
**permitting** 21:16 40:8 40:12 41:4 41:14 46:11 46:16 46:17 46:18 46:21 47:4 47:12
**permitting's** 40:24
**perpetuity** 27:17
**person** 16:13 46:2
**personally** 3:24
**perspective** 5:17 5:23 20:21 46:2 47:15
**perspectives** 9:18
**phase** 47:11
**phone** 3:10 3:11 3:13 5:7 16:17 16:21 42:5 49:10
**phones** 14:14
**pick** 46:10
**picture** 3:7 15:16
**piece** 19:22
**PIT** 25:9
**plan** 26:20 26:25 27:12 27:13 30:19
**planning** 53:13
**play** 20:5
**please** 2:17 3:2 3:5 3:9 3:12 3:14 11:16 15:24 16:7 16:11 16:21 16:23 20:19 22:23 54:18 55:14
**point** 7:22 12:13 13:14 15:8 20:5 21:14 24:14 27:15 32:14 35:7 40:1 42:1
**points** 4:10 12:1 20:15 33:22 34:18 54:4
**portion** 2:23 25:24
**Portland** 38:4
**possible** 4:7 35:24 50:17
**possibly** 7:20
**post** 4:10
**pot** 43:12 43:20
**potential** 4:10 51:6 53:9
**potentially** 46:14
**pots** 43:16 44:24
**preclude** 21:24
**preference** 50:6
**preparing** 53:24
**preponderance** 31:25
**present** 11:25
**presentation** 2:21 3:19 11:21
**press** 3:8 3:11 16:18 42:6
**Preston** 4:19
**pre-terminal** 29:3 29:4
**pretty** 30:22 35:10 39:8 51:12
**previous** 16:16
**previously** 17:9
**print** 11:23
**priorities** 14:23 33:18 42:17 43:23
**priority** 23:16 23:21 24:1 24:4
**probably** 13:7 17:8 19:24 20:5 23:15 31:20 32:16 37:7 39:20 55:7
**problem** 46:10 58:4
**process** 6:21 6:22 9:2 17:25 18:9 21:20 29:15 30:22 31:1 32:9 35:3 35:11 35:14

35:17 35:22 36:2 36:4 36:14 36:19 37:8 37:24 39:6 45:17 47:9 51:5 51:13
**processes** 51:22 51:22
**produce** 6:4 24:25
**produced** 53:3
**producing** 23:19
**production** 4:20 12:22 21:5 22:13 22:17 24:12 47:7 52:25
**professional** 35:4
**program** 4:3 6:6 6:6 6:12 7:24 8:6 8:13 8:17 8:20 9:9 12:6 12:14 14:21 15:23 18:16 18:21 19:9 20:10 21:2 22:5 22:17 23:12 23:12 24:24 25:14 26:18 31:24 32:6 36:17 44:25
**programs** 17:21 18:6 18:12 18:18 23:13 23:18 29:1 29:6 36:13
**progress** 40:15
**project** 12:21 12:21 21:21 21:24 22:11 25:24 30:20 31:9 38:8 39:7 39:10 39:22 39:25 40:2 40:10 40:11 40:12 40:25 41:5 41:16 41:20
**projects** 6:4 6:10 10:18 13:12 15:1 20:2 21:4 21:8 23:6 24:8 32:2 33:6 33:20 35:10 38:22 38:24 41:14 44:12 44:16 44:19 45:10 46:11 47:19
**promote** 26:25
**promoting** 27:4
**prompts** 42:12
**proof** 47:9
**properties** 44:13
**proposed** 11:25 12:4
**proud** 28:19
**provide** 2:25 3:15 11:7 41:18
**public** 23:14
**Puget** 28:24
**pushed** 18:18
**putting** 7:15

Q

**Quan** 2:13 3:19 3:20 4:14 11:5 19:5 20:7 20:14 20:16 20:19 22:19 24:15 30:6 31:16 35:20 42:13 43:15 45:2 45:18 46:23 47:25 50:2 51:2 53:10 53:21 54:20 54:23 56:20 57:23 58:10
**quarterly** 38:17
**question** 2:25 12:23 18:2 18:3 20:22 26:6 30:18 33:5 34:22 35:21 37:10 42:25 43:3 43:11 44:7 45:10 49:13 49:19 50:2 53:12 53:21 55:16 56:21
**questions** 7:3 12:2 12:4 12:12 14:17 14:19 18:1 19:7 19:11 30:10 31:16 31:17 41:24 42:11 42:14 42:16 46:24 46:25 49:8 49:8 52:9
**quick** 4:6 4:7 9:16
**quickest** 14:3
**quite** 21:3 50:8

R

**raise** 3:2 3:12 15:13 15:14 15:15 16:19 22:23 42:2 49:5

**raised** 3:4 15:20 15:23 49:6 55:22 58:3
**raising** 32:15 55:23
**rather** 17:23
**reach** 36:25 36:25 38:20 55:14
**reached** 58:12
**ready** 55:11 55:12
**real** 49:19
**realize** 51:9
**really** 3:24 4:6 5:14 5:17 6:17 8:22 13:21 14:17 19:11 20:1 20:12 20:24 24:17 25:19 34:6 34:6 37:10 39:13 41:24 42:1 43:21 46:23 48:2 48:3 48:18 50:2 52:12 52:13 53:16 55:4
**rearing** 23:19
**reason** 55:21 57:15
**recall** 30:13 50:22
**recap** 4:8
**receive** 50:14
**received** 18:16 18:20 55:1
**recent** 10:7 10:12 10:24 14:4 14:6 30:23
**recognize** 29:16 53:16
**recommend** 36:15
**recorded** 2:24
**recording** 49:3 49:4
**recovers** 57:18
**Reduction** 2:1 2:9 3:23 43:13
**reestablish** 29:25
**reference** 32:21 53:15
**referenced** 14:5 30:14
**referring** 36:13
**reflections** 41:25
**regard** 23:7
**region** 2:3 4:16 4:25 11:16 15:6 23:25 38:2
**regional** 4:15 4:18 5:10 9:22 14:8 50:15 51:24
**regionally** 36:14 36:15 37:6
**regular** 39:6
**reinforce** 6:24
**reiterate** 8:25 11:6
**reiterates** 54:15
**reiterating** 58:10
**relative** 19:25 30:10 31:24 42:23
**release** 20:1 52:24
**released** 18:5 25:14
**releases** 25:1
**releasing** 27:2
**relieve** 9:25
**remainder** 11:14
**remarks** 58:9
**remind** 28:16 29:7 42:5
**reminder** 48:5
**reminds** 28:3
**remote** 25:1 25:8 25:16
**remoteness** 52:20
**reoccurring** 32:17
**repeat** 16:13 16:14
**repeated** 18:10
**report** 55:9
**reporting** 6:15 38:14 38:16
**reports** 38:18
**representative** 34:7 38:10 38:11
**representatives** 10:12
**request** 9:4 41:12 48:8 48:10 55:13
**requested** 9:4
**require** 9:11
**required** 21:1 21:17 39:25 40:7
**requirements** 26:9 33:24 34:10 38:14 38:17 39:2
**requires** 46:11
**research**



34:10 42:22
**reservation** 28:22 29:10
**reserve** 13:25
**resilience** 19:16 28:13
**resiliency** 19:20
**responding** 55:20
**response** 34:8
**responses** 42:15
**responsive** 51:19
**rest** 14:11 51:25 58:15
**restoration** 25:3
**resubmitting** 26:22
**review** 10:16
**rewriting** 26:22
**rights** 6:2 13:18 14:1 17:22 29:2 29:3 29:18 29:21
**river** 17:12 24:2 24:4 25:15 26:18 27:10
**rivers** 27:1 27:4
**road** 47:21
**Robert** 15:21 17:2 17:3 19:5 22:22 22:22 34:3 36:11 36:11 43:8 44:7
**Rodgers** 34:20 34:20 37:15 37:19 39:12 45:8 46:1 47:14 49:18
**rolled** 26:3
**rounds** 32:18
**routine** 39:6
**Rumsey** 4:17 26:5 26:12 27:18 31:19
**run** 21:6 27:13
**runs** 25:1 25:12
**Russell** 27:23 30:6 30:7
**Ryan** 27:20 27:21 48:20 48:21 49:1

S

**salmon** 6:4
**salmons** 52:25
**scattered** 44:9
**scope** 6:10 8:14 10:18 12:14 12:16 13:12 20:25 33:6 38:5 38:13 50:21
**scopes** 21:8 37:2 38:21 39:1
**Scott** 4:17 31:19
**Scott's** 34:7
**screen** 15:19 16:1
**section** 26:23
**seeing** 54:7
**seem** 25:6 25:25 40:16
**seems** 34:24
**seen** 4:1 11:13
**Seitz** 24:21 24:21 26:11 26:15
**select** 16:20 36:14 37:9
**selecting** 31:13
**selection** 39:10
**self** 10:2
**self-governance** 38:5
**send** 53:14
**sending** 11:20
**sense** 46:22 53:18
**sent** 54:5
**separate** 44:24
**separately** 49:22
**series** 17:8
**service** 14:6 44:18 45:12 45:12 45:15 51:11
**session** 3:1 3:2 3:17 3:21 6:25 30:2 43:21 56:9 58:18
**sessions** 2:4 8:2 11:8 28:1
**setting** 6:6 28:1
**several** 23:7
**SF425s** 38:18
**shape** 4:4 7:10 8:13 9:10 12:6 13:22 14:19 14:19 19:10 20:8 20:9 55:2 55:3
**shapes** 55:10
**shaping** 8:5 9:7
**share** 7:2 12:4



20:18 49:23
**She's** 4:24 15:9
**short** 53:23
**shovel-ready** 23:6 41:1 46:12 46:14
**shows** 55:22
**shy** 49:18
**signed** 50:15
**significantly** 33:1
**silly** 49:13
**similar** 42:25 43:3 43:12
**simple** 35:11 35:24 37:22
**sink** 52:3
**situation** 17:19 18:5
**six** 13:8 18:21 30:14 31:6
**Skagit** 17:12 17:15 18:5
**slide** 2:18 7:13 7:13 16:16 17:1 36:23 50:20 54:14 54:21 58:7
**slides** 6:7 11:24 14:13 42:14 49:10 53:14 53:22 54:5 54:11
**small** 5:19 24:24
**smaller** 29:8
**sockeye** 29:12
**soft** 8:22 8:23
**somebody** 38:3 38:4 54:1
**somehow** 57:21 57:22
**sometime** 52:3
**somewhere** 40:14 57:20
**sorry** 2:13 2:14 5:1 34:18 36:11 45:6 54:17 54:20 55:24 56:1 56:2
**sort** 6:14 21:14 26:6 46:9 46:18 55:8
**Sound** 28:25
**sounded** 30:11
**sounds** 45:13 47:16
**space** 49:12
**speak** 17:5 54:18
**speaking** 2:15
**species** 23:20
**specific** 39:19
**specifically** 6:2
**spend** 23:24 24:1 28:17 37:6
**spent** 13:8 38:7 38:12
**sponsor** 44:12
**sponsors** 51:17
**spreading** 43:4
**square** 12:18
**staff** 9:11 9:20 11:3 30:20 32:2 32:4 35:18 39:4
**staffed** 32:25
**staffing** 10:10 31:25 32:5
**staged** 19:25
**stages** 40:20 41:2
**standpoint** 23:21 53:3 53:6
**stars** 50:12 50:12
**start** 8:5 8:17 12:17 16:7 29:15 41:17 55:2
**started** 4:16 5:2 40:18
**starting** 5:18 6:17 8:1 14:24 24:24 46:10
**state** 3:9 3:14 16:24 17:14 17:16 17:17 43:12 44:24 45:1
**stated** 19:9
**states** 17:21
**status** 40:14
**steelhead** 6:4 29:22
**step** 5:19 28:7
**steps** 21:18
**Steve** 34:19 34:20 45:4 48:2 49:16 52:7 52:11
**Steve's** 51:5
**stipulations** 41:14
**stock** 26:24 27:1
**straightforward** 35:10 39:9
**strategic** 15:5



**streamlined** 35:11 35:22 36:4 37:2 51:12
**streams** 25:2 25:8 25:11
**strong** 28:21
**structure** 7:16 47:11
**stuff** 35:4 41:11
**submit** 11:18 26:20 46:20 48:7 48:14 48:17 50:10 55:14
**submitted** 18:7
**submitting** 48:12 54:17
**success** 25:13
**successful** 10:8 10:23
**suggestion** 39:19
**sum** 8:9
**summary** 18:23
**summer** 8:12 8:22
**super** 24:15 25:10 25:25
**supplement** 54:5
**support** 4:3 18:11 28:13 28:23 28:24 29:2 29:5 32:18 34:10
**supported** 41:2
**supporting** 26:12
**supportive** 45:16
**supports** 29:12
**sure** 3:12 10:17 13:4 16:21 23:4 38:12 39:3 42:8 42:13 47:8 49:3 56:18
**survived** 27:3
**Svec** 27:22 27:23
**switch** 12:8

T

**table** 7:22 19:13 44:15 50:24
**tag** 25:9
**take-home** 48:9
**taking** 19:6
**talk** 3:22 6:5 6:7 6:12 9:17 12:25 15:9 45:22
**talked** 9:6 56:19
**talking** 2:11 6:8 42:19 42:20 54:19
**talks** 50:21
**target** 52:25
**targeted** 15:6 24:12 43:5
**task** 50:8
**team** 38:3 47:1
**technical** 10:12 33:24 34:22 38:9 38:11 55:24
**term** 52:20 53:24 56:14
**terms** 34:12 40:25
**thank** 3:20 15:21 17:7 17:24 19:4 20:11 21:9 21:13 22:17 24:15 24:17 27:19 27:25 30:2 30:4 30:6 30:9 31:15 34:6 34:16 34:17 39:12 41:8 41:20 41:21 44:21 45:3 50:3 52:11 52:17 52:17 54:24 56:8 56:8 56:20 57:24 57:25 58:1 58:15
**thanks** 3:17 5:11 9:19 11:2 11:5 15:10 19:5 20:16 22:20 24:14 26:4 27:18 30:7 32:13 45:8 52:8 53:10 58:11 58:17
**That'd** 47:25
**theme** 35:1
**there's** 7:18 16:2 16:4 16:10 21:4 22:13 23:2 25:12 25:17 27:8 27:11 31:23 31:25 33:8 34:25 36:23 39:1 40:11 40:13



