1   Todd Blanche
    Deputy Attorney General of the United States
2   Joseph P. Derrig
    Derek T. Taylor
3   Assistant United States Attorneys
    Eastern District of Washington
4   Post Office Box 1494
    Spokane, WA 99210-1494
5   Telephone: (509) 353-2767

6                    UNITED STATES DISTRICT COURT
7                    EASTERN DISTRICT OF WASHINGTON

8
    CONFEDERATED TRIBES OF THE
9   COLVILLE RESERVATION;                    Case No. 2:26-cv-00061-SAB
    CONFEDERATED TRIBES OF THE
10  CHEHALIS RESERVATION,                    **DEFENDANTS' RESPONSE TO**
                                             **PLAINTIFFS' MOTION(S) FOR**
11                      Plaintiffs,          **EMERGENCY TEMPORARY**
                                             **RESTRAINING ORDER**
12          vs.

13  NATIONAL OCEANIC AND
    ATMOSPHERIC ADMINISTRATION;
14  SECRETARY OF COMMERCE
    HOWARD LUTNICK, in his official
15  capacity; JENNIFER QUAN, Regional
    Administrator, NOAA Fisheries West
16  Region, in her official capacity; BUREAU
    OF INDIAN AFFAIRS; SECRETARY OF
17  THE INTERIOR DOUGLAS BURGUM,
    in his official capacity,
18
                        Defendants.
19

20

21
    DEFENDANTS' RESPONSE PLAINITFFS' MOTION(S) FOR TEMPORARY
    RESTRAINING ORDER - 1

## I.     INTRODUCTION

Two years ago, "Plaintiff Tribes separately learned [they were] excluded from the tribes 'eligible' to apply for the Inflation Act" funds for Pacific salmon and steelhead hatchery maintenance and modernization. ECF No. 26 at p. 9. Plaintiffs' long delays in deciding to file their "emergency" motion, demonstrates the lack of urgency and irreparable harm. *See, e.g., Jensen v. Biden*, No. 4:21-CV-5119-TOR, 2021 WL 10280395, at *9 (E.D. Wash. Nov. 19, 2021) (two-month delay).

The irreparable harm here would be <u>*any*</u> delay or withholding of awards to the eligible tribes with projects that can start in June 2026, the summer window for construction and repair, or miss entirely these funds that only remain available until September 30, 2026. A variety of factors, including a government shutdown, delayed sending award letters long planned for February of 2026. Defendants are already behind schedule, but it is anticipated awards will go out this Friday, i.e. tomorrow. After award-letters go out, 638 contracts[1] will need to be put in place or existing contracts and compacts will need to be amended. These 638 contracts require negotiations with the Tribal awardees and the Bureau of Indian Affairs Office of Self Governance, which often takes months, leaving no time for further delay.

In sum, Plaintiffs created "emergency" should not be permitted to harm the 27 eligible tribes, and Plaintiffs' TRO motion(s) should be denied on that basis alone.

---

[1] "638 contracts" are based on Public Law 93-638, the Indian Self-Determination and Education Assistance Act of 1975.

## II.    FACTS

### A. Inflation Reduction Act

The Inflation Reduction Act ("IRA"), enacted on August 16, 2022, allocated $2.6 billion for climate resilience grants. Declaration of Samuel D. Rauch III at ¶ 3 (March 4, 2026). NOAA circulated input from Tribes across the nation to solicit feedback on the overall appropriations. Rauch Decl. at ¶ 4. Various funding programs were established,[2] but at issue here is a single program directing $300 million toward NOAA Fisheries' West Coast Region for supporting hatcheries and Tribal fisheries. *Id.* at ¶ 3. Of the $300 million, $60 million to "Mitchell Act" hatcheries in the Columbia River are not at issue here, (ECF No. 26 at p. 3 fn. 2) and therefore the focus of the remaining facts will be on the $240 million.

### B. Tribal consultation, participation, and NOAA evaluation

On June 12, 2023, NOAA sent a "Dear Tribal Leaders" letter to numerous tribes, including the Confederated Tribes of the Colville Reservation ("Colville Tribes"), requesting participation and input regarding how to distribute of those funds. Id. at ¶¶ 5-6. The letter invited the Colville Tribes to participate in a series of meetings held from June 21-23 as well as requested comments to be provided via email until July 23, 2023. *Id.* at ¶ 6.