40:17 43:18 45:20 48:11 49:2 57:1 57:22
**they'll** 11:22 13:7
**they're** 8:22 17:15 18:8 21:18 55:12
**third** 11:8
**thoughtful** 57:10
**thoughts** 42:15 56:15
**THPOs** 39:4
**throughout** 9:4 44:9
**throw** 8:8
**throwing** 52:2 53:16
**THURSDAY** 2:6
**tiered** 14:9 51:15 51:21 51:22
**timeline** 7:15 18:1
**timewise** 13:1
**Title** 10:2 10:2
**today** 2:11 3:22 4:5 4:5 4:17 5:7 5:8 6:8 6:25 7:2 8:1 8:8 9:22 16:10 20:12 38:15 52:14 54:25
**tomorrow** 41:10 53:14
**top** 14:22 32:16 33:18 42:17
**topic** 17:1 48:24
**totally** 20:3 44:14
**touch** 17:8
**touched** 17:9
**touching** 33:7
**tough** 52:9
**towards** 7:17 23:11
**tracker** 39:3 39:5
**traditions** 28:22
**trained** 35:4
**transcript** 53:25
**transfer** 10:3 44:2 44:3
**transferring** 6:19
**transitioning** 4:25
**transparency** 9:14
**treaty** 4:2 29:2 29:3 29:18 29:19
**triangulate** 50:12
**tribal** 2:2 2:4 2:10 3:23 4:2 4:24 5:2 5:15 5:20 5:25 9:3 9:3 9:7 9:20 11:3 17:22 17:22 17:23 26:16 43:12 43:17 43:22 44:23 47:23
**tribally** 36:23
**tribally-directed** 51:8
**tribally-funded** 23:11
**tribe** 24:22 27:24 28:9 28:17 29:8 29:18 34:21 34:24 38:2 38:11 45:13 45:14 46:4 46:15 47:17 52:21
**tribes** 6:1 6:20 7:20 8:15 10:4 10:13 13:15 13:17 13:25 14:11 17:18 21:12 23:2 28:25 28:25 29:5 29:17 35:23 36:24 37:11 44:11 45:21 49:21 50:6 50:15 51:18 56:9
**tried** 45:6
**trigger** 12:23 14:15 14:15 19:24
**Trinity** 24:25 26:7 26:18
**Truscott** 22:25 23:1 23:1 30:9 52:17
**trust** 4:3
**try** 25:1 35:24 50:12 50:19 55:23 55:25
**trying** 25:12 27:17 28:5 30:20 34:23 35:5 35:13 40:23 41:8 42:1 45:10 48:19
**Tulalip** 21:11 41:13
**turn** 3:18

15:8
32:12 58:8
**tying** 47:13
**type** 17:19
23:17 40:10
**types** 14:25
20:2

U

**U.S** 43:22
45:11 48:22
**Umbrella**
29:11
**unable** 24:13
**underserved**
51:18
**understand**
40:8
40:23
41:3 50:8
52:1 52:5
**understanding**
10:20 31:22
36:1
**unique** 17:13
**universal**
14:2
**unmute** 3:4
3:6 3:6
12:9 16:3
16:4 16:5
16:20
17:4
21:11 22:25
24:20 27:21
30:8 34:3
34:19 39:17
42:6 43:9
45:5 45:6
49:17 52:16
55:18 55:19
**unmuted** 3:5
3:6 3:13
15:25
16:7 42:7
**unmutes** 3:14
**unprecedented**
3:25
**upper** 15:16
**urgency** 7:18
**utilities**
23:14

V

**valid** 32:14
33:22
**Valley** 24:22
**various** 38:21
39:1 54:17
**venture** 29:25
**versus**
23:13 41:6
**video** 5:8
**virtual** 3:2
11:8
15:14 15:15
**vision** 35:7
**voices** 5:18
16:10

W

**waive** 10:15
**walk** 12:9
38:11 47:18
**Washington**
17:14 17:16
17:17 44:10
**waste** 47:21
**water** 25:16
**ways** 11:7
13:20 13:20
15:5 57:22
**WCR** 2:3
**webinar** 17:7
**wedded** 13:23
**Weeder** 2:8
2:14 4:21
15:11 21:10
22:21 24:17
27:19
30:7 34:3
34:17 37:18
39:15 41:21
43:8 45:4
48:1
50:20
52:7
53:11 53:23
54:22 55:17
56:4 56:6
58:1 58:17
**week** 5:3
11:21
**weigh** 11:10
**weighted** 19:3
**welcome** 2:9
41:25
**welcomes** 4:7
**welcoming**
49:12
**we'll** 2:11
2:15 3:7
3:15 4:7
4:10 7:5
8:18
10:10 10:17
15:10 16:12
20:7
33:16 33:25
34:1 37:2
48:14 50:18
**we're** 4:12
5:3 5:18
7:4 7:15
7:23 8:7
8:14 9:7
9:10
10:22
13:4 13:5
13:21 13:23
14:16
18:3
19:18 22:19
24:24 24:25
25:14 25:15
26:21 26:23
27:3 27:5
28:19 28:20
29:22 29:23
31:5 32:2
35:4 35:5
35:13 37:10
38:16 43:20
44:14 44:15
45:19 45:24
45:24
47:5
47:21
48:3
48:13 48:19
49:15
51:7 52:1
53:8
53:16
54:3 54:8
56:11 56:24



57:5 57:8 57:18
**West** 2:3 4:15 4:25 11:16
**we've** 4:1 8:8 10:4 10:4 10:7 10:24 11:7 11:8 12:5 13:16 23:6 27:1 29:20 32:25 36:5 42:19 42:20 42:21 44:4 46:13 46:13 46:24 51:10 54:25 55:1 57:23
**whatever** 19:17 19:18 47:9 50:18 55:21
**WHEREUPON** 58:18
**whether** 7:8 12:20 18:3 23:10 23:20 40:1 40:10 44:23
**whole** 21:7 26:21 26:21 31:8
**Wildlife** 14:6 44:18 45:11 48:23 51:11
**willing** 44:14
57:3
**willingness** 3:21
**winter** 8:16
**wonder** 42:10
**wonderful** 48:1
**wondering** 24:23 26:10 44:23 56:13
**wording** 17:21
**work** 5:5 25:3 28:1 37:3 37:25 38:6 39:3 45:7 45:25 55:3
**working** 8:18 46:3 47:2
**works** 38:3 38:4
**worth** 18:22 47:20
**wrap** 8:4
**writers** 35:5
**writes** 48:21
**writing** 25:4
**written** 8:7 8:10 11:18 48:7 48:12 48:14 48:17 55:15
**wrong** 31:19 36:3

Y

**Yep** 56:4
**yesterday** 21:16 38:15
**yet** 25:14 40:18
**you'll** 3:11 16:6 42:7
**yours** 14:18
**yourself** 3:7 12:9 16:3 16:4 17:4 42:6 42:8
**you've** 30:20

Z

**zone** 24:6 52:23



EXHIBIT 6-B-3

COURT REPORTING
LEGAL VIDEOGRAPHY
VIDEOCONFERENCING
TRIAL PRESENTATION
MOCK JURY SERVICES
LEGAL TRANSCRIPTION
COPYING AND SCANNING
LANGUAGE INTERPRETERS

**INFLATION REDUCTION ACT (IRA):**

**TRIBAL HATCHERY FUNDS**

**WEST COAST REGION (WCR)**
**TRIBAL ENGAGEMENT SESSIONS**

**HELD ON**
**FRIDAY, JUNE 23, 2023**

**INFLATION REDUCTION ACT (IRA):**

**TRIBAL HATCHERY FUNDS**

**WEST COAST REGION (WCR)**

**TRIBAL ENGAGEMENT SESSIONS**

**HELD ON**

**FRIDAY, JUNE 23, 2023**

**DR. PENNEY:** (Speaks Native American.) Good morning. Thank you all for joining us today, June 23rd, 2023. Today -- this is the fifth of several consultations that we've done on Inflation Reduction Act funding for hatcheries. Today is regards to non-Mitchell Act funding.

So I'm Zach Penney. I'm NOAA's Senior Advisor on fisheries and tribal engagement to the undersecretary, and I'm going to help facilitate today's last engagement session.

So to start, I just want to make sure folks know this is being recorded. Participants will be in listen-only mode during the introductions and a brief presentation by West Coast Administrator Quan. And, you know, to ask a question or provide a comment, we're going to need you to raise your virtual hand, which is in the lower bottom box here. It's between the thing that says recording in

progress and the reaction symbol. So it's the hand -- you'll see it's a little hand.

So the moderator will call on each person in the order the hands were raised. And I'll do my best to unmute you. You will not be unmuted until you click the affirmative response on that notification. So please state your name and affiliation so we know who is talking. And if you're on the phone, you need to press *3 to raise your hand, and the moderator will call on you and will select to unmute you. So please ensure that your phone is not muted as well, otherwise we won't be able to hear you. And also, again, please state your name and affiliation first.

Next slide, please.

So for today's agenda, we're going to do some really quick introductions. Discuss how we got here, where to go next. And I'll begin the discussion and have a conversation.

Before I get any further, though, as we've done the past couple of days, I do want to make sure that -- give folks on the line an opportunity, if there's anybody who wishes to offer an invocation, an opening prayer, please raise your hand and we'll call on you.

Most folks have wanted to get down to brass tacks, so if there is nobody, I just want to take maybe 10 seconds of silence so folks can meditate or pray in whatever way best suits them.

So I'm not seeing any hands. Let's take that 10 seconds now. Thanks.

**(Pause in session.)**

**DR. PENNEY:** Okay. Well, thank you all again for joining. And I'm going to hand this off -- well, actually, let's go to the next slide first. Let me do some introductions first so you know who you're talking with.

So I've already introduced myself, but Regional Administrator for the West Coast region for NOAA, Jennifer Quan will be leading the presentation today. But we're also joined by Dr. Scott Rumsey, Deputy Regional Administrator for the West Coast region. Natasha Preston, the Branch Chief for Anadromous Production and Inland Fisheries in the West Coast region. And Lalena Amiotte, who is the new Tribal Coordinator for the West Coast region. I think she is now on her third or fourth day, so really glad we have her here. And we also have in attendance, Bryan Mercier of the Northwest -- or the Northwest Regional Director for the Bureau of Indian

 Affairs.

So with that said, Administrator Quan, I hand the floor over to you.

**MS. QUAN:** Great. Thank you so much, Zach. Good morning, all.

Thank you for your time and your willingness to join this session today. We're here to talk about IRA tribal hatchery funds, and I want to say that I am personally really excited to have this conversation. This is the fifth conversation we've had about IRA funds. And really, I think, now being at the end of the week, these are fun conversations to be had with NOAA, as opposed to some others you might have with us.

This is really an unprecedented opportunity, both in funding level, and from my perspective, I've never seen this level of funding come through NOAA and directed specifically to support tribal fishing treaty rights. So really feeling excited and honored to be working with you all.

So it's my expectation today that this session is really the beginning of the conversation on the engagement of these funds. We will share with you today what we're currently thinking about.

Nothing here is baked. It's really about wanting to get your input and shape the progress and program that we need to put together, so we're inviting you to do the same. If we don't know the answer to something, we're going to tell you that. We'll go get it. We'll bring it back. If we have to stop and think about something, we'll tell you we need to stop and think about something and get back to you.

I also expect that there will be the need for iterative meetings, follow-ups, one-on-one formal or informal consultations. And so, I just know that, again, this is -- coming into this today is the beginning of the conversation.

So let's see, we will jump right in. How did we get here?

So really, through your efforts in the IRA tribal consultations that happened with our headquarters, National Marine Fisheries headquarters, back in March, I would say your voices were heard. And today, we'll be discussing the 240 million that resulted from those discussions that will be allocated to tribal hatcheries. NOAA fisheries, NOAA, and the administration have, based on who we've heard these requests from, and the priority needed for salmon hatcheries, have really,



at this point, focused the conversation and distribution of these fundings to tribes with federally-reserved fishing rights, and hatcheries that are producing salmon and steelhead in support of those rights.

As I move forward in this conversation, I will be starting to refer loosely to what I'm calling a program. When I talk about program, I'm talking about, very loosely, eligible projects and criteria. I'm talking about the allocation process. And I'm talking also what the reporting process will look like. So those are kind of the key components of what needs to be developed to advance this conversation, at least from any perspective. If you have other ideas, we're open to that too. But I just want to tell you, you're going to see the term "program." Again, it's being loosely used to define those things.

NOAA will be transferring these funds to BIA for distribution through the 638 contract process.

So where do we go next?

This next slide lays out a framework of our thinking around a timeline, and it's a way to structure the conversation and motivate our



discussion. It's driven largely but an urgency and desire for NOAA to get these funds out the door and into the hands of the tribes as soon as humanly possible, or as soon as NOAA processes will allow as well.

So I am optimistic. I'm going to encourage us to try and stick to these timelines. Again, just as a way to structure the conversation, but also keep it moving. So between now and August 24th, you know, we're starting these tribal engagement sessions. We plan to continue to meet with you all one on one or as needed through then.

Written comments on how -- what your thoughts on priorities and projects, criteria, how to allocate these funds or other ideas that you have will be accepted through July 23rd. By late summer or fall, I hope to have kind of a determination of what this program looks like. And then I would follow up with further engagement sessions just to make sure we got it as close to right as possible.

And by this fall, hopefully, have it nailed down and get it ready to move into kind of more of an administrative process. Concurrently, we will be working with BIA on development of our interagency agreement. And again, all of this will

 be informed by our tribal input.

So how are we going to determine this?

Again, this is a brand new opportunity. The process we're using for this is to come to you to help shape it. We're not coming to you with a prescription right now. We'd like to not come to you with a prescription, but be completely transparent and engaged in shaping it in a way that's going to be most useful and effective for the tribes.

With that being said, we do have to consider what NOAA and BIA resources can be brought to the table. So we don't want to develop a program that then gets bottlenecked by a lack of resources on our side.