---

[2] *See e.g.*, https://www.noaa.gov/news-release/biden-harris-administration-noaa-award-1-point-nine-five-million-to-support-tribal-drought-resilience (last visited March 4, 2025) (Through NOAA the Colville Tribes received a portion of a $1.95 million allocation to support drought monitoring and resilience planning).

DEFENDANTS' RESPONSE PLAINITFFS' MOTION(S) FOR TEMPORARY RESTRAINING ORDER - 3

On September 9, 2023, the West Coast Region reached out to 24 Western Washington Tribes, including the Confederated Tribes of the Chehalis Reservation ("Chehalis Tribes"), by email to Tribes to a follow-up meeting held on October 11, 2023. *Id.* at ¶ 7. An email exchange of October11, 2023 indicates the Chehalis Tribe's participation. *Id.*

Finally, the West Coast Region convened a meeting in person with Tribes to exchange information in an open setting on December 4, 2023. *Id.* at ¶ 8. Following the meeting, which appears to have been attended by Charles (Chuck) Brushwood as the Colville Tribes Fish & Wildlife Policy Advisor, Mr. Brushwood asked for a copy of the slide deck to share with his staff and elected leadership of the Colville Tribes. *Id.*

NOAA Fisheries heard feedback from Tribes that the hatchery upgrade needs may cost substantially more than the $240 million available. *Id.* at ¶ 15. The Columbia River Inter-Tribal Fish Commission and Northwest Indian Fish Commission Tribes, representing the Columbia River and Puget Sound fisheries, shared their needs assessment with NOAA Fisheries asserting that approximately $1.5 billion may be needed for related hatchery repairs, counting only Tribal projects, and excluding another estimated $2 billion for other potential state and federal hatchery upgrades. *Id.* at ¶¶ 5,15.

Given the extensive need, NOAA Fisheries needed to reduce the number of

DEFENDANTS' RESPONSE PLAINITFFS' MOTION(S) FOR TEMPORARY RESTRAINING ORDER - 4

eligible tribes for the grants to be effective, and focus on the best way to deliver funding where it would have the greatest benefit. *Id.* at ¶¶ 14-16.

### C. NOAA' Eligibility Decision

On March 29, 2024, NOAA executed its decision with regard to the $240 million in available hatchery funding. In an effort to meet the needs and serve the many interests expressed in these engagements and meetings in 2022 and 2023, NOAA Fisheries' decision called for directing the funding to:

> Federally recognized tribes that have a Pacific salmon or steelhead hatchery facility or interest in a Pacific salmon or steelhead hatchery facility that needs maintenance and/or modernization, and where an allocation of funds for that facility would contribute to the exercise of tribal salmon fishing in four significant tribal salmon fisheries, the US v. Oregon, US v. Washington, Klamath/Trinity, and Metlakatla fisheries.

*Id.* at ¶ 9 (emphasis added). Based on these four geographically defined "significant tribal fisheries," 27 tribes whose hatcheries benefited those fisheries were selected as eligible. *Id.* at ¶ 17.

Based on Tribal feedback, NOAA Fisheries further decided to have the Bureau of Indian Affairs ("BIA") facilitate a noncompetitive and competitive allocation process for the 27 tribes meeting that criteria, and to award, disburse, and provide oversight of funds to the extent allowed through existing BIA contracts and compacts governed under the Indian Self-Determination and Education Assistance Act (ISDEAA), 25 U.S.C. §5301 et seq. *Id.* at ¶ 10. This decision was memorialized at the time in an Inflation Reduction Act Tribal

DEFENDANTS' RESPONSE PLAINTFFS' MOTION(S) FOR TEMPORARY RESTRAINING ORDER - 5

Funding Interagency Agreement between NMFS and BIA (IAA Memorandum). *Id.* at ¶ 10, Exhibit 11 & ¶ 11, Exhibits 12-13.

On or about April 4, 2024, Ms. Quan, Regional Administrator for NOAA Fisheries, contacted the Colville Tribe by phone to inform them that the action would not include their participation. *Id.* at ¶ 12. Similarly, the Chehalis Tribes were notified. ECF No. 26 at p. 9.