So with that, I'll take a second right now and hand it over to Bryan Mercier for some BIA comments.

**DIRECTOR MERCIER:** Thanks, Jen.

Hi, everyone. Bryan Mercier, Regional Director of the BIA out of the Portland office. Although today, I'm coming from my home.

And, yeah, as Jen mentioned, I think the intent here is really for us to relieve the administrate burden of getting these funds to you

all by leveraging our Title I 638 contracts, which are administered through awarding officials that work on my team here in Portland, or through Title IV self-governance compacts that are administered through the office of self-governance. They have a regional office across the river in Vancouver Washington.

So we are -- we've had some recent experience with Fish and Wildlife Service and other federal agencies doing a similar partnership, and it's worked very, very well for the tribes. Because we use the existing contracts to, essentially, modify these one-time funds for projects, and the reporting requirements that are in existing contracts, quarterly SF425s, annual narrative reports, have been sufficient to meet the requirements of these other funds from other agencies.

It's important to note that, you know, environmental compliance and regulatory requirements will still apply. So there is, for purposes of planning, that important fact to note. And then Jen talked a little bit -- this is quite a lot of money. The scale here is significant. And the program administration, both from the awarding official's

side, but also from the technical representatives that are walking alongside the tribes as these projects are completed, is a factor that we have to take into consideration. So we -- we are -- have offered to help, and NOAA has accepted that offer, and we'll probably have both BIA and NOAA technical representatives on many of these projects as we scope them out.

But I'm excited because I think it will be much less painful for you all. You don't have to stand up a whole new grant or agreement. You know, many of our tribal staff are collateral duty grant writers, and that avoids that whole workload here by leveraging these existing contracts and compacts.

So thanks for the few moments, Jen, I appreciate it. And look for to hearing from the tribal folks on the call today.

**MS. QUAN:** Thanks, Bryan. Really appreciate this partnership. Looking forward to it being a good model for us doing work in the future too.

All right. So real quickly, there are multiple ways for you to provide input and engage in this process today. And as the discussion begins, we'll be recording that. If you would like to set

up a one-on-one meeting, a consultation, please reach out to Julie Weeder. Her information is in here, and also in the letter that we sent out.

We also request written comments, if that's a better way for you to engage with us, and/or engage with us. Please send those by July 23rd to this link, which is also in your letter. I think that we will be putting this information also in the chat, so you'll be able to grab it.

One other thing that I will mention, too, is that we will be sending a copy of this PowerPoint presentation out later today.

All right. So let's move into discussion mode. For these next two slides, I'm going to present two discussion areas. No way is the conversation limited to these, but it's just simply a place to propose and try to catalyze some initial conversations around this topic. And then I will also share with you some proposed questions and considerations we have been thinking about, and getting some of that input -- responses to those questions will also help us think about how we can shape this program going forward.

And so after I get through those three slides, I'm going to then turn it over -- back over

to either Natasha or Zach to walk you through some instructions on how to unmute yourself and engage in the conversation.

So very quickly, this first discussion point is really, again, an area where these are just proposals and ideas but a way to start the conversation. We need to have and begin to shape the program scope and criteria. So what types of projects should be included, and what kind of criteria should we bring to move those projects forward?

So, obviously, maintenance, the intent of this and what we heard through the consultations back in March were that there's severe -- and we know this -- severe deferred maintenance issues. And expansion, we also heard the need to put in new places or expand existing facilities.

You know, with that, I just want to front-load in these discussions that anything that would -- whether it's an upgrade that expands existing production, you know, you upgrade through a maintenance project and the result is it expands production, or an expansion of a facility that expands production. It will trigger an HGMP question that we will have to answer and also

consider, you know, in moving ahead. You all know what it takes to engage in developing an HGMP. We're not opposed to the conversation, it's just something we need to take into consideration relative to the lifespan of these funds and also our staffing.

We also want to hear your other ideas. We heard some great ideas earlier this week. And as we move into the discussion, I'll be happy to share some other ones we heard.

The next discussion point is how do we allocate these funds? Again, what we've got here is just a brainstorm of ideas about allocating these funds. We're not tied to any of them, but I think I would speak for BIA and myself, the most easiest one for us would be if there is, you know, an agreement between the tribes with these federally-reserved fishing rights on how to distribute these funds. And that would be -- that's one method for doing it. You know, absent that, we know that that's kind of -- that could be a lot to ask for. Absent that, there is the recent model that Bryan referred to with Fish and Wildlife Service and the hatchery funding that was received through BIL, the Bipartisan Infrastructure Law.

We could -- while that was a national competition, we could look to just standing up a regional competition for these funds as well. And then there's kind of a tiered process which would be -- could be a mix of both. Perhaps it would be an initial allocation to tribes with federally-reserved fishing rights for select maintenance projects, and then we compete the rest. But we're also open to other ideas that you're thinking here.

So again, these are not tied to any of these. These are not baked. These are just a way to get the juices flowing and catalyze the conversation.

Finally, we've got a set of questions, and we'll be able to go back and forth to all these slides if people would like to see them as we open up for discussion. But really, the most important one is understanding what your top priorities are for these funds. We would like to have a better understanding too of how many projects might fit into a maintenance or expansion category, what other categories we should be considering, and how many projects you might have for that.

If there's a perspective about whether spreading these funds broadly is the best way to get

at what we need for salmon conservation and treaty right -- meeting treaty right obligations, or other geographic areas that there's an agreement that we should be targeting to do the same thing.

And then, again, what other factors should NOAA and BIA consider? And I would just, by example, one of them that we've heard repeatedly is kind of the reporting requirement and making it consistent with what BIA requires.

So those are our questions. I'm going to send it back to Natasha -- does that work? Okay. To walk you through how to unmute yourself and engage.

**MS. PRESTON:** Thanks, Jen.

So before we start answering questions, just some helpful information. This meeting, again, is being recorded. If you would like to ask a question, please raise your virtual hand, and either myself or someone else co-hosting will call on each person in the order that your hands were raised, and we'll unmute you. However, you won't be unmuted until you click the button that appears on your screen. Please state your name and affiliation.

Could we head back, I think, one more slide? There was one more piece to cover.

 And then if you're on the phone, just make sure to press *3 to raise your hand, and we'll call on you to unmute you. Oh, and please state your name and affiliation first, as well.

When it's your turn to speak, if you're calling via phone and not the computer, the moderator will unmute you. And then if you're on the computer, a box like this will appear, so just make sure to unmute yourself. You'll click that little box there. And I think that's it in terms of IT. We also have someone from our IT West Coast region here to support us in case we run into any technical difficulties.

Thanks.

**DR. PENNEY:** Thanks, Natasha.

So I'm looking at our queue of attendees right now. It looks like we have perhaps just over 10 from various tribes. A good Puget Sound representation today. Good to see you all.

So yeah, if there's something top of mind from the framing questions that Administrator Quan just asked, go ahead and click the hand-raise function, and you'll appear on my screen, and you'll appear in the order in which your hand was raised.

So far we haven't had any big issues with

folks having enough speaking time this week, but, you know, just a disclaimer out there is we do ask everybody providing comments that folks are always mindful that there could be many voices and comments to be heard today, so just to watch that. And, you know, we'll acknowledge each speaker once, you know, before taking any comments.

So if you have any questions, please go ahead and click the hand-raise function. Or if you're on then phone, *3 to get going.

I'm looking at the queue and it is quiet.

All right. So I see Jason Gobin first. So Jason, I'm going to go ahead and unmute you.

Go for it.

**(No response.)**

**DR. PENNEY:** Jason, if you're speaking, I can't hear you.

**MR. GOBIN:** Okay.

**DR. PENNEY:** I can hear you now.

We can hear you, Jason. Go for it.

**(No response.)**

**DR. PENNEY:** And he's gone.

All right. Hopefully, Jason will come back.

I'm going to go to our next speaker,

Joseph Peters.

Go ahead, Joseph.

**MR. PETERS:** Hello.

**DR. PENNEY:** Hello, I can hear you. Go for it.

**MR. PETERS:** Yeah, I can hear you.

Hey, Joseph Peters, Squaxin Island Tribe. I'm also the treasurer of the Northwest Indian Fish Commission. Thank you everybody -- or thank you, NOAA, for hosting this meeting today. I just have a couple topics.

First of all, I want to thank you again, a great presentation. And did I hear that we could have this copy of the presentation sent to us?

Thank you. Thank you.

First of all, I would like to acknowledge, yes, the tribes would love to have minimal reporting requirements. You know, annual narratives should be sufficient, for example, follow the same cyclical maintenance approach of annual site visits from BIA. I think you mentioned that, and we really appreciate that, minimal requirements.

And then I have a couple priorities I wouldn't mind sharing with you. Priority for facility programs that leverage of other federal

funds, for example, funding that has already been invested into programs. Example of -- maybe up at Lummi, for example, the Skookum Chinook program. Priorities for facility programs that are implementing ESA salmon recovery programs, per their watershed salmon recovery plans, and provide harvest opportunity while salmon recovery rebuild in that habitat.

And then my final comment is additional funding eligibility for tribal hatchery facilities or programs that are dependent on state-owned facility for successful implementation of shared spawning hatchery -- or hatching, rearing, and holding, caring for stock and steelhead.

So I just wanted to share that information. I'm sure you've heard many similar comments from other tribes, but I wanted to thank you for the opportunity and sharing your presentation. Thank you.

**DR. PENNEY:** Great, Joseph. Yeah, definitely, that's been -- many of those things have been themes in all the consultations this week, so appreciate that.

Jason, going to try you again. So take you off of mute.

**MR. GOBIN:** There. Can you hear me now?

**DR. PENNEY:** I can hear you now. Go for it.

**MR. GOBIN:** Okay. Thank you, everyone for the opportunity here to comment. I think this is a very -- a very good thing that has happened here. I think there is a lot of need in the tribal communities for improving our hatchery facilities across -- you know, up and down the Puget Sound, the West Coast here.

You know, we've -- you know, our particular facility here at Tulalip is 40 years old, and is, you know, it has a number or maintenance, deferred maintenance that, you know, we have been waiting for -- you know, funding to get to prioritize to get done. And also, you know, we're looking at expansion of that facility and one of our other facilities there in Tulalip Bay.

But I think, you know, following the -- similar to kind of the BIA funding that comes down for hatcheries, kind of that funding model, that competitive model, I think, is a good way to --

**(WHEREUPON, lost audio.)**

**DR. PENNEY:** Oh, we lost you a little bit there, Jason. You're breaking up.



**MR. GOBIN:** Okay. How about now?

**DR. PENNEY:** Yeah, that's better.

**MR. GOBIN:** Sorry, I'm on my phone. Somebody is trying to call me.

So it was -- you know, I think having this funding go down through BIA to minimize the reporting, you know, or to have similar reporting to what we already do with our BIA funds that come down through the 638 contracts, I think, is a good way to start that. You know, as we further get into this, as we hopefully develop this more, you know -- knowing this is a one-time funding, you know, I think is prioritizing some of those things that already have funding. Like Joe said, you know, because a number of our projects, you know, we're have tribal funding, federal funding already as partial, and, you know, this would hopefully allow us to finish those projects. And I think it's important, you know.

Also, you know, for Tulalip, you know, we would like to request an individual consultation on this to further vet this with staff and with the agencies, you know, as we think about this a little more. And as the -- I want to say as the pie gets almost put together, I think it would be better to

 have some of that individual consultation, you know. So that's something that we would like to see for Tulalip going forward. And I think it's -- you know, I think this is a really great thing and, you know, I look forward to getting this funding initialized and seeing the projects and the fruits from it.

**DR. PENNEY:** Great. Appreciate the good words, Jason. And definitely, I know the West Coast region is already underway in taking the requests from the tribes for, you know, any one on one.

Yeah. So anybody on today, you know, if you don't have a question and you need more time to look at the presentation and think about this, yeah, that timeline that we have, there's still plenty of time to have conversations about this.

Looking back at the queue, let me refresh this and see if we have anybody new or any new hands.

I am not seeing any new hands. So if you have a question, we've got plenty of time left.

**MS. QUAN:** So I would just jump in and just speak to a few things that have come up in the earlier sessions, so that if you weren't on an earlier session, you're privy to some of those

conversations. And one thing, Joseph, you brought up was tribes that are dependent on state hatcheries.

You know, it's our -- it's our -- you know, we completely understand that. And it is our vision that these funds would be distributed to tribes. If the tribes wanted to then partner with the state, with a state facility, and help, you know, with upgrades and what needs to be done in that state facility, that's completely within the range of acceptable, from our perspective.

**DR. PENNEY:** Thanks, Jen.

And Jason, I see your hand back up, so I'm going to go ahead and unmute you again. Let do this.

**MR. GOBIN:** Yeah, thanks.

It may have been an old hand, but I'd like to comment a little bit to what Jennifer just brought up with the -- I think, you know, prioritizing these fundings to the tribal facilities, I think, is going to be, you know, what we would like to see. You know, understanding that there is going to be some need there, potentially, you know, for state facilities. You know, we partner with the WFW in our watershed, and it's

essentially a joint program. But I think a lot of this facilities money should be focused on the tribal facilities. That would be our preference.

**DR. PENNEY:** Thanks again, Jason.

Okay, checking the queue. It's pretty quiet. But like you just did, Jen, maybe -- I don't know if Natasha or Scott, if there's anything over the last couple of days, any themes that you just want to bring up for other folks to think about while we're waiting for more hands to go up. Definitely an opportunity to do that now.

**MS. QUAN:** So I can jump in on a couple more. You know, I would say another potential area for scoping of these funds that we heard was the need for research and monitoring equipment required to implement some of the HGMPs out there. So that was a new, good add.

Some of the other piece of conversation that came up were just about HGMPs in general, questions about that in general. And our answers around permitting will really be -- it depends -- it will depend, ultimately, on the project itself.

And I'm looking through my notes right now.

Natasha or Scott, did you have any other

 nuggets we could throw out there?