**D. Funding Award Decisions**

The IAA memorandum (Exhibit 11) described in paragraph 9 and 10 that the BIA agreed to disburse the $240 million to 27 federally-recognized Tribes[3] in two phases: an initial round of up to $2 million to each participating Tribe that requests these funds, followed by a final round of funding pursuant to a competitive application process (approximately $184 million). *Id.* at ¶ 13.

On May 10, 2024, the BIA Regional Director sent the 27 eligible Tribes a request for proposal letter to non-competitively distribute up to $2,000,000 per Tribe. Declaration of Kurt Fredenberg at ¶ 3, Exhibit 20. The initial round of non-competitive funding (up to $2 million to each eligible tribe) was distributed at various times starting in August 2024 and is ongoing. Fredenberg Decl. at ¶ 3.

The final-round, competitive application process was initiated by a "Dear Tribal Leader" letter that was sent to eligible Tribes on November 18, 2025, and invited

---

[3] The 27 Tribes are listed in Table 1 of the IAA Memorandum, Exhibit 11.

DEFENDANTS' RESPONSE PLAINITFFS' MOTION(S) FOR TEMPORARY RESTRAINING ORDER - 6

eligible Tribes to submit applications "for projects that support a Tribe's explicit federally reserved and/or adjudicated fishing right(s)." *Id.* at ¶ 4, Exhibit 21. The November 18, 2025, letter noted that all applications should be submitted to the BIA by December 18, 2025, and included a "application guidance document." The guidance document provided the criteria and the timing of the funding awards, which noted that successful applicants should expect award notifications in **February 2026.** *Id.* at  ¶ 5 (emphasis added).

The timing of the award was selected in order to facilitate construction start dates in June 2026 to maximize the summer 2026 construction season. *Id.* Construction awards under the Indian Self-Determination and Education Assistance Act are time-consuming as BIA and the Tribe that are awarded funds must amend and negotiate existing contracts and compacts. *Id.* Additionally, critical "in-water projects" have a limited work window and if projects are not initiated within that window, an entire construction season will be lost. *Id.*

Section 40001 of the Inflation Reduction Act provides that the funds made available to NOAA would only remain available until September 30, 2026. *Id.* BIA wants to ensure that all available funds are obligated to eligible Tribes through 638 contracts before that date. *Id.*

### III.    RESTRAINING ORDER STANDARD

Preliminarily, Defendants respond on an expedited basis to Plaintiffs' TRO(s). Defendants request additional time to respond to Plaintiff's Preliminary Injunction, which may be immediately appealable. Defendants would like to ensure a full record available on appeal if the preliminary injunction motion continues to be pursued.

The standards applicable to TROs and preliminary injunctions are "substantially identical" when simply preserving the status quo pending a determination on the merits. *See Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017); *Chalk v. U.S. District Court*, 840 F.2d 701, 704 (9th Cir. 1988). But here where Plaintiffs seek injunctive relief that goes beyond the status quo and "orders a responsible party to take action," (i.e. set aside $22 million) – called a mandatory injunction – the plaintiff bears an even heavier burden. *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996). Because mandatory injunctions are especially disfavored, *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976), the plaintiff must meet a "doubly demanding" standard "that the law and facts clearly favor her position not simply that she is likely to succeed." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).

A TRO is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The Court cannot "mechanically" grant an injunction for every alleged violation of law. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). Instead, plaintiffs seeking a TRO must establish: (1) they are

"likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20. The mere "possibility" of irreparable harm is insufficient; instead, plaintiff must "demonstrate that irreparable injury is likely in the absence of an injunction." *Id.* at 22.

## IV.    LAW AND ARGUMENT

**A. Plaintiffs are unlikely to succeed on the merits.**

1. The court lacks jurisdiction.

The waiver of sovereign immunity in APA Section 702 does not apply, and thus courts lack jurisdiction to hear APA claims, where "agency action is committed to agency discretion by law." 5 U.S.C. 702(a)(2). A statute is committed to agency discretion under 702(a)(2) "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of its discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Here, as described below, Sec. 40001 of the Inflation Reduction Act is wholly discretionary. There is an appropriation of $2.6 billion, and NOAA can use it for direct funding, grants, contracts, etc., for a wide arrange of recipients and projects. *See Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) ("The allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion.") There is no limit other than it should be used for coastal and marine habitats, salmon, fisheries, coastal communities, marine mammals, and "other related administrative expenses." The act

DEFENDANTS' RESPONSE PLAINITFFS' MOTION(S) FOR TEMPORARY RESTRAINING ORDER - 9

1  is discretionary and strips this court of jurisdiction.