**MS. PRESTON:** Sure, I'd like to state --

**DR. RUMSEY:** I would add -- oh, go ahead, Natasha.

**MS. PRESTON:** Okay. I was just going to add, I know many of our Columbia Basin co-managers have compiled this list, kind of Columbia at large. And just throwing it out there that it may be helpful to consider in Puget Sound, if folks are interested in kind of getting a collective list together. I know that would easier in terms of our understanding of priorities. I believe the CRITFC Tribes will be organizing based on priority. So high, medium, low priority, as well as shovel-ready projects. So it kind of helps us orient ourselves to some of these prioritizations that you may have. I don't know if that's possible, but just throwing that out there.

**DR. RUMSEY:** Some other thing I had in my notes from prior discussions, Mr. Gobin, Mike Crewson with your tribe also underscored that all stages of a project should be supported. So asserting that these funds should support project design and the permitting required to implement a project, not just the dirt-turning work.

 We also heard from some Upper River Columbia Tribes looking for a priority for -- or I don't know how to phrase it, but tribes that are more remote that are sort of last in line in terms of their fisheries, that funding should support production, particularly for tribes that really don't fish unless they're producing fish, if that made any sense.

**DR. PENNEY:** Thanks, Jen, Natasha, and Scott.

So Grant, I see your hand went up, so I'm going to go ahead and unmute you.

So let's see here -- still working on it, Grant.

I still don't see you coming off of unmute yet.

IT, we might need some help on this one.

**DR. PENNEY:** Sorry folks, trying to figure out -- there we go.

Grant you should be able to go now.

**MR. KIRBY:** Can you hear me?

**DR. PENNEY:** We can hear you. Sorry about that.

**MR. KIRBY:** Okay. Yeah. Yeah.

If you recall our in-person, one-on-one



meetings a few days ago we -- Sauk-Suiattle did bring that up, that you need to include design, you know. In other words you get into trouble trying to put an infrastructure without good civil engineering design added to that. So I'm glad to hear that Tulalip mentioned that too.

I don't know -- you know, Northwest Indian Fishery Commission, their 20-member tribes, I don't know if we can come to a consensus on priority because it's going to vary per watershed. It's going to vary depending on capacity at facilities. You know, in the case of the Skagit, we just have two tribal hatcheries, and capacity is very small right now. Yet, we have some big issues, as Jason Gobin can attest to, where we have a driver stock that seems to be sock summer Chinook that tends to be a driver stock every other year.

So, yeah, I guess I would just add that priorities may be different depending on the watershed, depending on the facilities. And I don't know if we could come to a consensus of prioritizing within the group. I mean, that could be discussed, but I have my doubts. Thank you.

**DR. PENNEY:** Thanks for that, Grant. And yeah, definitely over the summer time frame, looking

for, you know, the best way to go about that, and make sure that we do it in the, I guess, the best way possible. And make sure tribes have as much input into that -- in how we do that as possible.

Jen, anything to add on to that one?

**MS. QUAN:** Yeah. I think -- I think you're right, Grant. And I think that this is where the iterative conversations will need to come in, you know, especially with Puget Sound. You know, I envision, you know, working with Northwest Indian Fish Commission, maybe to help convene some conversations. You know, in addition to one-on-ones, and really understanding what each tribe needs. It's a great opportunity. And then, now we're kind of to the hard part, where we have to figure out how to allocate it. So I hear you on this and the timing.

**DIRECTOR MERCIER:** Zach, can I jump in there and piggy-back on that?

**DR. PENNEY:** Yeah. Go ahead, Bryan.

**DIRECTOR MERCIER:** Thanks. Yeah. And yesterday at the call, I used the analogy of a guiding star, right, or North Star, because this question came up. And our preference, of course, is to have as few stars clustered in the same direction

as possible, because each of the tribes, as you submit your feedback, and especially around the solicitation on allocation of the funds, we'll be using that as guidance.

And so, I think it was Grant's question about consensus. Ideally, we'd love to have one letter with all 45 original tribes. We know that is logistically impossible, and it's just difficult to reach consensus across 45 sovereign nations. But I like Natasha's idea of if geographically -- because it's not just Puget Sound, Columbia Basin. We have some coastal fisheries, Klamath Basin, that are eligible here. The greater the consensus, or the clusters, if you will, of these guiding stars, the easier is will be for the federal family to make the decisions on how to allocate.

Because if we have 45 stars that range from north to south, it's going to be really hard for us to make a decision in which direction to head. And so I'm kind of playing off my analogy yesterday of that North Star, guiding star here, but I hope I'm making myself clear that the greater the consensus, that the easier it will be for us to reach a decision on how to allocate the funds.

**DR. PENNEY:** Thanks for chiming in with



that, Bryan. Really appreciate that.

Okay. Refreshing my queue real quick. Still plenty of time for folks if you have -- if any of this has spurred up questions you want to ask on any of the subjects discussed. Feel free to throw your hand up.

If it stays quiet for the next little bit, I have directions to wait for natural end, where folks are not talking. So if we need to end a little bit early and give folks time back, I'm fine with that, too, but I'm going to give it at least another minute, so don't be shy.

**MS. QUAN:** Well, maybe one other thing I would bring up, maybe this will pique some interest, is, you know, we did have a couple questions about the use of these funds for operations. And I will kind of give you the direction I've been given on that is that, you know, these are one-time funds. And, you know, unless there's good justification for an operation that's one time, we're really suggesting that we don't go down the path of funding operations with this. But also need to hear from you all if we should be thinking about that a different way with one-time funding.

I would also just add that that becomes a

consideration too. If you are building a brand new facility, these funds -- you know, it will be up to you to operate those facilities. And these funds -- we wouldn't want to jumpstart that with these funds either.

**DR. PENNEY:** Thanks for mentioning that, Jen, as well.

I still don't see any hands in the queue, but if that also spurred some questions -- there we go.

Grant, I'm going to take you off mute.

**MR. KIRBY:** Can you hear me now?

**DR. PENNEY:** We can hear you now.

**MR. KIRBY:** Okay. I got to click two buttons here.

I would just add to what -- or maybe some clarification on operations. Because usually it takes -- it takes at least one staff member to oversee projects, make sure vendors are meeting their deliverables, contracts, so forth. And I would think that as far as -- you should allow at least a project manager to oversee some of this stuff. You know -- you know, some of these projects that are awarded to any particular tribe, that there should be that option, you know, for the duration of

that maintenance improvement or whatever. Because that just eats into staff time that is devoted to other things. And to be able to allocate at least a little time to a project manager would be helpful to implement these improvements.

**MS. QUAN:** Thanks, Grant.

**MR. KIRBY:** I don't know what your thought is about that but --

**MS. QUAN:** Yeah. Thanks, Grant.

I'm going to look to Scott, but I kind of think that that's general -- you know, generally accepted as part of the proposals that we use for other grant programs.

**MR. KIRBY:** Great.

**DR. RUMSEY:** Absolutely.

Yeah, thank you for clarifying that Grant. I would say this is definitely an expectation in that whatever projects tribes bring forward, I think they should include the capacity they need to implement the project successfully, whether that's, you know, project managers, you know, people to, you know, work on the permitting and whatnot. Yeah. I wouldn't -- I personally wouldn't classify that as operations because it's intimately related to the project.

**DR. PENNEY:** Thanks, Scott and Jen.

Queue, no more hands are raised, but give it a little bit more time.

Just maybe for the good of the group, one of the ways that as folks were working on developing these set-asides for tribes too and, you know, the question about operations and, you know, it's -- sometime it doesn't do good to hire technicians if the tank has a crack in it, and it's not able it hold fish anymore.

So that was one of the early ways, I think, some people were framing it in terms of how to, you know, deal with this deferred maintenance. But also, as has come up in some of the past calls, you know, and somebody mentioned in this call, I mean, some of the hatchery technology that we have with places like the Pacific Northwest is a little aged, 40 years, sometimes older in certain places. So there's other things too, rather than necessarily fixing an old technology that there's other places for improvement as well.

**MS. QUAN:** I guess one last thing that I might add that we touched on just -- and I'll probably only touch on it briefly here, but I think we all are acutely aware that, you know -- well,

number one, I think our thinking about hatchery and hatchery practices has evolved a lot over the decades here. And we have -- a lot of us have a collective recognition of the importance right now of hatcheries on the landscape for conservation, for tribal treaty rights, for adapting to climate change. And I think you all are also aware that there are others that don't share those feelings.

So, you know, part of -- as developing that -- this program, we also are bringing an eye to ensuring that we are going to do the best we can to put a bullet-proof program on the ground that -- you know, that can sustain any potential legal challenges.

**DR. PENNEY:** Thanks, Jen, for -- that's a really important point to make.

So I'm not seeing any more hands, so I am okay to call this -- oh, Robert. Let me unmute you.

Go for it.

**MR. BLANKENSHIP:** Good morning. Can you hear me okay?

**DR. PENNEY:** I can hear you okay.

**MR. BLANKENSHIP:** All right. Robert Blankenship, hatchery manager for the Lower Elwha Klallam Tribe.



And I was just curious if there's been a project proposal format finalized for this funding?

**MS. QUAN:** Thanks, Robert.

No, there has not. So we are in the formative part of this. So we are -- we're soliciting your information right now about what types of projects that we should be funding with this. So we're very early on.

**MR. BLANKENSHIP:** Okay. I understand now.

I just want to say, also, thank you all for this excellent funding opportunity for these tribal hatcheries. So, thank you.

**MS. QUAN:** And thank you.

**DR. PENNEY:** Yeah, appreciate it.

I'll watch for some more hands, although that's a really good note to end on. But I'll watch a few more -- see if anymore hands come up. And thank you all for your patience today.

The queue is quiet. I'll keep my eye on the queue, but at this point in time, I think it's okay to go ahead and call us to a close. But I will give Administrator Quan the final word here, and we can goad and close out.

So, Jen?

**MS. QUAN:** Great.



So again, a lot of thanks has gone both ways, but it's Friday, end of a long, busy week. Really appreciate you showing up. Appreciate your feedback, thoughts, voices you're going to be putting into this process and helping us shape the program going forward.

I've put up our time frame right here. Again, we'll be sending these slides out so you'll have them in print and be able to refer to them. Invite you to request a separate meeting, if you want to provide more tribal government input, your tribal government's input directly to myself, or someone in our leadership, or on our team here. And again, written comments can be submitted to this link. But I hope you all have a great Friday -- rest of your Friday and a good weekend, and look forward to continued discussions on this. All right.

**DR. PENNEY:** Thanks, Jen.

Thanks, everybody, for attending. And we can go ahead and call it to a close.

**(WHEREUPON, listening session concluded.)**

# CERTIFICATE

I, Kimberly R. McLain, do hereby certify that the proceeding named herein was professionally transcribed on the date set forth in the certificate herein; that I transcribed all testimony adduced and other oral proceedings had in the foregoing matter; and that the foregoing transcript pages constitute a full, true, and correct record of such testimony adduced and oral proceeding had and of the whole thereof.

IN WITNESS HEREOF, I have hereunto set my hand this 17th day of July, 2023.

Kimberly R. McLain

1

**10** 4:3 4:6 17:18

2

**2023** 2:6 2:10

**20-member** 28:8

**23** 2:6

**23rd** 2:10 8:16 12:7

**240** 6:20

**24th** 8:10

3

**3** 3:9 17:2 18:10

4

**40** 21:12 34:18

**45** 30:7 30:9 30:17

6

**638** 7:20 10:1 22:9

A

**able** 3:13 12:9 15:15 27:20 33:3 34:9 37:9

**absent** 14:20 14:21

**Absolutely** 33:15

**acceptable** 24:11

**accepted** 8:16 11:5 33:12

**acknowledge** 18:6 19:16

**across** 10:6 21:9 30:9

**Act** 2:1 2:12 2:13

**actually** 4:10

**acutely** 34:25

**adapting** 35:6

**add** 25:17 26:3 26:6 28:18 29:5 31:25 32:16 34:23

**added** 28:5

**addition** 29:12

**additional** 20:9

**administered** 10:2 10:4

**administrate** 9:25

**administration** 6:23 10:25

**administrative** 8:23

**Administrator** 2:21 4:14 4:17 5:2 17:21 36:22

**advance** 7:13

**Advisor** 2:15

**Affairs** 5:1

**affiliation** 3:8 3:14 16:23 17:4

**affirmative** 3:6

**aged** 34:18

**agencies** 10:10 10:18 22:23

**agenda** 3:16

**ago** 28:1

**agreement** 8:25 11:11 14:16 16:3

**ahead** 14:1 17:22 18:9 18:13 19:2 24:14 26:3 27:12 29:20 36:21 37:21

**allocate** 8:15 14:12 29:16 30:16 30:24 33:3

**allocated** 6:22

**allocating** 14:13

**allocation** 7:10 15:6 30:3

**allow** 8:4 22:17 32:21

**alongside** 11:2

**already** 4:13 20:1 22:8 22:14 22:16 23:10

**am** 5:9 8:6 23:20 35:17

**American** 2:8

**Amiotte** 4:20

**Anadromous** 4:19

**analogy** 29:22 30:20

**and/or** 12:6

**annual** 10:15 19:18 19:20

**answer** 6:4 13:25

**answering** 16:15

**answers** 25:20

**anybody** 3:23 23:12 23:18

**anymore** 34:10 36:17

**anything** 13:19 25:7 29:5

**appear** 17:8

17:23 17:24
**appears** 16:22
**apply** 10:21
**appreciate** 11:16 11:19 19:21 20:23 23:8 31:1 36:14 37:3 37:3
**approach** 19:20
**area** 13:5 25:13
**areas** 12:15 16:3
**asserting** 26:23
**attendance** 4:24
**attendees** 17:16
**attending** 37:20
**attest** 28:15
**audio** 21:23
**August** 8:9
**avoids** 11:13
**awarded** 32:24
**awarding** 10:2 10:25
**aware** 34:25 35:7