2  To the extent the Plaintiffs argue Sec. 40001(b) somehow eliminates discretion,

3  such an argument is misplaced because 40001(b) is a definition section of "Tribal

4  Governments" and there is no dispute that all the 27 eligible tribes selected for Tribal

5  Fish Hatchery grant money meet the definition of "Tribal Governments" under IRA

6  Sec. 40001(b) as they are all List Act Tribes under 25 U.S.C. § 5131. Meaning, the

7  parameters on the Tribal Fish Hatchery money do not implicated Sec. 40001(b)

8  because there is no dispute that all entities are list act tribes and no decision has been

9  made contrary to 40001(b). The defining criteria was not a "Tribal Government"

10  definition decision, it was a discretionary decision on how to make best use of limited

11  money.

12     2.  Even if the Court has jurisdiction, Plaintiff's cannot prevail.

13  Plaintiffs' argument on the merits completely ignores the relevant provision of

14  the Inflation Reduction Act that is the starting point for this entire case. The money at

15  issue is a single small project under the $2.6 billion appropriated to NOAA under the

16  Inflation Reduction Act (Public Law 117-169). The specific IRA legal authority

17  states:

18  Sec. 40001 INVESTING IN COASTAL COMMUNITIES AND CLIMATE
   RESILIENCE

19
20  In addition to amounts otherwise available, there is appropriated to the National
   Oceanic and Atmospheric Administration for fiscal year 2022, […]
   $2,600,000,000, to remain available until September 30, 2026, to provide funding
21  through direct expenditure, contracts, grants, cooperative agreements, or technical

assistance to coastal states [...]the District of Columbia, Tribal Governments, nonprofit organizations, local governments, and institutions of higher education [...] for the conservation, restoration, and protection of coastal and marine habitats, resources, Pacific salmon and other marine fisheries, to enable coastal communities to prepare for extreme storms and other changing climate conditions, and for projects that support natural resources that sustain coastal and marine resource dependent communities, marine fishery and marine mammal stock assessments, and for related administrative expenses.

IRA Public Law 117-169 Sec. 40001(a). As is clear and unambiguous from the text of the IRA, the $2.6 billion appropriated for NOAA is for multiple types of projects (i.e. direct expenditure, contract, grants, etc.) for multiple types of entities, including states, tribes, nonprofits, municipalities and universities. Within this discretionary framework, NOAA has developed many different projects with appropriated IRA funding. *See https://www.fisheries.noaa.gov/national/climate-change/priority-climate-change-investments-under-inflation-reduction-act* (last accessed March 3, 2026). These projects include, but are not limited to, data modernization efforts, red snapper recovery, North Atlantic Right Whale work, artic research, permitting efficiencies, updating facilities, and the Tribal Fish Hatcheries at issue in this case. *Id.*

The Plaintiffs argue that because they meet the definition of Tribal Government under Sec. 40001of the IRA above, then they should automatically be eligible and entitled to $22 million under the Tribal Fisheries project. See ECF No. 16, pp. 13-15. But that reasoning is flawed and conflates the "definition" of Tribal Government under the extremely broad IRA appropriation language with the eligibility criteria for a specific project – the Tribal Fish Hatchery Project.

Under the Plaintiffs interpretation of the statute, because they are a Tribal Government under Sec. 40001, then they would automatically be eligible for any of the $2.6 billion in appropriated funds – including apparently the projects to protect North Atlantic Right Whales and Arctic Research. Surely Plaintiffs aren't arguing they are entitled to a piece of the $82 million NOAA set aside for the North Atlantic Right Whale recovery, but that is what their argument implies. On the flip side, if you take Plaintiffs argument to its logical conclusion – because they are a "Tribal Government" they are automatically eligible for IRA Sec. 40001 funding – then so too would be coastal states, municipalities, and universities. Technically, those entities as well as 574 federally recognized Tribes could all be eligible for the Tribal Fish Hatchery money under the IRA. That is a nonsensical interpretation of an unambiguous statute that would lead to an absurd result.