B

**baked** 6:1 15:11
**based** 6:23 26:13
**Basin** 26:6 30:11 30:12
**Bay** 21:18
**becomes** 31:25
**begin** 3:18 13:7
**beginning** 5:23 6:13
**begins** 11:24
**believe** 26:12
**best** 3:5 4:4 15:25 29:1 29:2 35:11
**better** 12:5 15:19 22:2 22:25
**BIA** 7:20 8:24 9:12 9:17 9:21 11:6 14:15 16:6 16:9 19:20 21:20 22:6 22:8
**BIL** 14:24
**Bipartisan** 14:25
**bit** 10:23 21:24 24:18 31:7 31:10 34:3
**Blankenship** 35:20 35:23 35:24 36:9
**bottlenecked** 9:14
**bottom** 2:24
**box** 2:24 17:8 17:10
**brainstorm** 14:13
**Branch** 4:18
**brand** 9:3 32:1
**brass** 4:2
**breaking** 21:25
**brief** 2:21
**briefly** 34:24
**bring** 6:6 13:10 25:9 28:2 31:14 33:18
**bringing** 35:10
**broadly** 15:25
**brought** 9:12 24:1 24:19
**Bryan** 4:24 9:17 9:20 11:18 14:22 29:20 31:1
**building** 32:1
**bullet-proof** 35:12
**burden** 9:25
**Bureau** 4:25
**busy** 37:2
**button** 16:22
**buttons** 32:15

C

**capacity** 28:11 28:13 33:19
**caring** 20:14
**case** 17:12 28:12
**catalyze** 12:17 15:12
**categories** 15:22
**category** 15:21
**certain** 34:18
**challenges** 35:14
**change** 35:7
**chat** 12:9
**checking** 25:5
**Chief** 4:18
**chiming** 30:25
**Chinook** 20:3 28:16
**civil** 28:4
**clarification** 32:17
**clarifying** 33:16
**classify** 33:23
**clear** 30:22
**click** 3:6 16:22 17:9



17:22 18:9 32:14
**climate** 35:6
**close** 8:20 36:21 36:23 37:21
**clustered** 29:25
**clusters** 30:14
**Coast** 2:3 2:21 4:14 4:17 4:20 4:21 17:11 21:10 23:9
**coastal** 30:12
**co-hosting** 16:19
**collateral** 11:12
**collective** 26:10 35:4
**Columbia** 26:6 26:7 27:2 30:11
**co-managers** 26:6
**comes** 21:20
**coming** 6:12 9:5 9:22 27:15
**comment** 2:23 20:9 21:5 24:18
**comments** 8:13 9:18 12:4

18:3 18:4 18:7 20:17 37:14
**Commission** 19:9 28:8 29:11
**communities** 21:8
**compacts** 10:4 11:14
**compete** 15:8
**competition** 15:2 15:3
**competitive** 21:22
**compiled** 26:7
**completed** 11:3
**completely** 9:7 24:5 24:10
**compliance** 10:20
**components** 7:12
**computer** 17:6 17:8
**concluded** 37:22
**Concurrently** 8:23
**consensus** 28:9 28:21 30:6 30:9 30:13 30:23
**conservation**

16:1 35:5
**consider** 9:12 14:1 16:6 26:9
**consideration** 11:4 14:4 32:1
**considerations** 12:20
**considering** 15:22
**consistent** 16:9
**consultation** 12:1 22:21 23:1
**consultations** 2:11 6:11 6:17 13:13 20:22
**continue** 8:11
**continued** 37:17
**contract** 7:20
**contracts** 10:1 10:12 10:15 11:14 22:9 32:20
**convene** 29:11
**conversation** 3:19 5:10 5:10 5:23 6:13 7:1 7:6 7:14 7:25 8:8 12:16 13:3 13:7

14:3 15:13 25:18
**conversations** 5:13 12:18 23:16 24:1 29:8 29:12
**Coordinator** 4:21
**copy** 12:11 19:14
**couple** 3:21 19:11 19:23 25:8 25:12 31:15
**course** 29:24
**cover** 16:25
**crack** 34:9
**Crewson** 26:21
**criteria** 7:10 8:14 13:8 13:10
**CRITFC** 26:12
**curious** 36:1
**currently** 5:25
**cyclical** 19:19

D

**day** 4:22
**days** 3:21 25:8 28:1
**deal** 34:13
**decades** 35:3
**decision**



30:19 30:24
**decisions** 30:16
**deferred** 13:15 21:14 34:13
**define** 7:17
**definitely** 20:21 23:9 25:11 28:25 33:17
**deliverables** 32:20
**depend** 25:22
**dependent** 20:11 24:2
**depending** 28:11 28:19 28:20
**depends** 25:21
**Deputy** 4:17
**design** 26:24 28:2 28:5
**desire** 8:2
**determination** 8:17
**determine** 9:2
**develop** 9:13 22:11
**developed** 7:13
**developing** 14:2 34:5 35:9
**development** 8:24
**devoted** 33:2
**different** 28:19 31:24
**difficult** 30:8
**difficulties** 17:13
**directed** 5:18
**direction** 29:25 30:19 31:17
**directions** 31:8
**directly** 37:12
**Director** 4:25 9:19 9:21 29:18 29:21
**dirt-turning** 26:25
**disclaimer** 18:2
**Discuss** 3:17
**discussed** 28:22 31:5
**discussing** 6:20
**discussion** 3:19 8:1 11:24 12:13 12:15 13:4 14:9 14:11 15:17
**discussions** 6:21 13:19 26:20 37:17
**distribute** 14:18
**distributed** 24:6
**distribution** 7:2 7:20
**done** 2:11 3:21 21:16 24:9
**door** 8:2
**doubts** 28:23
**Dr** 2:8 4:8 4:16 17:15 18:16 18:19 18:22 19:4 20:20 21:2 21:24 22:2 23:8 24:12 25:4 26:3 26:19 27:9 27:18 27:22 28:24 29:20 30:25 32:6 32:13 33:15 34:1 35:15 35:22 36:14 37:19
**driven** 8:1
**driver** 28:15 28:17
**duration** 32:25
**during** 2:20
**duty** 11:12

E

**earlier** 14:8 23:24 23:25
**early** 31:10 34:11 36:8
**easier** 26:11 30:15 30:23
**easiest** 14:15
**eats** 33:2
**effective** 9:9
**efforts** 6:16
**either** 13:1 16:18 32:5
**eligibility** 20:10
**eligible** 7:9 30:13
**else** 16:19
**Elwha** 35:24
**encourage** 8:7
**engage** 11:23 12:5 12:6 13:2 14:2 16:13
**engaged** 9:8
**engagement** 2:4 2:15 2:17 5:24 8:11 8:19



**engineering** 28:4
**ensure** 3:11
**ensuring** 35:11
**environmental** 10:20
**envision** 29:10
**equipment** 25:15
**ESA** 20:5
**especially** 29:9 30:2
**essentially** 10:12 25:1
**everybody** 18:3 19:9 37:20
**everyone** 9:20 21:4
**evolved** 35:2
**example** 16:7 19:19 20:1 20:2 20:3
**excellent** 36:11
**excited** 5:9 5:20 11:9
**existing** 10:12 10:14 11:14 13:17 13:20
**expand** 13:17
**expands** 13:20 13:22 13:24
**expansion** 13:16 13:23 15:21 21:17
**expect** 6:9
**expectation** 5:22 33:17
**experience** 10:9
**eye** 35:10 36:19

F

**facilitate** 2:16
**facilities** 13:17 20:10 21:8 21:18 24:21 24:24 25:2 25:3 28:11 28:20 32:3
**facility** 13:23 19:25 20:4 20:12 21:12 21:17 24:8 24:10 32:2
**fact** 10:22
**factor** 11:3
**factors** 16:5
**fall** 8:17 8:21
**family** 30:15
**federal** 10:10 19:25 22:16 30:15
**federally-reserved** 7:3 14:17 15:6
**feedback** 30:2 37:4
**Feel** 31:5
**feeling** 5:20
**feelings** 35:8
**fifth** 2:10 5:10
**figure** 27:18 29:16
**final** 20:9 36:22
**finalized** 36:2
**Finally** 15:14
**fine** 31:10
**finish** 22:18
**first** 3:14 4:10 4:11 13:4 17:4 18:12 19:12 19:16
**fish** 10:9 14:23 19:8 27:7 27:7 29:11 34:10
**fisheries** 2:15 4:19 6:18 6:23 27:5 30:12
**Fishery** 28:8
**fishing** 5:19 7:3 14:18 15:7
**fit** 15:20
**fixing** 34:20
**floor** 5:3
**flowing** 15:12
**focused** 7:1 25:2
**folks** 2:19 3:22 4:1 4:3 11:17 18:1 18:3 25:9 26:9 27:18 31:3 31:9 31:10 34:5
**follow-ups** 6:10
**formal** 6:11
**format** 36:2
**formative** 36:5
**forth** 15:15 32:20
**forward** 7:6 11:19 12:23 13:11 23:3 23:5 33:18 37:6 37:17
**fourth** 4:22
**frame** 28:25 37:7
**framework** 7:23
**framing** 17:21 34:12

**free** 31:5
**Friday** 2:6 37:2 37:15 37:16
**front** 13:18
**fruits** 23:6
**fun** 5:12
**function** 17:23 18:9
**funding** 2:12 2:13 5:16 5:17 14:24 20:1 20:10 21:15 21:20 21:21 22:6 22:12 22:14 22:16 22:16 23:5 27:5 31:21 31:24 36:2 36:7 36:11
**fundings** 7:2 24:20
**funds** 2:2 5:8 5:11 5:24 7:19 8:2 8:15 9:25 10:13 10:17 14:5 14:12 14:14 14:18 15:3 15:19 15:25 20:1 22:8 24:6 25:14 26:23 30:3 30:24 31:16 31:18 32:2 32:3 32:4
**future** 11:20

G

**general** 25:19 25:20 33:11
**generally** 33:11
**geographic** 16:3
**geographically** 30:10
**gets** 9:14 22:24
**getting** 9:25 12:21 23:5 26:10
**given** 31:17
**glad** 4:23 28:5
**goad** 36:23
**Gobin** 18:12 18:18 21:1 21:4 22:1 22:3 24:16 26:20 28:15
**gone** 18:22 37:1
**government** 37:11
**government's** 37:12
**grab** 12:9
**grant** 11:11 11:12 27:11 27:14 27:20 28:24 29:7 32:11 33:6 33:9 33:13 33:16
**Grant's** 30:5
**great** 5:4 14:8 19:13 20:20 23:4 23:8 29:14 33:14 36:25 37:15
**greater** 30:13 30:22
**ground** 35:12
**group** 28:22 34:4
**guess** 28:18 29:2 34:22
**guidance** 30:4
**guiding** 29:23 30:14 30:21

H

**habitat** 20:8
**hand** 2:24 3:1 3:2 3:10 3:24 4:9 5:3 9:17 16:18 17:2 17:24 24:13 24:17 27:11 31:6
**hand-raise** 17:22 18:9
**hands** 3:4 4:5 8:3 16:20 23:19 23:20 25:10 32:8 34:2 35:17 36:15 36:17
**happened** 6:17 21:6
**happy** 14:9
**hard** 29:15 30:18
**harvest** 20:6
**hatcheries** 2:12 6:22 6:25 7:3 21:21 24:3 28:13 35:5 36:12
**hatchery** 2:2 5:8 14:23 20:10 20:13 21:8 34:16 35:1 35:2 35:24
**hatching** 20:13
**haven't** 17:25
**having** 18:1 22:5
**head** 16:24 30:20
**headquarters** 6:18 6:19
**hear** 3:13



14:7
18:17 18:19
18:20
19:4 19:6
19:13
21:1 21:2
27:21 27:22
28:5
29:16 31:22
32:12 32:13
35:21 35:22

**heard** 6:20
6:24
13:13 13:16
14:8
14:10
16:7 18:5
20:16 25:14
27:1

**hearing** 11:16

**HELD** 2:5

**Hello** 19:3
19:4

**help** 2:16 9:5
11:5
12:22
24:8
27:17 29:11

**helpful** 16:16
26:9 33:4

**helping** 37:5

**helps** 26:15

**he's** 18:22

**Hey** 19:7

**HGMP** 13:24
14:2

**HGMPs** 25:16
25:19

**Hi** 9:20

**high** 26:14

**hire** 34:8

**hold** 34:10

**holding** 20:14

**home** 9:22

**honored** 5:20

**hope** 8:17
30:22 37:15

**hopefully**
8:21
18:23 22:11
22:17

**hosting** 19:10

**humanly** 8:3

I

**I'd** 24:17
26:2

**idea** 30:10

**Ideally** 30:6

**ideas** 7:15
8:15 13:6
14:7 14:8
14:13 15:9

**I'll** 3:4 3:18
9:16 14:9
34:23 36:15
36:16 36:19

**I'm** 2:14 2:14
2:16 4:5
4:9 7:7 7:8
7:10 7:11
8:6 9:22
11:9
12:14 12:25
16:10 17:16
18:11 18:13
18:25
19:8
20:16
22:3
24:13 25:23
27:11
28:5
30:20 30:22
31:10 31:11
32:11 33:10
35:17

**implement**
25:16 26:24
33:5 33:20

**implementation** 20:12

**implementing**
20:5

**importance**
35:4

**important**
10:19 10:22
15:17 22:19
35:16

**impossible**
30:8

**improvement**
33:1 34:21

**improvements**
33:5

**improving**
21:8

**include**
28:2 33:19

**included** 13:9

**Indian** 4:25
19:8 28:7
29:10

**individual**
22:21 23:1

**Inflation** 2:1
2:11

**informal** 6:11

**information**
12:2 12:8
16:16 20:16
36:6

**informed** 9:1

**infrastructure** 14:25
28:4

**initial** 12:17
15:6

**initialized**
23:6

**Inland** 4:19

**in-person**
27:25

**input** 6:2 9:1
11:23 12:21
29:4
37:11 37:12

**instructions**
13:2

**intent** 9:24
13:12

**interagency**
8:25

**interest**
31:14

**interested**
26:10

**intimately**



33:24
**introduced** 4:13
**introductions** 2:20 3:17 4:11
**invested** 20:2
**Invite** 37:10
**inviting** 6:3
**invocation** 3:23
**IRA** 2:1 5:8 5:11 6:16
**Island** 19:7
**issues** 13:15 17:25 28:14
**iterative** 6:10 29:8
**IV** 10:4
**I've** 4:13 5:17 31:17 37:7