Instead, IRA Sec. 40001 lists many potential recipient entities under many different types of projects for many different natural resource and marine resource issues. NOAA then took the broad criteria and, in its discretion, focused on "several critical areas focused on tackling the impacts of climate change." *https://www.fisheries.noaa.gov/national/climate-change/priority-climate-change-investments-under-inflation-reduction-act* (last accessed March 3, 2026). Each area has its own criteria and its own eligibility requirements. Just like coastal states, municipalities, and colleges are not applying for Tribal Fish Hatchery money, so too

are the Tribal Governments not applying for whale recovery and arctic research money.

This means the actual merits of this case will not be focused on the definition of "Tribal Governments" under IRA Sec. 40001, but instead on what eligibility parameters NOAA and NMFS developed for the Tribal Fish Hatchery money under IRA Sec. 40001 parameters, and whether that was an arbitrary and capricious decision.

The eligibility criteria developed by NOAA and NMFS for the Tribal Fish Hatchery grant money was developed after many meetings in 2022 and 2023, with tribal stakeholders and separate government-to-government meetings. The decision was made to direct funding to:

> Federally recognized tribes that have a Pacific salmon or steelhead hatchery facility or interest in a Pacific salmon or steelhead hatchery facility that needs maintenance and/or modernization, and where an allocation of funds for that facility would contribute to the exercise of tribal salmon fishing in four significant tribal salmon fisheries, the US v. Oregon, US v. Washington, Klamath/Trinity, and Metlakatla fisheries.

Rauch Decl. Ex. 11. Plaintiffs ignore these criteria in their briefing likely because they do not meet this eligibility requirement. Their hatchery does not support fishing in the geographic area of one of the four listed tribal salmon fisheries – the *US v. Oregon* (lower Columbia), *US v. Washington* (Puget Sound), Klamath/Trinity (California), and Metlakatla (Alaska).

Plaintiffs spend many pages rehashing verbal conversations between tribal

DEFENDANTS' RESPONSE PLAINITFFS' MOTION(S) FOR TEMPORARY RESTRAINING ORDER - 13

members and NOAA representatives on why they feel left out, but none of that is relevant or even admissible under the APA. Under the APA, a court conducting judicial review may not resolve factual questions but instead determines "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club v. Mainella*, 459 F.Supp.2d 76, 90 (D.D.C. 2006) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)). Generally, courts reviewing an agency decision are limited to the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). The Ninth Circuit explains that "[j]udicial review of an agency decision typically focuses on the administrative record in existence at the time of the decision and does not encompass any part of the record that is made initially in the reviewing court." *Southwest Ctr. for Biological Diversity v. United States Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir.1996). This general rule derives from the court's statutory role to review an agency's action. *See Fla. Power & Light Co.*, 470 U.S. at 743–44 ("The task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court.") (internal citation omitted). Plaintiffs' dependence on verbal statements and after decision discussions is irrelevant under the APA.

Ultimately, Defendants' decision to limit eligibility to the four *US v. Oregon*, *US v. Washington*, Klamath/Trinity, and Metlakatla fisheries was because the

DEFENDANTS' RESPONSE PLAINTFFS' MOTION(S) FOR TEMPORARY RESTRAINING ORDER - 14

monetary need of hatchery repairs/improvements was estimated to exceed $1.5 billion by hatchery managers, just for Tribal projects. Rausch Decl. ¶ 16. That number greatly exceeds the available funding, so NOAA decided it needed to reduce the number of eligible tribes so the grants could be effective. *Id.* at ¶ 17. In determining which reduced number of tribes would have the most impact, NOAA focused on hatcheries within the four geographically defined "significant tribal fisheries," which are the *U.S. v. Oregon* and *U.S. v. Washington* proceedings, the Klamath/Trinity fishery in California, and the Metlakatla fishery in Alaska. *Id* at ¶ 18. The hatchery production of Chinook salmon alone, supporting the *U.S. v. Oregon* and *U.S. v. Washington* fisheries, has averaged 157 million juvenile fish annually. *Id.*  This was a well-thought-out decision and designed to get the most impact out of money where the need greatly exceeded the amount available. It was not arbitrary and capricious, nor have Plaintiffs presented any evidence to the contrary.