J

**Jason** 18:12 18:13 18:16 18:20 18:23 20:24 21:25 23:9 24:13 25:4 28:14
**Jen** 9:19 9:23 10:22 11:15 16:14 24:12 25:6 27:9 29:5 32:7 34:1
35:15 36:24 37:19
**Jennifer** 4:15 24:18
**Joe** 22:14
**join** 5:7
**joined** 4:16
**joining** 2:9 4:9
**joint** 25:1
**Joseph** 19:1 19:2 19:7 20:20 24:1
**juices** 15:12
**Julie** 12:2
**July** 8:16 12:6
**jump** 6:14 23:22 25:12 29:18
**jumpstart** 32:4
**June** 2:6 2:10
**justification** 31:19

K

**key** 7:12
**KIRBY** 27:21 27:24 32:12 32:14 33:7 33:14
**Klallam** 35:25
**Klamath** 30:12

L

**lack** 9:14
**Lalena** 4:20
**landscape** 35:5
**large** 26:7
**largely** 8:1
**last** 2:17 25:8 27:4 34:22
**late** 8:16
**later** 12:12
**Law** 14:25
**lays** 7:23
**leadership** 37:13
**leading** 4:15
**least** 7:14 31:11 32:18 32:22 33:3
**legal** 35:13
**less** 11:10
**let's** 4:5 4:10 6:14 12:13 27:13
**letter** 12:3 12:7 30:7
**level** 5:16 5:17
**leverage** 19:25
**leveraging** 10:1 11:14
**lifespan** 14:5
**limited** 12:16
**line** 3:22
27:4
**link** 12:7 37:15
**list** 26:7 26:10
**listening** 37:22
**listen-only** 2:20
**little** 3:2 10:23 17:10 21:24 22:23 24:18 31:7 31:10 33:4 34:3 34:17
**load** 13:19
**logistically** 30:8
**long** 37:2
**loosely** 7:7 7:9 7:17
**lost** 21:23 21:24
**lot** 10:23 14:21 21:7 25:1 35:2 35:3 37:1
**love** 19:17 30:6
**low** 26:14
**lower** 2:24 35:24
**Lummi** 20:3

M

**maintenance** 13:12 13:15 13:22 15:7 15:21 19:20 21:13 21:14 33:1 34:13
**manager** 32:22 33:4 35:24
**managers** 33:21
**March** 6:19 13:14
**Marine** 6:18
**may** 24:17 26:8 26:16 28:19
**maybe** 4:3 20:2 25:6 29:11 31:13 31:14 32:16 34:4
**mean** 28:22 34:16
**meditate** 4:4
**medium** 26:14
**meet** 8:11 10:16
**meeting** 12:1 16:2 16:16 19:10 32:19 37:10
**meetings** 6:10 28:1
**member** 32:18
**mention** 12:10
**mentioned** 9:23 19:21 28:6 34:15
**mentioning** 32:6
**Mercier** 4:24 9:17 9:19 9:20 29:18 29:21
**method** 14:19
**Mike** 26:20
**million** 6:21
**mind** 17:20 19:24
**mindful** 18:4
**minimal** 19:17 19:22
**minimize** 22:6
**minute** 31:12
**mix** 15:5
**mode** 2:20 12:14
**model** 11:20 14:22 21:21 21:22
**moderator** 3:3 3:10 17:7
**modify** 10:13
**moments** 11:15
**money** 10:23 25:2
**monitoring** 25:15
**morning** 2:9 5:5 35:20
**motivate** 7:25
**move** 7:6 8:22 12:13 13:10 14:9
**moving** 8:9 14:1
**multiple** 11:23
**mute** 20:25 32:11
**muted** 3:12
**myself** 4:13 14:15 16:19 30:22 37:12

N

**nailed** 8:22
**narrative** 10:15
**narratives** 19:18
**Natasha** 4:18 13:1 16:11 17:15 25:7 25:25 26:4 27:9
**Natasha's** 30:10
**national** 6:18 15:1
**nations** 30:9
**Native** 2:8
**natural** 31:8
**necessarily** 34:19
**NOAA** 4:15 5:13 5:18 6:22 6:23 7:19 8:2 8:4 9:12 11:5 11:6 16:6 19:10
**NOAA's** 2:14
**nobody** 4:2
**non-Mitchell** 2:13
**north** 29:23 30:18 30:21
**Northwest** 4:24 4:25 19:8 28:7 29:10 34:17
**note** 10:19 10:22 36:16
**notes** 25:23 26:20
**Nothing** 6:1
**notification** 3:7
**nuggets** 26:1

O

**obligations** 16:2
**obviously** 13:12
**offer** 3:23 11:5
**offered** 11:5
**office** 9:21 10:5 10:6
**officials**

10:2
**official's** 10:25
**oh** 17:3 21:24 26:3 35:18
**okay** 4:8 16:11 18:18 21:4 22:1 25:5 26:5 27:24 31:2 32:14 35:18 35:21 35:22 36:9 36:21
**old** 21:12 24:17 34:20
**older** 34:18
**one-on** 29:12
**one-on-one** 6:10 12:1 27:25
**ones** 14:10 29:13
**one-time** 10:13 22:12 31:18 31:24
**open** 7:15 15:8 15:16
**opening** 3:24
**operate** 32:3
**operation** 31:20
**operations** 31:16 31:22 32:17 33:24 34:7
**opportunity** 3:22 5:16 9:3 20:7 20:18 21:5 25:11 29:14 36:11
**opposed** 5:13 14:3
**optimistic** 8:6
**option** 32:25
**order** 3:4 16:20 17:24
**organizing** 26:13
**orient** 26:15
**original** 30:7
**others** 5:14 35:8
**otherwise** 3:12
**ourselves** 26:15
**oversee** 32:19 32:22

P

**Pacific** 34:17
**painful** 11:10
**partial** 22:17
**Participants** 2:19
**particular** 21:12 32:24
**particularly** 27:6
**partner** 24:7 24:25
**partnership** 10:10 11:19
**past** 3:21 34:14
**path** 31:21
**patience** 36:18
**Pause** 4:7
**Penney** 2:8 2:14 4:8 17:15 18:16 18:19 18:22 19:4 20:20 21:2 21:24 22:2 23:8 24:12 25:4 27:9 27:18 27:22 28:24 29:20 30:25 32:6 32:13 34:1 35:15 35:22 36:14 37:19
**people** 15:16 33:21 34:12
**per** 20:5 28:10
**perhaps** 15:5 17:17
**permitting** 25:21 26:24 33:22
**person** 3:3 16:20
**personally** 5:9 33:23
**perspective** 5:17 7:14 15:24 24:11
**Peters** 19:1 19:3 19:6 19:7
**phone** 3:9 3:12 17:1 17:6 18:10 22:3
**phrase** 27:3
**pie** 22:24
**piece** 16:25 25:18
**piggy-back** 29:19
**pique** 31:14
**places** 13:17 34:17 34:18 34:20
**plan** 8:11
**planning** 10:22
**plans** 20:6
**playing** 30:20
**please** 3:7 3:11 3:13 3:15 3:24 12:1 12:6 16:18 16:23 17:3 18:8
**plenty** 23:15 23:21 31:3



**point** 7:1 13:5 14:11 35:16 36:20
**Portland** 9:21 10:3
**possible** 8:4 8:20 26:17 29:3 29:4 30:1
**potential** 25:13 35:13
**potentially** 24:23
**PowerPoint** 12:11
**practices** 35:2
**pray** 4:4
**prayer** 3:24
**preference** 25:3 29:24
**prescription** 9:6 9:7
**present** 12:15
**presentation** 2:21 4:15 12:12 19:13 19:14 20:19 23:14
**press** 3:9 17:2
**Preston** 4:18 16:14 26:2 26:5
**pretty** 25:5
**print** 37:9
**prior** 26:20
**priorities** 8:14 15:18 19:23 20:4 26:12 28:19
**prioritizations** 26:16
**prioritize** 21:16
**prioritizing** 22:13 24:20 28:21
**priority** 6:25 19:24 26:13 26:14 27:2 28:9
**privy** 23:25
**probably** 11:6 34:24
**process** 7:10 7:11 7:21 8:23 9:4 11:24 15:4 37:5
**processes** 8:4
**producing** 7:4 27:7
**production** 4:19 13:21 13:23 13:24 27:6
**program** 6:2 7:8 7:8 7:17 8:18 9:13 10:24 12:23 13:8 20:3 25:1 35:10 35:12 37:6
**programs** 19:25 20:2 20:4 20:5 20:11 33:13
**progress** 3:1 6:2
**project** 13:22 25:22 26:22 26:23 26:25 32:22 33:4 33:20 33:21 33:25 36:2
**projects** 7:9 8:14 10:13 11:3 11:7 13:9 13:10 15:7 15:20 15:23 22:15 22:18 23:6 26:15 32:19 32:23 33:18 36:7
**proposal** 36:2
**proposals** 13:6 33:12
**propose** 12:17
**proposed** 12:19
**provide** 2:22 11:23 20:6 37:11
**providing** 18:3
**Puget** 17:18 21:9 26:9 29:9 30:11
**purposes** 10:21
**putting** 12:8 37:5

Q

**Quan** 2:22 4:15 5:2 5:4 11:18 17:21 23:22 25:12 29:6 31:13 33:6 33:9 34:22 36:3 36:13 36:22 36:25
**quarterly** 10:15
**question** 2:22 13:25 16:18 23:13 23:21 29:24 30:5 34:7
**questions** 12:19 12:22 15:14 16:10 16:15 17:21 18:8 25:20 31:4 31:15 32:9



**queue** 17:16 18:11 23:17 25:5 31:2 32:8 34:2 36:19 36:20
**quick** 3:17 31:2
**quickly** 11:22 13:4
**quiet** 18:11 25:6 31:7 36:19
**quite** 10:23

R

**raise** 2:23 3:9 3:24 16:18 17:2
**raised** 3:4 16:20 17:24 34:2
**range** 24:11 30:17
**rather** 34:19
**reach** 12:2 30:9 30:24
**reaction** 3:1
**ready** 8:22
**real** 11:22 31:2
**really** 3:17 4:23 5:9 5:11 5:15 5:19 5:23 6:1 6:16 6:25 9:24 11:18 13:5 15:17 19:21 23:4 25:21 27:6 29:13 30:18 31:1 31:20 35:16 36:16 37:3
**rearing** 20:13
**rebuild** 20:7
**recall** 27:25
**received** 14:24
**recent** 10:8 14:22
**recognition** 35:4
**recorded** 2:19 16:17
**recording** 2:25 11:25
**recovery** 20:5 20:6 20:7
**Reduction** 2:1 2:12
**refer** 7:7 37:9
**referred** 14:22
**refresh** 23:17
**Refreshing** 31:2
**regards** 2:13
**region** 2:3 4:14 4:18 4:20 4:21 17:12 23:10
**regional** 4:14 4:17 4:25 9:20 10:6 15:3
**regulatory** 10:20
**related** 33:24
**relative** 14:5
**relieve** 9:24
**remote** 27:4
**repeatedly** 16:7
**reporting** 7:11 10:14 16:8 19:17 22:7 22:7
**reports** 10:16
**representation** 17:19
**representatives** 11:1 11:7
**request** 12:4 22:21 37:10
**requests** 6:24 23:10
**required** 25:15 26:24
**requirement** 16:8
**requirements** 10:14 10:17 10:20 19:18 19:22
**requires** 16:9
**research** 25:15
**resources** 9:12 9:14
**response** 3:6 18:15 18:21
**responses** 12:21
**rest** 15:8 37:16
**result** 13:22
**resulted** 6:21
**rights** 5:19 7:3 7:5 14:18 15:7 35:6
**river** 10:6 27:1
**Robert** 35:18 35:23 36:3
**Rumsey** 4:16 26:3 26:19 33:15
**run** 17:12

S

**salmon** 6:25 7:4 16:1 20:5 20:6 20:7
**Sauk-Suiattle** 28:1
**scale** 10:24
**scope** 11:8



13:8
**scoping** 25:14
**Scott** 4:16 25:7 25:25 27:10 33:10 34:1
**screen** 16:23 17:23
**second** 9:16
**seconds** 4:3 4:6
**seeing** 4:5 23:6 23:20 35:17
**seems** 28:16
**seen** 5:17
**select** 3:11 15:7
**self-governance** 10:4 10:5
**send** 12:6 16:11
**sending** 12:11 37:8
**Senior** 2:14
**sense** 27:8
**sent** 12:3 19:14
**separate** 37:10
**Service** 10:9 14:23
**session** 2:17 4:7 5:7 5:23 23:25 37:22
**sessions** 2:4 8:11 8:19 23:24
**set-asides** 34:6
**several** 2:11
**severe** 13:14 13:15
**SF425s** 10:15
**shape** 6:2 9:5 12:23 13:7 37:5
**shaping** 9:8
**share** 5:24 12:19 14:9 20:15 35:8
**shared** 20:12
**sharing** 19:24 20:18
**shovel-ready** 26:14
**showing** 37:3
**shy** 31:12
**significant** 10:24
**silence** 4:3
**similar** 10:10 20:16 21:20 22:7
**simply** 12:16
**site** 19:20
**Skagit** 28:12
**Skookum** 20:3
**slide** 3:15 4:10 7:23 16:25
**slides** 12:14 12:25 15:16 37:8
**small** 28:13
**sock** 28:16
**solicitation** 30:3
**soliciting** 36:6
**somebody** 22:4 34:15
**someone** 16:19 17:11 37:13
**sometime** 34:8
**Sorry** 22:3 27:18 27:22
**sort** 27:4
**Sound** 17:18 21:9 26:9 29:9 30:11
**south** 30:18
**sovereign** 30:9
**spawning** 20:13
**speak** 14:15 17:5 23:23
**speaker** 18:6 18:25
**speaking** 18:1 18:16
**Speaks** 2:8
**specifically** 5:18
**spreading** 15:25
**spurred** 31:4 32:9
**Squaxin** 19:7
**staff** 11:12 22:22 32:18 33:2
**staffing** 14:6
**stages** 26:22
**stand** 11:11
**standing** 15:2
**star** 29:23 29:23 30:21 30:21
**stars** 29:25 30:14 30:17
**start** 2:18 13:6 16:15 22:10
**starting** 7:7 8:10
**state** 3:7 3:13 16:23 17:3 24:2 24:8 24:8 24:10 24:24 26:2
**state-owned** 20:11
**stays** 31:7
**steelhead** 7:4 20:14
**stick** 8:7