Plaintiffs attempt to rely on the Indian Reorganization Act (25 U.S.C.§ 5123 (f)) to say they are similarly situated and treated differently, but that is not so. They are not similarly situated because they are not within the geographic area of the four selected significant salmon fisheries.  Plaintiffs are just like many other tribes with Salmon/Steelhead hatcheries that are not in one of the listed four tribal salmon fisheries. For example, the Spokane Tribal Hatchery is not eligible (https://spokanetribalfisheries.com/programs/spokane-tribal-hatchery/), yet they

DEFENDANTS' RESPONSE PLAINTFFS' MOTION(S) FOR TEMPORARY RESTRAINING ORDER - 15

produce sockeye and kokanee salmon. The Confederated Tribes of the Siletz Indians in the Stiletz River Basin, Oregon has the Lhuuke Illahee Fish Hatchery that produces Coho Salmon and they are not eligible for these funds. https://ctsi.nsn.us/other-natural-resources-programs/. Other tribes partner with state hatcheries to produce Pacific salmon specifies but are outside the geographic boundary selected for the grant money, and are therefore, not eligible. *See for example*, Coquille Indian Tribe (https://www.coquilletribe.org/11829/). These are just some examples. Accordingly, the Plaintiffs are not being treated differently under 25 U.S.C.§ 5123(f), they are just not similarly situated to the tribes geographically located on the four significant salmon fisheries.

If Plaintiffs' position under 25 U.S.C. § 5213(f) were true, then NOAA would have no meaningful way to set parameters on how to allocate this money. Hundreds of tribes around the nation have tribal fishing rights and many of those tribes have hatcheries or partnership with hatcheries. They would all become eligible for this grant money, and instead of making a meaningful impact as intended under Sec. 40001 of the IRA, then this money would be so dispersed as to have no impact.

**B. Plaintiffs' lengthy delay in moving for emergency injunctive relief reflects a lack of urgency and irreparable harm.**

A party's "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). Indeed, courts routinely deny TROs when plaintiffs delay

DEFENDANTS' RESPONSE PLAINTFFS' MOTION(S) FOR TEMPORARY RESTRAINING ORDER - 16

filing a TRO for as little as ten days. *See e.g., Perez v. City of Petaluma*, 2021 WL 3934327, at *1 (N.D. Cal. Aug. 13, 2021) (denying motion for temporary restraining order where plaintiff waited "a full month" after the issuance of city resolution to seek a TRO). *Devashayam v. DMB Capital Grp.*, 2017 WL 6547897, at *4 (S.D. Cal. Dec. 20, 2017) (one-month delay); *Lee v. Haj*, 2016 WL 8738428, at *2 (E.D. Cal. Feb. 22, 2016) (one-month delay); *Altman v. County of Santa Clara*, No. 4:20-cv-02180-JST, ECF No. 22 at 2 (ten-day delay); *Headwaters, Inc. v. Bureau of Land Mgmt.*, 665 F. Supp. 873, 876 (D. Or. 1987) (six-month delay); *Jensen v. Biden*, No. 4:21-CV-5119-TOR, 2021 WL 10280395, at *9 (E.D. Wash. Nov. 19, 2021) (two-month delay); *Wise v. Inslee*, No. 2:21-CV-0288-TOR, 2021 WL 4951571, at *6 (E.D. Wash. Oct. 25, 2021) (two-month delay); *Bacon v. Woodward*, No. 2:21-CV-0296-TOR, 2021 WL 5183059, at *6 (E.D. Wash. Nov. 8, 2021) (six-week delay).  In short, "[b]y sleeping on its rights, a plaintiff demonstrates the lack of need for speedy action[.]" *Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984).

Here, Plaintiffs were told they were not eligible for the funds at issue in "March or April, 2024." ECF No. 16 at p. 9. They received a formal press release on July 24, 2025, where they were not listed as an eligible tribe. ECF No. 16-1 at p. 31. Plaintiffs were apparently told by Senator Cantwell's office in August 2024 NOAA's decision would not change. ECF No. 16-1 p. 32 (Decl. Cody Desautel, P 14). Plaintiffs' post-hoc explanation for their additional 18-month delay following August 2024 is

apparently an anticipated federal administration change. *See* ECF No. 16-1 at pp. 32, 34. But in August of 2024, the election was still several months away, and any administration change was at least five months away. Plaintiffs' explanations for their repeated, extended delays do not add up.