**stock** 20:14 28:15 28:17
**stop** 6:6 6:8
**structure** 7:25 8:8
**stuff** 32:23
**subjects** 31:5
**submit** 30:2
**submitted** 37:14
**successful** 20:12
**successfully** 33:20
**sufficient** 10:16 19:19
**suggesting** 31:21
**suits** 4:4
**summer** 8:16 28:16 28:25
**support** 5:19 7:4 17:12 26:23 27:5
**supported** 26:22
**sure** 2:18 3:21 8:20 17:2 17:9 20:16 26:2 29:2 29:3 32:19
**sustain** 35:13
**symbol** 3:1

T

**table** 9:13
**tacks** 4:2
**taking** 18:7 23:10
**talk** 5:8 7:8
**talked** 10:23
**talking** 3:8 4:12 7:9 7:10 7:11 31:9
**tank** 34:9
**targeting** 16:4
**team** 10:3 37:13
**technical** 11:1 11:6 17:13
**technicians** 34:8
**technology** 34:16 34:20
**tends** 28:16
**term** 7:16
**terms** 17:10 26:11 27:4 34:12
**thank** 2:9 4:8 5:4 5:6 19:9 19:9 19:12 19:15 19:15 20:17 20:19 21:4 28:23 33:16 36:10 36:12 36:13 36:18
**thanks** 4:6 9:19 11:15 11:18 16:14 17:14 17:15 24:12 24:16 25:4 27:9 28:24 29:21 30:25 32:6 33:6 33:9 34:1 35:15 36:3 37:1 37:19 37:20
**themes** 20:22 25:8
**there's** 3:23 13:14 15:4 15:24 16:3 17:20 23:15 25:7 31:19 34:19 34:20 36:1
**they're** 27:7
**third** 4:22
**thoughts** 8:14 37:4
**throw** 26:1 31:5
**throwing** 26:8 26:17
**tied** 14:14 15:10
**tiered** 15:4
**timeline** 7:24 23:15
**timelines** 8:7
**Title** 10:1 10:3
**today** 2:9 2:10 2:12 4:16 5:7 5:22 5:25 6:12 6:20 9:22 11:17 11:24 12:12 17:19 18:5 19:10 23:12 36:18
**today's** 2:17 3:16
**top** 15:18 17:20
**topic** 12:18
**topics** 19:11
**touch** 34:24
**touched** 34:23
**transferring** 7:19
**transparent** 9:8
**treasurer** 19:8
**treaty** 5:19 16:1 16:2 35:6
**tribal** 2:2 2:4 2:15 4:21 5:8 5:19 6:17 6:22 8:10 9:1 11:12 11:17 20:10

21:7 22:16 24:20 25:3 28:13 35:6 36:12 37:11 37:12
**tribe** 19:7 26:21 29:13 32:24 35:25
**tribes** 7:2 8:3 9:10 10:11 11:2 14:17 15:6 17:18 19:17 20:17 23:11 24:2 24:7 24:7 26:13 27:2 27:3 27:6 28:8 29:3 30:1 30:7 33:18 34:6
**trigger** 13:24
**trouble** 28:3
**try** 8:7 12:17 20:24
**trying** 22:4 27:18 28:3
**Tulalip** 21:12 21:18 22:20 23:3 28:6
**turn** 12:25 17:5
**types** 13:8 36:7

U

**ultimately** 25:22
**underscored** 26:21
**undersecretary** 2:16
**understand** 24:5 36:9
**understanding** 15:18 15:20 24:22 26:12 29:13
**underway** 23:10
**unless** 27:7 31:19
**unmute** 3:5 3:11 13:2 16:12 16:21 17:3 17:7 17:9 18:13 24:14 27:12 27:15 35:18
**unmuted** 3:5 16:21
**unprecedented** 5:15
**upgrade** 13:20 13:21
**upgrades** 24:9
**Upper** 27:1
**urgency** 8:1
**useful** 9:9
**usually** 32:17

V

**Vancouver** 10:6
**various** 17:18
**vary** 28:10 28:11
**vendors** 32:19
**vet** 22:22
**via** 17:6
**virtual** 2:24 16:18
**vision** 24:6
**visits** 19:20
**voices** 6:19 18:4 37:4

W

**wait** 31:8
**waiting** 21:15 25:10
**walk** 13:1 16:12
**walking** 11:2
**Washington** 10:7
**watch** 18:5 36:15 36:16
**watershed** 20:6 24:25 28:10 28:20
**ways** 11:23 34:5 34:11 37:2
**WCR** 2:3
**we'd** 9:6 30:6
**Weeder** 12:2
**week** 5:12 14:8 18:1 20:22 37:2
**weekend** 37:16
**we'll** 3:24 6:5 6:6 6:7 6:20 11:6 11:25 15:15 16:21 17:2 18:6 30:3 37:8
**we're** 2:23 3:16 4:16 5:7 5:25 6:3 6:5 7:15 8:10 9:4 9:5 14:3 14:14 15:8 21:16 22:15 25:10 29:15 31:20 36:5 36:8
**West** 2:3 2:21 4:14 4:17 4:20 4:21 17:11 21:10 23:9
**we've** 2:11 3:20 5:11 6:24 10:8 14:12 15:14 16:7 21:11 23:21
**WFW** 24:25
**whatever**

4:4 33:1 33:18
**whatnot** 33:22
**WHEREUPON** 21:23 37:22
**whether** 13:20 15:24 33:20
**whole** 11:11 11:13
**Wildlife** 10:9 14:23
**willingness** 5:7
**wishes** 3:23
**work** 10:3 11:20 16:11 26:25 33:22
**worked** 10:11
**working** 5:20 8:24 27:13 29:10 34:5
**workload** 11:13
**writers** 11:13
**written** 8:13 12:4 37:14

Y

**yesterday** 29:22 30:21
**yet** 27:16 28:14
**you'll** 3:2 12:9 17:9 17:23 17:23 37:8
**yourself** 13:2 16:12 17:9
**you've** 20:16

Z

**Zach** 2:14 5:5 13:1 29:18

**From:** Lalena Amiotte - NOAA Federal
**To:** Dustin Klatush; Sharon Hall; Shawn Ortivez; Glen Connelly; Dawn.Gomez@hohtribe-nsn.org; Maria.Lopez@hohtribe-nsn.org; Julie.Koehlinger@hohtribe-nsn.org; bob.smith@hohtribe-nsn.org; rallen@jamestowntribe.org; hhals@jamestowntribe.org; lbarbee@jamestowntribe.org; rknapp@jamestowntribe.org; fgcharles@elwha.org; russell.hepfer@elwha.org; matt.beirne@elwha.org; robert.elofson@elwha.org; Anthony Hillaire; libchr@lummi-nsn.gov; travisb@lummi-nsn.gov; Lisa A. Wilson; bens@lummi-nsn.gov; merlej@lummi-nsn.gov; Timothy Greene; chad.bowechop@makah.com; Russell Svec; Ray.Colby@makah.com; jaison.elkins@muckleshoot.nsn.us; Isabel Tinoco; fisheries@muckleshoot.nsn.us; AStay@muckleshoot.nsn.us; choke.ken@nisqually-nsn.gov; troutt.david@nisqually-nsn.gov; smith.craig@nisqually-nsn.gov; slape.jamesjr@nisqually-nsn.gov; rlaclair@nooksack-nsn.gov; acharles@nooksack-nsn.gov; ncurrence@nooksack-nsn.gov; dwellman@pgst.nsn.us; paulm@pgst.nsn.us; romac@pgst.nsn.us; bill.sterud@puyalluptribe-nsn.gov; CouncilOffices@puyalluptribe-nsn.gov; Russ Ladley; char.naylor@puyalluptribe-nsn.gov; Doug.Woodruff@quileutenation.org; executive.secretary@quileutenation.org; Zach.Jones@quileutenation.org; qnr.director@quileutenation.org; dwayne.pecosky@quileutenation.org; chris.wagemann@quileutenation.org; jennifer.hagen@quileutenation.org; Guy.Capoeman@quinault.org; Cynthia.Ralston@quinault.org; FSharp@quinault.org; BBryson@quinault.org; Bingaman, Dave; Cleve; delbert.boyer@quinault.org; Chet; Gary Morishima; tomwooten@samishtribe.nsn.us; twoodard@samishtribe.nsn.us; njoseph@sauk-suiattle.com; chairman@sauk-suiattle.com; gkirby@sauk-suiattle.com; gmiller@skokomish.org; dherrera@skokomish.org; jwolf@skokomish.org; jpavel@skokomish.org; kpeters@squaxin.us; awhitener@squaxin.us; esparkman@squaxin.us; jdickison@squaxin.us; ewhite@stillaguamish.com; jsmith@stillaguamish.com; syanity@stillaguamish.com; lforsman@suquamish.nsn.us; rpurser@suquamish.nsn.us; pwilliams@suquamish.nsn.us; cschmidt@suquamish.nsn.us; sedwards@swinomish.nsn.us; ehaley@swinomish.nsn.us; twilbur@swinomish.nsn.us; tmitchell@swinomish.nsn.us; trgobin@tulaliptribes-nsn.gov; jgobin@tulaliptribes-nsn.gov; jasongobin@tulaliptribes-nsn.gov; darylwilliams@tulaliptribes-nsn.gov; dholmgren@tulaliptribes-nsn.gov; marilyns@upperskagit.com; scotts@upperskagit.com; hoopa.receptionist@gmail.com; executiveassistant49@gmail.com; hoopachairman@gmail.com; hupafish@hoopa-nsn.gov; Mike Orcutt; jjames@yuroktribe.nsn.us; fmyers@yuroktribe.nsn.us; Mike Crewson; Albert Smith; Dustin Winter; Jesse McMahan
**Cc:** Ruth Howell - NOAA Federal
**Subject:** Re: IRA Tribal Hatchery Information Todays Presentation and Notes Summary
**Date:** Wednesday, October 11, 2023 5:28:27 PM
**Attachments:** Mitchell Act Session 06-21-2023.pdf
Mitchell Act Session 06-22-2023.pdf

---

Attached are the two transcripts of tribal engagement sessions in June 2023. These three meetings were specific to Tribes party to the U.S. v. Oregon (Mitchell Act).

Respectfully,
Lalena Amiotte
*Tribal Relations Coordinator-West Coast Region*
NOAA Fisheries | U.S. Department of Commerce
Office: 360-519-4222



**From:** Lalena Amiotte - NOAA Federal
**To:** Jesse McMahan
**Subject:** Re: Tribal Hatchery Funding Questions
**Date:** Wednesday, October 11, 2023 3:12:01 PM
**Attachments:** Copy of NOAA IRA Funding Tribal Engagement Session 10.11.pdf

---

On Wed, Oct 11, 2023 at 12:05 PM Jesse McMahan <jmcmahan@chehalistribe.org> wrote:

> Great, talk to you then.
>
> Jesse McMahan
>
> Hatchery Supervisor
>
> The Chehalis Tribe
>
> (360)-709-1860
>
> ---
>
> **From:** Lalena Amiotte - NOAA Federal <lalena.amiotte@noaa.gov>
> **Sent:** Wednesday, October 11, 2023 12:04 PM
> **To:** Jesse McMahan <jmcmahan@chehalistribe.org>
> **Subject:** Re: Tribal Hatchery Funding Questions
>
> Hi Jesse:
>
> I will call you at 3pm today.
>
> -Lalena
>
> On Wed, Oct 11, 2023 at 9:23 AM Jesse McMahan <jmcmahan@chehalistribe.org> wrote:
>
>> I have a meeting at 1:30 to 2:30pm but I can do anytime before that and I can do 3:00 to 4:00pm after the meeting. My phone number is (360)- 709-1860 or my cell is (360)-269-1088. If today doesn't work the next two days are wide open for me.
>>
>> Jesse McMahan
>>
>> Hatchery Supervisor
>>
>> The Chehalis Tribe
>>
>> (360)-709-1860
>>
>> ---
>>
>> **From:** Lalena Amiotte - NOAA Federal <lalena.amiotte@noaa.gov>
>> **Sent:** Wednesday, October 11, 2023 9:17 AM
>> **To:** Jesse McMahan <jmcmahan@chehalistribe.org>
>> **Subject:** Re: Tribal Hatchery Funding Questions

Jesse thank you so much for reaching out. Would later today be a good time to just give you a call? There are so many moving parts with these funds and probably easier for me to talk with you and if there are questions I can't answer I can get you to the right people. The only thing I have going this afternoon is one meeting at 2 to 2:30pm. Otherwise completely wide open. Let me know if you have time today this afternoon.

-Lalena

On Wed, Oct 11, 2023 at 9:12 AM Jesse McMahan <jmcmahan@chehalistribe.org> wrote:

> Hi Lalena
>
> My name is Jesse McMahan I'm the new hatchery manager for the Chehalis Tribe and I have some questions about the allocation meeting that we just had. Please forgive my ignorance, I've only been at my new position for two months now and was I told very short notice that I should attend the meeting this morning.
>
> So, my primary question is there a timeline for submitting proposals for receiving funds or have the past meetings been just about how to allocate the funds that maybe available in the future and actual proposals will come later? We have two projects that we're trying to secure funding for, one is for a remodel of our current facility and the other is for a proposed new facility and even just 2 million would go along way.
>
> My other question is does the tribe have to submit a formal request before hand to be included? I was wondering if we were included in the 27 tribes that you mentioned and if not, would we qualify moving forward?
>
> Thank you
>
> Jesse McMahan
>
> Hatchery Supervisor
>
> The Chehalis Tribe
>
> (360)-709-1860

**From:** Lalena Amiotte - NOAA Federal
**To:** Jesse McMahan
**Subject:** Re: Chehalis Tribe Comment for Hatchery IRA Funding
**Date:** Tuesday, October 24, 2023 8:51:34 AM

Thank you so much Jesse for sending the comments to us. Right now we don't have any meetings or additional webex's scheduled. The plan so far that I am aware of is to receive comments, continue to work with the BIA for an inter-federal agency agreement and likely return to tribes in December with updates. We are being mindful that we have another potential federal government shut down, budget runs dry November 17, we are hoping this doesn't happen but being mindful of that timing. As we make progress I will continue to send out updates and I have you on my contact list now so Chehalis will be included.
Thank you!
-Lalena

On Tue, Oct 24, 2023 at 8:36 AM Jesse McMahan <jmcmahan@chehalistribe.org> wrote:

> Hey Lalena, here's the Chehalis Tribes official comment on how we think the funds should be allocated and a quick couple paragraphs about how we would use the funds if they became available. Let me know if you need anything else and please let me know when there is going to be another meeting.
>
> Thanks
>
> Jesse McMahan
>
> Hatchery Supervisor
>
> The Chehalis Tribe
>
> (360)-709-1860

EXHIBIT 6-E-1

# CONFEDERATED TRIBES of the CHEHALIS RESERVATION

**Department of Fisheries**

The Confederated Tribes of the Chehalis Reservation (CTCR) after attending the Inflation Reduction Act (IRA) meeting on October 20, 2023, would like to show their support for the hybrid approach of allocating funds. We believe that this would allow tribes with smaller hatchery related projects and/or who are at the feasibility and planning stage for larger projects access to funds that they might not be able to receive otherwise. Any remaining funds could then be allocated by the standard competitive selection process.