Moreover, "Plaintiff Tribes cannot state with absolute certainty that irreparable harm will result . . ." (ECF No. 16 at p. 21) and for good reason: Plaintiffs assert they would be entitled to *money* damages in a separate, nearly identical, and previously filed case in the Court of Federal Claims.  ECF No. 16 at p. 20 fn. 2. While Plaintiffs claim a case involving a dispute over grant *funding* is not "primarily" about money, that is exactly the relief Plaintiffs seek: "*The goal is that $22 million not be promised or distributed to <u>other</u> tribes . . ..*" ECF No. 13 at p. 2 (emphasis added). Taking Plaintiffs' statement as true, Plaintiffs have not demonstrated harms that are so concrete and immediate that emergency relief in the form of a TRO is not justified. *See e.g.*, *Silva v. Volkswagen Grp. of Am., Inc.*, CV 24-06367-MWF (EX), 2025 WL 819076, at *2 (C.D. Cal. Jan. 9, 2025) (alleged harms that are ultimately compensable by a damages award are not sufficiently irreparable for a TRO).

Finally, as discussed further below, Plaintiffs request for withholding and delaying distribution of $22 million *to the eligible Tribes*, which are not even parties here, would cause irreparable harm as well as create a slippery slope where the numerous other ineligible tribes may follow suit, asking the court to withhold or delay

remaining funds.

## C. Balance of the Harms and Public Interest

These two factors merge when the federal government is a party. *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009).

Timing here is critical as the ability to obligate this funding through 638 contracts which must be separately negotiated and put in place before June 2026. Withholding $22 million now at this late date practically guarantees it will not be able to be timely obligated for the June construction season. If funds are withheld, it also puts at risk whether there will be sufficient time to distribute these funds – particularly after the numerous other ineligible tribes decide to file suit to withhold funds for their own opportunities. Withholding funds also has potential to detrimentally impact the 27 other tribes and their members, whose deferred hatchery maintenance will continue to degrade and deprive the public of fish as a result.

Plaintiffs' concern regarding the environment, sports fishermen, and the public are well taken, but withholding funding now from other eligible tribes detrimentally impacts the same concerns equally as much, if not more. If this money is not awarded as soon as possible, projects that could be started this summer to benefit the environment, sports fisherman, and the public generally will not happen this year. Fredenberg Decl. at ¶ 5. Withholding over 10 percent of the remaining available funds, means negative impact on the environment, fishing, and the public this year.

DEFENDANTS' RESPONSE PLAINITFFS' MOTION(S) FOR TEMPORARY RESTRAINING ORDER - 19

*See id.*; Rauch Decl. at ¶ 17 (hatcheries supported by eligible tribes averaged 157 million juvenile chinook annually) Again, the limited available funding is a *small* band aid for the deep, systemic, and costly problem of long overdue maintenance and modernization. Rauch Decl. at ¶ 15. Any further delay will only make the problem worse – including worse harms to the environment and public.

## V.    CONCLUSION

For the above stated reasons, Plaintiffs' dual motions – for emergency and apparently non-emergency – temporary restraining orders must be denied.

RESPECTFULLY SUBMITTED:    March 5, 2026.

Todd Blanche
Deputy Attorney General of the
United States

*s/Joseph P. Derrig*
*s/Derek T. Taylor*
Joseph P. Derrig
Derek T. Taylor
Assistant United States Attorneys
Attorneys for United States

DEFENDANTS' RESPONSE PLAINITFFS' MOTION(S) FOR TEMPORARY
RESTRAINING ORDER - 20

1

### *Certificate of Service*

2      I hereby certify that on March 5, 2026, I electronically filed the foregoing with
the Clerk of the Court using the CM/ECF system, which will send notification of such
3  filing to the following:

4      Marty Raap            marty.raap.ORA@colvilletribes.com
       Robbi Kesler         rkesler@chehalistribe.org
5      Thomas J. Peckham     tpeckham@nordhauslaw.com

6  And to the following non CM/ECF participants:  N/A

7

                              *s/Joseph P. Derrig*
8                             Assistant United States Attorney

9

10

11

12

13

14

15

16

17

18

19

20

21
DEFENDANTS' RESPONSE PLAINITFFS' MOTION(S) FOR TEMPORARY
RESTRAINING ORDER - 21