The CTCR would use any funds allocated towards remodeling its current fish hatchery facility, which would include converting the current hatchery effluent pond into additional rearing space and include an adult fish collection facility, which the hatchery currently lacks. This would allow for increased production and easier collection of adults which would be used for broodstock needs and any surplus adults could be utilized for tribal use.

Remaining funds would be used for conception of a feasibility study for a proposed new hatchery facility on the Chehalis River that is out of the floodplain and would also supplement the production of the current facility. The CTCR would also be submitting proposals for additional funding from any non-allocated funds to help cover the costs of construction.

The CTCR would like to continue to be a part of any discussion on how these funds are to be allocated and will happily provide any feedback or additional information.

Thank you.

**Robbi Kesler**

**From:** Jesse McMahan
**Sent:** Thursday, April 11, 2024 3:35 PM
**To:** Harold Chesnin
**Cc:** Tara Livingood-Schott; Glen Connelly; Shawn Ortivez
**Subject:** FW: Do I remember correctly

Hey Harry,

So, we sent in the statement saying how we wanted the funds to allocated and I asked multiple times for confirmation that the tribe met the qualifications to receive funding. I was told that we qualified for the non-Mitchell act funding as federally recognized tribe, and at no point were we notified that we were not eligible.

I would also note that after the last meeting we attended we did not receive any further communication for NOAA. They had my, Glen's and the chairman's email address listed in the contact previously. So, it appears like a thoughtful act not to include us after that.

Jesse McMahan
Hatchery Supervisor
The Chehalis Tribe
(360)-709-1860

---

**From:** Tara Livingood-Schott <tlivingoodschott@chehalistribe.org>
**Sent:** Thursday, April 11, 2024 3:24 PM
**To:** Jesse McMahan <jmcmahan@chehalistribe.org>
**Subject:** Fwd: Do I remember correctly

Tara Livingood-Schott
Fish & Wildlife Biologist
The Chehalis Tribe
(360)742-4118

---

**From:** Harold Chesnin <hchesnin@chehalistribe.org>
**Sent:** Thursday, April 11, 2024 3:15:56 PM
**To:** Tara Livingood-Schott <tlivingoodschott@chehalistribe.org>; Shawn Ortivez <sortivez@chehalistribe.org>; Glen Connelly <gconnelly@chehalistribe.org>; Harold Chesnin <hchesnin@chehalistribe.org>
**Subject:** Do I remember correctly

When Chehalis participated in the NOAA hatchery funding discussion not only did we send in a statement but we were told we were in consideration or in the mix?

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WASHINGTON**

CONFEDERATED TRIBES OF THE COLVILLE RESERVATION; CONFEDERATED TRIBES OF THE CHEHALIS RESERVATION,

Plaintiffs,

v.

NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; SECRETARY OF COMMERCE HOWARD LUTNICK, in his official capacity; JENNIFER QUAN, Regional Administrator, NOAA Fisheries West Region, in her official capacity; BUREAU OF INDIAN AFFAIRS; SECRETARY OF THE INTERIOR DOUGLAS BURGUM, in his official capacity.

Defendants.

No. 2:26-cv-00061-RLP

**Affidavit of Cody M. Desautel**

I, Cody M. Desautel, declare under penalty of perjury that the following facts and observations, except where noted to be based on reasoned information and belief, are true and correct:

1.     I serve as the Executive Director for the Confederated Tribes of the Colville Reservation ("Colville Tribes"). In that role, I am responsible for oversight of all operations within the tribal government, which includes the Natural Resource Division and Fish & Wildlife Program. Prior to becoming Executive Director, I served as the Colville Tribes' Natural Resource Director for eight years, and before that, I worked for the Bureau of Indian Affairs as a forester. Separate from my current role as Executive Director of the Colville Tribes, I also serve as the President of the Intertribal Timber Council, a national organization composed of more than 60 Indian tribes and tribal organizations.

2.     I have been working in Indian Country for 30 years and have gained a thorough understanding of the Colville Tribes' operations, including the vital importance of relationships with other tribes and especially those tribes with common interests.  Common interests arise naturally from many factors, including location (e.g., Washington State tribes) or subject matter (e.g., hatchery-owning tribes).

3.     I am aware that our counsel has been informed by counsel for the federal agencies and officials in this case that the Bureau of Indian Affairs intends to make decisions on awards of the Inflation Reduction Act tribal hatchery grant funds to other tribes "no sooner than March 6, 2026," but I understand that the federal agencies were unwilling to negotiate an agreement that would fix a date

further out for awards, or to hold back $22 million, so that this litigation could proceed before awards of the entire $184 million are announced to other tribes.

4. I understand that the Colville and Chehalis Tribes are asking the Court to order the BIA not to award more than $162 million (the $184 million the BIA says is available minus the $22 million the two Tribes seek ($2 million each in non-competitive funds plus three proposed project applications of $6 million each, or $18 million)). Effectively, the Tribes are asking that $22 million be held back so that they can apply and have their project proposals judged fairly before the entire $184 million is committed.

5. If BIA issues award notices to other tribes totaling more than $162 million and Colville and Chehalis prevail in this litigation, that would predictably lead to a reduction in the amount BIA said would be awarded to other tribes ***after*** they have been given notice of their awards.

6. For example, if Tribe X received notice next week that it had been awarded $6 million (the maximum per project under the grant offering) and then later was told it was only going to get $5 million because Colville and Chehalis had prevailed in this litigation, Tribe X would understandably be upset.

7. Given my experience in Indian Country and with the Tribe, I can state with virtual certainty that upsetting other tribes if initial award amounts were later reduced for them would have immediate and, at a minimum, irreparable effects on

Colville's (and logically Chehalis') relationships with other tribes. I am aware that before the two tribes commenced this litigation, Colville Chairman Jarred Erickson affirmatively contacted the tribal leadership of some of the 27 eligible tribes to explain the two tribes' reasons for filing suit and the Tribes' intention to request that only that a small portion of the $184 million be set aside, not that the entire distribution of $184 million be delayed. My understanding is that those discussions were generally positive and that the tribes Chairman Erickson spoke with understood why the two Tribes felt compelled to file suit. They of course had concerns that litigation might delay the grants appreciably, which Chairman Erickson explained we would try to avoid, and had inevitable concerns about increased competition, but they also understand the competitive nature of the funding opportunity. In light of this prior outreach to tribal leadership, I believe the relationships with those tribes contacted prior to this litigation would be negatively impacted should those other tribes receive an award letter from the BIA only to receive a subsequent letter informing those tribes that the original award had been reduced because of this litigation.

8. The converse is ***not*** true. If a tribe received an award letter for $5 million and then later was told it would receive $6 million, the tribe would be more than satisfied, and it would not harm a tribe's relationship with Colville, or with the federal agencies, for that matter.

9. In my work with Colville and the BIA, I have gained considerable knowledge and experience with 638 contracts. I understand that, with respect to the Inflation Reduction Act hatchery funding, NOAA entered into an agreement with BIA to transfer the funds to BIA primarily so that BIA could use existing 638 agreements, with appropriate amendments, to distribute the hatchery funds to tribes.

10. In general, if the BIA agrees to provide funds through a 638 agreement and then later wants to increase the amount, my experience is sufficient that I can state with certainty that amendments are commonplace in 638 contracting and that they can generally be completed within weeks, and certainly within a couple months, if the BIA staff prioritize these modifications and transfers.

11. On information, belief, and experience, I presume that the versatility and ease is what made the funds transfer to BIA attractive to NOAA in the first place.

March 2, 2026

Cody M. Desautel, Executive Director
Confederated Tribes of the Colville Reservation

State of Washington

County of Okanogan

I certify that I know or have satisfactory evidence that ____________ (name of person) is the person who appeared before me, and said person acknowledged that (he/she) signed this instrument and acknowledged it to be (his/her) free and voluntary act for the uses and purposes mentioned in the instrument.

Dated: 03.02.26

(Seal or stamp)

FLODELL M WILLIAMS
COMMISSION EXPIRES 08/27/2026
NOTARY PUBLIC
Commission Number 148852
STATE OF WASHINGTON

Signature

Title

My appointment expires: 08.27.26

EXHIBIT 8

**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF WASHINGTON**

CONFEDERATED TRIBES OF THE COLVILLE RESERVATION; CONFEDERATED TRIBES OF THE CHEHALIS RESERVATION,

Plaintiffs,

v.

NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; SECRETARY OF COMMERCE HOWARD LUTNICK, in his official capacity; JENNIFER QUAN, Regional Administrator, NOAA Fisheries West Region, in her official capacity; BUREAU OF INDIAN AFFAIRS; SECRETARY OF THE INTERIOR DOUGLAS BURGUM, in his official capacity.

Defendants.

No. 2:26-cv-00061-RLP

**Affidavit of Glen Connelly**

I, Glen Connelly, declare:

1. I am over the age of eighteen and am competent to testify.

2.    I have personal knowledge of the facts to which I testify. Where opinions are stated, such opinions are: based on my knowledge, training, and/or experienced; based on information that I have personally observed/obtained or have a reasonable basis to believe is true; and are stated on a more probable than not basis.

3.    I am the Director of the Department of Natural Resources for the Confederated Tribes of the Chehalis Reservation (the "Tribe"). I have worked for the Tribe since 2004, including as the Director of the Department of Natural Resources for the Tribe since 2017.

4.    I have worked in Indian Country for over 21 years. I have gained a thorough understanding of the Tribe's operations, including the importance of relationships with other tribes. Relationships that are especially important between the Tribe and other tribes are the relationships with those tribes that share common interests. Common interests arise naturally from many factors, including location (e.g., Washington State tribes) or subject matter (e.g., hatchery-owning tribes).

5.    I am aware the Bureau of Indian Affairs intends to make decisions on awards of the Inflation Reduction Act tribal hatchery grant funds to other tribes "no sooner than March 6, 2026." However, I understand that the Defendants in the above captioned matter were unwilling to negotiate an agreement that would fix a

date farther out for awards, or to hold back $22 million, so that this litigation could proceed before awards of the entire $184 million are announced to other tribes.

6. The Plaintiffs in the above captioned matter are asking the Court to order the BIA not to award more than $162 million (the $184 million the BIA says is available minus the $22 million the two Plaintiffs seek ($2 million each in non-competitive funds plus three proposed project applications of $6 million each, or $18 million)).

7. If the BIA issues award notices to other tribes totaling more than $162 million and Plaintiffs prevail in this litigation, that would logically lead to a reduction in the amount awarded to other tribes ***after*** they are given notice of their awards.

8. For example, if Tribe X received notice next week that it had been awarded $6 million (the maximum per project under the grant offering) and then later was told it was only going to get $5 million because Plaintiffs had prevailed in this litigation, Tribe X would understandably be upset.

9. Given my experience in Indian Country and with the Tribe, I can state with certainty that upsetting other tribes in that way would have immediate and irreparable effects on the Tribe's relationships with other tribes, including our ability to work together on common interests, whether they be state legislative initiatives, environmental program coordination, and so on. Precisely what those

specific effects would be is difficult to predict, but negative effects are inevitable and would last at least long enough (i.e., years) that the negative effects in the interim could not be repaired.

10.    The converse is ***not*** true.  If a tribe received an award letter for $5 million and then later was told it would receive $6 million, the tribe would be more than satisfied, and it would not harm a tribe's relationship with the Tribe, or with the federal agencies, for that matter.

11.    In my work with the Tribe, I have gained considerable knowledge and experience with 638 contracts.  I understand that, with respect to the Inflation Reduction Act hatchery funding, NOAA entered into an agreement with the BIA to transfer funds to the BIA primarily so the BIA could use existing 638 agreements, with appropriate amendments, to distribute the hatchery funds to tribes.

12.    If the BIA agrees to provide funds through a 638 agreement and then later wants to increase the amount, my experience is sufficient that I can state with certainty that amendments are commonplace in 638 contracting and that they can generally be completed within a few weeks, and certainly within 2-3 months.

13.    On information, belief, and experience, I presume that that versatility and ease is what made the funds transfer to the BIA attractive to NOAA in the first place.

I declare under penalty of perjury under the laws of the United States, State of Washington, and the Tribe that the foregoing is true and correct.

Dated this 2nd day of March 2026 at Olympia, Washington.

Glen Connelly, Director of Natural Resources
The Confederated Tribes of the Chehalis Reservation

***For acknowledgment in a representative capacity:***

STATE OF WASHINGTON )
) ss.
COUNTY OF THURSTON )

This record was acknowledged before me on March 2, 2026, by GLEN CONNELLY as DIRECTOR OF NATURAL RESOURCES of THE CONFEDERATED TRIBES OF THE CHEHALIS RESERVATION.

NOTARY PUBLIC
STATE OF WASHINGTON
SHELBY R.W. WEEKS
COMM. # 137250
COMM. EXP. 08/01/2028

Notary Public in and for the state of Washington.
My Commission Expires: August 1, 2028